# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **BONNIE COLE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:17-cv-01378-WSD-AJB** |
| **COBB COUNTY SCHOOL** | : | |
| **DISTRICT and CHRIS** | : | |
| **RAGSDALE,** *Individually and in* | : | |
| *his capacity as Superintendent of* | : | |
| *Cobb County School District*, | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES MAGISTRATE JUDGE'S
## NON-FINAL REPORT AND RECOMMENDATION

This matter is presently before the Court on a motion to dismiss the complaint, [Doc. 9], and a motion to dismiss the amended complaint, [Doc. 14], both filed by Defendants Cobb County School District ("CCSD") and Cobb County School District Superintendent Chris Ragsdale ("Ragsdale") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the undersigned **RECOMMENDS** that the motion to dismiss the original complaint be **DENIED AS MOOT**, [Doc. 9], and that the motion to dismiss the amended complaint be **GRANTED IN PART and DENIED IN PART**, [Doc. 14].

## I.	*Motion to Dismiss the Original Complaint*

Plaintiff Bonnie Cole, proceeding through counsel, initiated this action by complaint on April 18, 2017. [Doc. 1]. Defendants timely responded to the complaint on May 11, 2017, with a motion to dismiss. [Doc. 9]. Fourteen days later, on May 25, 2017, Plaintiff filed an amended complaint. [Doc. 11].

Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, a party may amend her pleading once as a matter of course within twenty-one days after serving it or within twenty-one days after service of a motion under Rule 12(b)(6). Fed. R. Civ. P. 15(a)(1). Plaintiff having filed her amended complaint within twenty-one days after Defendants' first motion to dismiss, the amended complaint was properly filed as a matter of course. *See* Fed. R. Civ. P. 15(a)(1)(B); *El-Saba v. Univ. of S. Ala.*, Civ. Action No. 15-00087-KD-N, 2015 WL 5849747, at *5 n.7 (S.D. Ala. Sept. 22, 2015) (noting that after defendant executed waiver of service, then filed motion to dismiss approximately two months later, plaintiff had additional twenty-one days to file amended complaint). Moreover, Defendants did not object to Plaintiff's having filed the amended complaint as a matter of course. [*See* Doc. 14-1 at 1 n.1 (acknowledging that "under operative law," Plaintiff's amended

complaint took the place of her original complaint)]. The Court therefore accepts the amended complaint, [Doc. 11], as the operative complaint in this matter.

In light of Plaintiff's having filed the amended complaint, the undersigned concludes that the motion to dismiss the original complaint should be denied as moot. [Doc. 9]. Plaintiff's amended complaint supersedes the original complaint. *See Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1345 n.1 (11th Cir. 1999) ("An amended complaint supersedes an original complaint."); *Varnes v. Local 91, Glass Bottle Blowers Ass'n*, 674 F.2d 1365, 1370 n.6 (11th Cir. 1982) ("As a general rule, an amended complaint supersedes and replaces the original complaint unless the amendment specifically refers to or adopts the earlier pleading."). Further, the amended complaint renders moot the motion to dismiss the original complaint because that motion seeks to dismiss a pleading that has been superseded. *Fountain v. Hyundai Motor Co.*, Civ. Action No. 1:15-CV-00446-ELR, 2016 WL 4361528, at *2 (N.D. Ga. Mar. 4, 2016) (Ross, J.) ("The filing of the amended complaint has rendered the arguments contained in the first motion to dismiss moot."); *Mizzaro v. Home Depot, Inc.*, No. Civ. A. 1:06-CV-11510, 2007 WL 2254693, at *3 (N.D. Ga. July 18, 2007) (Evans, J.) (dismissing as moot a motion to dismiss addressing the original complaint following defendants' acceding to the filing of an amended complaint). Defendants

3

also concede that the amended complaint moots their first motion to dismiss. [Doc. 14-1 at 1 n.1].

Because the motion to dismiss the original complaint seeks to dismiss a pleading that has been superseded, the undersigned **RECOMMENDS** to the District Judge that he **DENY AS MOOT** the motion to dismiss the original complaint.  [Doc. 9].

## II.    *Motion to Dismiss the Amended Complaint*

On June 8, 2017, Defendants filed a motion to dismiss the amended complaint in its entirety. [Doc. 14].   On June 22, 2017, Plaintiff filed a response brief in opposition to the motion to dismiss, [Doc. 15], and on July 13, 2017, Defendants filed a reply brief in support of their motion, [Doc. 18].[1]  With briefing complete, the undersigned now examines the motion and submits this Report and Recommendation ("R&R") for the District Judge's consideration.

---

[1]    The reply brief was timely filed, pursuant to an unopposed motion for extension of time, [Doc. 16], that the Court granted on June 29, 2017.  (*See* Dkt. Entry, June 29, 2017).

AO 72A (Rev.8/82)

**A.    *Facts*[2]**

Plaintiff began working for CCSD in 1998, as a teacher at Vaughan Elementary School.  [Doc. 11 ¶ 11].  In 2004, Plaintiff became Assistant Administrator of Bullard Elementary School.  [*Id*. ¶ 12].  Two years later, in 2006, Plaintiff became Assistant Principal of Bullard Elementary School.  [*Id*. ¶ 13].  Plaintiff is a practicing Christian.  [*Id*. ¶ 15].

During the 2014-2015 school year, Plaintiff and several other teachers implemented breathing and stretching exercises based on yoga[3] and meditation[4] in classrooms as a way of reducing stress and encouraging relaxation among Bullard's teachers and students.  [*Id*. ¶ 16].  Plaintiff did not consider the techniques to be religious or based in religion.  [*Id*. ¶ 17].  The mindfulness practices consisted of

---

[2]    For the purposes of this R&R, the undersigned presumes that the well-pleaded facts set forth in the amended complaint are true.  *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1367 (11th Cir. 1997); *Duke v. Cleveland*, 5 F.3d 1399, 1402 (11th Cir. 1993) ("We must take the complaint's allegations as true and read them in the light most favorable to the plaintiffs.") (citation omitted).

[3]    Yoga is defined as "a Hindu spiritual and ascetic discipline, a part of which, including breath control, simple meditation, and the adoption of specific bodily postures, is widely practiced for health and relaxation."  Yoga, *The New Oxford Am. Dictionary* (2001 ed.).

[4]    Meditation refers to the action of thinking deeply or focusing one's mind for a period of time.  Meditate, Meditation, *The New Oxford Am. Dictionary* (2001 ed.).

AO 72A
(Rev.8/8
2)

well-established techniques used to promote general well-being, facilitate education, and reduce disruptive behaviors. [*Id*. ¶ 18]. With teacher input, Plaintiff and others also decorated a faculty room with soft lighting, fountains, and peaceful music, and designated it a place where faculty could relax in a quiet environment: where they could "take a few deep breaths, color mandalas,[5] or play with kinetic sand." [*Id*. ¶ 20]. In July 2015, Plaintiff became a licensed reiki practitioner[6] and opened a side business offering reiki services to the public, but she did not perform reiki or promote her practice at the school. [*Id*. ¶¶ 25, 26].

The mindfulness program was similar to programs introduced elsewhere in CCSD, including the Department of Physical Education and the county counseling department. [*Id*. ¶ 22]. In February 2016, Bullard Elementary sent a newsletter to

---

[5] Traditionally, a mandala is defined as "a Hindu or Buddhist graphic symbol of the universe," specifically, "a circle enclosing a square with a deity on each side." Mandala, *Merriam-Webster's Collegiate Dictionary* (10th ed. 1993). It is also more generally defined as "a graphic and often symbolic pattern usually in the form of a circle divided into four separate sections or bearing a multiple projection of an image." *Id*.

[6] Reiki is "a healing technique based on the principle that the therapist can channel energy into the patient by means of touch, to activate the natural healing processes of the patient's body and restore physical and emotional well-being." Reiki, *The New Oxford Am. Dictionary* (2001 ed.). The literal Japanese translation is "universal life energy." *Id*.

6

AO 72A
(Rev.8/8
2)

parents stating that mindfulness practices included "piping music through the hallways," "decorating and painting," "yoga sequences," and "mindful quiet time." [*Id.* ¶ 19]. After implementing the mindfulness practices, Bullard Elementary documented a thirty-three-percent decrease in disruptive behaviors and policy violations for the period spanning November 2, 2015, through March 4, 2016. [*Id.* ¶¶ 23-24].

During the 2015-2016 school year, some parents who attended church with Defendant Ragsdale and the Chair of CCSD's board, Randy Scamihorn, made religion-based complaints to Ragsdale about Plaintiff's use of mindfulness practices at Bullard Elementary. [*Id.* ¶ 27]. Ragsdale expressed his support for the complaints and advised the parents that such information "helps tremendously." [*Id.* ¶ 28].

On February 29, 2016, CCSD received an anonymous letter complaining about the use of mindfulness practices. [*Id.* ¶ 29]. Five members of the CCSD board also received the anonymous letter. [*Id.* ¶ 29]. CCSD then received emails from parents stating, among other things, that Plaintiff was a Buddhist[7] trying to indoctrinate their

---

[7]    Buddhism is a widespread Asian religion dating to the fifth century, B.C. Buddhism, *The New Oxford Am. Dictionary* (2001 ed.). It "has no creator god and gives a central role to the doctrine of karma." *Id*. "The 'four noble truths' of Buddhism state that all existence is suffering, that the cause of suffering is desire, that freedom from suffering is nirvana, and that this is attained through the 'eightfold' path of ethical

AO 72A
(Rev.8/8
2)

children with Buddhism.  [*Id.* ¶ 30].  Plaintiff was also falsely accused of leading chants in the hallways, placing stones on children in an effort to "heal" them, forcing children to color mandalas green for Buddha, and requiring children to bow to her in hallways. [*Id.* ¶ 31].  Plaintiff was also accused of attempting to indoctrinate children into Buddhism by reading the book "Peaceful Piggy Meditation," which was written by a Jewish author and does not espouse any particular religion, but merely describes the practice of meditation.  [*Id.* ¶ 33].

Plaintiff denied the allegations, and CCSD's investigations failed to substantiate them.  [*Id.* ¶ 32].  On March 16, 2016, several parents held a prayer rally on the grounds of Bullard Elementary "for Jesus to rid the school of Buddhism."  [*Id.* ¶ 34].  The next day, two women stood outside Plaintiff's office with their hands on her windows, praying. [*Id.* ¶ 34].  Community members posted selectively chosen and out-of-context passages from Plaintiff's personal business website in an effort to attack her "evil practices," forcing her to take the web page down.  [*Id.* ¶ 35].  Defendants became aware that the controversy attracted national attention from the media, including the Washington Post.  [*Id.* ¶ 36].

_____

conduct, wisdom, and mental discipline (including meditation)."  *Id.*

AO 72A
(Rev.8/8
2)

Initially, several members of CCSD's administration voiced support for Plaintiff and assured her that the situation was "not her fault" and that she would not be moved. [*Id.* ¶ 37]. On March 17, 2016, the principal of Bullard Elementary, Patrice Moore, held a meeting—open to all parents—to explain mindfulness and to answer questions. [*Id.* ¶ 38].

At some time after the meeting, an attendee sent emails to CCSD, Ragsdale, and CCSD's human resources department in which he summarized his concerns and stated that he could not see how the school community could heal if Plaintiff were allowed to stay in her job. [*Id.* ¶ 39]. During the same period of time, the CCSD board, including Ragsdale, received numerous emails of support from parents, teachers, a school psychologist, speech-language pathologists, and special educators, praising Plaintiff, her work, and the practices of mindfulness and yoga as showing positive results with students. [*Id.* ¶ 40].

In March 2016, CCSD halted all mindfulness practices at Bullard Elementary and issued a statement to that effect. [*Id.* ¶ 44]. The statement did not state that the practices were in fact secular or defend Plaintiff against the false accusations. [*Id.* ¶ 45].

9

Fearing for her job, Plaintiff asked certain members of CCSD district leadership to support her in defending herself from the false allegations. [*Id.* ¶ 46]. She also stated to at least two members of the district leadership—John Adams and Grant Rivera—that she was being discriminated against based on community members' beliefs about her religion. [*Id.*].

On March 24, 2016, Ragsdale and CCSD's board voted to move Plaintiff to another school, Mableton Elementary, sixteen miles further from her home. [*Id.* ¶¶ 47, 48]. The transfer added an hour to Plaintiff's daily commute. [*Id.* ¶ 49]. Mableton Elementary is also a lower-performing school and offers fewer academics, sports, and extra-curricular activities than Bullard Elementary. [*Id.* ¶ 49].

### B.    *Claims*

In her amended complaint, Plaintiff asserts claims against CCSD pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C. § 2000e *et seq.*, for "reverse religious discrimination," (Count I), and retaliation, (Count II), and she asserts claims against CCSD and Ragsdale pursuant to the Free Exercise and Establishment Clauses of the First Amendment to the United States Constitution, as enforced through 42 U.S.C. § 1983, (Counts III and IV, respectively). [Doc. 11 ¶¶ 1, 51-78].

10

### C.    Legal Standard

To avoid dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In evaluating the sufficiency of a complaint, a court "must accept the facts pleaded as true and construe them in a light most favorable to [the] plaintiff[]." *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp., S.A.*, 711 F.2d 989, 994-95 (11th Cir. 1983).  At the same time, however, a court should not accept "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).  And while a complaint need not contain detailed factual allegations, mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555; *accord Iqbal*, 556 U.S. at 678-79 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and are "not entitled to the assumption of truth.").  Rather, plaintiffs are required to make factual allegations that are "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.  Complaints must "contain either direct or inferential

11

AO 72A
(Rev.8/8
2)

allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam) (internal quotation marks omitted). The court also may dismiss a complaint pursuant to Rule 12(b)(6) when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action. *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

### D.   Discussion

Defendants seek dismissal of all of the claims asserted in the amended complaint. [Doc. 14]. The Court will analyze Defendants' motion to dismiss with regard to each of Plaintiff's claims, considering the arguments in logical order.

### 1.   Title VII

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Title VII also makes it unlawful for an employer to retaliate against an employee because: (1) "[s]he has opposed any practice made an unlawful

12

employment practice by [Title VII]," or (2) "[s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a) .

To state a claim under Title VII, a plaintiff must allege that the defendant's actions were purposefully discriminatory and motivated by discrimination. *See Gen. Bldg. Contractors Assoc., Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982) (holding that "[42 U.S.C.] § 1981, like the Equal Protection Clause, can be violated only by purposeful discrimination")[8]; *Bernstein v. Ga. Dep't of Educ.*, 970 F. Supp. 2d 1340, 1355 (N.D. Ga. 2013) (Duffey, J.) (reciting standard in context of summary judgment motion). A plaintiff can support her claim with direct or circumstantial evidence. *Dixon v. The Hallmark Cos.*, 627 F.3d 849, 854 (11th Cir. 2010); *EEOC v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1272 (11th Cir. 2002).

### a.   *"Reverse" Religious Discrimination Claim*

In Count I of the amended complaint, Plaintiff asserts a claim for "reverse" religious discrimination. [Doc. 11 ¶¶ 51-59]. Specifically, she contends that she was subjected to an adverse employment action in the form of transfer to a different and

---

[8]     When 42 U.S.C. §§ 1981 and 1983 serve as a basis for allegations of violations of civil rights in employment, intent is inferred in same manner as under Title VII. *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. Apr. 28, 1980).

AO 72A
(Rev.8/8
2)

lower-performing school sixteen miles further away from her home and that she was subjected to this treatment "because of false allegations that she held 'unacceptable' religious beliefs, including Buddhism, and because her Yoga and Reiki practices [sic] were considered offensive to the religious faiths of CCSD board members, including Defendant Ragsdale." [*Id.* ¶¶ 53, 54].

Defendants argue that Plaintiff's "reverse" religious discrimination claims should be dismissed because the claims are based on the allegation that Plaintiff was only perceived to be practicing a certain religion (but was not practicing that religion, and was, in fact, a practicing Christian), and Title VII does not protect persons who allegedly suffer discrimination based on *perceived* characteristics. [Doc. 14-1 at 7-9 (citing *Uddin v. Universal Avionics Sys. Corp.*, Civ. Action File No. 1:05-CV-1115-TWT, 2006 WL 1835291, at *6 (N.D. Ga. June 30, 2006) (Thrash, J., *adopting* Brill, M.J.))]. Defendants also point to cases where courts in other jurisdictions have agreed that Title VII does not recognize "perceived characteristic" discrimination claims, [Doc. 14 at 8 (citing *Yousif v. Landers McClarty Olathe KS, LLC*, No. 12-2788-CM, 2013 WL 5819703 (D. Kan. Oct. 28, 2013); *Burrage v. FedEx Freight, Inc.*, No. 4:10CV2755, 2012 WL 1068794 (N.D. Ohio Mar. 29, 2012); *El v. Max Daetwyler Corp.*, No. 3:09cv415, 2011 WL 1769805 (W.D.N.C. May 9, 2011);

14

*Adler v. Evanston NW Healthcare Corp.*, No. 07 C 4203, 2008 WL 5272455 (N.D. Ill. Dec. 16, 2008); *Lewis v. N. Gen. Hosp.*, 502 F. Supp. 2d 390, 401 (S.D.N.Y. 2007); *Butler v. Potter*, 345 F. Supp. 2d 844, 850 (E.D. Tenn. 2004)], highlighting, in particular, the reasoning that "if Congress had intended Title VII to protect persons from discrimination based on *perceived* characteristics, it would have explicitly done so by using language similar to that found in the [Americans with Disabilities Act] or the Rehabilitation Act," [Doc. 14 at 8-9 (quoting *Burrage*, 2012 WL 1068794 at *5) (italics added in brief)].

Plaintiff, in response, takes a broader view of the protections available under Title VII, pointing to a case from the former Fifth Circuit where the court stated that "Congress, through Title VII, has provided the courts with a means to preserve religious diversity from forced religious conformity." [Doc. 15 at 10 (quoting *Young v. Sw. Sav. & Loan Ass'n*, 509 F2d 140, 141 (5th Cir. 1975)[9])]. More specifically, Plaintiff argues that Title VII protects employees from discrimination for failing to conform to an employer's religious beliefs and, further, that a claim for discrimination may be established based on intent to discriminate against an employee on the basis of

---

[9]    In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

an unsubstantiated suspicion regarding his or her religion, not actual knowledge. [Doc. 15 at 9-13]. Plaintiff points out that the Seventh, Eighth, and Tenth Circuit Courts of Appeals, as well as several courts in this circuit, have recognized failure-to-conform claims. [Doc. 15 at 10-12 (citing *Winspear v. Cmty. Dev., Inc.*, 574 F.3d 604, 609 n.2 (8th Cir. 2009); *Campos v. City of Blue Springs, Mo.*, 289 F.3d 546, 550-51 (8th Cir. 2002); *Venters v. City of Delphi*, 123 F.3d 956 (7th Cir. 1997); *Shapolia v. Los Alamos Nat'l Lab.*, 992 F.2d 1033, 1036 (10th Cir. 1993); *Burrows v. Coll. of Cent. Fla.*, No. 5:14-cv-197-Oc-30PRL, 2014 WL 7224533, at *2 (M.D. Fla. Dec. 17, 2014); *Panchoosingh v. Gen. Labor Staffing Servs., Inc.*, No. 07-80818-CIV, 2009 WL 961148, at *6 (S.D. Fla. Apr. 8, 2009); *Blanton v. Bunch & Assocs., Inc.*, No. 8:04-CV-1057-T-27MAP, 2006 WL 269981, at *9 (M.D. Fla. Feb. 3, 2006); *Tillery v. ATSI, Inc.*, 242 F. Supp. 2d 1051, 1061 (N.D. Ala. 2003))]. She also argues that recent precedent of the United States Supreme Court, *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028 (2015), counsels that, in light of the promulgation of 42 U.S.C. § 2000e-2(m) in 1991, "[w]hat matters is not the specific nature of Defendants' perception of [Plaintiff], but their intent to discriminate against her." [Doc. 15 at 12-16 (citing *Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2031, 2033

("intentional discrimination provision prohibits certain *motives*, regardless of the state of the actor's knowledge.")].[10]  Additionally, Plaintiff points out that *Uddin*'s strict focus on the accuracy of the employer's perception, logically applied, may have the anomalous effect of shielding an employer from liability for intentional discrimination simply because the discrimination is based not on the individual's actual protected class, but rather on the employer's mistaken perception of the individual's protected class.  [Doc. 15 at 15 (citing *Arsham v. Mayor & City Council of Baltimore*, 85 F. Supp. 3d 841, 845 (D. Md. 2015) (describing such reasoning as "superficially logical, but fundamentally abhorrent"))].

In reply, Defendants reiterate their argument that because Plaintiff is a "practicing Christian" she is precluded from asserting that she failed to conform to Defendants' Christian beliefs.  [Doc. 18 at 2].  Defendants additionally contend that the "failure to conform" theory is due to be dismissed for failure to state facts sufficient to establish a plausible claim for relief.  [*Id.* at 2-3].  Defendants further argue that Plaintiff's reliance on *Abercrombie* is misplaced because *Abercrombie* applies

---

[10]     Section 2000e-2(m) provides, in relevant part, that "an unlawful employment practice is established when the complaining party demonstrates that . . . religion . . . was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).

17

specifically to disparate-treatment claims based on a failure to accommodate an *actual* religious practice and does not extend to protect persons who allegedly suffer discrimination based on *perceived* characteristics. [*Id.* at 3-6].

Having reviewed the amended complaint and the authority on which the parties rely, the undersigned is not convinced that Plaintiff's Title VII "reverse religious discrimination" claim is due to be dismissed as a matter of law. While there is no controlling precedent directly on point, the Court is persuaded by Plaintiff's proffered authority and other recent cases.

Defendants correctly state that judges in a number of district courts, including judges presiding over a case in this district, have held that Title VII does not protect persons who suffer discrimination based on perceived characteristics. *See, e.g., Yousif*, 2013 WL 5819703 at *5; *Burrage*, 2012 WL 1068794 at *8; *El*, 2011 WL 1769805 at *6; *Adler*, 2008 WL 5272455 at *4; *Lewis*, 502 F. Supp. 2d at 401; *Uddin*, 2006 WL 1835291 at *6; *Butler*, 345 F. Supp. 2d at 850. Certainly, the holding in *Uddin*, the only case Defendants cite from any of the districts in this circuit, was not unreasonable, grounded as it was in the court's explanation that 42 U.S.C. § 2000e-2(a)(1) "does not explicitly protect persons who are perceived to belong to a protected class," that the plaintiff had not cited any controlling authority

18

that would permit a claim for discrimination based on perceived characteristics, and that the Court was unaware of any such precedent. *Uddin*, 2006 WL 1835291 at *6. Approximately six years after the *Uddin* decision was entered, however, the Eleventh Circuit held that "a harasser's use of epithets associated with a different ethnic or racial minority than the plaintiff will not necessarily shield an employer from liability for a hostile work environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1299-1300 (11th Cir. 2012) (holding that racial slurs geared toward someone of Indian descent could support an African-American employee's Title VII claim for race-based hostile work environment) (citing *EEOC v. WC&M Enters., Inc.*, 496 F.3d 393, 401 (5th Cir. 2007) ("stating that, in the context of national origin discrimination, 'a party is able to establish a discrimination claim based on [his] own national origin even though the discriminatory acts do not identify the victim's actual country of origin' and the discrimination associates the victim with a different country based on shared physical features" (alteration in *Jones*)); *LaRocca v. Precision Motorcars, Inc.*, 45 F. Supp. 2d 762, 770 (D. Neb. 1999) ("The fact that [the employer] ignorantly used the wrong derogatory ethnic remark toward the plaintiff is inconsequential. It is enough that the plaintiff's Italian characteristics were the foundation of [the defendant's] harassment.")). District courts have since cited *Jones* as holding that claims of

discrimination based on mistaken perception are actionable under Title VII. *See, e.g., Capek v. BNY Mellon, N.A.*, No. 15 Civ. 4155 (LTS) (AJP), 2016 WL 2993211, at *3 (S.D. N.Y. May 23, 2016) ("That an employer discriminates against an employee based on a mistaken belief regarding that employee's race (or any of the characteristics protected under Title VII) does not make the practice less damaging to the employee nor does it make the discrimination itself less worthy of redress."); *Arsham*, 85 F. Supp. 3d at 847 ("Treating certain people less favorably than others on the basis of a protected classification is the essence of disparate treatment. This is true regardless of whether an employer intends to discriminate against an individual expressly because of a protected characteristic or intends to discriminate based on the employer's perception, mistaken or accurate, of an individual's protected characteristic."); *see also id.* at 846 (expressly rejecting *Uddin*). The Third Circuit has also signaled acceptance of Title VII claims based on mistaken perception. *See Fogelman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002) (explaining that in a hypothetical Title VII case in which an employer refuses to hire a prospective employee because he thinks that the applicant is Muslim, "[t]he employer is still discriminating on the basis of religion even if the applicant he refuses to hire is not in fact a Muslim").

20

Plaintiff's analogy of her own case to that of the aggrieved individual in *Abercrombie* is also well taken. In that action, the EEOC sued Abercrombie on behalf of a prospective employee, claiming that Abercrombie's refusal to hire the individual based on a potential accommodation related to the prospective employee's headscarf violated Title VII. *Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2031. In its defense, Abercrombie argued that disparate treatment could not be proved without a showing that it had "actual knowledge" of the applicant's need for an accommodation. *Id.* at 2031-32. The Supreme Court disagreed, holding that "an applicant need only show that his need for an accommodation was a motivating factor in the employer's decision" and further stating that "the rule for disparate-treatment claims based on a failure to accommodate a religious practice" is that "[a]n employer may not make an applicant's religious practice, confirmed or otherwise, a factor in employment decisions." *Id.* at 2032-33.

It is true, as Defendants point out, that *Abercrombie* is not on all fours with the case at hand. This case, unlike *Abercrombie*, does not involve a reasonable-accommodation allegation. [*See* Doc. 11, *passim*]. Also unlike the case at hand, the aggrieved individual in *Abercrombie* did, in fact, hold the religious belief the defendant found objectionable: *Abercrombie* involved a job applicant who was a

21

practicing Muslim and, "consistent with her understanding of her religion's requirements, wears a headscarf," and although the applicant was otherwise qualified, Abercrombie refused to hire her based on its belief that the plaintiff wore her headscarf because of her faith, which would require an accommodation from the provision in Abercrombie's dress code that forbade employees from wearing "caps." *Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. at 2031. Thus, unlike in the present case, the aggrieved individual did, in fact, engage in a religious practice of the sort traditionally protected under Title VII. *See Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1321 (11th Cir. 2007) (explaining that a claim for religious discrimination typically requires a predicate showing that the aggrieved individual has "a bona fide religious belief that conflicted with an employment requirement" and that the individual suffered an adverse employment action because of her failure to comply with the conflicting requirement). Defendants also correctly state that *Abercrombie* does not contain the phrase, "perceived as." [*See* Doc. 18 at 5].

The undersigned nevertheless finds that *Abercrombie* is not so inapposite as to lack persuasive value here. First, the Supreme Court took great pains to explain in *Abercrombie* that it considered the plaintiff's claim to be a disparate-treatment claim, the reasonable-accommodation aspect of the claim notwithstanding. *Abercrombie &*

22

*Fitch Stores, Inc*., 135 S. Ct. at 2032-33. Second, although it is true that the opinion never uses the words "perceived as" *per se*, the entire case turns on the question of whether Abercrombie's *belief*—as opposed to actual knowledge—that the applicant would require a religious accommodation was sufficient to incur liability for failure to hire her on religious-discrimination grounds. *Id*. at 2031. That Plaintiff alleges Defendants (and the community and parents) to have "perceived" her as having a certain religious convictions—in contrast to having "believed" that she had those convictions (as the decisionmaker did in *Abercrombie*)—strikes the undersigned as a distinction without a difference. Third, *Abercrombie* found no issue of fact as to whether the applicant wore a headscarf because of her sincerely held religious beliefs, and thus the question of whether Abercrombie discriminated against her based on her real religious beliefs or on religious beliefs it mistakenly believed she had was simply not at issue. *Id*. Thus, the Court finds nothing in *Abercrombie* to suggest that its holding—that even if the basis for the employer's adverse decision is based on "unsubstantiated suspicion," it is the employer's discriminatory motive or intent to discriminate that implicates Title VII liability, *Abercrombie & Fitch Stores, Inc*., 135 S. Ct. at 2033 & n.3—is any less applicable or that unsubstantiated suspicion

23

giving rise to an adverse employment action is any less blameworthy simply because the suspicion was incorrect.

In any event, Defendants concede to Plaintiff's contention that Title VII protects against forced religious conformity. [Doc. 18 at 2]. Where a plaintiff claims she was discriminated against for holding religious beliefs different from those of her supervisor, she may establish a *prima facie* case of discrimination by showing: (1) that she was subjected to some adverse employment action; (2) that, at the time the employment action was taken, her job performance was satisfactory; and (3) that there is some additional evidence to support the inference that the employment action was taken because of a discriminatory motive based upon the employee's failure to hold or follow her employer's religious beliefs. *Burrows*, 2014 WL 7224533 at *3 (citing *Venters*, 123 F.3d at 972; *Shapolia*, 992 F.2d at 1038; *Panchoosingh*, 2009 WL 961148 at *6). Under this standard, Plaintiff must show that her perceived religious shortcomings "played a motivating role" in her discharge. *Venters*, 123 F.3d at 972 (citing 42 U.S.C. § 2000e-2(m) and explaining that where an employee claims that she suffered an adverse employment action because she did not measure up to the employer's religious expectations, "[w]hat matters in this context is not so much what [the employee's] own religious beliefs were, but [the employer's] asserted

24

perception that she did not share his own"); *Panchoosingh*, 2009 WL 961148 at *6 (citing 42 U.S.C. § 2000e-2(m)); *Blanton*, 2006 WL 269981 at *9; *Tillery v. ATSI, Inc.*, 242 F. Supp. 2d 1051, 1060-61 (N.D. Ala. 2003), *reconsidered on other grounds*, 2003 WL 25699080 (N.D. Ala. Apr. 14, 2003). It is therefore clear that Plaintiff's profession that she is a practicing Christian does not preclude her from asserting a claim for discrimination motivated by her employer's perception that her Christian beliefs were non-conforming.

Defendants do not argue that Plaintiff had failed to plead facts sufficient to support the "adverse employment action" element or the "satisfactory performance" element of the *prima facie* case for discrimination based on non-conforming religious beliefs. [*See* Doc. 14-1, *passim*; Doc. 18, *passim*; *see also* Doc. 11 ¶¶ 47-49 (alleging that Plaintiff was moved to Mableton Elementary, a lower-performing school, and that the transfer added an hour to her daily commute); *id.* ¶ 14 (alleging that Plaintiff consistently received excellent evaluations and annual pay increases, had never been sanctioned, and had never undergone any form of discipline)]. Defendants do contend, however, that the claim is due to be dismissed based on Plaintiff's failure to plead facts sufficient to support the inference that the employment actions were taken because of a discriminatory motive that was based upon Plaintiff's failure to hold or follow

25

Defendants' religious beliefs: that Plaintiff did not allege that Defendants perceived any religious shortcomings, but instead alleged that it was community members or parents who complained about her and that "[p]arents complaining that a teacher at a public school is trying to indoctrinate their children into a religion is a far cry from establishing that the Board was trying to force Plaintiff to conform to a certain religious belief," [Doc. 14-1 at 2-3 (emphasis omitted)]; that it is "rank speculation" that the parents' complaints about the yoga practices were motivated by the practices' lack of conformity with the parents' religious beliefs, [*id.* at 3]; and that the amended complaint does not contain facts suggesting that a majority of the board voted to transfer Plaintiff in an effort to force her to practice Christianity in a certain way, [*id.*].

The Court cannot agree. It bears repeating that in reviewing a complaint upon a 12(b)(6) motion to dismiss, the Court is bound to view the allegations in the light most favorable to Plaintiff. *See Quality Foods de Centro Am., S.A.*, 711 F.2d at 994-95. Additionally, while the pleading standard does not allow a plaintiff to go on a fishing expedition based on the bare allegation that she believed that an adverse employment action was predicated on a protected characteristic, she need not make out a *prima facie* case of discrimination in order to survive a motion to dismiss. *See Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510-11 (2002) (clarifying that the

AO 72A
(Rev.8/8
2)

*prima facie* case under the well-established *McDonnell-Douglas* construct "is an evidentiary standard, not a pleading requirement" (referencing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 802-03 (1973)); *Surtain v. Hamlin Terr. Found.*, 789 F.3d 1239, 1246 (11th Cir. 2015) (vacating judgment where the district court had denied relief because the complaint did not make out *prima facie* case of discrimination under *McDonnell Douglas*). Rather, the complaint need only contain some "specific facts suggesting intentional discrimination." *See Castillo v. Allegro Resort Mktg.*, 603 Fed. Appx. 913, 917-18 (11th Cir. Mar. 18, 2015); *see also Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1253 (11th Cir. 2017).

Here, the complaint does sufficiently allege such facts. Plaintiff specifically alleged that during the 2015-2016 school year, some parents who attended church with Defendant Ragsdale and the Chair of CCSD's board began to make religiously based complaints to Ragsdale about Plaintiff's use of mindfulness practices at Bullard Elementary, that Ragsdale expressed support for the complaints, and that Ragsdale said the information "helps tremendously," [Doc. 11 ¶¶ 27, 28]; on February 29, 2016, CCSD and five members of the CCSD board received an anonymous letter about the complaints, [*id.* ¶ 29]; CCSD was "inundated" with emails stating that Plaintiff was a Buddhist and trying to indoctrinate children with Buddhism, [*id.* ¶ 30]; Plaintiff was

also accused of leading chants in the hallways, placing stones on children in an effort to "heal" them, forcing children to color mandalas green for Buddha, requiring children to bow to her in hallways, and reading a certain children's book in an attempt to indoctrinate children into Buddhism, [*id.* ¶¶ 31, 33]; community members posted select portions of her website advertising her personal reiki business in an attempt to attack her "evil practices," [*id.* ¶ 35]; and in March 2016, CCSD halted all mindfulness practices at Bullard and announced that fact without defending Plaintiff or stating that the practices were secular, and the board voted to transfer Plaintiff to Mableton, [*id.* ¶¶ 44-48]. These specific facts are certainly sufficient to support Plaintiff's conclusion that she was subjected to an adverse employment action because of "false allegations that she held 'unacceptable' religious beliefs, including Buddhism, and because her Yoga and Reiki practices were considered offensive to the religious faiths of CCSD board members, including Defendant Ragsdale." [*Id.* ¶ 54].

The Court also finds little traction in Defendants' suggestion that Plaintiff has failed to plead facts indicating that the activities community members undertook and the complaints they made were not predicated on their beliefs about Plaintiff's religion and thus could not be actionable. In some cases, an adverse-employment-action recommendation by a party with no power to actually effect the recommendation may

28

be actionable if the plaintiff proves that the recommendation directly resulted in the employer's adverse employment action. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1331-32 (11th Cir. 1999); *Zaklama v. Mt. Sinai Med. Ctr.*, 842 F.2d 291, 294 (11th Cir. 1988); *see also Godwin v. WellStar Health Sys., Inc.*, 615 Fed. Appx. 518, 528 (11th Cir. June 17, 2015) ("In such a case, the recommender is using the decisionmaker as a mere conduit, or cat's paw, to give effect to the recommender's discriminatory animus.") (internal punctuation omitted). Plaintiff states not only that the parents and community members complained about her to CCSD and its board members but that they acted in a hostile and aggressive manner and called her a Buddhist, [Doc. 11 ¶ 30]; on March 16, 2016, several parents held a prayer rally "for Jesus to rid the school of Buddhism," [*id*. ¶ 34]; on March 17, 2016, two women stood outside Plaintiff's office with their hands on her windows, praying, [*id*.]; some community members posted selectively chosen and out-of-context passages from Plaintiff's personal business website in an apparent effort to attack her "evil practices," [*id*. ¶ 35]; an attendee of a school meeting sent emails to CCSD, Ragsdale, and CCSD's human resource department summarizing his concerns and stating that he could not see how the school community could heal if Plaintiff were allowed to stay in her job, [*id*. ¶ 39]; and shortly thereafter, the board voted to transfer Plaintiff to Mableton

AO 72A
(Rev.8/8
2)

Elementary, [*id*. ¶¶ 47, 48].  These facts also are sufficient to show that some parents and members of the community had concerns about Plaintiff's religion or apparent religious practices and were motivated by those concerns to exert influence in an attempt to have her removed from her position.

Based on these facts asserted in the amended complaint, the undersigned finds that Plaintiff has satisfied Title VII's pleading requirements with regard to her Title VII disparate-treatment claims.  The undersigned therefore finds no basis for dismissal in this aspect of Defendants' motion.

For these reasons, the undersigned finds that Plaintiff has stated a claim, "plausible on its face," of religious discrimination under Title VII.  Accordingly, it is hereby **RECOMMENDED** that the District Judge **DENY** Defendants' motion to dismiss Count I on that basis.

### b.    *Title VII Retaliation Claim*

In Count II of the amended complaint, Plaintiff alleges that Defendants retaliated against her in violation of Title VII when they declined to provide institutional support to Plaintiff against the parents who believed that mindfulness and yoga were "unChristian," transferred her, and deprived her of advancement opportunities. [Doc. 11 ¶¶ 60-64].

AO 72A
(Rev.8/8
2)

"A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a casual connection between the protected activity and the adverse employment action." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). Title VII does not limit protection to individuals who file formal complaints, but extends it to those "who informally voice complaints to their superiors." *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989). The plaintiff is not required to show that an employer actually engaged in the employment practice that was the subject of the plaintiff's complaint, but only that the plaintiff had a good-faith, objectively reasonable belief that such a practice was occurring and that it violated Title VII. *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998); *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997); *Rollins*, 868 F.2d at 400.

Defendants contend that Plaintiff appears to assert that Defendants' conduct was undertaken in retaliation for her having "asked members of CCSD District Leadership . . . to support her in defending against the false allegations against her . . . and [having] stated that she was being discriminated against based on community members' beliefs about her religion," [Doc. 11 ¶ 46], and argues that

31

Plaintiff fails to allege that she engaged in a protected activity because Plaintiff's disagreement with Defendants' handling of complaints does not relate to employment practices made unlawful by Title VII. [Doc. 14 at 9-11]. Specifically, Defendants contend that Plaintiff's disagreement with *how* the CCSD handled complaints does not provide a viable foundation for a Title VII retaliation claim. [*Id.* at 10-11 (citing *Brush v. Sears Holdings Corp.*, 466 Fed. Appx. 781, 788 (11th Cir. Mar. 26, 2012))]. They also suggest that because Plaintiff's complaint to CCSD district leadership rests on her allegation of being "perceived as" a member of another religion, then the substance of the complaint does not constitute a practice made unlawful by Title VII, and it was therefore not objectively reasonable for Plaintiff to believe that her activity was statutorily protected. [*Id.* at 11 n.2].

In response, Plaintiff contends that Defendants are mistaken in asserting that Plaintiff's opposition was against Defendants' investigation procedures, arguing that her complaint states that Plaintiff asked for the district leadership's involvement because the community members had called for her to lose her job over their religious complaints, she perceived that Defendants seemed to agree with those making religious claims against her, and she therefore feared for her job. [Doc. 15 at 16-17 (citing [Doc. 11 ¶¶ 39, 46]; *Locasio v. BBDO Atlanta, Inc.*, 56 F. Supp. 3d 1356, 1367

(N.D. Ga. 2014) (Thrash, J., *adopting* Vineyard, M.J.) (explaining that an employer may not "absolve itself from liability for its own act of racial discrimination by shifting the blame to an outside party who instigated the practice that the employer implemented"))]. In sum, Plaintiff argues that it was not mere disagreement with Defendants' handling of parent and community complaints that was at issue in her complaint to CCSD leadership, but rather that her job was at stake due to religious complaints, and that Defendants retaliated against her because of "her opposition to imminent adverse employment action against her." [Doc. 15 at 18].

In reply, Defendants argue that Plaintiff did not allege in her amended complaint that Defendants seemed to be siding with those making religious claims against her and that she asked for help from the CCSD district leadership to prevent what she feared was the imminent loss of her job. [Doc. 18 at 6-7]. Defendants also reiterate their position that a "perceived as" claim is not actionable under Title VII. [*Id.* at 8].

Having reviewed the amended complaint and the authority on which the parties rely, the undersigned is not persuaded that Plaintiff's Title VII retaliation claim is due to be dismissed for failure to state a plausible claim for relief. To be sure, the allegations underlying Plaintiff's Title VII retaliation claim could have been—and having been pleaded with advice of counsel, the Court would expect them to have

AO 72A
(Rev.8/8
2)

been—pleaded more precisely. *See, e.g., Hunt v. Nationstar Mortg., LLC*, 684 Fed. Appx. 938, 943-44 (11th Cir. Apr. 11, 2017) (criticizing "pleadings . . . that incorporate every antecedent allegation by reference into each subsequent claim for relief"). Nevertheless, Defendants' argument glosses over the fact that Plaintiff indeed stated in her amended complaint that she made the request for support from the CCSD district leadership in the context of community members' threats regarding her job and her resulting "[f]ear[] for her job." [*Compare* Doc. 11 ¶¶ 39, 46 *with* Doc. 14-1 at 9-11; Doc. 18 at 6-8]. Viewing the allegations in the light most favorable to Plaintiff, as the Court, of course, must in reviewing a 12(b)(6) motion to dismiss, the undersigned finds them sufficient—barely—to state a plausible claim for retaliation undertaken in response to Plaintiff's opposition to the imminent loss of her position at Bullard Elementary.

That the imminent discrimination Plaintiff complained of may have been based on her "perceived" religion and may have originated with parents and community members also does not serve to bar Plaintiff's retaliation claims as a matter of law. As discussed previously, the Eleventh Circuit has recognized "perceived as" claims as cognizable under Title VII, as have numerous other courts in well-reasoned opinions. *See, e.g., Jones*, 683 F.3d at 1299-1300; *WC&M Enters., Inc.*, 496 F.3d at 401;

34

*Fogelman*, 283 F.3d at 571; *Capek*, 2016 WL 2993211 at *3; *Arsham*, 85 F. Supp. 3d at 847; *LaRocca*, 45 F. Supp. 2d at 770. And it is well established that an employer may be liable under Title VII for its own act of discrimination even if an outside party instigated the practice. *See, e.g., Godwin*, 615 Fed. Appx. at 528; *Stimpson*, 186 F.3d at 1331-32; *Zaklama*, 842 F.2d at 294; *Locasio*, 56 F. Supp. 3d 1367.

The Court therefore finds that the facts alleged in the amended complaint, when viewed in the light most favorable to the Plaintiff, are sufficient to establish that Plaintiff's opposition to losing her position at Bullard Elementary because of discrimination based on her perceived religion or her failure to conform to religious expectations constituted a protected activity under Title VII and thus that Plaintiff has stated a claim, "plausible on its face," for retaliation under Title VII. Accordingly, it is hereby **RECOMMENDED** that the District Judge **DENY** Defendant's motion to dismiss Count II.

### 2. *First Amendment*

The First Amendment to the United States Constitution provides that "Congress shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." U.S. Const. amend. I. The Religion Clauses are applicable to the

35

states via the Fourteenth Amendment. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 8 n.4 (2004) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014). Proceeding under 42 U.S.C. § 1983, Plaintiff asserts both a count for violation of the Free Exercise Clause (Count III) and a count for violation of the Establishment Clause (Count IV). [Doc. 11 ¶¶ 65-78].

### a.     *Free Exercise Claim*

In Count III, Plaintiff alleges that Defendants violated the Free Exercise Clause of the U.S. Constitution "[b]y punishing [her] for not conforming to an accepted predominant standard of religious belief and practice" and "[b]y transferring [her] due to the perception that she was 'Buddhist' and allegedly engaging in 'Buddhist' practices." [Doc. 11 at ¶¶ 67, 68].

Defendants argue that Plaintiff's free-exercise claim fails because the amended complaint does not identify any religious practices allegedly burdened by Defendants' conduct and in fact admits that the activities at issue were not religious in any way. [Doc. 14-1 at 11-13 [citing Doc. 11 ¶¶ 15-18, 21, 29, 31]]. Specifically, Defendants point out that Plaintiff admits she is a practicing Christian, [Doc. 11 ¶ 15], and does not allege that Defendants burdened or interfered with her ability to practice her Christian

36

faith. [Doc. 14-1 at 12]. They also contend that because Plaintiff admits that the mindfulness, yoga, and reiki activities are not religious, [Doc. 11 ¶¶ 16-18, 21, 29, 31], she fails to meet a threshold condition for determining that a government has impermissibly burdened an individual's religious practices. [Doc. 14-1 at 11-13 (citing *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1286 (11th Cir. 2012) (holding that plaintiff could not establish a free-exercise claim because she could not show that defendants "burdened one of her sincerely held religious beliefs" (punctuation omitted)); *Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562, 564 (8th Cir. 1988) ("First, we must ask whether the regulation burdens, directly or indirectly, the plaintiff's religious practice.") (citing *United States v. Lee*, 455 U.S. 252, 256-58 (1982)))].

In response, Plaintiff first quotes Supreme Court language stating that under the Free Exercise Clause, " '[t]he government may not compel affirmation of religious belief, . . . punish the expression of religious doctrines it believes to be false, . . . impose special disabilities on the basis of religious views or religious status, . . . or lend its power to one or the other side in controversies over religious authority or dogma.' " [Doc. 15 at 18 (quoting *Emp't Div., Dep't of Human Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990) (citations omitted), *partially overturned by* 42 U.S.C. § 2000bb (Nov. 16,

1993))]. She then points out that in *Heffernan v. City of Patterson, N.J.*, 136 S. Ct. 1412, 1416 (2016), the Supreme Court held that "[t]he First Amendment generally prohibits" government officials from taking an adverse employment action against an employee because of the official's perception that the employee engaged in constitutionally protected political activity, even where the employer's action is based on a factual mistake about the employee's behavior. [Doc. 15 at 19]. Plaintiff then contends that under *Shahar v. Bowers*, 114 F.3d 1097, 1103 (11th Cir. 1997), the "appropriate test" for evaluating the constitutional implications of a government employee's free-exercise discrimination claim is the same as the test for evaluating the constitutional implications of a government employer's decision based on the employee's exercise of her right to free speech, and thus, Defendants are liable under the Free Exercise Clause for punishing Plaintiff for what they believed was the expression of religious doctrine, despite Plaintiff's admission that her activities were non-religious. [Doc. 15 at 19-20].

In reply, Defendants reiterate their position that Plaintiff cannot state a free-exercise-of-religion claim under the First Amendment based on Plaintiff's engagement in non-religious activity, and they argue that because "Plaintiff does not

38

identify any religious doctrines Defendants are alleged to be punishing," her free-exercise claims are due to be dismissed. [Doc. 18 at 8-10].

After careful consideration of the arguments and proffered authority, the undersigned is persuaded that Plaintiff's claims asserted under the Free Exercise Clause are indeed due to be dismissed. Eleventh Circuit precedent holds that "[t]o plead a valid free exercise claim, [the plaintiff] must allege that the government has impermissibly burdened one of [her] 'sincerely held religious beliefs.' " *Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1294 (11th Cir. 2007) (quoting *Frazee v. Ill. Dep't of Emp't Sec.*, 489 U.S. 829, 834 (1989)); *accord GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1253 (11th Cir. 2012) ("The protections afforded by the Free Exercise Clause prevent the government from discriminating against the exercise of religious beliefs or conduct motivated by religious beliefs."); *id.* at 1256 (referring to the need for the plaintiff to "allege a constitutionally impermissible burden on a sincerely held religious belief" as a "threshold issue" necessary to trigger the protection of the Free Exercise Clause); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) ("The Free Exercise Clause protects religious observers against unequal treatment . . . .") (punctuation omitted). The Supreme Court further explained in *Smith*—in a portion of the opinion Plaintiff did not reference—that "[t]he

39

free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires" and that the First Amendment thus "obviously excludes all 'governmental regulation of religious *beliefs* as such.' " *Smith*, 494 U.S. at 877.

It also bears remark that in *Smith*, there was no question that the plaintiffs' activities were based on sincerely held religious beliefs, and the government defendants' conduct was nevertheless held to be lawful. *Smith*, 494 U.S. at 874, 890. In fact, Plaintiff has cited no case where a court has extended the reach of the Free Exercise Clause to a situation where a government actor undertook an adverse action due to the government actor's mistaken perception that the plaintiff sincerely held a religious belief, [Doc. 15 at 18-20], and the Court knows of none. Additionally, the Court is not persuaded by Plaintiff's suggestion that *Shahar* provides any basis for analogizing *Heffernan* to the case at hand, as the portion of *Shahar* cited by Plaintiff simply held that the standard of review to apply to the plaintiff's constitutional claims (one of which was a free-exercise claim) was the same standard of review applicable to a free-speech claim. *Shahar*, 114 F.3d at 1103 (holding that the *Pickering* balancing test applied, referring to *Pickering v. Bd. of Ed.*, 391 U.S. 563, 566-68 (1968)). In fact, the *Shahar* court simply presumed, without deciding, that the plaintiff held the

AO 72A
(Rev.8/8
2)

constitutional rights she claimed and then went on to hold that the government employer's adverse action was still lawful. *Shahar*, 114 F.3d at 1100. Thus, it appears to the undersigned that Plaintiff is urging the Court to establish a new sort of free-exercise claim essentially out of whole cloth.

In sum, Plaintiff confirms that the practices at issue did not constitute religious activity or reflect her sincerely held religious beliefs, [Doc. 11 ¶ 17; Doc. 15 at 20]; she makes no allegation that Defendants burdened her Christian beliefs, [Doc. 11 ¶ 15; Doc. 15 at 18-20]; and she cites no authority plausibly suggesting that the protection of the Free Exercise Clause of the First Amendment to the U.S. Constitution extends to adverse employment actions undertaken due to an employer's mistaken beliefs about the employee's religious convictions or practices or the employee's failure to conform to an accepted or predominant standard of religious belief or practice, [Doc. 11 ¶¶ 67, 68; Doc. 15 at 18-20]. For these reasons, the undersigned finds that Plaintiff has failed to state a plausible claim for violation of the Free Exercise Clause of the First Amendment to the United States Constitution. Accordingly, it is hereby **RECOMMENDED** that the District Judge **GRANT** Defendants' motion to dismiss Count III.

41

AO 72A
(Rev.8/8
2)

### b. *Establishment Clause Claim*

In Count IV, Plaintiff alleges that Defendants violated the Establishment Clause of the First Amendment by failing to remain neutral and by adopting the religious perspective of a particular group of parents who complained about Plaintiff's implementation of mindfulness practices. [Doc. 11 ¶¶ 50, 74]. She further alleges that Defendants violated the Establishment Clause by allowing Christian practices to take place on school grounds, "including educators' use of CCSD computers to spread certain 'acceptable' Christian devotional materials, while not allowing [Plaintiff] the same opportunities with regard to her secular yoga and mindfulness program." [*Id*. ¶¶ 41-43, 75].

Defendants argue that Plaintiff's Establishment Clause claim fails because she does not identify any CCSD policy or practice that constituted an establishment of one religion over another. [Doc. 14-1 at 13]. Defendants also once again point out that Plaintiff admits that her yoga-related activities were not religious, and they argue that it thus "defies logic that any action taken regarding these admittedly secular activities would invoke any aspect of the First Amendment. [*Id*. at 13-14].

While Defendants purport to raise the issue of the sufficiency of Plaintiff's pleading of her Establishment Clause claims, they do not set forth any legal authority

42

establishing the elements that must be pleaded in order to state a plausible claim under the Establishment Clause. [*Id.*]. Nor do they otherwise explain why Plaintiff's allegations that overtly Christian practices were allowed at the school, that parents complained that Plaintiff did not conform to their religious beliefs, and that Plaintiff was transferred after prayer vigils and religiously based complaints to CCSD employees and the CCSD board, [Doc. 11 ¶¶ 27-31, 33-35, 39-43, 47, 50, 74-75], are insufficient to state a claim under the Establishment Clause. [Doc. 14-1 at 13-14]. Indeed, Defendants do not cite any legal authority at all to support dismissal of Count IV. [*Id.*].

Defendants are, of course, represented by counsel, and in any event, the Court may not make arguments on their behalf or act as their *de facto* counsel. *See Lampkin-Asam v. Volusia Cnty. Sch. Bd.*, 261 Fed. Appx. 274, 276 (11th Cir. Jan. 9, 2008) (noting that a court is not to act as counsel even for a *pro se* party); *GJR Invs., Inc. v. Cnty. of Escambia, Fla.*, 132 F.3d 1359, 1369 (11th Cir. 1998) (A court does not have "license to serve as de facto counsel for a party."); *Ward v. United States*, 154 F.R.D. 291, 293 (M.D. Fla. 1994) (court refuses to supply argument for party). Additionally, where a party simply raises an issue without providing any supporting argument or authority, that issue is not properly before the Court. *See*

AO 72A
(Rev.8/8
2)

*Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that movant waived an issue by failing to elaborate on his argument or provide a citation to authority regarding the argument); *see also Cheffer v. Reno*, 55 F.3d 1517, 1519 n.1 (11th Cir. 1995) (concluding that issue was waived, even though party's brief listed the issue in the statement of issues, because party provided no argument on the merits of the claim). Consequently, the undersigned finds nothing in Defendants' motion to support a determination that Plaintiff has not properly pleaded a claim for violation of the Establishment Clause.

### c.    *Official-Capacity Claims*

Defendants alternatively argue that even if Plaintiff stated a claim for a violation of her First Amendment rights in Counts III and IV, the claims still fail as a matter of law because Plaintiff has not alleged a basis for assigning liability to CCSD or to Ragsdale in his official capacity. [Doc. 14-1 at 14-17]. Specifically, they argue that a county may not be held liable under § 1983 on a *respondeat superior* theory, but instead may only be held liable for the acts for which it is actually responsible, by way of (1) an officially promulgated school district policy, (2) a decision made by an official with final policymaking authority for the school district, or (3) county practices so permanent and well settled as to constitute a "custom or usage" with the force of law,

44

[*id*. at 14-15 (relying principally on *Monell v. Dep't of Human Servs.*, 436 U.S. 658, 690-91, 694 (1978))]; that Plaintiff has not pleaded facts satisfying any of the three permissible theories, [Doc. 14-1 at 15-16]; and that, to the extent that she may argue that the county may be held liable for her transfer due to the board's policymaking authority, her allegations are too conclusory:  she "provides no facts to support her conclusion that any Board Member (much less a majority of the Board Members) voted to transfer her for an impermissible reason," [*id*. at 15-17 (citing *Franklin v. Curry*, 738 F.3d 1246, 1251 (11th Cir. 2013); *Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1296-97 (11th Cir. 2002); *Vaughn v. City of Sandy Springs*, Civ. Action File No. 1:09-cv-2852-ODE-WEJ, 2010 WL 11508351, at *9-10 (N.D. Ga. May 25, 2010) (Evans, J., *adopting* Johnson, M.J.))].

Contrary to Defendants' position, the undersigned finds that Plaintiff has pleaded facts sufficient to show that the county may be held liable based on the board's policymaking authority.  While it is true that Plaintiff has not pleaded facts specific to the intent of each individual board member, she has—unlike the plaintiffs in *Franklin* and *Vaughn*—asserted far more than mere labels and conclusions or a formulaic recitation of the elements of a cause of action and has pleaded facts showing that Defendants were at least aware of the religious nature of the community complaints:

45

AO 72A
(Rev.8/8
2)

that parents who attended church with Ragsdale and the Chair of CCSD's board made religiously based complaints, that a letter about the complaints went to five members of the CCSD board, that CCSD was "inundated" with emails stating that Plaintiff was a Buddhist, that parents held a prayer rally on campus, that the controversy attracted national media attention, that a member of the community emailed Ragsdale and the CCSD human resources department summarizing the concerns and calling for Plaintiff's job, and that CCSD halted the mindfulness practice and the board transferred Plaintiff despite results showing that the mindfulness practice she championed dramatically decreased disruptive behavior and policy violations. *Compare Franklin*, 738 F.3d at 1250-51 (finding that plaintiff had failed to plead facts establishing that supervisory defendants had reason to know of facts indicating risk of sexual assault); *Vaughn*, 2010 WL 11508351 at *9-10 (granting defendant's motion to dismiss § 1983 claims where plaintiff failed to allege any of the three potential bases to hold government entity liable for any alleged constitutional violation) *with* [Doc. 11 ¶¶ 23, 24, 27, 29-31, 33-36, 39]. The present case, which is before the Court on a motion to dismiss, is also unlike the posture in *Matthews*, where the evidence had been developed and the court's judgment was based on a special jury verdict elaborating on factual findings. *Compare Matthews*, 294 F.3d at 1296-97 *with*

46

[Doc. 14]. At this stage of the proceedings, where the Court is to accept Plaintiff's allegations as true and construe them in the light most favorable to her, the undersigned finds that these pleadings are sufficient to state a plausible allegation that the majority of the board voted to transfer Plaintiff based on perceptions that she did not conform to the community's Christian values.

> ### d. *Claims Against Superintendent Ragsdale in his Individual Capacity*

Defendant Ragsdale also seeks dismissal of the claims asserted against him in his individual capacity. [Doc. 14-1 at 17-20]. He first contends that as superintendent, he had the power only to recommend Plaintiff's transfer, not to actually transfer Plaintiff to another school, and therefore, he could not be held individually liable as a "decisionmaker." [*Id*. at 17-18 (citing *Kamensky v. Dean*, 148 Fed. Appx. 878, 879-80 (11th Cir. Sept. 14, 2005); *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1326 (11th Cir. 2003))]. Second, he argues that he is entitled to qualified immunity because Plaintiff has not pleaded facts showing that he violated Plaintiff's constitutional rights, much less that he violated constitutional rights that were "clearly established." [Doc. 14-1 at 18-20 & nn.6, 7 (citing *Pearson v. Callahan*, 555 U.S. 223, 241 (2009);

*Saucier v. Katz*, 533 U.S. 194, 201 (2001), *modified by Pearson, id.*; *Randall v. Scott*, 610 F.3d 701, 714, 716 (11th Cir. 2010); [Doc. 11 ¶ 47])].

In response, Plaintiff contends that Ragsdale's argument that he could not be held individually liable as a "decisionmaker" fails because the case is only at the pleadings stage and therefore is premature and underdeveloped, [Doc. 15 at 23-24 (citing *Crutch v. Lawrence Cnty. Bd. of Educ.*, No. 3:12-CV-827-PWG, 2012 WL 3030173, at *3 n.4 (N.D. Ala. July 23, 2012))], and because she has pleaded facts alleging that Ragsdale "recommended and advocated" for Plaintiff to be transferred and thus has plausibly pleaded facts showing that he personally participated in the deprivation of Plaintiff's constitutional rights or that there was a causal connection between Ragsdale's activity and the constitutional deprivation, [Doc. 15 at 23-24 (citing *Hackett v. Fulton Cnty. Sch. Dist.*, 238 F. Supp. 2d 1330, 1359 (N.D. Ga. 2002) (Carnes, J.))]. As to the qualified-immunity argument, Plaintiff contends that her pleadings show that Ragsdale violated her constitutional rights by taking sides in a dispute over religious dogma and by punishing her for what he believed were Buddhist or anti-Christian activities outside of school, [Doc. 11 ¶ 47], and suggests that the answer to whether there was a violation may depend on facts not yet fully developed. [Doc. 15 at 24-25 (relying on *Pearson*, 555 U.S. at 239)].

48

In reply, Ragsdale seeks to distinguish *Hackett*, argues that *Crutch* is an "outlier district court decision" that is inconsistent with Eleventh Circuit precedent, and points to other district court decisions wherein courts in this circuit held that only a final decision maker can be held individually liable on a § 1983 claim. [Doc. 18 at 13-15 & n.4]. He also contends that, once the defendant shows that he was acting within the scope of his discretionary authority, it is the plaintiff's burden to show that qualified immunity is not appropriate, and that Plaintiff has not shown that she can do so. [Doc. 18 at 16-17 & n.5 (citing *Carollo v. Boria*, 833 F.3d 1322, 1328 (11th Cir. 2016))].

On the issue of his individual liability, the undersigned finds that Defendant Ragsdale has the better end of the argument. As Ragsdale points out, it is, at best, questionable whether Plaintiff may rely on *Hackett* for her proposition that a supervisor need not hold decision-making power in order to be held individually liable under § 1983 so long as he "personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervisory official and the alleged constitutional violation," as *Hackett* was not an employment case but instead involved a student's allegations against a teacher's supervisors for the teacher's sexual misconduct. *Hackett*, 238 F. Supp. 2d at 1359. Even so, it is not entirely clear that an

49

individual defendant without decision-making power, such as Ragsdale, may not be held liable under a "cat's paw" theory, or, in other words, where the individual's discriminatory animus can be shown to be the proximate cause of the adverse action. *See, e.g., Harris v. Pierce Cnty., Ga.*, No. CV 513-82, 2014 WL 3974688, at \*8 (S.D. Ga. Aug. 14, 2014) (criticizing *Kamensky*'s "rubber stamp" holding in light of *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011)); *Polion v. City of Greensboro*, 26 F. Supp. 3d 1197, 1219 & n.16 (S.D. Ala. June 10, 2014) (same); *see also Smith v. Bray*, 681 F.3d 888, 899 (7th Cir. 2012) (stating that five other circuits have held that individual liability under § 1983 is appropriate on this basis); *Crutch*, 2012 WL 3030173 at \*3 n.4 (explaining that *Kamensky*'s persuasive value is limited, particularly in its application on a motion to dismiss, because it is unpublished and was based on a summary-judgment record).

Be that as it may, Plaintiff has implicitly conceded that Ragsdale did not proximately cause her transfer, as Plaintiff bases her claim against Ragsdale in his individual capacity exclusively on the allegations appearing in paragraph 47 of the amended complaint: "On March 24, 2016, the Board *and* Mr. Ragsdale capitulated to the complaining parents' demands and voted to move [Plaintiff] to another school 16 miles further from her home." [Doc. 11 ¶ 47 (emphasis added) [cited in

50

Doc. 15 at 23-25]]. Indeed, the allegation falls far short of Plaintiff's suggestion in her response brief that Ragsdale "recommended and advocated" for Plaintiff to be transferred, much less that he was the proximate cause of the decision. [*Compare* Doc. 11 ¶ 47 *with* Doc. 15 at 24]. Accordingly, even viewing the complaint's allegations in the light most favorable to Plaintiff, the undersigned finds that Plaintiff has failed to state facts sufficient to state a plausible claim against Ragsdale in his individual capacity and finds nothing to suggest that dismissal of the claims asserted against Ragsdale in his individual capacity at this stage of the case would be "premature."

The undersigned is also persuaded by Ragsdale's argument regarding qualified immunity. "Qualified immunity offers 'complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Lee v. Ferraro*, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2011)) (internal quotations omitted). Moreover, "[b]ecause qualified immunity is a defense not only from liability, but also from suit, 'it is important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible.' " *Id.* at 1194 (quoting *GJR Invs., Inc.*,

51

132 F.3d at 1370). To warrant qualified immunity, a public official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Id.* If official shows that his or actions were performed pursuant to and within the scope of his discretionary authority, the burden shifts to the plaintiff to demonstrate that the official should not be cloaked in qualified immunity:

> Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. . . . As a "threshold question," a court must ask, "taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). If a constitutional right would have been violated under the *plaintiff's* version of the facts, the court must then determine "whether the right was clearly established."

*Lee*, 284 F.3d at 1194; *see also Pearson*, 555 U.S. at 236 (receding from *Saucier*'s requirement that the court determine whether facts alleged or shown by plaintiff made out a violation of a constitutional right before determining whether the plaintiff has shown that the constitutional right allegedly violated was "clearly established").

A right is clearly established when it would be clear to a reasonable official that his conduct is unlawful under the circumstances. *Bashir v. Rockdale Cnty.*, 445 F.3d 1323, 1330 (11th Cir. 2006).

> This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." . . . "The contours of the right

must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent."

*Id.* at 1330-31 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In general, to determine if a public official had "fair and clear notice" that his actions violated the Constitution, a court must examine "case law existing at the time of the violation,"—"decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state"—involving facts "similar to the case at hand." *Id.* at 1331 & n.9.

Plaintiff does not claim that Ragsdale was acting outside his discretionary authority, and Ragsdale does not disagree that the right to be free from discrimination on the basis of religion is a constitutional right. Therefore, the Court will consider these arguments waived. *See, e.g., Kramer v. Gwinnett Cnty.*, 306 F. Supp. 2d 1219, 1221 (N.D. Ga. 2004) (Evans, J.) (holding that where a party fails to respond to any portion or claim in a motion, that portion, claim, or defense is waived); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) (Carnes, J.) (same); *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1148 (N.D. Ga. 1997) (Hull, J.) (same). The burden thus rests on Plaintiff only to show that

53

qualified immunity is not appropriate because the right at issue in this specific instance was clearly established. *Lee*, 284 F.3d at 1194.

Plaintiff suggests that Ragsdale violated her clearly established constitutional rights "by taking sides in a dispute over religious dogma, . . . by punishing her for what he believed were "Buddhist" or anti-Christian activities outside of the school . . . [, and] [b]ecause [he] promoted a particular religious viewpoint by exerting influence over the Board in order to act against [Plaintiff]." [Doc. 15 at 24-25 [citing Doc. 11 ¶ 47]]. She presents no further argument—and not a single citation to any caselaw—to explain how or why this case involves facts similar to those in another case that would have made it clear to Ragsdale that his conduct was unlawful under the circumstances. *Bashir*, 445 F.3d at 1330-31 & n.9. Consequently, Plaintiff has not met her burden to show that qualified immunity is inappropriate for Ragsdale.

Accordingly, the undersigned **RECOMMENDS** to the District Judge **DISMISS** the claims asserted against Ragsdale in his individual capacity on qualified-immunity grounds. Additionally, because a claim asserted against a supervisory employee in his official capacity is redundant with a claim against the employer, *Cook v. Randolph Cnty.*, 573 F.3d 1143, 1149 (11th Cir. 2009), the undersigned further **RECOMMENDS**

that the District Judge **DISMISS** the official-capacity claims against Ragsdale as redundant and **DROP** Ragsdale from the case.

### III.     Conclusion

For the reasons discussed above, the undersigned **RECOMMENDS** that the first motion to dismiss be **DENIED AS MOOT**, [Doc. 9]; that the second motion to dismiss be **GRANTED IN PART and DENIED IN PART**, [Doc. 14]; that the claims against Ragsdale in his official capacity be **DISMISSED AS REDUNDANT**; and that Ragsdale be **DROPPED** from the case. Should the District Judge fully adopt this R&R, Counts I, II, and IV will remain pending against CCSD.

**IT IS SO RECOMMENDED**, this the 6th day of December, 2017.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)