IN THE MATTER OF

# Cole

VS

# Cobb County School District

## TRANSCRIPT OF DEPOSITON OF

# Christopher G. Ragsdale

On November 2, 2018

---

*Reported by* Joel P. Moyer
*Certified Court Reporter*

---

**DONOVAN REPORTING & VIDEO CONFERENCING**
***Certified Court Reporters***
237 Roswell Street / Marietta, GA 30060
770.499.7499 800.547.1512
**Book online at <www.donovanreporting.com>**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BONNIE COLE,
Plaintiff,

vs. CASE NO. 1:17-CV-01378-WSD

COBB COUNTY SCHOOL DISTRICT,
Defendant.

\- - -

Deposition of CHRISTOPHER G. RAGSDALE,

Taken by Edward D. Buckley III,

Before Joel P. Moyer,
Certified Court Reporter,

At the Law Offices of
Gregory Doyle Calhoun & Rogers LLC,
Marietta, Georgia,

On Friday, November 2, 2018,
Beginning at 10:05 a.m. & ending at 3:28 p.m.

\- - -

APPEARANCES OF COUNSEL

For the Plaintiff:

EDWARD D. BUCKLEY III
T. BRIAN GREEN
Buckley Beal LLP
Suite 3900
600 Peachtree Street, NE
Atlanta, GA 30308
404.781.1100

For the Defendant:

CHARLES L. BACHMAN JR.
Gregory Doyle Calhoun & Rogers LLC
49 Atlanta Street
Marietta, GA 30060
770.422.1776

ALSO PRESENT:

Bonnie Cole





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

INDEX TO PROCEEDINGS

EXAMINATION INDEX

| | |
|---|---|
| CHRISTOPHER G. RAGSDALE | |
| Examination by Mr. Buckley | 6 |
| Errata Sheet | 193 |
| Certificate Page | 195 |

(Continued on next page)



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

EXHIBIT INDEX

Plaintiff's Exhibits


| | | |
|---|---|---|
| 2 | Email thread ending with email to Grant Rivera from Barbara Swinney 3-13-2016 (Cole 000164 - 165) | 129 |
| 3 | Email thread ending with email to Chris Ragsdale from Melissa Vickers 3-13-2016 (Cole 000166 - 168) | 146 |
| 10 | Email to Chris Ragsdale from Darren Lamb with attachment, 3-14-2016 (Cole 000200 - 205) | 155 |
| 11 | Email to humanresources@cobbk12.org and others from Adam Glass 3-17-2016 (Cole 000270 - 271) | 164 |
| 14 | Email thread ending with email to Grant Rivera and others from John Adams, 3-18-2016 (Cole 000282 - 283) | 173 |
| 15 | Email thread ending with email to Bonnie Cole's personal email address from Bonnie Cole's Cobbk12.org email address, 3-28-2016 (Cole 000304 - 305) | 77 |
| 17 | Email to Grant Rivera from Chris Ragsdale, 3-12-2016 (Cole 000330 - 331) | 98 |
| 21 | Email thread ending with email to Grant Rivera and John Adams from Chris Ragsdale, 3-22-2016 (CCSD 001642) | 184 |
| 23 | Email thread ending with email to Brian Clark from Chris Ragsdale 3-10-2016 (CCSD 001657 - 1658) | 116 |
| 24 | Color copy of handwritten org chart | 52 |


(End of Index)



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

November 2, 2018
10:05 a.m.

(Whereupon the reporter provided a written disclosure to all counsel pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting.)

MR. BUCKLEY: This will be the deposition of Chris Ragsdale. It is taken for purposes of discovery and cross-examination and all purposes permitted by law. All objections except as to the form of the question are reserved until the time of trial or until the time the deposition is to be used in evidence.

It's taken pursuant to the Federal Rules of Civil Procedure in the matter of Bonnie Cole versus Cobb County School District and Chris Ragsdale individually and in his capacity as superintendent of Cobb County School District.

Would you go ahead and swear Mr. Ragsdale in.

- - -

- - -

- - -

- - -

CHRISTOPHER G. RAGSDALE,
being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. BUCKLEY:

Q Mr. Ragsdale, my name is Ed Buckley, and I represent Bonnie Cole.
A All right.
Q And I'm going to be asking you questions today, and my purpose is to get information. You are under oath under penalty of perjury, and you understand that; right?
A Sure, yes.
Q And you understand that I am entitled to truthful answers to my questions under the law; right?
A Yes.
Q Okay. And so when I ask you a question, sometimes people find they have convenient memories because it's convenient to do so. I expect your best recollection, sir, because that is how we will get to the truth of the matter in this case. Are we agreed on that?
A Absolutely.

Q All right. Good. Now, in asking you questions, if you don't understand my question, please tell me. Okay?
A Okay.
Q And I will do a better -- try to do a better job in asking the question. If you have a yes-or-no answer, that's fine. And if you need to explain your answer, you know, yes but, that's okay too. Just tell me. Okay?
A Sure.
Q I will try to let you answer these questions fully and truthfully. And if I accidentally cut you off when you're in the middle of an answer, please tell me, and I'll let you finish. Okay?
A Sure.
Q All right. As you're doing here, you're giving oral answers to the questions, and we need that for our record because uh-huh or huh-uh or a nod or a shake of the head is awfully hard for Joel to take down.
A Right.
Q All right? So we need a record that's on a transcript where I know you're saying yes or no or whatever you're





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

saying. Okay?
A Right.
Q All right. And sometimes you may think I'm finished with a question when I'm not, and you may anticipate the answer, and you may start rolling into your answer and cutting me off. And if you do, I'll tell you because we want to have a good record.
We want to have my full question and your full answer. Agreed?
A Sure.
Q Okay. Good. All right. Are you laboring under any disabilities or taking any medication that would render your memory less than accurate?
A No.
Q Okay. Good. Go ahead and state your full name for the record.
A It's Christopher Glen Ragsdale, one N.
Q Right. And what's your date of birth, sir?
MR. BACHMAN: And before we --
A January --
MR. BUCKLEY: Sorry.

MR. BACHMAN: Here's what I've learned is if we just do month and year.
MR. BUCKLEY: Right.
MR. BACHMAN: Then if we file the transcript, we don't have to worry about redacting it. Because the rule's now --
MR. BUCKLEY: All right.
MR. BACHMAN: Is that okay?
Q Give me the month and year of your birth.
A January 1969.
Q Everybody I depose now is younger than me. What's your residential address?
A It's 4400 Morrison Road, Powder Springs.
Q Do you have a phone number?
A I do.
Q What is it?
A 678 --
Q 678.
A -- 873 --
Q 873.
A -- 8885.
Q 8885. Do you have a home landline?
A I do, but there's no phone connected


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

to it, so.
Q Okay.
A Welcome to it, if you want it though.
Q Well, go ahead and give it to me for whatever it's worth.
A 770-485-2323.
Q And I imagine you have a work email, and maybe you have a separate personal email account. Can you give me both of those, please?
A Sure. It's chris.ragsdale@cobbk12.org.
Q Cobbk12 is all one word?
A Yes, k12.org.
Q .org?
A Yeah.
Q Okay. Do you have a personal email address?
A I do. Cragsdale@bellsouth.net.
Q Do you use email at work?
A Yes.
Q Okay.
A Well, I mean, work email at work, yes.

Q Right.
A Yeah.
Q Do you ever use your personal email at work?
A I will check it from time to time, yes.
Q Have you ever used your personal email for work-related matters?
A No.
Q Okay. Have you ever had your deposition taken?
A Yes.
Q When was that?
A Too long ago to remember.
Q Okay. And do you remember what sort of matter it was in?
A I don't actually.
Q Do you remember if it was -- well, let me go through a little list of categories. Was it a personal matter, or was it a work-related matter?
A It was work related.
Q Okay. Was it work related with respect to your work for the School District?
A It was -- yes. It was right after I



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

came to Cobb as chief technology officer.
Q Okay. Was it an employment-related matter? And by that, I mean, was it a case brought by an employee or former employee?
A I don't remember.
Q Do you remember if you were named as a party in the case, as a party defendant?
A No, I was not.
Q Were you a suing party in the case?
A No.
Q Okay. You were just a witness?
A Correct, providing technical details.
Q Okay. Providing technical details. Do you remember if it was a contractual dispute?
A I don't.
Q Okay. Do you remember who the attorney was that deposed you?
A I don't.
Q Okay. Do you remember who defended your deposition?
A Well, at that time it would have been Brock Clay.
Q Okay.





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A But I don't remember the specific attorney.

Q Okay. Do you remember whether the case was in Superior Court, like Cobb Superior Court, say, or Cobb State Court or whether it was in Federal District Court?

A I don't remember.

Q Okay. And when you say it was too long ago to remember, can you ballpark when that occurred? You know, ten years ago? Five years ago?

A Yeah. It was ten -- I came to the district in '06, and it was shortly thereafter, I think.

Q Do you remember the name of the suing party in the case?

A No, I don't.

Q Do you have any knowledge or recollection as to whether the case was resolved?

A I don't.

Q Did you ever -- you know, when people get deposed in civil cases, often those cases will end up going to court and the person ends up testifying under oath in court in the


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

trial of the case. Did you testify in court in that instance?

A No.

Q Okay. So presumably, although you're not really sure, the case was resolved short of going to trial by -- we don't know how?

A Yeah. I don't know.

Q Okay. Fine. You were testifying about IT-related matters?

A Yes.

Q Okay. Do you remember any of the specifics of any of the categories of information you were testifying about?

A To the best of my recollection, I believe it was how we backed up our data.

Q Okay. There is a rule called Rule 30(b)(6), which is a rule under which depositions are taken of persons with knowledge concerning certain subject matter areas. Do you happen to recall whether it was a 30(b)(6) deposition?

A I don't.

Q Okay. All right. What did you do to prepare for this deposition today?



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Met with Chuck once.
Q Okay. And when -- sorry. Go ahead.
A And that was pretty much it.
Q Okay.
A We went over a few emails.
Q Okay.
A Yeah.
Q When was that meeting?
A A week ago, couple weeks ago.
Q Okay. How long was the meeting?
A About an hour.
Q And you say you looked at a few emails?
A Correct.
Q Do you remember what -- who the emails were from or what they concerned?
A I -- well, it was the case, obviously. But from and to, I was either a to or a copy.
Q Okay.
A Yeah, or a from.
Q But they concerned Bonnie Cole?
A Correct.
Q And we will be looking at some emails today. And maybe some of them, if they

are emails you reviewed, you know, you can say, hey, this is one that I reviewed.
A Sure.
Q Okay. Now, you became aware at some point of the existence of this lawsuit before you did your preparation with Chuck; right?
A Correct.
Q And we'll get into that in a little depth, but at a certain point did you become aware that Ms. Cole's lawyers, that's us, were asking for documents including emails and any sort of communications or writings concerning her case?
A Yes.
Q Okay. Did you or somebody for you conduct a search to see whether or not you had any information that was responsive to those requests for production of documents?
A Yes.
Q Did you do it, or --
A No.
Q -- did you get somebody else to do it?
A Somebody else does it.
Q Who did you get to do it?

A I didn't get anybody to do it. It's part of the process when documents are asked for that our IT department is involved if it's email related. And pretty much anything electronic related, the IT department is involved.

Q Now, I don't know, but, you know, let's say that the IT department did a search and maybe they did a search of your emails. But do you have or have you had any separate documents, maybe personal notes, maybe hard documents of some kind, that you have kept separately that would not be found in an electronic search?

A No.

Q Okay. Do you have any sort of desk file that concerns Bonnie Cole or this litigation?

A No.

Q Okay. Do you or have you ever in the course of your duties kept desk files or files of any kind concerning your principals or assistant principals?

A No.

Q Okay. Do you leave all that up to



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

personnel?
A Yes.
Q And who is that?
A John Adams. He's the deputy superintendent and also the chief HR officer, so he serves both roles.
Q Okay.
A Operations and HR.
Q Did you have an opportunity to review the documents that were produced or found, I guess I should say, by your IT person that were responsive to requests for production of documents to you?
A No.
Q Okay. So you don't know as you sit here today under oath whether everything you had was necessarily produced. Am I right about that?
A No. If it's electronic, it was produced because there's no deletion of documents.
Q All right. Did you have any emails in your -- what did you say it was? A BellSouth account?
A Right, right.





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q In your BellSouth email address, do you have any or have you had any that concerned this matter?
A No.
Q Or that concerned Ms. Cole --
A No.
Q -- in any way or any sort of religious objections that people may have had to Ms. Cole's activities as an assistant principal?
A No.
Q Okay.
A Not at all.
Q And when you said in the course of reviewing materials with Chuck you reviewed, you said, some emails.
A Right.
Q Did you review any other kind or category of documents as a part of preparing for this deposition?
A No.
Q Okay. And separate from Chuck, did you take home a file or a folder or anything with any documents for your review in order to prepare for this deposition?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A No.
Q Okay. Did you watch any video programs or listen to any audio programs or audio or video information in order to prepare for your deposition?
A No.
Q Okay. Are school board meetings -- are they videotaped?
A Yes.
Q They are?
A Yes.
Q Did you review any videos of any school board meeting, say, that occurred that might have concerned Bonnie Cole?
A No.
Q Are personnel matters at school board meetings ordinarily handled in executive session?
A For the most part, yes.
Q Okay. And executive sessions, are they recorded in any way?
A My secretary serves as the secretary during executive sessions and takes minutes of those meetings, of those portions of the meetings.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q And is the reason for conducting discussions about personnel matters in executive session to protect the privacy of the people who are being discussed?
A Yes.
Q Okay. Was there ever an executive session in any meetings that you were present in in any discussion of Bonnie Cole?
A Not specifically to my recollection, but I'm sure that that would have been discussed upon the movement of her from one school to another.
Q Okay. Would there have been a vote on that?
A Not in executive session.
Q Not in executive session?
A Correct.
Q Would the vote have been out in public session?
A Yes.
Q But discussion concerning it would have occurred in executive session.
A Correct.
Q Right? So your secretary would have minutes that reflect any discussion that was


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

had concerning Ms. Cole?
A Yes.
Q All right. What is her name?
A Lynn Gordon.
Q Okay. All right. Let me get a little background information about you.
A Sure.
Q Where were you born?
A Kennestone Hospital.
Q Okay.
A Marietta.
Q Local boy.
A Exactly.
Q All right.
A Yeah.
Q Okay. And you grew up here?
A Paulding County.
Q Paulding County?
A Right.
Q What high school did you go to?
A Paulding County High School.
Q Okay.
A There's only one.
Q Okay. You got a degree there?
A KSU. Oh, high school diploma, yes.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q High school diploma.
A Right.
Q And then you went to KSU; right?
A I did, yes.
Q And when did you go to KSU?
A So I graduated high school in '87, so it would have been '87 for four-and-a-half years. Graduated I guess in spring of '92 maybe. Degree in information systems.
Q Tell me what in layperson's terms a degree in information systems is?
A Just technology.
Q Okay. Computers and --
A Yeah.
Q -- and --
A Programming.
Q -- programming?
A Networking, infrastructure.
Q Systems for organizations?
A Exactly, right.
Q At that point in time, did you know if you were going to go into public service or the private sector or have any idea at that point?
A I did not.

Q Okay. Now, I think you have a master's degree; right?

A That's correct.

Q And did you get your master's degree right after you got your degree in information systems?

A Unfortunately, no.

Q Okay. So you actually had to work for a while; right?

A Yes.

Q All right. Let's talk about that. What I want to do is kind of do a time line, if we can.

A Sure.

Q So what was your first position after you got out of KSU? Or maybe you started it while you were in KSU, and then you involved into full-time.

A Right. I worked at IBM for a time and then also at BellSouth, was then, now currently AT&T. But I did both networking and programming positions with both of those companies.

Then I also worked with Seasons 4, which my dad was VP there. It was a



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

manufacturing company. I did basically wiring diagrams in the information technology department.

Q Was that for the product, or was that for infrastructure?

A For the product.

Q Okay. What was the product?

A It was industrial air conditioning for grocery stores and hospitals, those kind of things, not the window units.

Q One of my best friends is an HVAC guy, and he has more free certificates for meals in restaurants in Decatur, Georgia, than I have ever seen. And when he walks in, they practically bow down to him.

A Right.

Q Because I guess they saves them periodically.

A There you go, yeah.

Q Right? Okay. So you did that, and how long did you work for Seasons 4?

A I really can't remember. I started at Paulding County School District in '92.

Q And this is before you got your master's?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Oh, yes. I just recently got my master's.

Q Okay.

A Two years ago maybe.

Q Paulding School District, '92. And was that in some kind of an information officer capacity?

A Correct.

Q What was your job title?

A When I first started, I think it was technology director.

Q Okay. And how long were you at the Paulding School District?

A I think approximately 15 years, until I came to Cobb in '06.

Q You started as technology director. Was that your position when you left, or had you advanced?

A Chief information officer. It was basically the same function, just a different title.

Q So you're dealing in that job with the computer infrastructure, I guess; right?

A Correct.

Q Was it broader than that as --


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Not in Paulding, no.
Q Okay. So you're basically dealing with their website. They had an intranet, I assume?
A Well, at that point in time, the Internet didn't exist.
Q Oh, my Lord.
A That's been a minute ago.
Q Okay.
A Yeah.
Q Right. Okay. Yeah. '92.
A So I'm not that much younger than you are when you made that first comment, see.
Q Well.
A We can both say we remember when the Internet wasn't there.
Q Yeah. I can remember when there weren't little yellow sticky notes.
A Exactly.
Q So when did you leave Paulding School District and come here?
A September of '06.
Q Right. So and you left as chief information officer -- well, in '06 computers were up and running; right?

A Sure, yeah, absolutely.
Q So in that, did you -- I just want to get a broad picture of your jurisdiction so to speak.
A Right.
Q You were involved in -- the Paulding School District had a website; right?
A Yes.
Q Did they have an intranet?
A Not at that time, no.
Q Okay. Did they --
A It was all just one network.
Q Were there internal records digitally stored? Not perfectly?
A Not perfectly.
Q Right.
A There were certainly word processing documents and certainly emails that were not deleted, so in that regard they were stored.
Q In that capacity, did you ever -- were you ever tasked with responding to discovery requests in litigation?
A Not at that point in time, not during my tenure at Paulding, no.
Q Okay. All right. So is it


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

September '06 that you came to Cobb County School District?

A Yes.

Q And I think you said you came as an information officer or something like that?

A Chief technology officer.

Q Okay. I meant to ask you, you became aware of this litigation because you got served with a lawsuit; right?

A Correct.

Q At that point in time, I assume you turned it over to your lawyers?

A Correct.

Q Did anyone circulate internally at the Cobb County School District any writing or email or memorandum or anything that instructed people to preserve documents including electronic communications that would be relevant to this case?

A I can't remember, but I'm sure that's always been part of the process, is the people involved would have been directed to do so, specifically IT. But, you know, again, that process is automatic.

Q Well, it is. But if somebody


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

decides to delete and double-delete an email --
A Not possible.
Q Not possible?
A Not possible.
Q What is your -- what kind of email system do y'all have?
A We're on Outlook --
Q Okay.
A -- now. We were on GroupWise, but we're now on Outlook, and all email incoming is preserved.
Q Okay. It's backed up?
A Correct.
Q So even if you wanted to delete and then double-delete, it still would be on a hard drive somewhere?
A Retrievable, yes.
Q It would be on your server maybe?
A It's, yes, on a number of servers scattered throughout, yes.
Q So do y'all do periodic backups off site?
A Yes.
Q Do you have any knowledge one way or the other whether your IT person, in addition

to searching what was on the server, what was on your computer, say, did any search of backed up information with respect to this case?

A It would have all been searched.

Q Okay.

A An email is actually not off site. It's contained within the same server.

Q Okay.

A Yeah.

Q Okay. And so I can be clear, I guess you have a server at your administrative offices; right? That's where your server is located, or no?

A It's in the data center.

Q Okay.

A Which is in Kennesaw.

Q Okay. I mean, at a certain point, like any other computer, it becomes crowded. So is the backup preserved on site?

A I can't speak specifically today because I'm no longer the CTO.

Q Right.

A But if, if it becomes to that point, then it is backed up. But, again, I can't say with absolute certainty, but I'm relatively



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

sure that all email is housed in one place on site.
Q Who is your chief technology officer?
A Well, at this point in time, we have kind of a split role, if you will. So John Floresta is the chief strategy and accountability officer, and he has Mark Smith who is the executive -- senior executive director for technology reports to him.
So between those two, that pretty much encompasses the chief technology officer position and role.
Q Okay.
A So I guess you could say technology position represented on executive cabinet is John Floresta.
Q All right. Good. He's the person who would probably be best able to answer the questions I just asked you?
A No.
Q No. Smith would be?
A You would probably have to get down into Herb Ague, who is --
Q Herb?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Herb Ague. He's a director in technology. But between he and Mark Smith would be the two to answer that question.

Q Okay. What's your current title?

A Superintendent.

Q All right. So I just -- and when did you become superintendent?

A You know, that -- I keep asking that -- being asked that question. And I, for the life of me, cannot keep it's straight. It's either 2013 when I became interim and then '14 I became permanent or '14, '15.

Q Okay.

A I really need to nail that down.

Q Well, keep that resumé brushed up.

A Exactly.

Q Right. So were you -- and before that, were you chief information officer, or did you have other titles?

A I had other titles. I had moved from chief technology officer to -- I guess under the previous superintendent I was deputy superintendent over operations which included technology, so I was -- I had transportation, public safety, maintenance, and technology.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Okay.
A Yeah.
Q And then you became superintendent?
A Interim superintendent.
Q Interim?
A Right.
Q And interim, you think that might have been 2013 or '14. You're not sure?
A It was either '13 or '14, yes, and then permanent the next year.
Q How do you become superintendent? Is that an elected position?
A No. It's appointed by the board.
Q Appointed by the board?
A Correct.
Q Okay. Now, somewhere in here you got your master's degree?
A Correct.
Q And when was that?
A If I can't remember when I became superintendent, I really can't remember when I got my master's, but --
Q Okay.
A -- it would have been '13 or '14 more than likely, yeah. It was --


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q And it's a master's in what?
A Educational leadership.
Q Did you get that at KSU as well?
A I did.
Q How long a program was that?
A About a year.
Q Okay.
A Yeah.
Q It was something you did while you were working full-time; right?
A Correct, while I was interim, as a matter of fact.
Q Was it a night school program?
A Online. It was hybrid. So there were some classroom courses, and there were some online courses as well.
Q Okay. Other than your undergraduate degree in information system and your master's in educational leadership, do you have any other coursework that you've done or have you obtained any other certificates or anything that are related to the job that you presently hold?
A No.
Q Okay. Do you -- you know, as


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

lawyers, we do continuing legal education. We have to do so many hours a year. Do you have to do anything or are you required to do anything in terms of continuing education in order to be in your position?

A No.

Q All right. Do you separate and apart from that -- and I want to be sure I'm being broad and inclusive here. Have you ever taken any courses or even seminars in human-resources-related matters?

A Not separate. I can't recall if there was -- I'm pretty sure there was some coursework in the master's related to HR, but it wasn't like an entire course dedicated to it.

Q Right. Sometimes organizations, such as school districts or government entities, will have vendors come in or even lawyers and spend a day or a half day walking people through sort of the rules of the road in terms of employment laws and things to do, things to avoid doing, that sort of thing.

Have you been -- have you ever participated in any sort of, say, educational


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

activities like that?
A Other than board training that we've had with our board, both at conferences and with our attorneys conducting those trainings.
Q And so let's talk about that for a minute. When was that?
A Generally, we have annual training from our attorneys with the board. Going back to the required continuing education, the board members are required to have I believe it's nine hours of continuing education type. I don't think it's called continuing education, but training as a board member.
And generally, our attorney's firm will conduct kind of whole board governance training is the way it's referred to.
Q Okay. The firm we're at here today?
A Correct.
Q And does that training, that board training, ever include human-resources-related training?
A Not specifically, but, you know, kind of as a board member making sure that, you know, what's discussed in executive session stays in executive session and, you know, the



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

appropriateness of being a board member and what you can and can't talk about.

Q Okay. Is there anything with respect -- any training with respect to, say, board governance and that sort of thing?

A Yes.

Q Okay.

A Yes.

Q All right. So if you could, give me as good a description as you can of your job now as superintendent. Okay? This is a test.

A Is that a trick question? Yeah, really.

Q All right. Come on. Do your best.

A So, you know, it's -- well, it's being the CEO of a billion-dollar organization. We have about a 1.2, $1.3 billion budget annually. We have a board of seven board members, and we have approximately 18,000 employees.

So it's a full plate that varies from day to day. Sometimes you're dealing with the political nature of board members. Being an elected position, you have to be very cognizant of that and what that means to them.

And ultimately, they are my seven bosses.
Q Yeah.
A You know, that's a little bit different as far as your typical job of having one boss, you know, to deal with, but I have seven.
Q Right.
A Other districts have more and less. Some have five. Some have 13, so.
Q When does the board -- well, we were talking for a minute ago about executive session and personnel decisions.
A Sure.
Q Do you have at any level hiring and firing authority?
A Yes.
Q Okay. Up to what level can you hire or fire?
A All levels.
Q Okay. Up to? Who's the highest personal under you? Your assistant superintendent?
A Executive cabinet. Those are my direct reports.
Q Okay. So you could hire or



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

terminate them if you wished?
A Correct.
Q Would you need to get board approval to do that?
A All personnel actions require board approval.
Q All right. So you decide to fire the janitor or hire a janitor. You have to go to the board for that?
A It is presented to the board.
Q Right.
A But only director positions and above are voted on in public by the board. So the board ultimately approves every single personnel hire or every single personnel action. But the custodian, for example, is going to be hired by a principal at a school.
And that's going to be on a list that the board sees in executive session but does not take individual action on for Chris Ragsdale, a custodian at Hillgrove High School.
Q Well, I mean, when a hiring or firing decision is made, is there a recommendation made to the board that they then approve or they don't approve?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Yes. And let me back up too because, while hirings are on, you know, the list that the board sees but doesn't take specific action on, terminations, the board is apprised of every specific termination.
Q Apprised of. And do they have to approve it?
A Ultimately, yes.
Q Okay.
A But, again, it's not individually. It's on our board meeting days after we come back from executive session. There's a line item on every single agenda item that -- or every single agenda that says items requiring action following executive session.
Q Okay.
A And all of those personnel actions are in there. Director and above are read out specifically.
Q Are transfers considered personnel actions?
A Yes.
Q Okay. Do you have authority to transfer people?
A Yes.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Okay. Do you have to get board approval to do that?
A Yes.
Q All right. So, for example, Bonnie Cole, who was transferred, did you have to get board approval to do that?
A Yes.
Q Okay. Were you the person that recommended to the board that she be transferred?
A Ultimately, it is the superintendent's recommendation.
Q Okay.
A It's the CHR that presents it in executive session.
Q Chief human resources officer?
A Correct.
Q And that is Mr. Adams; is that right?
A Correct, yes.
Q What is his first name?
A John, John Adams.
Q John Adams?
A Yes.
Q But in some way, shape, or form, if

you disagree with Mr. Adams, you could veto that recommendation; right?
A That's correct.
Q Okay. Does Mr. Adams, before he makes a recommendation to the board concerning transfer, does he run it by you for your approval?
A Yes.
Q So he ran by the transfer of Bonnie Cole with you before he sought approval from the board?
A Yes.
Q Okay. We're going to get further into that, but in that instance was that -- was that recommendation conducted in executive session or public session?
A To me or the board?
Q Yes, sir, to the board.
A To the board is in executive session.
Q And to you, it would just be in your office or something; right?
A Correct.
Q Okay. Was there any writing that was sent to you that made that recommendation?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A No.
Q Okay. Did he come into your office and talk to you?
A Yes.
Q Okay. We'll get into that a little bit further --
A Sure.
Q -- in a little bit. Was the board vote on the transfer of Bonnie Cole unanimous, or was it a split decision?
A Well, again, it wouldn't be individual. But I don't -- I don't recall if it was a unanimous vote or not.
Q Okay. Tell me what you mean by that, it wouldn't be individual. What do you mean?
A Again, going back to that agenda item.
Q Oh, oh.
A All items as discussed in executive session that require action.
Q Well, so if -- and do you recall in that instance whether Ms. Cole was the only transfer that was on the agenda that date, or were there other transfers on the agenda?



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A There were others.
Q Okay. Do you recall whether Adams in that meeting as he was recommending however many transfers there were, was he giving specific reasons for each transfer?
A I don't recall exactly, but I can say that he would have identified Bonnie Cole in that because the board had received communication from the community.
Q Right. There was a controversy swirling in the community about her?
A Right, right.
Q So he would have highlighted his reasons for recommending that she be transferred.
A Yes.
Q Right? And you were present during that; right?
A Yes.
Q Do you recall what he said?
A I do not.
Q Okay. Do you remember whether what he said with reference to his recommendation concerned the controversy in the community that had occurred and had become very public


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

concerning Ms. Cole?
A I don't recall specifically, no.
Q Okay.
A But he would have referenced, you know, the situation going on at the school.
Q Okay.
A Yeah.
Q Well, getting back to my earlier question and your earlier answer, you said, well, they wouldn't have voted individually. My question is still the same. Do you recall whether there was a unanimous vote with respect to Ms. Cole, either individually or with this other group of folks, or whether there was a split vote?
A I don't recall.
Q Do you recall separate and apart from what Mr. Adams said whether there was other discussion among the board members specifically concerning Ms. Cole in that meeting?
A I don't recall specifically. But if there was lengthy discussion, I would be able to recall that.
Q Right.

A But there was just -- I don't recall specifically.

Q Okay. If you don't recall specifically, do you recall generally any discussion that occurred concerning Ms. Cole?

A Generally, he just basically said, as the board, you know, is probably aware, many of you have gotten emails about the situation going on at the school. Ms. Cole is the assistant principal at that particular school.

Q Right. And he -- did he reference her involvement in implementing some yoga practices at the school in that conversation?

A Not to my knowledge.

Q Okay. But he did reference the controversy that had occurred in the community as a result of her yoga-related practices?

A Yes.

Q Okay. Did he say in light of that -- I mean, that was reason the reason he recommended her transfer; right?

A The culmination of their involvement, both he and Grant Rivera, that they came to that conclusion and recommendation to bring forth as the best resolution to the


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

disruption that was taking place at the school.

Q Did you have separate conversations with Grant Rivera about this?

A I don't recall, but generally it was with both John and Grant because they were both involved in the situation.

Q Do you remember, was the meeting or the conversation that you had separately with John in your office?

A Yes.

Q Okay. And do you remember if Grant was present during that meeting?

A I don't recall, but it's not my practice. It's not our practice to do that. Generally, it's John comes in with a list of personnel issues, recommendations, items, et cetera, and we go through those before we go into the board meeting. Generally, it's the day before.

Q Did he tell you that Grant had signed off on it so to speak?

A I'm sure that would have been part of the conversation, yes.

Q Okay. And would that have been important to you?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Absolutely.
Q Yeah. And, for example, if Grant had said, no, I don't think this is a good idea, that would have been important to you as well?
A Absolutely.
Q Okay. All right. Do you recall any separate conversations with Grant Rivera concerning this controversy around Bonnie Cole?
A I'm sure we had separate conversations along the way. I don't recall specifically how many, if more than one or two.
Q Okay. We'll get a little more in the weeds on that stuff in a bit.
A Sure.
Q Okay. So just so I understand, your general -- this part of your job description, are you involved in either a reviewing or recommending capacity with respect to all personnel matters?
A That are presented to the board, yes.
Q Are there personnel matters that are not presented to the board?
A Well, if letters are placed in

files, those kind of things, that don't result in an employment action, those certainly would not be presented to the board in an official capacity.

Q I'm going to guess performance reviews aren't presented to the board either?

A No.

Q Do you sign off on performance reviews at the principal and assistant principal level?

A I sign off as a superintendent when my direct reports review their direct reports.

Q Your direct reports being?

A Yeah. So, for example, when John Adams reviews his directors, so like transportation director, maintenance director, public safety director, I have to sign off on his review of those reviews, but not further down.

Q What about principals and assistant principals?

A I don't, no.

Q Let me ask you if you can do this for me.

A Sure.

Q Can you just give me -- I understand you can just put board at the top of this because that's who you report to; right?
A Correct.
Q But give me a little org chart --
A Yeah, sure.
Q -- that shows you and your direct reports, and I want to see this org chart all the way down to the assistant principal level even though you're saying, well, you don't sign off on those performance reviews, but I want to see who supervises the principals, assistant principals --
A Yeah.
Q -- et cetera, how that goes.
A Okay.
Q Thank you.
A So I'm just going to put chief one time, but all of my direct reports are chief.
MR. BUCKLEY: Okay.
THE WITNESS: Help me. Who's my direct reports?
MR. BACHMAN: Well, I think, Ed, and tell me if I'm wrong, instead of doing the org chart for the bus drivers and transportation, I

think you're just asking for the line of authority up and down through --

Q Yeah, that's what I'm looking for. I'm looking for who are your direct reports --

A Okay.

Q -- you know, what their job titles are. And then I want to see somewhere in this chain -- yeah, I don't need to know about bus drivers. I want to see in this chain where the principals and the assistant principals and teachers all -- and you don't have to name all of them.

A I think that's pretty much everything that's under school leadership that you're talking about with principals, assistant principals.

MR. BUCKLEY: Okay. Let me go ahead and mark this as Exhibit 1.

(Whereupon a document was identified as Plaintiff's Exhibit 24.)

Q Okay. Mr. Ragsdale, this is the organizational chart you just drew out for me; right?

A Right.

Q And I just want to make sure I


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

understand it. You're showing at the top of the chain of command the board, the school board; right?
A Correct.
Q And then beneath it is the superintendent, which is you; right?
A Correct.
Q And then you have direct reports which includes?
A Chief academic officer.
Q Chief academic officer.
A Chief of staff.
Q Chief of staff.
A CFO.
Q CFO.
A Chief strategy and accountability.
Q And then the?
A The deputy, which is HR and operations.
Q Okay. Then you kind of have over to the left of that a chain of command which starts with the chief of school leadership. Does that individual report to you too?
A Yes. All of these are direct reports right here.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Okay. All right.
A Six direct reports.
Q Okay. And then to the chief school leadership, the assistant superintendent actually reports; is that right?
A The assistant supes that are responsible for schools.
Q Okay.
A Now, the chief academic officer also has assistant superintendents as well too.
Q Okay.
A But I thought you were just focused on --
Q No. I mean, I want to make sure I understand. So the assistant superintendents, they report to the chief school leadership, chief of school leadership and also --
A No. I'm sorry.
Q -- to the chief academic officer?
A Let me modify this a little bit.
Q Okay.
A So --
MR. BACHMAN: Let me make one other wrinkle. Are you asking about now or when Ms. Cole was transferred? Because I think


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

some of this has changed.
MR. BUCKLEY: We'll ask him some questions about that. Okay?
MR. BACHMAN: Okay.
A Yeah. So assistant superintendent is considered a cabinet level position. My direct reports are executive cabinet.
Q All right.
A So I don't necessarily meet with assistant superintendents, but there are -- like, for example, under the chief academic officer there's assistant superintendent for special ed and then there's assistant superintendent for academics. All right?
The assistant superintendents under the chief school leadership officer, there are seven of those, and those are categorized in levels.
Q Okay.
A So there's three assistant supes for elementary, two for middle, and two for high.
Q I get it.
A And they supervise directly the principals of those schools that they're assigned.

Q Okay.
A And then under them, obviously all the principals report up through them, all assistant principals report up to the principals, and all the teachers report to the assistant principal and the principal.
Q Great. Thank you.
A Yeah.
Q Has this changed since Bonnie Cole? Since the controversy around Bonnie Cole started, has this organizational chart changed?
A People in them have changed.
Q What about just the hierarchy?
A No.
Q And when you say CHRO here, we're talking about at that time Adams; right?
A Correct.
Q Was he also the chief operations officer too?
A Yes, yes.
Q All right. Great.
A And he's considered -- I guess his title is actually deputy superintendent.
Q Yeah.
A But deputy superintendent does not





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

annotate that he is -- or designate that is he my number two and everybody else reports up through him. This is the reporting structure.

Q Okay.

A Yeah.

Q You're aware this is a case about religion; right?

A Well, the religious overtones to it, yes.

Q Right. Are you a member of an organized religion?

A Yes.

Q What is that?

A Burnt Hickory Baptist Church.

Q Okay. Are you a parishioner, or are you a member of the church hierarchy?

A No.

Q No to either? You're not a parishioner, or you're not a member of the church hierarchy?

A Well, I'm a member of the church.

Q Member. I say parishioner because I come from a Catholic background.

A Okay. Gotcha.

Q A member of the church. Okay.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Yeah.
Q But you are not -- for example, you know, in different churches there are board members, elders, that sort of thing.
A Right, deacons and --
Q Deacons.
A I am not --
Q None of those?
A -- either of those, yes.
Q Yeah. Do you teach Sunday school classes?
A No.
Q Or are you involved in other church-related activities?
A No.
Q Okay. You just attend Sunday service?
A Correct.
Q All right. How long have you been a member of Burnt Hickory Baptist Church?
A Over ten years.
Q Okay. Have you always been a member of the Baptist faith?
A Yes.
Q All right. Since childhood?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Correct.
Q Okay.
A Well, Methodist. When I was a kid, we were in the Methodist church, so Methodist and Baptist.
Q Close cousins of the Baptist church?
A Yeah, exactly.
Q Right.
A Yeah, yeah.
Q Do you attend church regularly?
A Yes.
Q Like every Sunday?
A Not every Sunday.
Q Right.
A We're able to stream service, so sometimes we attend church on the couch.
Q Oh, okay.
A Yeah.
Q All right. We used to call that mattress mass.
A Exactly.
Q All right. So but when you're streaming the service, you're streaming Burnt Hickory Baptist Church service?
A Correct, yes.

Q And has that been consistent for the ten years you've been a member of that church?
A Streaming was not always available, but it's just recently available, but yes.
Q Clearly, they need a chief information officer. All right.
A I am not in that capacity though.
Q I understand. I understand. So have you ever attended church with any of the following people: Randy Scamihorn?
A No.
Q John Adams?
A No.
Q Brad Daniel, Daniel?
A I don't know that person.
Q Okay. Heather or Brian Clark?
A Don't know them.
Q Melissa Vickers?
A I don't know her.
Q Adam Glass?
A I don't know him.
Q Do you know if any of these folks are members of Burnt Hickory Baptist Church?
A I don't know. Now, it's a big church.

Q I understand. Do you have any even ballpark idea of how large the membership is?
A I don't.
Q Okay. All right. So you know -- where do you know Scamihorn from?
A Just board member.
Q All right. But you don't know what church Scamihorn goes to?
A I do not.
Q And John Adams, of course, you know is -- he's your chief human resources officer.
A Right.
Q You've never attended church -- when I say attended church with somebody, I don't mean you went and sat in the same pew with them necessarily.
A Yeah, yeah.
Q I mean you saw them across the way or something.
A No. I believe he goes to Piedmont Baptist, just recently I think, yeah.
Q Okay. All right. Have you ever practiced yoga?
A I have not.
Q Okay. Do you know anything about





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

it?
A No, other than the -- and it just left me. Something dog, you know.
Q Than just what?
A The position.
Q Oh.
A The position.
Q The downward facing dog?
A Downward facing dog. Thank you.
Q All right. Did you do that in gym class one time or something?
A No. Just saw it on TV.
Q Saw it on TV. So do you know -- you've heard of it before obviously?
A Yeah, sure, right.
Q And you probably know people who practice yoga, right, or do you?
A I don't know.
Q They're not telling you about it?
A Exactly.
Q Right. Okay. So you don't really have any kind of working familiarity with the philosophy of yoga or the reason for it or anything like that?
A I don't.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Have you ever heard of meditation related to yoga and the same conversation?
A Sure.
Q Yeah.
A Right.
Q That people meditate and it helps them, calms them down or what have you?
A Right.
Q You've heard of that?
A Right.
Q Right. And do you have, I mean, any relatives that practice yoga or family members anything, anybody like that?
A I don't know.
Q Okay. All right. Do you -- this is a broad question. Do you ever meditate?
A Well, a lot of people use terms interchangeably, so I pray.
Q Yeah. Okay.
A I don't know that I would say I meditate to relax. I don't do that.
Q Okay.
A Yeah.
Q You don't have any objection to people doing that, do you?



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A No.
Q All right. And you don't necessarily connect meditation with prayer, do you?
A No.
Q Okay. Sometimes you just sit in your office and look out the window and think; right?
A I don't have too many windows, but.
Q All right.
A It's taken me 30 years to get a window, so.
Q Maybe --
A But sometimes I just look at the wall and think.
Q Yeah.
A There you go.
Q Stare at the desk blotter or something?
A Yeah.
Q I do the same thing. It's where you're working through problems or issues or concerns or what have you; right?
A Sure.
Q It's not a religious practice. It's

just something you do to sort out the things that you're confronted with; right?
A Sure.
Q Okay. So when -- have you ever heard of the term mindfulness before?
A I have.
Q In what context have you heard of the term?
A Pretty much exactly what you've just described, as a method of kind of relaxation and, you know, reducing stress to a degree.
Q Right. It's a little bit of a -- it's gotten a little more publicity in the last few years than maybe it's had. Of course, everything gets publicity with the Internet; right?
A Right.
Q So you've probably heard a little more and seen it a little more, maybe read a few articles about it?
A No, not really, just, you know. I can tell you that that would be -- when you say what is mindfulness, I would equate that to, you know, kind of just, again, relaxation technique, you know, a way to reduce stress.

Q Okay. Have you ever heard of breathing techniques being used in the context of meditation or yoga as a way to relax?
A Not specifically.
Q Not specifically?
A Right.
Q Have you ever heard of people using slowing down their breathing in order to relax and, you know, try to avert stress and that sort of thing?
A Sure.
Q Yeah. Okay. You've probably done a little bit yourself. Take a deep breath?
A Exactly.
Q We all say it sometimes; right?
A Before you get the blood pressure test.
Q Right.
A Yeah.
Q Take a deep breath, count to ten, or whatever?
A Right, yeah.
Q Right. All right. So have you ever heard of centering or focusing activities?
A No.

Q Okay. Do you have any opinion as to the morality of --
A Say that one more time.
Q Yeah. Do you have any opinion as to the morality of practicing yoga or mindfulness or meditation?
A Morality?
Q Yeah.
A No.
Q It doesn't rub up against your Christian beliefs, does it?
A No.
Q Okay. And you're a Christian man; right?
A Correct.
Q And you don't think of those practices, or do you -- if you do, fine. But do you think of those practices, the ones we've been talking about, as religious in nature?
A No.
Q Okay. Now, are you aware of mindfulness activities being practiced in the Cobb County School District at any time?
A Not specifically.
Q Are you aware of meditation


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

practices being practiced in the Cobb County School District?

A Not specifically.

Q Okay. Well, when you say not specifically, you're certainly aware that that was something that was going on at the time that controversy arose concerning Bonnie Cole?

A Right, right.

Q Okay. But are you --

A When you say specifically in Cobb County schools, I know that mindfulness is having a place in education to where there are, you know, seminars and, you know, things of that nature.

Q And, again, let me make sure I understand. When we talk about mindfulness, I'm talking about -- and see if you agree with this definition, you might not, but if you do -- brain-based awareness or centering practices meant to increase sensory awareness, improve focus, and improve emotional control.

Have you ever -- is that definition -- have you ever heard anything related to that?

A I have not.

Q You just haven't gotten that deep into it?
A Right, haven't gotten that deep.
Q Right. But have you heard that some of the exercises related to meditation and mindfulness have been productive in a decrease in disciplinary problems in schools?
A I have not been presented that information, no.
Q Okay. All right. Would that sort of information be valuable to you?
A Sure.
Q Yeah. Okay. And separate and apart from Bonnie Cole now, are you aware in or have you ever -- maybe you've been to a meeting or seminar, or I don't know what, where anyone has discussed the use of meditation or mindfulness practices with students as a way to help them relax and control their emotions?
A I have not.
Q You have not?
A No.
Q Okay. Academically, anything that helps students control their emotions and behave better in school probably would have


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

some interest to you; right?
A Absolutely.
Q Yeah. Okay. And as far as that goes and the way that I've described it, as a Christian person, you don't have any, you know, religious objection that comes to mind concerning that sort of practice, do you?
A No, but that -- regardless of the religious affiliation I would be, that would be inappropriate to apply that kind of filter to a decision --
Q Right. Okay.
A -- for the School District.
Q It would be inappropriate for you to impose your personal religious beliefs on your decisions as an administrator?
A Absolutely.
Q Okay. Now, in terms of just your own walking-around knowledge of yoga, which I understand is --
A Minimal at best.
Q Yeah, not deep into it?
A Right.
Q Do you think of it as a religion or as a religious practice?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A No.
Q You've heard of people though refer to it as a religious practice, haven't you, because you were involved in getting emails in this controversy?
A Right.
Q Okay. And when you read of or heard of these concerns, did you do any sort of -- you know, take any sort of look into the practice to see if that was a problem?
A No.
Q Okay. But you knew that there were religious people in the community that objected to it?
A There were objections from the community being raised.
Q Right.
A Yes.
Q And some of those were in your church; right?
A I have no idea.
Q You don't know, but you did know that there were objections from people who characterized themselves as Christian to the practice?



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Yes.
Q All right. In terms of, you know, you're the superintendent of the schools, and your background is in educational leadership, or your education. Excuse me. But in terms of your educational background, do you consider yourself an educator?
And I'm using that -- well, I'm sure you have a definition. I'm interested in your answer.
A Yes.
Q Okay. You do consider yourself an educator?
A Yes.
Q Do you consider yourself an educator in terms of having expertise in terms of class curriculum and what, you know, what should be taught under state law, under federal law, and in the school setting?
A As far as the adherence to the standards that we need to be aligned to what we teach in the classroom, yes.
Q You have that expertise?
A But as far as being a classroom teacher and how to relate that information to


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

students, no, I have never been in a classroom.
Q Okay. All right. Fine. When did you first become aware that mindfulness activities were being used at Bullard school?
A It was first of the year, probably a couple years ago, 2016, you know, January, February, somewhere thereabouts in that time frame.
Q How did you become aware?
A I don't recall how I was first informed, whether it was emails from community or whether it was brought up the chain. I don't remember. I don't remember what was first.
Q Okay. So you don't remember, for example -- and I'm going to give you a couple of for instances. Could have been an individual walking into your office and telling you about it or a member of the community taking you aside and talking to you about it or somebody sent you an email. You don't really recall?
A It was either one of my staff, direct reports, coming to say, you know, we have a situation that the community is getting

involved in or it would have been emails from community. I don't believe that I received, you know, hundreds of emails --
Q Right.
A -- in this regard, so.
Q How many do you recall? Handful? 10, 12, 20? What?
A Yeah, a handful.
Q Okay.
A Yeah. I wouldn't know. I mean, that's certainly something we can find out, but I don't, I don't know.
Q Well, we'll look at some later.
A Yeah, sure.
Q But I just want to make -- find out how it came to your attention.
A Yeah.
Q At some point, did you become aware of an incident where people came to Bullard school and engaged in some sort of prayer service at the school and laid their hands on the windows of Bonnie Cole's office in some sort of a praying-type situation?
A I remember hearing about that. I don't remember if it was an email or somebody

telling me that, but I do recall hearing about that.

Q Did you find that a little alarming?

A Certainly out of the ordinary.

Q Yeah. And what was your reaction to that when you -- I mean, I'm sure you didn't just sit there when somebody -- I know I didn't when I first heard of it, somebody came in and told you that people had gone and laid their hands on her windows and prayed at the windows. What was your reaction to that?

A I don't know that I reacted to that individually, but it certainly kind of was applied to the overall growing seriousness of the situation.

Q Right.

A Yeah.

Q Okay.

A But I wouldn't have -- I didn't say, oh, my gosh, this is terrible versus, you know, it's not, you know. That would not have been a reaction.

Q Did you consider it alarming?

A I considered it a disruption to the school.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Okay. All right.
A Yeah.
Q Do you remember who told you about the hands-on-the-windows incident?
A I don't.
Q Okay. Now, again, you're a person of faith. Have you ever engaged in any kind of similar activity like that?
A No.
MR. BACHMAN: Ed, I don't want to interrupt your train of thought, but at some point, sooner than later, if we could take a break.
MR. BUCKLEY: We can do that right now because we're getting ready to look at an exhibit.
(Proceedings in recess, 11:22 a.m. to 11:33 a.m.)
MR. BUCKLEY: Chuck, if you're okay with this, we're going to mark what was -- because we have other marked exhibits, we're going to re-mark Exhibit -- what Exhibit 1 as Plaintiff's Exhibit 24. Are you agreeable to that?
MR. BACHMAN: That's fine, yes.

Q Okay. So the testimony, Mr. Ragsdale, that you gave concerning Plaintiff's Exhibit 1 is now Plaintiff's Exhibit 24. And that testimony was true as to Exhibit 24 as well; correct?

A Yes.

(Whereupon a document was identified as Plaintiff's Exhibit 15.)

Q Thank you, sir. Okay. So we want to show you now what's marked as Plaintiff's Exhibit 15. And you to take a moment --

A Sure.

Q -- to take a look at this document, and then I'll have some questions about it.

A Okay.

Q All right. So have you had an opportunity to review this exhibit?

A Yes.

Q Do you know Brian Clark?

A I don't.

Q Had you ever met him before you received this email?

A No.

Q Did you ever meet him or speak with him after you received the email?

A No.
Q All right. But he did send you this email here; right?
A Yes.
Q And if I read this correctly, did you forward this to Grant Rivera?
A I more than likely blind copied Grant on my reply to Brian.
Q Okay.
A That's generally my practice.
Q Okay. So you said here, "Brian, thank you very much for sending this information. I will make sure someone communicates back with you ASAP with findings and actions." That was your email; right?
A Yes.
Q And with respect to Mr. Clark, his email very clearly expressed concerns about the yoga and breathing exercises being taught or promulgated by Bonnie Cole in religious terms; right?
A Yes.
Q And he indicated that he was concerned that these practices go against his own religious beliefs, his words; right?

A Right.
Q Okay. And he also said there were websites and other activities that were being sent out to teachers for use within the classroom with quotes from Buddha, yoga terminology such as namaste, meaning I bow to the God within you, pose names, et cetera, all under a mindfulness guise, but Christian biblical teachings are not included in the mindfulness resources or lessons at Bullard.
First of all, as a school administrator, superintendent, you know that in the school system you shouldn't teach any religion; right?
A Correct.
Q Including Christianity; right?
A Correct.
Q There's all kinds of Constitutional restrictions on what can be taught in terms of religion and concerns, legal concerns, about entanglement of the government, when government arms such as an education system with religion; right?
A Right.
Q And so you try to steer clear of





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

teaching religion in schools?

A You can't just try.

Q You have to?

A You cannot. Yes.

Q Right. And, actually, you-all had, and I don't know if this was before your time or not, some experience on this back in 2006, probably when you -- I think when you first came on board in a case called Selman versus Cobb County School District where stickers were attached to biology textbooks establishing -- or discussing evolution and stating that it was just a theory.

And the court found that was a violation of the establishment clause. Do you remember that case?

A I know of it, but I thought that was before I was in the district.

Q When did you say you started in the district?

A 2006, September of '06.

Q The decision was issued --

A Okay. The decision, yeah.

Q The decision was issued by the 11th Circuit May 25th, 2006.

A Yes.
Q Would you have been in the district?
A No.
Q Okay. So it happened just before, but you --
A Well, the decision. But I think the actual stickers were applied and that kind of thing was much before, but I don't know.
Q Before you?
A Correct.
Q But in any event --
A I do know of it.
Q -- you were aware of the decision, and it was a guideline for you, I imagine, at least to some extent; right?
A It was certainly a --
Q Okay.
A -- you know, a line item to be very cognizant of, yes.
Q Now, this man here, Mr. Clark, is in essence accusing -- either accusing Ms. Cole of engaging in a non-Christian activity or in an activity that is violative of his Christian beliefs; right?
A He's perceiving what was being done

as religious.
Q Yeah. Did you ever investigate to see whether websites and other activities were being sent to teachers for use within the classroom?
A No. I did not, no.
Q Okay. Do you know if anybody did?
A I would assume that Grant would have started that process. And certainly, I would have anticipated that would have been a question he would ask during that, you know, during that process.
Q And Grant -- but for the record, Grant, what was his job?
A At that time, he was chief leadership officer or chief school leadership officer. Yeah.
Q Okay.
A And then he moved to chief of staff at some point in time. I don't remember the exact time though.
Q Okay. Did Grant ever report back to you any findings concerning the yoga practices in the school, whether they were, you know --
A Not really findings.





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q -- these things --
A He was keeping me abreast of what he was doing and his involvement in kind of how they were, you know, looking to handle the situation.
Q Did he tell you whether he learned that any websites were being sent to teachers with quotes from Buddha and the terminology, yoga terminology and the like?
A No, no.
Q Okay. What do you remember about your -- I guess you were sending this -- in fact, you're blind copying Ragsdale as you're replying --
A Grant. I blind copied --
Q Excuse me. Blind copying Grant Rivera?
A Right.
Q As you're replying to Brian Clark. And is the inference of your copying him to say, hey, take a look into this and see what this is all about?
A Yes. It's basically my process of handing it off to the person that's most appropriate to handle it.

Q Okay. Tell me the substance of your conversations with Grant concerning his findings as a result of his looking into it.

A We really didn't have like an ongoing conversation. We probably talked about maybe a couple of times during the process. The only conversation I recall specifically was about the meeting that was being held at the school with -- for parents to come.

And I don't even know exactly what the, what the intent of the meeting was other than to try to alleviate and, you know, resolve any kind of angst the community was having.

Q That was a meeting that Ms. Swinney conducted or was involved in?

A I don't know who conducted it or was involved in it.

Q It was some kind of Coffee and Conversation meeting. Do you remember that?

A Yes. It was midmorning on a school day.

Q And what was the purpose, as you understood it and as Grant Rivera told you, what was the purpose of that meeting?

A Just to allow the community members to come in and have some conversation to try to relieve the pressure of this situation that was brewing.
Q And Ms. Swinney, was she the principal of the school?
A No. She was one of the assistant supes right here.
Q Assistant superintendents. All right. Okay.
A Right, that reported to Grant.
Q Okay.
A So that would have been her school of responsibility, would have been the reason she was involved.
Q Did you at some time learn from Grant, or anyone else for that matter, that he felt that Ms. Swinney did not handle the situation well or appropriately?
A It wasn't necessarily this situation.
Q Yeah.
A Assuming we can talk about personnel.
Q You can.

A Okay.
Q Yeah.
A All right. So Barbara Swinney, there was a cloud of concern around her job performance as an assistant superintendent, so it was not this situation. There had been previous situations prior to this that probably prompted Grant to be more involved --
Q Okay.
A -- you know, than the chief school leadership officer would be.
Q She's not still an assistant superintendent; right?
A That's correct.
Q Is she still with the School District?
A Yes, sir.
Q In what capacity?
A She's a principal at Riverside, Riverside Intermediate. We have two Riversides. There's a primary and an intermediate, and she's at intermediate.
Q So she took a demotion basically?
A Yes.
Q And that demotion was caused by


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

concerns about her job performance?
A Correct.
Q And part of, if we looked at -- would there have been perhaps a performance review or other disciplinary documents that would reflect those concerns?
A I believe Grant definitely started that process. Now, he was -- he was new. Well, he had been in the district, but he was new to this position under my administration.
Q Okay.
A So prior to him, I don't know what would have been in her -- because she was, she was in that position prior to me being interim and him being school leadership officer.
Q Would you have -- he discussed his concerns with you, obviously?
A Yes, yes.
Q Would you have reviewed or perhaps even signed off on any of the performance-related documents concerning Ms. Swinney?
A I would have signed off on those as I described earlier in the process. That would be one of those evaluations that I would sign


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

off on.
Q Did you sign off on her demotion?
A Yes.
Q Okay. Was that document --
A Well, sign off, I didn't physically sign off on her being demoted, but verbally signed off and approved, yes.
Q Okay. And if you'd said, no, I don't want to demote her, that would have been the law as far as that goes.
A Correct.
Q Right?
A Yes.
Q You could have vetoed it?
A That's correct.
Q So did you see the document or documents that justified her demotion?
A I don't recall seeing the evaluation.
Q Okay.
A I recall vivid conversations we had about that, though.
Q Did any of those vivid conversations involve her handling of this controversy concerning the yoga practice at the school?



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A In a way, yes. But it wasn't like this was the straw that broke the camel's back. Basically, he was involved to prevent her previous, you know, unsatisfactory job performance from bleeding over into this situation.

Q Yeah.

A And potentially not handling it and allowing it to grow worse versus resolving it.

Q But you-all felt that this Coffee and Conversation meeting didn't defuse the situation?

A So the report I got from the meeting that would have caused me to say this is a bigger issue and is still ongoing is the fact that -- for whatever reason, the number 150 is in my head, that there was 150 parents that showed up for this meeting in the middle of a day at 10:00 on a weekday.

Now, that 150 could be or could not be an accurate number. That's just -- for whatever reason, it's what I remember.

Q Okay.

A So that being said, 150 community members showing up to this meeting at 10:00 on

a weekday is certainly out of the ordinary of what I would have anticipated. I would have anticipated a handful of people showing up. The Brian Clarks like that sent this email, I would have anticipated those people showing up.

Q Okay. Do you know, was it Ms. Swinney who headed up the meeting?

A I don't know.

Q Okay. You don't know who was present or who headed it up?

A I believe John Adams was present at the meeting.

Q Okay.

A I believe.

Q Do you know if Grant was present?

A I'm not sure. I just don't know.

Q Okay. You weren't though?

A No, I was not.

Q Okay. I'm looking at this email chain here, and it looks like -- who is Patrice Moore? Looks like Barbara Swinney --

A Patrice is a principal.

Q She's the principal?

A Correct.

Q Do you know if Ms. Moore was


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

present?
A I don't know, but I would expect she was.
Q Okay. And it looks like, I'm not sure I'm reading this chain right, but it looks like maybe this was forwarded to Bonnie Cole. Do you know whether it was or not? See?
A Well, at the top of the page it's Bonnie Cole's Cobb email address sent to I'm assuming a personal email address.
Q Forwarded to her personal one?
A Yeah.
Q Right. Okay. So after the meeting, did somebody -- maybe it was Adams or someone else who reported to you 150 people or a lot of people showed up at this meeting. Did he talk to you about the -- what was said at the meeting or the tone of the meeting, any of that nature?
A No.
Q Did he tell --
A Not that I recall.
Q -- you that people were expressing religious concerns about the yoga practices?
A No.

Q Okay. But he indicated that they were expressing concerns, I take it?

A Right.

Q Okay.

A The indication that he gave me was that this was not resolved by this meeting.

Q Okay.

A Which was -- would have been the intent of the meeting, was to help simmer everything down, and that did not happen.

Q What prompted the decision to have the meeting? Was there -- I mean, we've looked at one email which is from one individual in the community. But was it this email from Brian Clark that prompted this meeting that turned into 150 people, or were there other communications or other people raising their hands and voicing concerns that led to that meeting?

A I don't know what the thought process was of why the meeting was held, but there were other communications.

Q Okay.

A So it wasn't a single email that caused the meeting to be held.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q As you understood it from where you were sitting, the concerns that were expressed about the yoga practices at the school were religious concerns, right, people who felt that it conflicted with their Christian beliefs?

A Well, yes and no, or yes and yes. Because, yes, like this email indicated, he was saying, this goes against my personal Christian beliefs, according to Brian Clark. But he also makes the reference of, paraphrasing, I thought it was not correct for any religious overtones to be presented in a school.

Q Right.

A That was the last thing that he said.

Q Right.

A "Is it ethical to teach practices based on a religious faith?"

Q Yeah.

A So that's -- the concern for me was not that Christians are coming up, you know, up in arms about something that's going on in the school. The question is, are we doing something in the school that has a religious overtone to it?

Q Right.
A Regardless of the faith.
Q Did you conclude that you were doing something in the school that had a religious overtone? When I say "you," I mean your --
A Yeah. I mean --
Q -- your people.
A -- the conclusion was made that, that things could have been done differently. But because they were done in the manner in which they were, the perception became that it was religious, such that, you know, Grant in one of our conversations had indicated he said, okay, I went out and met with them, and I said to do this and not do this kind of thing.
Gave them kind of a game plan of what to do and what not to do. And then that -- again, that was at the front end of it.
Q Yeah.
A And I don't know if that was before or after the meeting was held, but things continued to escalate.
Q Notwithstanding that instruction?
A Correct.
Q And I think that instruction is

reflected in an email. Have you seen that email?

A I believe that might have been one of the emails we went over, that Chuck and I went over.

Q Let me give you that.

A Yeah.

Q While he's looking for that, let's go back to what I was asking. And you said things could have been done differently to maybe avoid the perception that the school was engaging in a religious practice.

My question for you is: Perception being one thing and reality maybe being another, did you ever conclude that these folks that were expressing concerns were correct that indeed Ms. Cole was engaging in a religious practice in the school? Did you ever reach that conclusion?

A No.

Q All right. And did you reach a conclusion that in essence what was going on was a secular practice or a secular exercise?

A Yeah. There -- to me, there was no intent of having some religious activity be

part of -- included within the practice.
Q Did you ever talk to Patrice Moore about the yoga and meditation practices that were going on at the school?
A No.
Q Okay. Did you ever talk to Ms. Swinney?
A No.
Q So the information you got was filtered up to you by Grant and Mr. Adams?
A Correct.
Q Safe to say?
A Correct.
Q Okay. And then I guess whatever else, whatever other information, you're getting from members of the community through emails or otherwise?
A Yeah. And when I get emails from the community, I forward them on to the most appropriate person of my direct reports to handle them.
Q Okay. While this controversy was occurring, you were attending your church; right?
A Right.

Q Did anybody in your church, either at church or otherwise, ever approach you in person, on the phone, and talk to you about the yoga and mindfulness practices at Bullard school?
A No.
Q Okay. So I just want to be very, very clear. Other than the administrative people who were looking at the question, you had zero oral conversations with anybody outside of your administration about yoga and mindfulness practices at Bullard?
A With the exception of Randy Scamihorn, who was the board member, and that conversation was simply him asking what's up with this and me saying Grant and John are looking into it.
Q Okay.
A We'll let you know.
Q Okay. Did --
A So other than those three, no.
Q Did he, Randy, other than saying what's going on with this, did he, Randy, go any further and express any concerns that people in the Baptist community or in the faith

community, if you want to say the Christian community, were upset and expressing concerns about the yoga and mindfulness practices?

A No.

Q Did he, Randy, did he ever personally express concerns that these practices might be in any way religious practices or practices that were violative of Christian beliefs?

A No.

(Whereupon a document was identified as Plaintiff's Exhibit 17.)

Q Okay. Let me show you what's marked as Plaintiff's Exhibit 17.

A Okay.

Q Take a moment to look at this, and we'll have some discussion about it.

A What are the -- is this something that didn't print out correctly? You've got the same thing on yours? Okay.

Q I think it's the way it was produced.

MR. BACHMAN: It was. It's just some flaw with the --

THE WITNESS: The font?


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

MR. BACHMAN: Yes.
Q Okay. You know, you left that IT position.
A You know.
Q And all kinds of things fly apart.
A I know, exactly.
Q Right. This is a document that the School District or perhaps you produced in this litigation. Let me know when you're finished reviewing it.
A Okay.
Q Do you recognize this document?
A Well, yes. This is one of the ones that Chuck and I went over before.
Q Okay. But you are cc'd the original message from Mr. Rivera dated March 12, 2016, at 3:05 p.m.?
A Right.
Q Do you recall receiving this document?
A I don't recall, but I receive thousands of emails.
Q All right. Does it look familiar, though?
A Sure, yeah.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q And you had testified a few minutes ago that you remembered that Grant prepared sort of an outline of things --
A Right.
Q -- that were permitted and not permitted. Is this consistent with your recollection?
A Yes.
Q Okay.
A Basically the game plan of how to move forward.
Q So let's go through this. And at this point, by the why, Grant never told you that he had concluded that this school or Ms. Cole was engaging in any religious practice at the school, had he?
A No.
Q Okay. So let's go through this. So what -- part of your concern as an administrator, and maybe Grant's too, was not so much is there a religious practice going on, you didn't really think so, but is there a perception that there's a religious practice going on. Is that fair?
A Well, the initial -- when you have

an accusation that a religious practice is going on, you go in there with that lens.

Q Right.

A So then if it's determined, okay, there's not, okay, what is the perception and are there things that can be done to remedy this and get us moving forward?

Q So the purpose of this memo was not to stop a religious practice. It was to correct any perception that a religious practice might be taking place?

A Right. And this email from Grant to Barbara Swinney, in all reality, that's him trying to make sure that she does not mishandle this situation.

Q Okay. Great.

A Because there's a great level of detail here that, you know, you would normally not think would be needed.

Q And you were copied on this. And who is Angela Huff?

A She was at the time chief of staff.

Q And John Adams was copied as well?

A Correct.

Q And then it looks like you actually

replied to Grant just saying, "Thanks."
A Yeah.
Q Right?
A Yeah.
Q So let's go through this for a minute because I want to make sure I understand, and maybe this will prick your memory on a couple of things.
A Sure.
Q So Grant says in this, "Barbara, I wanted to summarize our conversation and action items from yesterday's meeting with Patrice Moore and Bonnie Cole."
And he told you he met with Moore and Cole and Swinney as well, right, or did he?
A I don't know that he did after the fact. I mean, he told me, he said, I'm going out to meet, you know, with them all in the same room and get to the bottom of it.
Q Fine. So he has several I guess we call them action items, and number one is internal processes, immediate changes. And he has a, b, c, d, e.
A Right.
Q "No videos should be shown that

encourage students to place their hands in a prayer position or recite the word namaste."
Did you become aware that any videos were being -- or did he tell you that any videos were being shown that encouraged students to place their hands in a prayer position or recite the word namaste?
A I don't recall specifically. I believe that we had a conversation that he said that students were placing their hands in the, you know, prayer position, that kind of thing, but not --
Q You don't know whether they were being told or instructed to recite the word namaste?
A Right. I don't recall.
Q It says, "No coloring should be done using shapes that resemble mandalas or other religious symbols."
Did he tell you that he had learned that there was coloring of shapes resembling mandalas or other religious symbols?
A The only thing I remember was something about stones which I think is kind of -- is letter d. I remember him saying

something about stones. I don't know if they were colored or if they were there or what. I just remember something about stones.

Q Okay. And here on c, he says, "Bonnie Cole should not be leading classroom lessons in yoga, breathing, or destressing activities."

Do you know why he did not want, assuming that the perception was otherwise taken care of, why he did not want Bonnie teaching any of these, any of these things?

A Well, as the escalation of the environment progressed, she was at the center of it. But also in my estimation today, we didn't have this conversation. But per your question, I would not think it's standard operating procedure to have an AP going into a classroom leading a lesson.

Q Okay. All right.

A But that's just today. We didn't have that conversation.

Q There was, you know, I mean, there was kind of of a religious fervor going on in the community about this practice, wasn't there?

A It was a fervor.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Okay.
A I don't know that I would characterize it as, you know, religious. I mean, there were, you know -- but it was becoming a disruption to the school.
Q Well, when I say religious fervor, what I'm really saying is the objection to these practices was based in certain religious folks' expressed perception --
A Expressed perception, yes.
Q -- that it violated their religious beliefs; right?
A Correct.
Q Okay.
A Well, not violated their religious beliefs. It was being expressed as a perception that we, being the School District, and we, the school, were conducting something that was religious in nature.
Q Right.
A And therefore, that -- we were violating.
Q Okay. But when you go back, for example, to Exhibit 15, this gentleman here, Mr. Clark, is expressly stating that it

violates --
A Yes.
Q -- his Christian beliefs.
A Yes, yes.
Q All right.
A I'm not saying that there were not some saying this violates my personal religious belief.
Q Right. Okay.
A But the overall what we were using the lens on is, okay, what are we doing and could it be perceived as religious if in fact we've concluded that it's not intended to be religious.
Q And you concluded that it was not religious nor intended to be religious but that there could be that perception?
A That -- yes.
Q Okay. Now, let's go on down to line here to d. It says, "No rocks, crystals, or other symbols that could be considered religious should be used by staff as part of any yoga or breathing exercises with students."
Did Mr. Rivera or anyone else tell you that indeed rocks, crystals, or other

symbols that could be considered religious were being used as part of any of these exercises?

A I can't remember specifically that he said they were being used. I just remember some reference to stones/crystals, and that's -- but, again, I don't recall that it was, you know, the world is coming to an end kind of thing, you know, situation.

Q Were some of the things, did you conclude, or Mr. Rivera conclude and tell you, or Mr. Adams, that some of the things that were being alleged were more rumor than fact?

A I don't know that he characterized it like that, but he definitely -- they both definitely concluded that, you know, there was not a violation, a significant violation.

Q Okay.

A Now, you know, he did -- both of them said, you know, yeah, we need to change some things moving forward.

Q Okay.

A But as far as it being a strict religious violation, the conclusion was not.

Q Now, this next one, 1.e, I admit it, it amuses me a little bit.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Yeah.
Q "Peaceful Piggy Meditation" --
A Yeah, yeah.
Q -- "should not be used as curricular material with students." Do you even know what Peaceful Piggy Meditation is?
A I don't.
Q Have you ever read Peaceful Piggy Meditation?
A I have not.
Q Okay. We may give you that opportunity. Okay?
So you don't know whether that book is at all religious or in any way objectionable --
A No.
Q -- in terms of Christianity?
A I have no idea.
Q You've never read it. You've never laid eyes on it?
A Correct.
Q Do you happen to know whether Mr. Rivera has?
A Based on this being in his email, I would assume he would have had to to reference





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

it.

Q Okay. All right. So going on down the line, it says, item 2, internal processes and quality control: "If staff desire to use breathing or stretching exercises with students in PE or as a brain break in academic classes, these materials should be provided through Mark Anderson or other CCSD central office personnel and not obtained through unapproved online recourses." Who is Mark Anderson?

A At the time, he was -- I don't know exactly what his title was. He was basically the coordinator of PE at the central office.

Q Okay. So that I guess the point here is let's go through central office with respect to any of these exercises, relaxation exercises, or what have you that we are going to do?

A Correct.

Q Okay. The next item, 3, it says Staff. It says, "Although we have no evidence this occurred, please remind Patrice" -- that would be Patrice is the principal?

A Correct.

Q "Please remind Patrice that no





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

faculty meetings should include mandatory" -- it says mediation. I assume it means mediation -- "or quiet time. Staff who desire to participate in yoga may do so voluntarily after school on designated days just as they do with other staff or aerobics classes."

Did you ever become aware of any staff member who objected to the yoga or meditation practices that Bonnie Cole had implemented?

A Not specifically, but that there was a staff I guess line, if you will, of those on one side of the issue and those of another, but not, not to the level of, you know, Chris Ragsdale, teacher of, you know, language arts, is totally opposed to this process and, you know, Chuck Bachman, teacher of PE, is all about it. It never got to that level.

Q Did anybody ever tell you that any staff person, I include teachers in that, objected to the yoga and meditation practices on religious grounds?

A No.

Q Okay. Did any staff person ever directly approach you with an objection?

A No.

Q And actually, item a says, "Although we have no evidence this occurred." So they have no evidence -- he had no evidence that faculty meetings included mandatory meditation. He's just kind of maybe taking, taking a step just to avoid that from happening?

A Sure.

Q Okay. So we don't know that that ever -- you don't know that that ever even occurred, that there were mandatory you will do yoga, you will do mindfulness?

A I mean, for him to have put it in here, there had to be some realm of evidence that said, okay, there was the accusation. Now, maybe, you know, like you said, there's no evidence that this occurred, but to put it in the game plan, something had to be brought to his attention for that.

Q And the next item is, it says, "Although we have no evidence this occurred," again, "please remind Bonnie she's not to promote her business or solicit clients through her professional interactions with students, staff, and families."


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

And I gather, since he says there is no evidence that it occurred, that there was no evidence that Bonnie was promoting her business through her work as a school administrator?

A Not that was brought forward, no.

Q Okay. But she was accused by somebody of promoting her business or something; right? You knew she had this other business?

A During this process, it was brought up that there was a website, that she did have a business of doing this on the side kind of thing. But past that, that was the end of the conversation.

Q Okay. The next item on 3, Staff, says, "I spoke with Jeff Dess on Friday afternoon. Please coordinate details so he can assist with any staff dissension resulting from this incident." Who is Jeff Dess?

A Again, I can't recite his exact title, but he is response to intervention, so he is the person that's called in when, you know, there's a situation that requires, you know, response to intervention. Maybe, you know, a death of a student or a teacher, that

kind of thing, he's going to be the one to come out and kind of coordinate the efforts at the school to dissuade the situation.

Q Is he sort of in the nature of a counseling personnel?

A Yes, but he's not in -- he's not a counselor. But, yes, it's similar to that, yeah.

Q So when situations occur in a school that might create controversy or perhaps anxiety or anguish --

A Yeah.

Q -- he will be called in to look at the situation and try to figure out the best way to diffuse it?

A Yeah, exactly, yeah.

Q All right. And the last one is Family Communication. And Grant says, "I am aware of Patrice's intention to offer a meeting with families regarding how breathing techniques are used to help students destress. Please continue to work with her on how to best deliver this message should we have any families show up at the meeting."

And so that was in anticipation of

the meeting that you talked about, and I talked about coffee and conversation, that had 150 allegedly people show up; right?

A Correct, correct.

Q Okay. So he is asking Ms. Swinney to coordinate that with the principal; right?

A Correct.

Q Okay. Mr. Rivera at the bottom says, "Also, I spoke with appropriate board members on Friday afternoon to confirm that you and I met with the principal to review above items. If you feel there is any additional information relevant for Chris, John, Angela, or the board members, please let me know."

He's giving Ms. Swinney that direction?

A Correct.

Q Okay. So based on what you know, Mr. Rivera was both trying to deal with the situation and give Ms. Swinney pretty specific direction on what she should do because he had some concerns about her administrative abilities?

A Correct.

Q All right. Fine. I was going to





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

ask you this. I think I asked you. Maybe I didn't. Do you know what church Mr. Brian Clark goes to?

A I do not.

Q Did you become aware that the church that you attend, and when I say, did you become aware, by any means, that the church that you attend -- that there were people at that church who became very active in opposing the yoga and meditation practices?

A No.

Q All right. Were you ever in attendance either telephonically, televisionally, or streamingly or in person at any service where the yoga or mindfulness practices were discussed from the pulpit?

A No.

Q Okay. Do you know what a chakra leader is?

A I do not.

Q Do you have any opinion as to whether mindfulness activities or meditation of the sort that was being done at Bullard are Hindu-based practices?

A I don't.





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q I think you said you don't know Brad Daniel?
A I don't.
Q Kate, you don't know Kate Daniel either?
A I do not.
Q Do you know whether Brad Daniel met with Randy Scamihorn about the yoga and mindfulness practices?
A I do not.
Q Randy never told you he did?
A It's possible, but I don't recall that.
Q All right. We'll do another exhibit or two and take a lunch break.
A Sure.
(Whereupon a document was identified as Plaintiff's Exhibit 23.)
Q This is Exhibit 23. I think you already have before you an earlier email from Mr. Clark, which is Exhibit 15. Take a minute to look at this, and then I'm going to ask you a few questions about it.
A 23?
Q Yes, sir.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Okay. Okay.
Q Okay. Do you remember or do you recognize this email exchange?
A I don't remember it, but obviously it happened. I don't remember it though.
Q The email happened. Do you know if the incidents discussed in the email actually happened?
A No.
Q Okay.
A That's why I would have got John Adams involved, because this is definitely an HR-related accusation.
Q Okay. Do you know if Adams investigated the allegations in this email?
A I'm sure he would have, yes.
Q Did he report back to you any findings?
A I don't recall.
Q If he were to investigate the accusation that Dr. Moore talked to this gentleman's wife, who was a teacher, about or had a discussion with her about the meditation practices and whether or not her children were allowed to be removed from classes where that





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

material was taught, would he have taken investigative notes of some kind?

A I'm sure he would have if he did the investigation. It's very possible he had one of his investigators interact with this particular part of this investigation.

Q So do you recall whether -- I mean, did Adams ever tell you, hey, you know, this email is true or this email is not true, anything of that nature?

A I don't recall a specific recollection of that. But if -- again, the accusations are quite serious as far as repercussions and threatening someone's job, so if that would have been found to be true, employment action would have been taken.

Q Okay. Well, to your knowledge, was any employment action taken concerning Dr. Moore?

A Not to my knowledge. I am not sure of anything being placed in her personnel file, but no employment action as far as suspension, termination, et cetera, was taken.

Q Okay. Had that occurred, you would have been in the chain of command that would


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

have approved that?
A Right.
Q Or declined to approve it?
A Not, not a letter in a file kind of thing, but any employment action absolutely because it would have had to go to the board.
Q If there was a letter in her file, would that be something Adams would have composed?
A Possibly, or Grant.
Q Okay.
A Yeah.
Q Right.
A It just depends.
Q But the letter would not go to the board for approval?
A No.
Q And the letter would not go to you for approval?
A No.
Q All right. So you might not even know about it?
A Correct.
Q All right. But if there was a recommendation for demotion or transfer, you

would have seen that?
A Correct.
Q And is there any other, other than a letter in a file -- which I guess when you call it a letter, you're talking about a warning or something?
A Yeah, letter of direction or, you know, something that would be placed in a personnel file that's not necessarily a positive thing to be in your personnel file.
Q Is there any other discipline, short of demotion, termination, transfer, that you would consider disciplinary action with respect to say a principal level personnel?
A Corrective action maybe, you know, like a principal can be put on -- and I forget the acronym now, but it's basically a performance development plan --
Q Right.
A -- that identifies a problem, gives you a certain time to resolve it, and then has another conference at the end of the time period to where it's been resolved or it's not.
Q Right. Okay.
A So that could have been something

that would have been done without having approval, without needing approval.

Q If that were done with respect to Dr. Moore, you would not necessarily have been in the loop on that?

A Not necessarily.

Q Okay.

A No.

Q There's a whole lot in here. It's saying Ms. Cole is training an intern at the Breath of Life Center to be a healer as well, that you can find them coloring mandalas in Dr. Moore's office most days or find them coloring in a room they call Australia. And he says, we have ample documentation and are willing to give you teachers' names who are also concerned, and it goes on.

Do you know if Mr. Adams sought to collect all of this alleged documentation that Mr. Clark said he had?

A I don't know.

Q Okay. You haven't seen it anyway?

A No.

Q If he had collected that sort of material, would that be something he would have

shown to you?
A Not necessarily.
Q If there's documentation that all this crazy stuff is going on at school or anything of that nature, I mean, if it was serious enough?
A If it was serious enough, we would have definitely had that conversation that, hey, we did find this, this is evidentiary that this took place.
Q But his investigation didn't gather evidence that would have raised those sorts of alarm bells apparently?
A It certainly seems to align with the game plan that Grant put forward, kind of to your, you know, to your point earlier when it says, "Although we have no evidence that this occurred." Certainly that seems to be that they have looked into it.
There is this conversation out there. There is a concern such that it necessitated being included in the game plan, but not as, you know, an employment action against the principal was needed.
Q Okay. In your reply to Mr. Clark's

email, you say, "you are not the only ones who have brought it to our attention." Do you see that down on the third to last line?
A Right.
Q Who else at that point had brought it to your attention?
A I don't specifically recall, but I do -- the details, but I do recall the accusation about emails being sent directly to the principal and perhaps Bonnie.
Q Okay.
A That accusation was out there, but I was not involved in that further. I would assume, if that was the acquisition, then they would have gotten -- someone would have gotten IT involved to say, hey, was this email forwarded kind of thing.
Q Did you ever have an opportunity to evaluate Bonnie Cole's performance as an assistant principal?
A No.
Q Did anybody ever tell you how she performed as an assistant principal?
A No.
Q Okay. So you didn't have any


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

knowledge, positive or negative, as far as you knew?

A No, but the assumption would have been positive, you know.

Q If she -- and I'm setting aside all the uproar over yoga and mindfulness. If she had been a problematic performer in her job in performance of her job duties, is that something that would have been brought to your attention?

A Eventually, yes.

Q Okay.

A You know, where it's like, okay, you know, an AP needs to tweak a certain, you know, job action kind of thing, not necessarily. But when it gets to the point of, okay, we've, you know, kind of taken these steps with this AP and it's just not working kind of thing, some options would then be brought.

Q Okay.

A You know.

Q At the time that you were in discussions concerning her transfer, the discussions surrounded the yoga and mindfulness practices and the uproar in the community about

them; right?
A It was more the disruption of the school.
Q Right. Okay.
A But yeah.
Q And it did not -- those discussions did not include any discussions about her overall competence as an assistant principal.
A No.
Q Right? And so to your knowledge, that would have been -- if she had other performance-related problems as an assistant principal, that would have been a good time for that discussion to occur; right?
A Absolutely.
Q Okay. And you didn't hear anything?
A No.
Q All right. Let's get this Exhibit 17, and then we'll take a break for lunch.
A Okay.
Q Wait, wait. We already looked at that. Okay. Excuse me. Excuse me.
Do you know if this gentleman who wrote this Exhibit 23, do you know if he ever


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

withdrew his kids from the school?
A I don't know.
Q Do you know if any other parents withdrew their kids from the school?
A I don't know.
Q If they had withdrawn their kids from Bullard in Cobb County School District purportedly because of these yoga practices, would they have automatically been allowed to transfer to another school?
A No.
Q Okay. What would happen if a parent who was -- their home was in the district for that school --
A Right.
Q -- if they decided to withdraw their children from the school, what would their options be?
A So within the Cobb County School District, there's only one option, and that is to apply for school choice, which is a lottery type of program that happens once a year.
Q Right. Okay.
A You can't just say, I don't like Bullard. I want to go, you know, somewhere

else.

Q All right. And how does that lottery work? I mean, the fact that you apply for a lottery doesn't mean you're going to get in; right?

A That's correct. It's the number of open seats are determined, and then the number of -- the applicants are then placed into the lottery and then drawn. And those that get chosen have to confirm, yes, I do want that seat at that school. And if not, then it goes to the next person.

Q Okay.

A So, yes, you're correct that everybody that applies does not get school choice.

Q So if they couldn't get it, then they've got to apply to a private school or something; right?

A Homeschool, private school, yeah. That's all on the parents at that point in time if you withdraw your student.

Q I see. Did you -- I mean, if there had been a surge of parents withdrawing their children from Bullard school as a result of the

yoga and mindfulness practices there, is that the sort of thing that would have been brought to your attention?
A Absolutely.
Q Was that sort of thing ever brought to your attention, that there's an upsurge of parents withdrawing their kids from this school because of this?
A No.
Q Did you become aware -- if in any given school there was an upsurge of parents withdrawing their kids from the school, any school in your purview, is that the sort of thing that would be investigated to learn the reason?
A You know, it would depend, I think. It would depend on the number of students.
Q Right.
A You know, because there are certain areas of the county where parents withdraw their kids to go to private school for a time and then bring them back, so it kind of just depends.
MR. BUCKLEY: All right. Why don't we take that lunch break.

(Proceedings in recess, 12:37 p.m. to 1:36 p.m.)

Q We are back on the record. And you of course know you're still under oath; right?

A Right. Yes.

Q All right. Now, we covered some ground, and you have testified about in response to a number of questions in the morning and early afternoon before we took a break. Is there anything that you've testified to that upon reflection you believe was inaccurate or needs clarification?

A No.

Q All right. Have you had any discussions with your counsel concerning your testimony during the break?

A No.

(Whereupon a document was identified as Plaintiff's Exhibit 2.)

Q All right. Well, let's go forward then. Let's start with Exhibit 2 here this afternoon. And I'm showing you Exhibit 2, and take a moment to look at it, and I'm going to ask you some questions about it.

Okay. Have you had an opportunity


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

to review this?
A Yes.
Q Okay. You were copied on this; correct?
A Yes.
Q Do you recall receiving this?
A No.
Q Okay. You say you don't recall it. You're not saying you didn't. You just don't have any present recollection of receiving it?
A That's correct.
Q But you don't question that you did receive it?
A I do not question that at all, no.
Q And you don't at this point, although you may not remember it presently, you are not testifying that you didn't read it at or about the time you received it?
A Correct.
Q All right. Now, it appears that this concerns the Coffee and Conversation meeting and preparation for it and that Ms. Swinney planned to have Jeff Dess there. I think you said he's the person you-all send in whenever there is a conflict or controversy at

a school; right?
A Right, right.
Q And then she really goes on to talk about the fact that yoga videos and destressing activities that teachers use at Bullard are used throughout the district with special education students. Were you aware of that before?
A No.
Q I mean, so you became aware of it at this point in time at least?
A Sure, absolutely.
Q Did you tell any principal -- and when I say you, you or your subordinates -- tell any principal at any school including but not limited to Bullard that as a result of this controversy that they were to cease yoga or meditation or mindfulness practices?
A No.
Q Okay. Do you know if those practices continued at Bullard after Ms. Cole was transferred away from there?
A I do not.
Q Did you as a result do anything or talk to anybody as a result of receiving this





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

email here?

A I do not believe so, no.

Q All right. It appears that she is -- and I'm looking at the first paragraph. It says, "Though much of the practices have been misconstrued or questioned out of context, it's" important to -- "extremely important to ensure we are meeting the needs of the broader community."

And it appears in this email that she is saying that much of the uproar about this stuff is due to rumors and misinformation. Is that the take that you got from this email?

A Well, to a degree. Part of it as well is the fact that she's sending this to Grant in reply to his basically game plan. And what she is saying is indicative of the concerns and issues we had with her job performance because what she wants to do is kind of lump everything together.

As you can see when she said, "I've spoken to Tracie Doe and other principals in the area as a precaution as the yoga videos and destressing activities at Bullard are used with special education students," that's absolutely





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

moot. That has nothing to do with this situation.

And she's saying even though they've misconstrued or questioned out of context, to ensure -- it's important to ensure we da, da, da, to work with the administrative team and staff to modify their practices.

So hence why Grant is more involved in this than he normally would have been in a situation like this at a particular school. That is the job of the area assistant superintendent to deal with that.

And what she is failing to see in her first couple of sentences is the bigger picture, that it's not whether or not we have mindfulness or we're using the videos in other schools with different types of students. It's that the situation at Bullard has become a disruption to the school and has to be dealt with.

So there again, what she has outlined in this first paragraph is basically the root of her job performance, the inability to see the bigger picture as far as what the impact can be when things deescalate out of


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

control -- I'm sorry, escalate out of control.
Q Escalate.
A You know what I'm saying.
Q Right. Okay. Well --
A And, again, I still think that it's still, yes, the perception of what the community had perceived is at the root of the disruption.
Q Right.
A Right? Right, wrong, or indifferent, it's the perception. Through his game plan, Grant identifies pretty much that, look, there was not a malicious intent here to try to have a religious faith being, you know, injected into students unwillingly. That was definitely not the issue.
But it was the perception, and this thing has escalated to the point of being a true disruption, whether it be in the staff, whether it's dissension among the staff on one side of the issue or the other, and the community through, you know, the exhibit of the meeting that the principal had.
Q The practices, as you understood it from this memo anyway, that were being -- the

practices at the Bullard, as you read this memo, were not really much different from the practices at other schools in the School District, though. That's the way I read this. Is that the way you read it?

A Exactly. And I think the key word there to what you just said is much different.

Q Right. Okay.

A Because when you're dealing with something that can be perceived as religion, you're threading a needle, you know, and it becomes very, very -- a fine line that you're trying to walk in a school district in education as a government entity that anytime religion comes into play, perceived or otherwise, it's a fine line you're walking.

Q Well, the whole objection to the practices, be they characterized as religious or otherwise, was that these practices offended the religious beliefs of people in the community; right?

A The perception of what it was, yes.

Q Okay.

A Yes.

Q Short of transferring Ms. Cole out



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

of the school, were there any other steps that could have been taken to diffuse this community uproar over the yoga and meditation and mindfulness practices?

A The information that was brought to me by Grant and both John was, no, that because the staff had become a dissension between staff, the community was not settling down, that it was continued to escalate instead of being deescalated by the meeting that they had, by the management of Barbara and the situation, that that was what was presented to me.

And again, this was kind of a short turnaround time, you know, that had it been a different time of the year, it could have been, you know, construed or, you know, perhaps looked at differently.

But because that's the time of the year that we were in where we do relocate assistant principals and different staff members, that it made a, you know, that was the recommendation that was brought, that it just made a lot of sense to try to diffuse this situation in that regard at that particular time.

Q In the midst of this community uproar, and you understand how it would be -- and I'm including everything, the emails, the people coming to meetings and expressing their upset over this, and even the people coming to the school and engaging in a prayer service and putting their hands on her office window.

Can you see how it would be distressing to her to be ordered to transfer to another school as a solution to this problem?

A From any employee's perspective, absolutely.

Q Yeah.

A But the flip side of that coin is is that both Grant and John felt that the situation at the school was not going to deescalate in any other manner. And we're -- you know, quite honestly, they weren't a hundred percent sure that it would be deescalated because, again, the principal, you know, was involved in this as well.

So there was that thought that this is -- this is the first move to attempt to deescalate, and it was the hope that they said was -- you know, by moving the assistant

principal, Bonnie, that this would deescalate the situation at the school.
Q Now, Bullard is one of your preeminent schools, is it not?
A Sure. It's high performing, yes.
Q High performing. It has a really very good reputation, as I understand it, in the community; right?
A Sure.
Q And it's -- can you see how a transfer from this high-performing school with a really terrific reputation, one that I assume Ms. Cole was at least partially responsible for building, to another school as a result of this uproar could be humiliating to Ms. Cole?
A I think humiliating is too strong of a word. We relocate and move assistant principals all the time.
Q Right.
A And the performance of the school is not taken into consideration. You know, performance of the school too is very, you know, subjective these days because of the scores that are attributed to a school and whether or not those hold water or don't or

change from one year to the next.
So you can be at a high-performing school, what's perceived to be a high-performing school, and just, very bluntly, the blink of an eye the next year is not considered such a high-performing school.
Q And in a nutshell, that might be fine. But you would agree with me that if you transfer a staff member, be it a teacher or an assistant principal or a principal from, let's say, a high-performing, high-status school to one of lesser status for discriminatory reasons, that would be wrong, wouldn't it?
A Absolutely.
Q Okay. Whether it be out of punishment or out of concern for how the community is reacting to an individual, it still would be wrong?
A Yes.
Q Okay.
A Now, those are two totally different differentiations.
Q Okay.
A Right? Punishment is taking something out on an employee because of

something that they have done that's perceivably wrong, and that's never taken into consideration. The fact that the community and the school environment had become a disruption for whatever reason, if that's taken into consideration, that's not relative to, oh, well, this was because of, you know, this particular thing that was done.

We don't necessarily move principals in the same way that we do assistant principals. Principals, I feel very strongly about. They are the link between the school and the community. And so unless a principal desires to be relocated to a different level or different school, different location, whatever, that's, that's not a practice that I adhere to.

Assistant principals being relocated, on the other hand, is something that we employ as far as moving them, moving them regularly. It's not our practice to have an assistant principal by procedure to stay at a location their entire career. We expect assistant principals to be able to be moving up to be principals.

So therefore, being able to have

experiences in different schools, both high-performing schools and low-performing schools, that's something that allows that AP to become a principal.

Q Well, I understand that. Follow my track for a minute.

A Sure.

Q You've said she wasn't -- you know, that she was transferred because there was disruption at the school, in so many words. But the cause of the disruption in the school was this uproar of -- or the dissension of people in the community either because of perceived religious practices or because what was happening offended their own religious practices. We've already agreed on that?

A Right.

Q All right. So I'm going to give you another for instance. Okay? And we can assume the most benign intentions on your part, but let's imagine for a minute that there was -- and suspend your disbelief, but if there was an out uproar in the community or in a school by parents who felt that they didn't approve of the race of a teacher.

Let's say there was a bit of a ground swell that I don't think -- we don't think this particular race should be teaching our kids or, or we know that Mr. So-and-so is a Buddhist, and we're concerned about having a Buddhist teacher of our children or something along those lines.

And so you've got people expressing maybe racial, maybe religious reasons and saying to you, you need to get this person out of here, and it creates an uproar.

Do you think that under those circumstances it would be appropriate to transfer that individual notwithstanding the fact that the underlying motivation for this person being transferred is their race or their religion or other protected characteristic? You follow me?

A Uh-huh (affirmative).

Q Okay. What's your perception or take on that?

A We would not transfer somebody based on those things, just like we are prohibited from hiring using those specific examples --

Q Right.

A -- as a practice.
Q Even if --
A But again --
Q -- it's creating an uproar in the community?
A Well, again, it's apples and oranges, though, to me because the uproar, the disruption that was being created, was the accusation that we are doing something as a school, as a school district, that is religiously affiliated.
Having an uproar because a teacher is a Muslim or is a certain color or from a certain country, that's just, quite honestly, not -- that's not acceptable. So an uproar would have to be -- for that teacher to be moved, an uproar would have to be affiliated with something that that teacher was doing inside the classroom.
Q So the parents would just have to basically be told, sorry, but we're not going to move because of this person's race or because of this person's religion; right?
A And that, again, is a hypothetical --





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Yeah.
A -- that we have never had.
Q It's a hypothetical.
A So.
Q But I'm just saying that would be an appropriate response in your mind to that sort of situation?
A And it depends on how many -- you know, what exactly is the disruption. Is it a disruption to a class, or is it a disruption to the entire school? All of those factors have to be taken into consideration.
Q But even so, if the underlying reason is that a person has a protected characteristic -- and by that, I mean --
A Right.
Q -- race or sex or religion or national origin, what have you. If that's the underlying reason for parental dissent, say, and even if there is disruption, in looking at that underlying reason, it's your view that maybe it would justify a transfer?
A No.
Q Okay. It would not?
A Would not.

Q All right. And a transfer would be an inappropriate decision to make under those circumstances?
A Yes.
Q Basically, the parents would just have to be told too bad?
A Yes. As long as the teacher was not injecting something into his or her curriculum in the classroom, yes.
Q That was religious, say?
A Correct.
Q Okay. And y'all pretty much concluded that Ms. Cole was not injecting anything religious into the things that she was teaching at the school; right?
A Yeah. I mean, it was concluded that there was no malicious intent to say, we are going to inject these religious things into the mindfulness, into the breathing, and to yoga.
Q Okay.
A What was, what was done, and maybe done without the necessary parameters, is how it was implemented. You know, there were different ways that you could have gone about that, the implementation, as you made note in

one of these emails talking about other schools that do have the mindfulness methodologies employed.

And that's why part of the game plan from Grant was to ensure that whatever the process was going to be that it go through the appropriate central office people that could direct and basically give the school and the people at the school cover that, you know, hey, this was approved by the central office, this, you know, by the specific curricular content area to make sure that the correct parameters had been employed.

(Whereupon a document was identified as Plaintiff's Exhibit 3.)

Q Well, okay. Let me show you what's marked as Exhibit 3.

A Y'all keep getting smaller and smaller font. Is that on purpose? Good Lord.

Q That's the way you-all produced that.

A What is that? .08 font?

Q I know. I'm sorry. It's taxing my eyes too. Take a minute and look at this, and then we'll ask a few questions about it.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Okay.
Q Okay. You received this from Ms. Vickers. Did you ever talk to her on the phone or in person about the concerns she expresses in here?
A No.
Q Did you ever investigate or have anyone, Mr. Adams or anyone else, investigate to find out whether her allegations in here are true?
A Like I said, I would -- in my response, I would have more than likely blind copied Grant and/or John.
Q Okay. Having done that presumably, do you recall Grant or John ever coming back to you and telling you telephonically or in person what, if any, findings they had as a result of this email?
A Yeah. The only thing that I recall is, as I stated earlier, was something about the stones.
Q Right.
A You know, that there -- I just remembered that as part of a conversation, and that's pretty much the extent that I recall.

Q Do you remember if they said that Ms. Cole used stones at the school or if Ms. Cole suggested kids pick up a stone a home or if there was something about stones in a video or something that people were watching?
A I can't recall.
Q Okay.
A Just that -- and it's possible too that it was the coloring part as well, but I just don't recall which segment that was within.
Q Nothing that they told you caused you to draw a conclusion that Ms. Vickers drew that this was some sort of Buddhist practice, that --
A Well --
Q -- Ms. Cole was endorsing?
A Yeah. I mean, the conversations that we had basically centered around the game plan that Grant had put forth for Barbara to manage the situation, and that's kind of what has led to that creation of the game plan.
Again, I don't have recollection of having a whole lot of conversations about this. Like I said, the few that I remember, I know

about the meeting. I knew about that there was something having to do with stones. But basically, it was my expectation -- that's my practice, is when I get information that's either affiliated with something or it's brand-new, to blind copy the person that's best appropriate to deal with it, and I expect them to deal with it and then bring me updates if needed.

In this regard, because board members and -- you know, by the time it got to past the meeting, it was escalating. So we had, you know, a couple or three conversations about it.

Q You mentioned a minute ago that you talked about assistant principals, and it sounded like you said ultimately the goal is that these are the people that the School District hopes one day will be promoted to principal. Did I understand that correctly?

A That's the expectation, is that people that go into the role of assistant principal ultimately will go into the role of principal.

Q Do you know how long Ms. Cole has


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

worked for the School District?
A I do not.
Q Do you have any knowledge about whether or not she is tracking to be promoted to principal?
A I do not.
Q Do you view what's happened here as a barrier to her becoming a principal?
A Absolutely not.
Q Is the fact that she's brought this lawsuit in any way a barrier to her being promoted?
A No.
Q You know, once she was transferred out of that school, did things calm down?
A Yes. That particular environment deescalated.
Q Have you ever given any consideration to allowing her to transfer back to that school?
A I have not.
Q All right. Do you think that's something that could happen?
A It would depend.
Q Right. Well, in terms of


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

trying to -- when you say it would depend, what would it depends on?

A Well, it would depend on everybody that has been involved kind of conducting an analysis of, okay, what has happened at the school since this environment deescalated and what is the propensity or the feasibility of it returning should that happen.

Q You're not -- I think you've already said you're not really aware one way or the other whether any kind of yoga or mindfulness or meditation practices are taking place at Bullard right now?

A I don't know.

Q And so is there any controversy or has there been any controversy that you're aware of surrounding Ms. Cole at the school she's at presently?

A No.

Q Okay. Separate and apart from the religious objections that people have made concerning Ms. Cole, do you know of any other reason why her possible transfer back to Bullard would create controversy?

A I don't know.





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q But you would be the person that would sign off on any such transfer if that were to happen?
A I would ultimately sign off on it, but it would be presented --
Q To the board?
A -- by others. Well, it would be presented to me by others.
Q Okay. I got it. But, I mean, the buck kind of stops with you. So if you --
A Oh, absolutely.
Q If you thought in your judgment as a person with oversight that a transfer should take place, possibly to resolve this case, for instance, you could facilitate that?
A Yes.
Q Okay.
A I could facilitate that. It would be out of the ordinary for me to facilitate the starting of a transfer.
Q I understand.
A In any, in any regard.
Q I get it.
A Yeah.
Q I understand it might not be the

procedural norm, but I'm also just asking whether you would have the authority to do it.

A Yes.

Q And it sounds like the answer is yes.

A Yes.

(Whereupon off-the-record discussions ensued.)

Q All right. Mr. Ragsdale, go back to Exhibit 3 there for a minute.

A Okay.

Q And --

A Was that about tiny and can't see?

Q Yeah. If you look above Ms. Vickers' email, it appears that that is your reply dated March 13, 2016.

A Yes.

Q And you say, "Melissa, thank you very much" -- or, yes, "Thank you very much for sending such thorough information. We are addressing the situation, but this information helps tremendously." Do you see that?

A Uh-huh (affirmative).

Q What did you mean when you said, "We are addressing the situation"?



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Well, she identifies herself as a parapro, which is an employee of the District, and I just wanted her to know as an employee that, you know, we're addressing the situation, not saying specifically what employment actions, if any, will or will not be taken.

But when I address employees, I take a little bit different approach than when I address a community member or a parent.

Q I mean, do you happen to know if Ms. Vickers was interviewed as a result of this email by anybody?

A No.

Q But if she was, there would be notes about that; right?

A Sure.

Q Okay. And you don't know specifically whether any of the allegations she makes in this email --

A No.

Q -- were investigated?

A I don't.

Q But if they were, there would be notes?

A Absolutely. I say absolutely as an

assumption. That's the process when the investigators go and investigate something that there are detailed notes taken because, again, subsequent employee actions can be taken based on that investigation.

Q Did you regard Ms. Vickers' allegation skeptically at the time you received them?

A I really didn't regard it any differently than any of the other emails except that's why I noted such thorough information. She put a ton of stuff in here. So most of my replies to people in these kind of situations are basically meant to acknowledge receipt of the email. Yeah.

(Whereupon a document was identified as Plaintiff's Exhibit 10.)

Q Let me show you what's marked as Exhibit 10.

A All right.

Q And for the record, it's an email with an attachment sent by Darren Lamb. Let me know when you've had a chance to review it.

A Okay.

Q Okay. Do you recall receiving this

email and attachment?

A Again, I don't recall, but obviously I did. I'm not disputing that at all.

Q All right. So do you know Mr. Lamb?

A I do not.

Q All right. Did you do anything as a result of receiving this email and the attachments?

A I'm sure I would have forwarded it to Grant and/or John.

Q Okay. Did you ever speak to Mr. Lamb before or after receiving this email?

A I did not.

Q I haven't really asked you this, but I will. Have you personally conducted any investigation into any of the allegations that came across your desk concerning Ms. Cole?

A No.

Q And by personally investigate, I mean interview anyone, ask for any documents, that sort of thing.

A No.

Q Did you determine one way or the other whether the allegations of Mr. Lamb's letter were true?

A No, I did not.
Q Was one of the concerns about the whole meditation thing, I mean, was there -- it sounded to me in the evidence that we reviewed that mindfulness and meditation practices were happening districtwide. You said you don't know, and I understand that.
Was there ever any process one way or the other whereby the meditation and mindfulness practices became a part of the School District's approved curriculum?
A No.
Q Okay. And you say no, but you're not way down in the weeds on what the curriculum is, are you? I mean --
A I'm not into the weeds of what the curriculum is. But when you say "approved curriculum" --
Q Right?
A -- the curriculum, when you say the term curriculum, that is the standards which are set by the state which are passed down to us that we have to do.
Q Yeah.
A So in that regard, no.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Okay. Is it, well, let me say black letter school district law that teachers cannot teach outside of the approved curriculum?

A Yes.

Q Okay. And I'm thinking of everything from recreational therapy to relaxation exercises. They don't have -- I mean, those sorts of things, hey, kids, let's get up and stretch and take a break and take a bunch of deep breaths, that doesn't have to be approved by any curriculum committee or anything like that; right?

A No, definitely not.

Q So this activity that we're talking about here, this mindfulness, meditation, yoga, if it was yoga, it sort of falls into a gray area; right? It's not the sort of thing that necessarily had to be approved?

A Well, I'll differentiate a little bit in your example.

Q Okay.

A Because the example you provided of a teacher saying, hey, let's get up and stretch and, you know, have a brain break or whatever you want to call it for that particular class,

that's different than an entire school saying we're going to adopt this process or procedure --
Q Right.
A -- of a specific mindfulness technique that we're going to employ as a school. Those are two totally different things.
Q All right.
A You know, to where, yes, a teacher has some autonomy and, you know, authority to go -- I'm not going to say outside the box because it's not the Wild West. There are certain parameters that are expected and desired to be taught.
Q Right.
A But to your point, an individual teacher has some flexibility in, okay, how they get kids to engage.
Q How they motivate them?
A How they motivate them, how they keep their attention.
Q Right. Is it fair to say that principals have any discretion in that as well?
A To a degree. But because it's the

principal over an entire school instead of a teacher over an entire class, that starts to go up the ladder, so to speak, of making sure, not necessarily to get it approved, but to make sure that, okay, is this something that other schools are doing in the district and here's kind of the best practices template for you to follow or talk to your, you know, assistant superintendent, you know, to make sure it's in line with what other schools are doing.

Q What in your mind -- you know, you got some emails and some inquiries and whatnot, and then there was this -- what did you hear about this session where people came over to the school and laid hands on the windows of Ms. Cole's room and engaged in some kind of prayer service?

What did you actually hear? I understand you were not there?

A No.

Q What did you actually hear happened?

A Exactly what you just said. That was pretty much the extent of it. It was not like a, oh, my gosh, you're not going to believe, and then we have to go into a diatribe





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

of, you know, what took place or didn't take place. It was pretty much a description exactly as you just said.
Q And who gave you that description?
A I don't remember.
Q Right. And then you heard about the meeting with you've said the 150, you're not sure --
A Right.
Q -- but a large number of people. Now, do you know if those people were all parents or if some of them were faculty or staff? Do you --
A The faculty staff would not have been included in that number.
Q Okay.
A Because we're having school. So when we're having school, the faculty staff is doing what they do. So it would have been community/parents.
Q What was, in your mind, the tipping point that caused you and Mr. Adams and Mr. Rivera to decide that Ms. Cole needed to be transferred?
A I can't say what their tipping point

was.

Q Yeah.

A Because obviously they came to that conclusion and brought me the recommendation. When the recommendation was presented as this pretty much is the only way we think we can deescalate this issue at the school, timing was right for this was not --

Like it would have been perceived differently had we moved an assistant principal in November because then you're talking about there's a, there's a spotlight on it, it's out of the ordinary, what's going on here.

Q Right.

A Because there was the window to where we were moving multiple assistant principals, that, that helped to form their recommendation.

Q Was there any kind of announcement, written or oral, to the parent community at Bullard that Ms. Cole was going to be transferred away from that school?

A Not that I'm aware.

Q Are you aware -- well, you said that it seemed to diffuse the situation, though. So

do you know of any notification that went out either through maybe an email to parents or a writing to parents? Or maybe it was just a public announcement that appeared in the newspaper.

Do you know how it got out to the community that Ms. Cole was no longer an assistant principal at Bullard?

A I do not.

Q Okay. You weren't involved in crafting any announcement of that nature?

A Absolutely not.

Q There was a little bit of press activity on this thing, wasn't there?

A I don't, I don't recall. To be honest, in our conversation I had either forgotten about or did not recall that national media attention had gotten a hold of this in some way, shape, or form.

Q Was that media attention a factor at all in the decision to transfer Ms. Cole?

A I can't say that in my regard because the recommendation was brought to me, but I would assume that would have played a part in that because the disruption is


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

all-inclusive.
(Whereupon a document was identified as Plaintiff's Exhibit 11.)
Q Let me show you what's marked as Exhibit 11 and ask you to take a look at that document. Take a minute to review it, and I'll have some questions for you.
A Okay.
Q Do you recall receiving this? This is an email, by the way for the record, it's an email from Adam Glass dated March 17, 2016, subject: Bullard ES concerns.
A Right.
Q Do you recall receiving this?
A I do not, but I'm not disputing that I received it.
Q Okay. Because you are cc'd on there --
A Correct.
Q -- according to the cc line?
A Yes.
Q Now, this is from Glass apparently to John Adams. Would you have taken any steps as a result of receiving this email?
A Just to forward it to John and/or

Grant.
Q All right. Did you ever talk to Mr. Glass about any of his concerns in here?
A I did not.
Q Did you ever take any steps to ascertain whether Bullard's math and reading performance had declined in recent years?
A I did not.
Q So you don't know whether what he says there is true or not?
A I do not.
Q All right. And your decision to transfer Bonnie Cole didn't have anything to do with Mr. Glass's allegation that the math and reading performance in that school had declined?
A No.
Q Is the email address humanresources@cobbk12.org, is that John Adams' email address?
A No. That's more than likely a public kind of reporting, if you will, kind of like communications@cobbk12.org.
Q Info@ or something like that?
A Just departmental, yeah,

departmental email that I'm sure multiple people have access to to receive that.
Q Okay.
A Now, Misty Chapman is his assistant.
Q Okay.
A Yeah.
Q So she was copied on that?
A Yeah. So she would have handed it off to him, I'm sure.
Q Do you know where Adam Glass attends church?
A I do not.
Q Did you understand as you read this that Mr. Glass was calling for Ms. Cole's termination or transfer?
A I believe he said that in so many words.
Q Yeah. Okay. Do you believe that his recommendation had any effect on the ultimate outcome for Ms. Cole?
A No.
Q So what is the normal process of transferring an administrator? Let me be more specific. What's the normal process for transferring an assistant principal?

A Just the recommendation is made from John in coordination with the chief school leadership officer, which is now chief leadership officer.
Q And what are the factors that go into such a decision?
A I'm sure it varies, but I could not specifically tell you what those are.
Q Okay. You don't know?
A Right.
Q Do you recall any other instance where an assistant principal was transferred from a school because of perceived disruption at the school as a result of a parent -- parent dissension?
A I can't recall. It's certainly possible. I just can't recall.
Q You're aware that Ms. Cole was transferred to Mableton Elementary School?
A Yes.
Q And would that have been -- I mean, I know you approved the recommendation. Would it have been Mr. Adams who had decided on Mableton or somebody else, or Adams and Rivera together?





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A I'm sure those two together. I would not think it would have been -- well, it could have been just Grant because he's ultimately -- he was ultimately over all principals at that point in time, all schools, so.

Q Did either of them speak to you before the recommendation was made to transfer her?

A The recommendation to me or the board?

Q To you. Well, you had to approve it, right --

A Yeah.

Q -- before it went to the board?

A Yeah. So John talks to me before any personnel recommendation goes to the board, and that's the only conversation we pretty much had.

Q Tell me the substance of that conversation.

A It's John comes in. Generally, it's the day before the board meeting. And we go through a list of all personnel items, whether it's employment actions or transfers or new

hires, everything that's going to be presented to the board.

Q And you talk about them both as a group and about the people individually?

A Individually if the case, you know, depicts that, yeah.

Q If John came in to talk to you about transferring Bonnie Cole, tell me the substance of that conversation.

A It was very brief. I don't recall specifics, but it would just have been that this is the recommendation that we feel would deescalate the issue at Bullard.

MR. BUCKLEY: All right. Let's get that. We haven't done that yet, have we?

MR. BACHMAN: Ed, while you guys are pulling that out, I'd like to just use the restroom.

MR. BUCKLEY: You need to take a break? That's fine.

(Proceedings in recess, 2:37 p.m. to 2:48 p.m.)

MR. BUCKLEY: All right. We're back on the record.

Q We've had a number of breaks





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

throughout the day. Is there any testimony that you have given, any answer to any question, that you upon reflection believe you need to clarify or change?

A No.

Q All right. Fine. By the way, is your cell phone a personal cell phone, or is it issued by the School District?

A The School District.

Q All right. And do you, being a highly technical IT kind of guy, do you often text with people concerning business-related matters?

A Yes.

Q All right. And in the course of responding to discovery requests in this case, did anyone including you look at your phone to see whether you had any text messages concerning Ms. Cole or any of the controversy surrounding her?

A Yes.

Q Okay. Who did that?

A I did.

Q Did you? Did you find any?

A No.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q All right. Now, in terms of the overall policy concerning preservation of documents, first of all, did you -- were you aware when Ms. Cole filed a charge of discrimination with the United States Equal Employment Opportunity Commission?
A No.
Q No. Does the Cobb County School District have any policy concerning preservation of records with respect to claims of discrimination that are made against her?
A Generally, our attorneys issue the order to retain all records. And at that point in time, anybody that receives that is instructed to do so.
Q Okay. Would such -- you say orders. I guess it's a letter or something?
A Yeah. Letter, yeah.
Q Would such a letter have been distributed in the case that we're here about today?
A If, if records were needed to be retained, yes.
Q Okay. Is there any policy concerning the preservation of records, either


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

digital, electronic, or nonelectronic, that they're only retained for a certain period of time and then they're deleted or disposed of?

A The only one I'm semi-aware of is email, and there is a retention policy for that. But, again, I'm not familiar with exact what that is. I would -- I would say today that, again, I think all emails are retained. I don't know that we have purged any emails out of the system.

Q So your knowledge is that emails as a matter of policy are retained indefinitely?

A Yes.

Q And your knowledge also is that an individual --

A Now, I could be mistaken on that because that's -- I'm going back to my CTO days.

Q Right.

A That could have changed in our retention policy, and I'm not aware of that, so I'm not a hundred percent sure.

Q In your view based on your IT background, that would be a best practice?

A Yes, yes.

Q And based on your testimony earlier today as I understand it, even if an individual wanted to delete their emails at their desktop or in their laptop and tried to do so, they would not be able to delete the record of the email on the server or on any backup that the School District has?
A That's correct.
Q All right. And now, I'm not clear. Is the backup something that is kept in the administration building along with the server or somewhere else?
A Well, the data center is off site, so it's not in the admin building, and there's a backup data center as well.
Q Okay.
A So we have redundant data centers.
Q The backup data center is in a different place from the data center?
A Yes.
Q All right.
A Yes.
(Whereupon a document was identified as Plaintiff's Exhibit 14.)
Q Let me show you another exhibit.

This is Exhibit 14. It is an email chain which starts at the bottom with an email from adamglass@yahoo.com dated March 17th, 2016. Once you've reviewed it, let me know.

A Okay.

Q All right. Do you recall receiving this email chain?

A Again, I don't recall but don't dispute that I did.

Q Okay. You see on the second page of this document that it expressly says here in the second full paragraph, "Most people were upset because" of the inaction -- "of the actions and poor judgment of the assistant principal Bonnie Cole.

"As you are aware, she's the one who chose to use crystals and teach children about their chakra in several of her classroom lessons. This is very clearly an extension of her part-time job at Breath of Life healing center at Kennesaw," and it goes on to talk about that.

And then Mr. Adams emails him back and cc's you on March 18th, 2016, saying, "Adam, I enjoyed speaking with you yesterday as


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

well and appreciated your reasonable, balanced perspective. It was truly a pleasure meeting you, albeit under less than ideal circumstances.

"We are indeed continuing to closely monitor, review, and discuss the matter at the executive cabinet level and will take any additional action as may be needed. Like you, our shared goal is for the school to move forward as a united community and for it to reach even greater academic heights in the near future.

"Thanks for your passion, professionalism, and dedication to Bullard."

What discussions were occurring at the executive cabinet level that he is referring to here?

A I would assume he's just meaning between he and Grant being on executive cabinet.

Q Well, there were discussions with you too; right?

A Yeah, right. That's -- you know, executive cabinet is kind of considered I'm -- it's myself and executive cabinet.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q All right. And then there's a forwarded email from John Adams which forwards Adam's -- which forwards Adam Glass's email to Grant Rivera and Barbara Swinney and cc'ing you.

And it says, "As Barbara and I discuss in our private debrief after the meeting, you will need to reassign the AP for next year in order for the school to get past this. We can discuss more next week."

Was that the first occasion that you learned of a recommendation to reassign Bonnie Cole, or had he already talked to you in your office about that?

A No, I don't think so.

Q Okay.

A Yeah. The meeting in my office is right before the board meeting.

Q Okay.

A So this would have been probably the first, yes.

Q Now, I want to ask you a little bit about what he says here. He says, "As Barbara" -- that's Ms. Swinney; right?

A Yes.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q "As Barbara and I discussed in our private debrief after the meeting " -- is that after the meeting with the parents, the 150?

A That would be my assumption.

Q Right. Okay.

A Because, again, I think that the reason John was there is that Grant could not be.

Q Okay.

A But I could be wrong on that.

Q So to your knowledge, and maybe John Adams told you this, did he tell you that he and Swinney together first discussed the idea of transferring Bonnie after this parent meeting Coffee and Conversation?

A Yeah. I don't recall a conversation that we had concerning that.

Q Okay. Do you have -- and, you know, we were talking earlier, and I said, was there any tipping point? Remember that? And I mentioned, you know, there was the prayer at the school event, and then there was this big meeting where the parents turned out.

And there were no other big meetings that you know of that occurred as a result of



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Bonnie's involvement in mindfulness and meditation and that sort of thing?
A Not that I'm aware.
Q Okay. And so is it fair to conclude from this email that the tipping point, at least for John Adams, was the meeting, the parent meeting?
A I think that's a safe assumption.
Q Okay. All right. And that was your assumption upon reading this; right?
A Right.
Q Okay. And John had separately reported to you that -- what had he reported to you about that meeting?
A Again, I don't remember specifics except that -- the number that I referenced, that there was 150 people at the meeting.
Q And did he tell you that the predominant sentiment expressed in the meeting was an objection to the mindfulness and meditation practices?
A We really didn't have -- I don't recall getting that kind of detail of the meeting.
Q Did you get any detail that the


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

parents were unhappy?
A That it varied, you know, that some parents were saying exactly what they had, you know, communicated in emails. And to be honest with you, I can't recall much more of a conversation about the meeting.
Q Did you ever take any notes about any of your conversations with John Adams on this subject?
A No.
Q Do you know if John -- is John a note taker?
A I don't know.
Q All right. Have you ever sat in a meeting with him where he was taking notes?
A Not when he and I meet, he doesn't take notes.
Q Okay. All right. Have you seen any occasions where a recommendation concerning an employment action is made in the context of forwarding email as you see in this, in this particular document? You know what I mean?
A Are you saying because of an email that that kind of --
Q Well, I mean, this is a forwarded





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

email from this gentleman objecting to --
A Right.
Q -- Ms. Cole's practices, forwarded to a number of people including you. And then there's a written recommendation in this --
A Correct.
Q -- at the top of this forwarded email that she be transferred.
A Yeah. I would not --
Q Is that the norm?
A No, and I would not discern from this that it was because of this email that he forwarded that that was the recommendation --
Q Okay.
A -- that was brought about.
Q You discerned that it was because of whatever happened at that meeting?
A Yeah. That was, you know, to use your term, the tipping point.
Q Okay.
A That would be my assumption in reading that.
Q All right. We had 11?
A Yeah, we've done 11.
Q Okay. Sorry about that.



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A No. It's cool.
Q And you've never spoken with Mr. Glass?
A No.
Q In any of your conversations with Adams or Rivera concerning Ms. Cole, you know, at the executive cabinet level, did you recommend that she be transferred?
A No.
Q Okay. That didn't come from you?
A No.
Q It came from Rivera? Adams? Both? What?
A Ultimately, John was the one that brought it to me.
Q Yeah.
A Again, the assumption is he and Rivera, he -- John and Grant worked together on it.
Q They presumably reached a consensus?
A Yes.
Q All right.
A Yes.
Q That was your impression?
A Yes.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

Q Did John say as much?
A Yes.
Q Okay.
A I mean, you know, it was discussed because I don't take singular, you know, recommendations that include other people's departments without their buy-in.
Q Okay. After you saw recommendations contained in this email here, Exhibit 14, did you and John have any follow-up conversations concerning Ms. Cole specifically and her fate before the school board meeting?
A Well, before the meeting, the day before the meeting?
Q Right.
A No, no. That would have been the last conversation we had.
Q The day before the meeting you would have had a conversation?
A Exactly.
Q Which is after this email?
A Correct.
Q And I just want to be sure. I want to cover in this deposition every conversation you had concerning Ms. Cole and the concerns

about teaching mindfulness and meditation with anybody.

A Right.

Q Okay. So between the time of that email that's Exhibit 14 and your meeting, your pre-board meeting meeting with Mr. Adams, did you have any other conversations about Ms. Cole and the concerns surrounding her and the recommendation to transfer her with Mr. Adams or Mr. Rivera?

A Not that I recall, no.

Q Okay. So let's go to -- what is it? A day before the board meeting?

A Right.

Q That's when you normally have conversations concerning transfers or other employee-related actions?

A Yes.

Q And you had a conversation with Mr. Adams that day in your office?

A Correct.

Q Was Mr. Rivera not present, or was he present?

A It's not normal practice for him to be present. I don't recall, but I don't think


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

he was present.

Q Right. And so tell me everything you remember about the substance of that conversation.

A It was just very simple. We go through all the employment actions. And then he, you know, basically said, you know, this is kind of what we think is going to resolve -- what we hope to resolve the situation at Bullard.

Q Okay.

A That she'll be transferred to Mableton.

Q And he didn't give you any other reason for the transfer?

A No.

Q All right.

A No.

Q And you agreed with him?

A Right.

(Whereupon a document was identified as Plaintiff's Exhibit 21.)

Q Okay. Let me show you Exhibit 21. This appears to be an email from Kary Brownlee at Freedom Wealth Partners to you.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Okay.
Q In this letter or email, I guess, he recommends appropriate changes in leadership and states, "I am concerned that if a change is not made, quality teachers will leave an excellent school leaving the students in a lesser position."
Now, at this point, had the decision been made to go ahead and transfer Ms. Cole?
A I don't know.
Q Well, the prior email --
A Let me look at that email.
Q -- that's Exhibit 14 had been sent making that recommendation.
A Four days before, yeah.
Q Four days before that.
A So obviously, that would have been John's thought and conversation with Barbara.
Q John had already made his recommendation at this point?
A Right.
Q And then when was the board meeting that the decision was actually voted on?
A I don't know.
Q Okay. You don't know whether --

A I would assume it was March, but I don't know the specific date.
Q You don't know whether it was the 22nd or before or after the 22nd?
A Right, right. We can certainly find that out. I mean, I just don't remember. We have since gone to one board meeting a month too, so I don't know if we were still having two then or just one, so that would also kind of play into when the board meeting was.
Q Okay. Well, this was sent to you, and it looks like you sent it to Grant Rivera?
A And John.
Q And said, "I will copy you on my response but probably need an additional response." Did you ever respond to Mr. Brownlee?
A I don't know. I was waiting for you to you hand me that to see what my response was.
Q I'd love to tell you.
A I would generally have said it would have just been kind of the typical thank you for sending me this information. And then what I would have meant by probably needing





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

additional response is, is that if any additional information regarding -- you know, I think he was talking about pulling his kids out kind of thing.

So, you know, maybe a reaching out from the assistant superintendent or in this case Grant would have been appropriate.

Q He talks about -- do you happen to know Kary Brownlee?

A I don't, no.

Q You've never met him. You don't do investments with him or anything like that?

A No.

Q Okay. He says, "While most are not upset about the idea of a mindfulness program, many are upset with the deceptive manner in which it was implemented." Do you have any idea what he's talking about there?

A I think, again, it just comes back to that perception.

Q Yeah.

A You know, whether or not somebody started, you know, believing it was intentional about, you know, having religious overtones or not, I think that, you know, when you drill

down to it, people understand that you can't have any religious overtones to anything.

So regardless if you're Christian faith or if you're Muslim faith or what have you, you can't have any overtones to anything you do in public schools.

Q Well, you're not aware of anything based on either any of the investigation that you authorized -- you're not aware of any evidence that Ms. Cole or Ms. Moore engaged in any deceitful conduct, are you?

A No, not anything -- again, malicious intent on the injection of religion, so that's going back to the game plan that Grant put together. I mean, that's why it was not, you know, thou shalt. It was just kind of a best practices kind of thing.

Q Did you ever instruct anyone to investigate any allegations that Dr. Moore was bullying any parents or parapros at the school?

A Not specifically, no.

Q Okay.

A If I received emails indicating such, I would have just forwarded it to John or Grant.

Q And you never signed off any discipline concerning Dr. Moore arising out of this whole matter involving mindfulness and meditation?

A No.

MR. BUCKLEY: If the print gets any smaller, I'm not sure I'll be able to -- why don't we take a minute. We'll take a little break. We're getting close to getting finished.

THE WITNESS: All right.

(Proceedings in recess, 3:14 p.m. to 3:25 p.m.)

Q All right. You are still under oath, of course.

A Okay. Yes.

Q Do you know Melissa Vickers?

A I don't.

Q She sent you some emails about Ms. Cole. She was a parapro at Bullard. Did anything she say have any influence on you in your decision to terminate -- not terminate, but to transfer Ms. Cole?

A No.

Q All right. Now, when you -- I mean,


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

is it fair to say that you directed John Adams to investigate the allegations that were being made about Ms. Cole?

A That's fair.

Q Okay. And I'm asking you that question about Adams. I don't know if you gave any similar direction to Mr. Rivera.

A Well, that's what I was going to say.

Q Yeah.

A Let me backtrack. So, no, I think the Adams would have been inferred by what I was forwarding him and Grant.

Q Okay.

A Grant was the initial, this is your lane. Right? So Adams didn't really have any play in it to start with. It was just Grant getting with Barbara, going out and having the meeting, and then staying in that lane.

Q But it was implied, if not said expressly, that you wanted them to look into this and find out whether there was any truth --

A Absolutely.

Q -- to what was being said.


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A Yes.
Q Right?
A Yes.
Q Do you know whether Rivera or Adams or anyone in the course of investigating these allegations ever sat down with Ms. Cole and interviewed Ms. Cole?
A I do not, other than the initial meeting from the email that Grant said.
Q Okay.
A You know, with him and Barbara and Bonnie and Patrice.
Q Okay. Do you think it would have been -- because there were a lot of kind of inflammatory allegations being slung around here. Do you think it would have been a good idea to confront Ms. Cole with these allegations and ask her whether there was any truth to them?
A That would have been my expectation from the game plan that Grant put forward.
Q Okay. Fine. All right. Anything else?
All right. We've covered a lot of ground today, and this is kind of your last

chance. Is there any testimony that you've given that, as you reflect on it, you believe -- any answers to any questions that you believe is either not accurate or incomplete?

A No.

MR. BUCKLEY: Okay. Great. All right. Appreciate your time today, sir.

THE WITNESS: Cool.

MR. BUCKLEY: I know you've got plenty to do. Thank you.

THE WITNESS: Appreciate it.

MR. BUCKLEY: We are concluded.

MR. BACHMAN: I don't have any questions. We'd like to reserve signature, please.

MR. BUCKLEY: All right. Good.

(Proceedings adjourned, 3:28 p.m.)

I, CHRISTOPHER G. RAGSDALE, Deponent, do hereby certify that I have read the foregoing deposition, and the same is a true and accurate transcript of my testimony, except for the changes listed below, if any.

PAGE/LINE/CHANGE REASON

_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________
_______________________________________________

If additional space is needed, please attach separate sheet(s) and indicate number of additional page(s) here:________

___________________________________
CHRISTOPHER G. RAGSDALE, Deponent
This _____ day of ____________, 20_____.

Donovan Reporting, PC FAX: 770-428-5801
237 Roswell Street Marietta, GA 30060
Date of Deposition: 11-2-2018 CR: JM


Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA

COUNTY OF COBB

I hereby certify that the foregoing deposition was reported as stated in the caption, and the questions and answers thereto were reduced to writing by me;

That the witness's right to read and sign the deposition was reserved;

That the foregoing pages 1 through 195 represent a true, correct, and complete transcript of the evidence given on the above-referenced date by the witness, CHRISTOPHER G. RAGSDALE, who was first duly sworn by me;

That I am not of kin or counsel to any of the attorneys or parties in this case.

I do hereby disclose pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that I am a Georgia Certified Court Reporter; that I am an employee of Donovan Reporting PC; that Donovan Reporting PC was contacted by the attorney taking the deposition to provide court



Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

reporting services for this deposition; that I am not taking this deposition under any contract that is prohibited by OCGA 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and I am not disqualified for a relationship of interest under OCGA 9-11-28(c).

There is no contract to provide reporting services between myself or any person with whom I have a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond my usual and customary rates have been disclosed and offered to all parties.

This 14th day of November, 2018.

__________________________
JOEL P. MOYER, CCR 2745
Certified Court Reporter





Electronically signed by Joel Moyer (501-161-376-4513) 4b141093-ff81-40a1-8d49-1c787deed2b6

A

**a.m** 1:14 5:2 76:17,18
**abilities** 114:23
**able** 32:19 46:23 59:15 140:23,25 173:5 189:7
**above-referenced** 194:13
**abreast** 83:2
**absolute** 31:25
**absolutely** 6:25 28:1 49:1,6 70:2,17 119:5 125:15 128:4 131:12 132:25 137:12 139:14 150:9 152:11 154:25,25 163:12 190:24
**academic** 53:10,11 54:9,19 55:11 109:6 175:11
**Academically** 69:23
**academics** 55:14
**acceptable** 143:15
**access** 166:2
**accidentally** 7:13
**account** 10:10 18:24
**accountability** 32:8 53:16
**accurate** 8:15 89:21 192:4 193:4
**accusation** 101:1 111:15 117:13,21 123:9,12 143:9
**accusations** 118:13
**accused** 112:6
**accusing** 81:21,21
**acknowledge** 155:14
**acquisition** 123:14
**acronym** 120:17
**action** 40:16,20 41:4 41:15 44:21 50:2 102:11,21 118:16 118:18,22 119:5 120:13,15 122:23 124:15 175:8 179:20 195:12,12 195:13,14,15,16
**actions** 40:5 41:17,21 78:15 154:6 155:4 168:25 174:14 183:17 184:6
**active** 115:9
**activities** 19:9 37:1 58:14 66:24 67:22 73:4 79:3 82:3 104:7 115:22 131:5 132:24
**activity** 76:8 81:22,23 95:25 158:14 163:14
**actual** 81:7
**Adam** 4:9 60:20 164:11 166:10 174:25 176:3
**Adam's** 176:3
**adamglass@yahoo....** 174:3
**Adams** 4:12,19 18:4 42:18,22,23 43:1,4 45:2 46:18 50:15 56:16 60:12 61:10 90:11 91:14 96:10 101:23 107:11 117:12,14 118:8 119:8 121:18 147:8 161:22 164:23 167:23,24 174:23 176:2 177:12 178:6 179:8 181:6,12 183:6,9,20 190:1,6 190:12,16 191:4
**Adams'** 165:19
**addition** 30:25
**additional** 114:12 175:8 186:15 187:1 187:2 193:19,20
**address** 4:14,15 9:13 10:19 19:1 91:9,10 154:7,9 165:18,20
**addressing** 153:21,25 154:4
**adhere** 140:16
**adherence** 72:20
**adjourned** 192:18
**admin** 173:14
**administration** 87:10 97:11 173:11
**administrative** 31:11 97:8 114:22 133:6
**administrator** 70:16 79:12 100:20 112:4 166:23
**admit** 107:24
**adopt** 159:2
**advanced** 26:18
**aerobics** 110:6
**affiliated** 143:11,17 149:5
**affiliation** 70:9
**affirmative** 142:19 153:23
**afternoon** 112:17 114:10 129:9,22
**agency** 195:10
**agenda** 41:13,14 44:17,24,25
**agent** 195:13
**ago** 11:14 13:9,10,11 15:9,9 26:4 27:8 39:11 73:6 100:2 149:15
**agree** 68:17 139:8
**agreeable** 76:23
**agreed** 6:23 8:10 141:16 184:19
**Ague** 32:24 33:1
**ahead** 5:20 8:17 10:5 15:2 52:17 185:9
**air** 25:8
**alarm** 122:13
**alarming** 75:3,23
**albeit** 175:3
**align** 122:14
**aligned** 72:21
**all-inclusive** 164:1
**allegation** 155:7 165:14
**allegations** 117:15 147:9 154:18 156:16,24 188:19 190:2 191:6,15,18
**alleged** 107:12 121:19
**allegedly** 114:3
**alleviate** 84:12
**allow** 85:1
**allowed** 117:25 126:9
**allowing** 89:9 150:19
**allows** 141:3
**ample** 121:15
**amuses** 107:25
**analysis** 151:5
**and/or** 147:13 156:10 164:25
**Anderson** 109:8,10
**Angela** 101:21 114:13
**angst** 84:13
**anguish** 113:11
**annotate** 57:1
**announcement** 162:19 163:4,11
**annual** 37:7
**annually** 38:18
**answer** 7:7,8,11,14 8:5,6,10 32:19 33:3 46:9 72:10 153:4 170:2
**answers** 6:15 7:18 192:3 194:6
**anticipate** 8:5
**anticipated** 82:10 90:2,3,5
**anticipation** 113:25
**anxiety** 113:11
**anybody** 17:1 63:13 82:7 97:1,10 110:19 123:22 131:25 154:12 171:14 183:2
**anytime** 135:14
**anyway** 121:22 134:25
**AP** 104:17 124:14,17 141:3 176:8
**apart** 36:8 46:17 69:13 99:5 151:20
**apparently** 122:13 164:22
**APPEARANCES** 2:1
**appeared** 163:4
**appears** 130:20 132:3 132:10 153:15 184:24
**apples** 143:6
**applicants** 127:8
**applied** 75:14 81:7
**applies** 127:15
**apply** 70:10 126:21 127:3,18
**appointed** 34:13,14
**Appreciate** 192:8,12
**appreciated** 175:1
**apprised** 41:5,6
**approach** 97:2 110:25 154:8
**appropriate** 83:25 96:20 114:9 142:13 144:6 146:7 149:7 185:3 187:7
**appropriately** 85:19
**appropriateness** 38:1
**approval** 40:3,6 42:2 42:6 43:7,10 119:16 119:19 121:2,2
**approve** 40:25,25 41:7 119:3 141:24 168:12
**approved** 88:7 119:1 146:10 157:11,17 158:3,11,18 160:4 167:22
**approves** 40:14
**approximately** 26:14 38:19
**area** 132:23 133:11 146:12 158:17
**areas** 14:20 128:20
**arising** 189:2
**arms** 79:22 93:22
**arose** 68:7
**arrangements** 195:17
**Article** 5:5 194:19 195:4
**articles** 65:20
**arts** 110:15
**ASAP** 78:14
**ascertain** 165:6
**aside** 73:20 124:5
**asked** 17:2 32:20 33:9 115:1 156:14
**asking** 6:9 7:1,6 16:11 33:8 52:1 54:24 95:9 97:15 114:5 153:1 190:5
**assigned** 55:25
**assist** 112:18
**assistant** 17:23 19:9 39:21 47:10 50:9,20 51:9,12 52:10,15 54:4,6,10,15 55:5 55:10,12,13,15,20 56:4,6 85:7,9 86:5 86:12 123:20,23 125:8,12 133:11 136:20 137:25

138:17 139:10 140:10,17,21,23 149:16,22 160:8 162:10,16 163:8 166:4,25 167:12 174:14 187:6
**assume** 27:4 29:11 82:8 108:25 110:2 123:14 138:12 141:19 163:24 175:18 186:1
**assuming** 85:23 91:10 104:9
**assumption** 124:3 155:1 177:4 178:8 178:10 180:21 181:17
**AT&T** 24:21
**Atlanta** 1:2 2:5,9
**attach** 193:19
**attached** 80:11
**attachment** 4:7 155:22 156:1
**attachments** 156:8
**attempt** 137:23
**attend** 58:16 59:10,16 115:6,8
**attendance** 115:13
**attended** 60:9 61:13 61:14
**attending** 96:23
**attends** 166:10
**attention** 74:16 111:19 123:2,6 124:10 128:3,6 159:22 163:18,20
**attorney** 12:19 13:2 194:24 195:11,14
**attorney's** 37:14
**attorneys** 37:4,8 171:12 194:17
**attributed** 138:24
**audio** 20:3,4
**Australia** 121:14
**authority** 39:15 41:23 52:2 153:2 159:11
**authorized** 188:9
**automatic** 29:24
**automatically** 126:9
**autonomy** 159:11
**available** 60:3,4
**avert** 66:9
**avoid** 36:23 95:11 111:7
**aware** 16:4,10 29:8 47:7 57:6 67:21,25 68:5 69:14 73:3,9 74:18 81:13 103:3 110:7 113:19 115:5 115:7 128:10 131:7 131:10 151:10,17 162:23,24 167:18 171:4 172:21 174:16 178:3 188:7 188:9
**awareness** 68:19,20
**awfully** 7:21

**B**

**b** 102:23 195:4
**Bachman** 2:8 8:23 9:1 9:4,8 51:23 54:23 55:4 76:10,25 98:23 99:1 110:17 169:16 192:14
**back** 37:8 41:1,12 44:17 46:8 78:14 80:7 82:22 89:2 95:9 105:23 117:17 128:22 129:3 147:15 150:19 151:23 153:9 169:23 172:17 174:23 187:19 188:14
**backed** 14:16 30:12 31:2,24
**background** 22:6 57:23 72:4,6 172:24
**backtrack** 190:11
**backup** 31:19 173:6 173:10,15,18
**backups** 30:21
**bad** 145:6
**balanced** 175:1
**ballpark** 13:9 61:2
**Baptist** 57:14 58:20 58:23 59:5,6,24 60:23 61:21 97:25
**Barbara** 4:3 86:3 90:21 101:13 102:10 136:11
148:20 176:4,6,24 177:1 185:18 190:18 191:11
**barrier** 150:8,11
**based** 93:18 105:8 108:24 114:18 142:22 155:4 172:23 173:1 188:8
**basically** 25:1 26:20 27:2 47:6 83:23 86:23 89:3 100:10 109:12 120:17 132:16 133:22 143:21 145:5 146:8 148:19 149:3 155:14 184:7
**Beal** 2:4
**becoming** 105:5 150:8
**Beginning** 1:14
**behave** 69:25
**belief** 106:8
**beliefs** 67:11 70:15 78:25 81:24 93:5,9 98:9 105:12,16 106:3 135:20
**believe** 14:16 37:10 61:20 74:2 87:7 90:11,14 95:3 103:9 129:11 132:2 160:25 166:16,18 170:3 192:3,4
**believing** 187:23
**bells** 122:13
**BellSouth** 18:24 19:1 24:20
**beneath** 53:5
**benign** 141:20
**best** 6:21 14:15 25:11 32:19 38:14 47:25 70:21 113:14,22 149:6 160:7 172:24 188:16
**better** 7:5,6 69:25
**beyond** 195:17
**biblical** 79:9
**big** 60:24 177:22,24
**bigger** 89:15 133:14 133:24
**billion** 38:17
**billion-dollar** 38:16
**biology** 80:11
**birth** 8:22 9:10
**bit** 39:3 44:6,8 49:14 54:20 65:12 66:13 107:25 142:1 154:8 158:20 163:13 176:22
**black** 158:1
**bleeding** 89:5
**blind** 78:7 83:13,15 83:16 147:12 149:6
**blink** 139:5
**blood** 66:16
**blotter** 64:18
**bluntly** 139:4
**board** 5:6 20:7,13,17 34:13,14 37:2,3,8,9 37:13,15,19,23 38:1 38:5,18,18,23 39:10 40:3,5,9,10,13,14 40:19,24 41:3,4,11 42:1,6,9 43:5,11,17 43:18,19 44:8 45:8 46:19 47:7 48:18 49:21,24 50:3,6 51:2 53:2,3 58:3 61:6 80:9 97:14 114:9,14 119:6,16 149:10 152:6 168:11,15,17,23 169:2 176:18 182:12 183:13 185:22 186:7,10 194:20 195:5
**Bonnie** 1:3 2:12 4:14 4:14 5:16 6:7 15:22 17:17 20:14 21:8 42:4 43:9 44:9 45:7 49:9 56:9,10 68:7 69:14 74:22 78:20 91:6,9 102:13 104:5 104:10 110:9 111:22 112:3 123:10,19 138:1 165:13 169:8 174:15 176:12 177:14 191:12
**Bonnie's** 178:1
**book** 108:13
**born** 22:8
**boss** 39:5
**bosses** 39:1
**bottom** 102:19 114:8 174:2
**bow** 25:15 79:6
**box** 159:12
**boy** 22:12
**Brad** 60:14 116:1,7
**brain** 109:6 158:24
**brain-based** 68:19
**brand-new** 149:6
**break** 76:13 109:6 116:15 125:19 128:25 129:10,16 158:9,24 169:20 189:9
**breaks** 169:25
**breath** 66:13,20 121:11 174:20
**breathing** 66:2,8 78:19 104:6 106:23 109:5 113:20 145:19
**breaths** 158:10
**brewing** 85:4
**Brian** 2:3 4:21 60:16 77:19 78:8,11 83:19 90:4 92:15 93:9 115:2
**brief** 169:10
**bring** 47:25 128:22 149:8
**broad** 28:3 36:9 63:16
**broader** 26:25 132:8
**Brock** 12:24
**broke** 89:2
**brought** 12:4 73:12 111:18 112:5,10 123:2,5 124:9,19 128:2,5 136:5,22 150:10 162:4 163:23 180:15 181:15
**Brownlee** 184:24 186:17 187:9
**brushed** 33:15
**buck** 152:10
**Buckley** 1:9 2:3,4 3:4 5:7 6:5,6 8:25 9:3,7 51:20 52:17 55:2 76:14,19 128:24

169:14,19,23 189:6 192:7,10,13,17
**Buddha** 79:5 83:8
**Buddhist** 142:5,6 148:14
**budget** 38:17
**building** 138:14 173:11,14
**Bullard** 73:4 74:19 79:10 97:4,12 115:23 126:7,25 127:25 131:5,16,21 132:24 133:18 135:1 138:3 151:13 151:24 162:21 163:8 164:12 169:13 175:14 184:10 189:20
**Bullard's** 165:6
**bullying** 188:20
**bunch** 158:10
**Burnt** 57:14 58:20 59:23 60:23
**bus** 51:25 52:8
**business** 111:23 112:3,7,9,12
**business-related** 170:12
**buy-in** 182:7

**C**

**c** 102:23 104:4
**cabinet** 32:16 39:23 55:6,7 175:7,16,20 175:24,25 181:7
**Calhoun** 1:12 2:8
**call** 59:19 102:21 120:4 121:14 158:25
**called** 14:17 37:12 80:9 112:22 113:13
**calling** 166:14
**calm** 150:15
**calms** 63:7
**camel's** 89:2
**capacity** 5:18 26:7 28:20 49:19 50:4 60:7 86:18
**caption** 194:6
**care** 104:10
**career** 140:22
**case** 1:4 6:23 12:3,7,9 13:4,16,19 14:1,5 15:17 16:13 29:19 31:3 57:6 80:9,16 152:14 169:5 170:16 171:20 187:7 194:17
**cases** 13:23,24
**categories** 11:19 14:13
**categorized** 55:17
**category** 19:19
**Catholic** 57:23
**cause** 141:11
**caused** 86:25 89:14 92:25 148:12 161:22
**cc** 164:20
**cc'd** 99:15 164:17
**cc'ing** 176:4
**cc's** 174:24
**CCR** 195:22
**CCSD** 4:19,22 109:8
**cease** 131:17
**cell** 170:7,7
**center** 31:14 104:13 121:11 173:13,15 173:18,19 174:21
**centered** 148:19
**centering** 66:24 68:19
**centers** 173:17
**central** 109:8,13,15 146:7,10
**CEO** 38:16
**certain** 14:20 16:9 31:17 105:8 120:21 124:14 128:19 143:13,14 159:14 172:2
**certainly** 28:17,18 50:2 68:5 74:11 75:4,13 81:16 82:9 90:1 122:14,18 167:16 186:5
**certainty** 31:25
**Certificate** 3:6 194:1
**certificates** 25:12 35:21
**Certified** 1:10 194:22 195:23
**certify** 193:2 194:4
**cetera** 48:17 51:15 79:7 118:23
**CFO** 53:14,15
**chain** 52:8,9 53:2,21 73:12 90:20 91:5 118:25 174:1,7
**chakra** 115:18 174:18
**chance** 155:23 192:1
**change** 107:19 139:1 170:4 185:4
**changed** 55:1 56:9,11 56:12 172:20
**changes** 102:22 185:3 193:5
**Chapman** 166:4
**characteristic** 142:17 144:15
**characterize** 105:3
**characterized** 71:24 107:13 135:18
**charge** 171:4
**CHARLES** 2:8
**chart** 4:23 51:5,8,25 52:22 56:11
**check** 11:5
**chief** 12:1 18:5 26:19 27:23 29:6 32:3,7 32:12 33:18,21 42:16 51:18,19 53:10,11,12,13,16 53:22 54:3,9,16,17 54:19 55:11,16 56:18 60:5 61:11 82:15,16,19 86:10 101:22 167:2,3
**childhood** 58:25
**children** 117:24 126:17 127:25 142:6 174:17
**choice** 126:21 127:16
**chose** 174:17
**chosen** 127:10
**CHR** 42:14
**Chris** 4:5,7,16,19,21 5:8,17 40:20 110:14 114:13
**chris.ragsdale@co...** 10:13
**Christian** 67:11,13 70:5 71:24 79:8 81:23 93:5,8 98:1,9 106:3 188:3
**Christianity** 79:16 108:17
**Christians** 93:21
**Christopher** 1:8 3:3 6:1 8:19 193:1,22 194:14
**CHRO** 56:15
**Chuck** 15:1 16:6 19:15,22 76:19 95:4 99:14 110:17
**church** 57:14,16,20 57:21,25 58:20 59:4 59:6,10,16,24 60:2 60:9,23,25 61:8,13 61:14 71:20 96:23 97:1,2 115:2,5,7,8 166:11
**church-related** 58:14
**churches** 58:3
**Circuit** 80:25
**circulate** 29:14
**circumstances** 142:13 145:3 175:4
**civil** 5:15 13:23
**claims** 171:10
**clarification** 129:12
**clarify** 170:4
**Clark** 4:21 60:16 77:19 78:17 81:20 83:19 92:15 93:9 105:25 115:3 116:21 121:20
**Clark's** 122:25
**Clarks** 90:4
**class** 62:11 72:16 144:10 158:25 160:2
**classes** 58:11 109:6 110:6 117:25
**classroom** 35:15 72:22,24 73:1 79:5 82:5 104:5,18 143:19 145:9 174:18
**clause** 80:15
**Clay** 12:24
**clear** 31:10 79:25 97:8 173:9
**clearly** 60:5 78:18 174:19
**clients** 111:23
**close** 59:6 189:9
**closely** 175:5
**cloud** 86:4
**Cobb** 1:5 5:16,18 12:1 13:4,5 26:15 29:1,15 67:23 68:1 68:10 80:10 91:9 126:7,19 171:8 194:3
**Cobbk12** 10:14
**Cobbk12.org** 4:14
**coffee** 84:19 89:11 114:2 130:21 177:15
**cognizant** 38:25 81:19
**coin** 137:14
**Cole** 1:3 2:12 4:4,6,8 4:10,12,15,17 5:16 6:7 15:22 17:17 19:5 20:14 21:8 22:1 42:5 43:10 44:9,23 45:7 46:1 46:13,20 47:5,9 49:9 54:25 56:9,10 68:7 69:14 78:20 81:21 91:6 95:17 100:15 102:13,15 104:5 110:9 121:10 131:21 135:25 138:13,15 145:13 148:2,3,17 149:25 151:17,22 156:17 161:23 162:21 163:7,21 165:13 166:20 167:18 169:8 170:19 171:4 174:15 176:13 181:6 182:11,25 183:7 185:9 188:10 189:20,23 190:3 191:6,7,17
**Cole's** 4:14,14 16:10 19:9 74:22 91:9 123:19 160:16 166:14 180:3
**collect** 121:19
**collected** 121:24
**color** 4:23 143:13
**colored** 104:2

**coloring** 103:17,21 121:12,14 148:9
**come** 27:21 36:19 38:14 41:11 44:2 57:23 84:9 85:2 113:1 181:10
**comes** 48:15 70:6 135:15 168:22 187:19
**coming** 73:24 93:21 107:7 137:4,5 147:15
**command** 53:2,21 118:25
**comment** 27:13
**Commission** 171:6
**committee** 158:11
**communicated** 179:4
**communicates** 78:14
**communication** 45:9 113:18
**communications** 16:12 29:18 92:17 92:22
**communications@c...** 165:23
**community** 45:9,11 45:24 47:16 71:13 71:16 73:11,19,25 74:2 84:13 85:1 89:24 92:14 96:16 96:19 97:25 98:1,2 104:24 124:25 132:9 134:7,22 135:21 136:2,8 137:1 138:8 139:17 140:3,13 141:13,23 143:5 154:9 162:20 163:7 175:10
**community/parents** 161:20
**companies** 24:23
**company** 25:1
**competence** 125:8
**complete** 194:11
**composed** 119:9
**computer** 26:23 31:2 31:18
**computers** 23:13 27:24
**concern** 86:4 93:20 100:19 122:21 139:16
**concerned** 15:16,22 19:2,5 20:14 45:24 78:24 121:17 142:5 185:4
**concerning** 14:20 16:12 17:22 21:21 22:1 43:5 46:1,20 47:5 49:9 68:7 70:7 77:2 82:23 84:2 87:21 88:25 118:18 124:23 129:15 151:22 156:17 170:12,19 171:2,9 171:25 177:17 179:19 181:6 182:11,25 183:16 189:2
**concerns** 17:17 64:23 71:8 78:18 79:20,20 87:1,6,17 91:24 92:2,18 93:2,4 95:16 97:24 98:2,6 114:22 130:21 132:18 147:4 157:2 164:12 165:3 182:25 183:8
**conclude** 94:3 95:15 107:10,10 178:4
**concluded** 100:14 106:13,15 107:15 145:13,16 192:13
**conclusion** 47:24 94:8 95:19,22 107:23 148:13 162:4
**conditioning** 25:8
**conduct** 16:16 37:15 188:11
**conducted** 43:15 84:15,16 156:15
**conducting** 21:1 37:4 105:18 151:4
**conference** 120:22
**conferences** 37:3
**confirm** 114:10 127:10
**conflict** 130:25
**conflicted** 93:5
**confront** 191:17
**confronted** 65:2
**connect** 64:3
**connected** 9:25
**consensus** 181:20
**consider** 72:6,12,15 75:23 120:13
**consideration** 138:21 140:3,6 144:12 150:19
**considered** 41:20 55:6 56:22 75:24 106:21 107:1 139:6 175:24
**consistent** 60:1 100:6
**Constitutional** 79:18
**construed** 136:16
**contacted** 194:24
**contained** 31:7 182:9
**content** 146:11
**context** 65:7 66:2 132:6 133:4 179:20
**continue** 113:22
**continued** 3:10 94:22 131:21 136:9
**continuing** 36:1,4 37:9,11,12 175:5
**contract** 195:3,8
**contractual** 12:15
**control** 68:21 69:19 69:24 109:4 134:1,1
**controversy** 45:10,24 47:16 49:9 56:10 68:7 71:5 88:24 96:22 113:10 130:25 131:17 151:15,16,24 170:19
**convenient** 6:20,20
**conversation** 47:13 48:8,23 63:2 84:5,7 84:19 85:2 89:11 97:15 102:11 103:9 104:15,21 112:14 114:2 122:8,20 130:21 147:24 163:16 168:18,21 169:9 177:15,16 179:6 182:17,19,24 183:19 184:4 185:18
**conversations** 48:2 49:8,11 84:2 88:21 88:23 94:13 97:10 148:18,24 149:13 179:8 181:5 182:10 183:7,16
**cool** 181:1 192:9
**coordinate** 112:17 113:2 114:6
**coordination** 167:2
**coordinator** 109:13
**copied** 78:7 83:15 101:20,23 130:3 147:13 166:7
**copy** 4:23 15:19 149:6 186:14
**copying** 83:13,16,20
**correct** 12:12 15:14 15:23 16:7 21:17,23 24:3 26:8,24 29:10 29:13 30:13 34:15 34:18 35:11 37:18 40:2 42:17,20 43:3 43:23 51:4 53:4,7 56:17 58:18 59:1,25 67:15 77:5 79:15,17 81:10 86:14 87:2 88:11,15 90:24 93:11 94:24 95:16 96:11,13 101:10,24 105:13 108:21 109:19,24 114:4,4,7 114:17,24 119:23 120:2 127:6,14 130:4,11,19 145:11 146:12 164:19 173:8 180:6 182:22 183:21 194:11
**Corrective** 120:15
**correctly** 78:5 98:19 149:20
**couch** 59:16
**Council** 194:21
**counsel** 2:1 5:4 129:15 194:16
**counseling** 113:5
**counselor** 113:7
**count** 66:20
**country** 143:14
**county** 1:5 5:16,18 22:17,18,21 25:23 29:1,15 67:23 68:1 68:11 80:10 126:7 126:19 128:20 171:8 194:3
**couple** 15:9 73:6,16 84:6 102:8 133:14 149:13
**course** 17:21 19:14 36:15 61:10 65:14 129:4 170:15 189:15 191:5
**courses** 35:15,16 36:10
**coursework** 35:20 36:14
**court** 1:1,10 5:6 13:4 13:5,5,6,24,25 14:1 80:14 194:1,20,22 194:25 195:23
**cousins** 59:6
**cover** 146:9 182:24
**covered** 129:6 191:24
**CR** 193:25
**crafting** 163:11
**Cragsdale@bellsou...** 10:20
**crazy** 122:4
**create** 113:10 151:24
**created** 143:8
**creates** 142:11
**creating** 143:4
**creation** 148:22
**cross-examination** 5:9
**crowded** 31:18
**crystals** 106:20,25 174:17
**CTO** 31:21 172:17
**culmination** 47:22
**current** 33:4
**currently** 24:21
**curricular** 108:4 146:11
**curriculum** 72:17 145:8 157:11,15,17 157:18,20,21 158:3 158:11
**custodian** 40:16,21
**customary** 195:17
**cut** 7:13
**cutting** 8:6

**D**

**d** 1:9 2:3 102:23 103:25 106:20
**da** 133:5,5,6
**dad** 24:25
**Daniel** 60:14,14 116:2 116:4,7
**Darren** 4:7 155:22
**data** 14:16 31:14 173:13,15,17,18,19
**date** 8:21 44:24 186:2 193:25 194:13
**dated** 99:16 153:16 164:11 174:3
**day** 36:20,20 38:22 38:22 48:19 84:22 89:19 149:19 168:23 170:1 182:13,18 183:13 183:20 193:23 195:20
**days** 41:11 110:5 121:13 138:23 172:18 185:15,16
**deacons** 58:5,6
**deal** 39:5 114:19 133:12 149:7,8
**dealing** 26:22 27:2 38:22 135:9
**dealt** 133:19
**death** 112:25
**debrief** 176:7 177:2
**Decatur** 25:13
**deceitful** 188:11
**deceptive** 187:16
**decide** 40:7 161:23
**decided** 126:16 167:23
**decides** 30:1
**decision** 40:23 44:10 70:11 80:22,23,24 81:6,13 92:11 145:2 163:21 165:12 167:6 185:8,23 189:22
**decisions** 39:12 70:16
**declined** 119:3 165:7 165:16
**decrease** 69:6
**dedicated** 36:15
**dedication** 175:14
**deep** 66:13,20 69:1,3 70:22 158:10
**deescalate** 133:25 137:17,24 138:1 162:7 169:13
**deescalated** 136:10 137:20 150:17 151:6
**defendant** 1:6 2:7 12:7
**defended** 12:21
**definitely** 87:7 107:14 107:15 117:12 122:8 134:16 158:13
**definition** 68:18,23 72:9
**defuse** 89:11
**degree** 22:24 23:9,11 24:2,4,5 34:17 35:18 65:11 132:14 159:25
**delete** 30:1,14 173:3,5
**deleted** 28:19 172:3
**deletion** 18:20
**deliver** 113:23
**demote** 88:9
**demoted** 88:6
**demotion** 86:23,25 88:2,17 119:25 120:12
**department** 17:3,5,8 25:3
**departmental** 165:25 166:1
**departments** 182:7
**depend** 128:16,17 150:24 151:1,3
**depends** 119:14 128:23 144:8 151:2
**depicts** 169:6
**Deponent** 193:1,22
**depose** 9:12
**deposed** 12:19 13:23
**deposition** 1:8 5:8,13 11:11 12:22 14:22 14:25 19:20,25 20:5 182:24 193:3,25 194:5,9,25 195:1,2
**depositions** 14:19
**depth** 16:9
**deputy** 18:4 33:22 53:18 56:23,25
**described** 65:10 70:4 87:24
**description** 38:10 49:17 161:2,4
**designate** 57:1
**designated** 110:5
**desire** 109:4 110:3
**desired** 159:15
**desires** 140:14
**desk** 17:16,21 64:18 156:17
**desktop** 173:3
**Dess** 112:16,19 130:23
**destress** 113:21
**destressing** 104:6 131:4 132:24
**detail** 101:18 178:23 178:25
**detailed** 155:3
**details** 12:13,14 112:17 123:8
**determine** 156:23
**determined** 101:4 127:7
**development** 120:18
**diagrams** 25:2
**diatribe** 160:25
**different** 26:20 39:4 58:3 133:17 135:2,7 136:15,20 139:21 140:14,15,15 141:1 145:24 154:8 159:1 159:7 173:19
**differentiate** 158:19
**differentiations** 139:22
**differently** 94:9 95:10 136:17 155:10 162:10
**diffuse** 113:15 136:2 136:23 162:25
**digital** 172:1
**digitally** 28:14
**diploma** 22:25 23:1
**direct** 39:24 50:12,12 50:13 51:7,19,22 52:4 53:8,24 54:2 55:7 73:24 96:20 146:8
**directed** 29:22 190:1
**direction** 114:16,21 120:7 190:7
**directly** 55:23 110:25 123:9
**director** 26:11,16 32:10 33:1 40:12 41:18 50:16,16,17
**directors** 50:15
**disabilities** 8:13
**disagree** 43:1
**disbelief** 141:22
**discern** 180:11
**discerned** 180:16
**disciplinary** 69:7 87:5 120:13
**discipline** 120:11 189:2
**disclose** 194:18
**disclosed** 195:18
**disclosure** 5:4
**discovery** 5:9 28:22 170:16
**discretion** 159:24
**discrimination** 171:5 171:11
**discriminatory** 139:12
**discuss** 175:6 176:7 176:10
**discussed** 21:4,11 37:24 44:20 69:17 87:16 115:16 117:7 177:1,13 182:4
**discussing** 80:12
**discussion** 21:8,21,25 46:19,23 47:5 98:17 117:23 125:14
**discussions** 21:2 124:23,24 125:6,7 129:15 153:7 175:15,21
**disposed** 172:3
**dispute** 12:16 174:9
**disputing** 156:3 164:15
**disqualified** 195:6
**disruption** 48:1 75:24 105:5 125:2 133:19 134:8,19 140:4 141:10,11 143:8 144:9,10,10,20 163:25 167:13
**dissension** 112:18 134:20 136:7 141:12 167:15
**dissent** 144:19
**dissuade** 113:3
**distressing** 137:9
**distributed** 171:20
**district** 1:1,1,5 5:16 5:19 11:24 13:6,13 25:23 26:5,13 27:21 28:7 29:2,15 67:23 68:2 70:13 80:10,18 80:20 81:2 86:16 87:9 99:8 105:17 126:7,13,20 131:6 135:4,13 143:10 149:19 150:1 154:2 158:2 160:6 170:8,9 171:9 173:7
**District's** 157:11
**districts** 36:18 39:8
**districtwide** 157:6
**DIVISION** 1:2
**document** 52:19 77:7 77:13 88:4,16 98:11 99:7,12,20 116:17 129:18 146:14 155:16 164:2,6 173:23 174:11 179:22 184:21
**documentation** 121:15,19 122:3
**documents** 16:11,18 17:2,11,12 18:10,13 18:21 19:19,24 28:18 29:17 87:5,21 88:17 156:20 171:3
**Doe** 132:22
**dog** 62:3,8,9
**doing** 7:17 36:23 51:24 63:25 83:3 93:23 94:3 106:11 112:12 143:9,18 160:6,10 161:19
**Donovan** 193:24 194:23,23
**double-delete** 30:1,15
**downward** 62:8,9
**Doyle** 1:12 2:8

**Dr** 117:21 118:19 121:4,13 188:19 189:2
**draw** 148:13
**drawn** 127:9
**drew** 52:22 148:13
**drill** 187:25
**drive** 30:16
**drivers** 51:25 52:9
**due** 132:12
**duly** 6:2 194:14
**duties** 17:21 124:8

**E**

**e** 102:23
**earlier** 46:8,9 87:24 116:20 122:16 147:20 173:1 177:19
**early** 129:9
**ed** 6:6 51:23 55:13 76:10 169:16
**education** 36:1,4 37:9 37:11,12 68:12 72:5 79:22 131:7 132:25 135:14
**educational** 35:2,19 36:25 72:4,6
**educator** 72:7,13,15
**Edward** 1:9 2:3
**effect** 166:19
**efforts** 113:2
**either** 15:18 33:11 34:9 46:13 49:18 50:6 57:18 58:9 73:23 81:21 97:1 115:13 116:5 141:13 149:5 163:2 163:16 168:7 171:25 188:8 192:4
**elders** 58:4
**elected** 34:12 38:24
**electronic** 17:5,14 18:19 29:18 172:1
**elementary** 55:21 167:19
**email** 4:3,3,5,5,7,9,11 4:11,13,13,14,14,16 4:18,18,21,21 10:8 10:9,18,21,24 11:3 11:8 17:4 19:1 29:16 30:1,5,10 31:6 32:1 73:21 74:25 77:22,25 78:3 78:15,18 90:4,19 91:9,10 92:13,14,24 93:7 95:1,2 101:12 108:24 116:20 117:3,6,7,15 118:9 118:9 123:1,16 132:1,10,13 147:18 153:15 154:12,19 155:15,21 156:1,7 156:12 163:2 164:10,11,24 165:18,20 166:1 172:5 173:6 174:1,2 174:7 176:2,3 178:5 179:21,23 180:1,8 180:12 182:9,21 183:5 184:24 185:2 185:11,12 191:9
**emails** 15:5,13,16,25 16:1,11 17:9 18:22 19:16 28:18 47:8 71:4 73:11 74:1,3 95:4 96:17,18 99:22 123:9 137:3 146:1 155:10 160:12 172:8,9,11 173:3 174:23 179:4 188:23 189:19
**emotional** 68:21
**emotions** 69:19,24
**employ** 140:19 159:6
**employed** 146:3,13
**employee** 12:4,4 139:25 154:2,3 155:4 194:22
**employee's** 137:11
**employee-related** 183:17
**employees** 38:20 154:7
**employment** 36:22 50:2 118:16,18,22 119:5 122:23 154:5 168:25 171:6 179:20 184:6
**employment-related** 12:2
**encompasses** 32:12
**encourage** 103:1
**encouraged** 103:5
**endorsing** 148:17
**ends** 13:25
**engage** 159:19
**engaged** 74:20 76:7 160:16 188:10
**engaging** 81:22 95:12 95:17 100:15 137:6
**enjoyed** 174:25
**ensued** 153:8
**ensure** 132:8 133:5,5 146:5
**entanglement** 79:21
**entire** 36:15 140:22 144:11 159:1 160:1 160:2
**entities** 36:19
**entitled** 6:15
**entity** 135:14
**environment** 104:13 140:4 150:16 151:6
**Equal** 171:5
**equate** 65:23
**Errata** 3:5
**ES** 164:12
**escalate** 94:22 134:1 134:2 136:9
**escalated** 134:18
**escalating** 149:12
**escalation** 104:12
**essence** 81:21 95:22
**establishing** 80:11
**establishment** 80:15
**estimation** 104:14
**et** 48:16 51:15 79:7 118:23
**ethical** 93:17
**evaluate** 123:19
**evaluation** 88:19
**evaluations** 87:25
**event** 81:11 177:22
**Eventually** 124:11
**everybody** 9:12 57:2 127:15 151:3
**evidence** 5:13 109:21 111:3,4,4,14,17,21 112:2,3 122:12,17 157:4 188:10 194:12
**evidentiary** 122:9
**evolution** 80:12
**exact** 82:21 112:20 172:6
**exactly** 22:13 23:20 27:19 33:16 45:6 59:7,21 62:20 65:9 66:14 84:10 99:6 109:12 113:16 135:6 144:9 160:22 161:3 179:3 182:20
**Examination** 3:2,4 6:4
**examined** 6:2
**example** 40:16 42:4 49:2 50:14 55:11 58:2 73:16 105:24 158:20,22
**examples** 142:24
**excellent** 185:6
**exception** 97:13
**exchange** 117:3
**Excuse** 72:5 83:16 125:23,23
**executive** 20:17,20,23 21:3,6,15,16,22 32:9,9,16 37:24,25 39:11,23 40:19 41:12,15 42:15 43:15,19 44:20 55:7 175:7,16,19,24,25 181:7
**exercise** 95:23
**exercises** 69:5 78:19 106:23 107:2 109:5 109:16,17 158:7
**exhibit** 4:1 52:18,20 76:16,22,22,23 77:3 77:4,5,8,11,17 98:12,14 105:24 116:15,18,19,21 125:19,25 129:19 129:21,22 134:22 146:15,17 153:10 155:17,19 164:3,5 173:24,25 174:1 182:9 183:5 184:22 184:23 185:13
**exhibits** 4:2 76:21
**exist** 27:6
**existence** 16:5
**expect** 6:21 91:2 140:22 149:7
**expectation** 149:3,21 191:20
**expected** 159:14
**experience** 80:7
**experiences** 141:1
**expertise** 72:16,23
**explain** 7:8
**express** 97:24 98:6
**expressed** 78:18 93:2 105:9,10,16 178:19
**expresses** 147:5
**expressing** 91:23 92:2 95:16 98:2 137:4 142:8
**expressly** 105:25 174:11 190:21
**extension** 174:19
**extent** 81:15 147:25 160:23
**extremely** 132:7
**eye** 139:5
**eyes** 108:20 146:24

**F**

**facilitate** 152:15,18 152:19
**facing** 62:8,9
**fact** 35:12 83:13 89:15 102:17 106:12 107:12 127:3 131:4 132:15 140:3 142:15 150:10
**factor** 163:20
**factors** 144:11 167:5
**faculty** 110:1 111:5 161:12,14,18
**failing** 133:13
**fair** 100:24 159:23 178:4 190:1,4
**faith** 58:23 76:7 93:18 94:2 97:25 134:14 188:4,4
**falls** 158:16
**familiar** 99:23 172:6
**familiarity** 62:22
**families** 111:25 113:20,24
**family** 63:12 113:18
**far** 39:4 70:3 72:20

72:24 88:10 107:22 118:13,22 124:1 133:24 140:19
**fate** 182:11
**FAX** 193:24
**feasibility** 151:7
**February** 73:7
**federal** 5:14 13:6 72:18
**feel** 114:12 140:11 169:12
**felt** 85:18 89:10 93:4 137:15 141:24
**fervor** 104:23,25 105:6
**figure** 113:14
**file** 9:4 17:17 19:23 118:21 119:4,7 120:4,9,10
**filed** 171:4
**files** 17:21,22 50:1
**filter** 70:10
**filtered** 96:10
**financial** 195:13,15 195:16
**find** 6:19 74:11,15 75:3 121:12,13 122:9 147:9 170:24 186:5 190:22
**findings** 78:14 82:23 82:25 84:3 117:18 147:17
**fine** 7:7 14:9 67:17 73:2 76:25 102:20 114:25 135:12,16 139:8 169:20 170:6 191:22
**finish** 7:15
**finished** 8:4 99:9 189:10
**fire** 39:18 40:7
**firing** 39:15 40:23
**firm** 37:14,17
**first** 6:2 24:15 26:10 27:13 42:21 73:3,5 73:10,14 75:8 79:11 80:8 132:4 133:14 133:22 137:23 171:3 176:11,21 177:13 194:14
**five** 13:10 39:9
**flaw** 98:24
**flexibility** 159:18
**flip** 137:14
**Floresta** 32:7,17
**fly** 99:5
**focus** 68:21
**focused** 54:12
**focusing** 66:24
**folder** 19:23
**folks** 46:14 60:22 95:15
**folks'** 105:9
**follow** 141:5 142:18 160:8
**follow-up** 182:10
**following** 41:15 60:10
**follows** 6:3
**font** 98:25 146:19,22
**foregoing** 193:3 194:4,10
**forget** 120:16
**forgotten** 163:17
**form** 5:11 42:25 162:17 163:19
**former** 12:4
**forth** 47:25 148:20
**forward** 78:6 96:19 100:11 101:7 107:20 112:5 122:15 129:20 164:25 175:10 191:21
**forwarded** 91:6,11 123:17 156:9 176:2 179:25 180:3,7,13 188:24
**forwarding** 179:21 190:13
**forwards** 176:2,3
**found** 17:13 18:11 80:14 118:15
**Four** 185:15,16
**four-and-a-half** 23:7
**frame** 73:8
**free** 25:12
**Freedom** 184:25
**Friday** 1:13 112:16 114:10
**friends** 25:11
**front** 94:18
**full** 8:9,10,18 38:21 174:12
**full-time** 24:18 35:10
**fully** 7:12
**function** 26:20
**further** 43:13 44:6 50:18 97:24 123:13
**future** 175:12

**G**

**G** 1:8 3:3 6:1 193:1 193:22 194:14
**GA** 2:5,9 193:24
**game** 94:16 100:10 111:18 122:15,22 132:16 134:12 146:4 148:19,22 188:14 191:21
**gather** 112:1 122:11
**general** 49:17
**generally** 37:7,14 47:4,6 48:4,15,18 78:10 168:22 171:12 186:22
**gentleman** 105:24 125:24 180:1
**gentleman's** 117:22
**Georgia** 1:1,12 25:13 194:2,21,21
**getting** 46:8 71:4 73:25 76:15 96:16 146:18 178:23 189:9,9 190:18
**give** 9:9 10:5,10 38:9 51:1,5 73:16 95:6 108:11 114:20 121:16 141:18 146:8 184:14
**given** 128:11 150:18 170:2 192:2 194:12
**gives** 120:20
**giving** 7:18 45:4 114:15
**Glass** 4:9 60:20 164:11,22 165:3 166:10,14 181:3
**Glass's** 165:14 176:3
**Glen** 8:19
**go** 5:20 8:17 10:5 11:19 15:2 22:20 23:5,22 25:19 40:8 48:17,17 52:17 64:17 78:24 95:9 97:23 100:12,18 101:2 102:5 105:23 106:19 109:15 119:6,15,18 126:25 128:21 129:20 146:6 149:22,23 153:9 155:2 159:12 160:2,25 167:5 168:23 183:12 184:5 185:9
**goal** 149:17 175:9
**God** 79:7
**goes** 51:15 61:8,20 70:4 88:10 93:8 115:3 121:17 127:11 131:3 168:17 174:21
**going** 6:9 13:24 14:6 23:22 37:8 40:17,18 43:13 44:17 46:5 47:9 50:5 51:18 68:6 73:16 76:20,22 93:22 95:22 96:4 97:23 100:21,24 101:2 102:17 104:17,23 109:2,17 113:1 114:25 116:22 122:4 127:4 129:23 137:16 141:18 143:21 145:18 146:6 159:2 159:6,12 160:24 162:13,21 169:1 172:17 184:8 188:14 190:8,18
**good** 7:1 8:8,12,17 32:18 38:10 49:3 125:13 138:7 146:19 191:16 192:17
**Gordon** 22:4
**gosh** 75:20 160:24
**Gotcha** 57:24
**gotten** 47:8 65:13 69:1,3 123:15,15 163:18
**governance** 37:15 38:5
**government** 36:18 79:21,21 135:14
**graduated** 23:6,8
**Grant** 4:3,11,16,19 47:23 48:3,5,11,20 49:2,8 78:6,8 82:8 82:13,14,22 83:15 83:16 84:2,24 85:11 85:17 86:8 87:7 90:15 94:12 96:10 97:16 100:2,13 101:12 102:1,10 113:18 119:10 122:15 132:16 133:8 134:12 136:6 137:15 146:5 147:13,15 148:20 156:10 165:1 168:3 175:19 176:4 177:7 181:18 186:12 187:7 188:14,25 190:13,15,17 191:9 191:21
**Grant's** 100:20
**gray** 158:16
**great** 56:7,21 101:16 101:17 192:7
**greater** 175:11
**GREEN** 2:3
**Gregory** 1:12 2:8
**grew** 22:16
**grocery** 25:9
**ground** 129:7 142:2 191:25
**grounds** 110:22
**group** 46:14 169:4
**GroupWise** 30:9
**grow** 89:9
**growing** 75:14
**guess** 18:11 23:8 25:17 26:23 31:11 32:15 33:21 50:5 56:22 83:12 96:14 102:20 109:14 110:12 120:4 171:17 185:2
**guideline** 81:14
**guise** 79:8
**guy** 25:12 170:11
**guys** 169:16
**gym** 62:10

**H**

**half** 36:20
**hand** 140:18 186:19
**handed** 166:8
**handful** 74:6,8 90:3
**handing** 83:24
**handle** 83:4,25 85:18 96:21
**handled** 20:17
**handling** 88:24 89:8
**hands** 74:21 75:10 92:18 103:1,6,10 137:7 160:15
**hands-on-the-wind...** 76:4
**handwritten** 4:23
**happen** 14:21 92:10 108:22 126:12 150:23 151:8 152:3 154:10 187:8
**happened** 81:4 117:5 117:6,8 150:7 151:5 160:21 180:17
**happening** 111:7 141:15 157:6
**happens** 126:22
**hard** 7:21 17:11 30:15
**head** 7:20 89:17
**headed** 90:7,10
**healer** 121:11
**healing** 174:20
**hear** 125:16 160:13 160:18,21
**heard** 62:14 63:1,9 65:5,7,18 66:1,7,24 68:23 69:4 71:2,7 75:8 161:6
**hearing** 74:24 75:1
**Heather** 60:16
**heights** 175:11
**held** 84:8 92:21,25 94:21
**help** 51:21 69:18 92:9 113:21
**helped** 162:17
**helps** 63:6 69:24 153:22
**Herb** 32:24,25 33:1
**hey** 16:2 83:21 118:8 122:9 123:16 146:9 158:8,23
**Hickory** 57:14 58:20 59:24 60:23
**hierarchy** 56:13 57:16,20
**high** 22:20,21,25 23:1 23:6 40:21 55:21 138:5,6
**high-performing** 138:11 139:2,4,6,11 141:2
**high-status** 139:11
**highest** 39:20
**highlighted** 45:13
**highly** 170:11
**Hillgrove** 40:21
**Hindu-based** 115:24
**hire** 39:17,25 40:8,15
**hired** 40:17
**hires** 169:1
**hiring** 39:14 40:22 142:24
**hirings** 41:2
**hold** 35:23 138:25 163:18
**home** 9:24 19:23 126:13 148:3
**Homeschool** 127:20
**honest** 163:16 179:4
**honestly** 137:18 143:14
**hope** 137:24 184:9
**hopes** 149:19
**Hospital** 22:9
**hospitals** 25:9
**hour** 15:11
**hours** 36:2 37:11
**housed** 32:1
**HR** 18:5,8 36:14 53:18
**HR-related** 117:13
**Huff** 101:21
**huh-uh** 7:20
**human** 42:16 61:11
**human-resources-r...** 36:11 37:20
**humanresources@c...** 4:9 165:19
**humiliating** 138:15 138:16
**hundred** 137:19 172:22
**hundreds** 74:3
**HVAC** 25:11
**hybrid** 35:14
**hypothetical** 143:25 144:3

**I**

**IBM** 24:19
**idea** 23:23 49:4 61:2 71:21 108:18 177:13 187:15,18 191:17
**ideal** 175:3
**identified** 45:7 52:19 77:7 98:11 116:17 129:18 146:14 155:16 164:2 173:23 184:21
**identifies** 120:20 134:12 154:1
**III** 1:9 2:3
**imagine** 10:8 81:14 141:21
**immediate** 102:22
**impact** 133:25
**implementation** 145:25
**implemented** 110:10 145:23 187:17
**implementing** 47:12
**implied** 190:20
**important** 48:25 49:4 132:7,7 133:5
**impose** 70:15
**impression** 181:24
**improve** 68:21,21
**inability** 133:23
**inaccurate** 129:12
**inaction** 174:13
**inappropriate** 70:10 70:14 145:2
**incident** 74:19 76:4 112:19
**incidents** 117:7
**include** 37:20 110:1 110:20 125:7 182:6
**included** 33:23 79:9 96:1 111:5 122:22 161:15
**includes** 53:9
**including** 16:11 29:17 79:16 131:15 137:3 170:17 180:4
**inclusive** 36:9
**incoming** 30:10
**incomplete** 192:5
**increase** 68:20
**indefinitely** 172:12
**Index** 3:1,2 4:1,25
**indicate** 193:20
**indicated** 78:23 92:1 93:7 94:13
**indicating** 188:23
**indication** 92:5
**indicative** 132:17
**indifferent** 134:11
**individual** 40:20 44:12,15 53:23 73:18 92:13 139:17 142:14 159:17 172:15 173:2
**individually** 5:17 41:10 46:10,13 75:13 169:4,5
**industrial** 25:8
**inference** 83:20
**inferred** 190:12
**inflammatory** 191:15
**influence** 189:21
**Info** 165:24
**information** 6:11 14:14 16:17 20:4 22:6 23:9,11 24:5 25:2 26:6,19 27:24 29:5 31:3 33:18 35:18 60:6 69:9,11 72:25 78:13 96:9,15 114:13 136:5 149:4 153:20,21 155:11 186:24 187:2
**informed** 73:11
**infrastructure** 23:18 25:5 26:23
**initial** 100:25 190:15 191:8
**inject** 145:18
**injected** 134:15
**injecting** 145:8,13
**injection** 188:13
**inquiries** 160:12
**inside** 143:19
**instance** 14:2 43:14 44:23 141:19 152:15 167:11
**instances** 73:17
**instruct** 188:18
**instructed** 29:16 103:14 171:15
**instruction** 94:23,25
**intended** 106:13,16
**intent** 84:11 92:9 95:25 134:13 145:17 188:13
**intention** 113:19
**intentional** 187:23
**intentions** 141:20
**interact** 118:5
**interactions** 111:24
**interchangeably** 63:18
**interest** 70:1 195:6,13 195:16
**interested** 72:9
**interim** 33:11 34:4,5 34:7 35:11 87:14
**intermediate** 86:20 86:22,22
**intern** 121:10
**internal** 28:13 102:22 109:3
**internally** 29:14
**Internet** 27:6,16 65:15
**interrupt** 76:11
**intervention** 112:21 112:24
**interview** 156:20
**interviewed** 154:11 191:7
**intranet** 27:3 28:9
**investigate** 82:2 117:20 147:7,8 155:2 156:19 188:19 190:2
**investigated** 117:15 128:14 154:21
**investigating** 191:5
**investigation** 118:4,6 122:11 155:5 156:16 188:8
**investigative** 118:2
**investigators** 118:5 155:2

**investments** 187:12
**involve** 88:24
**involved** 17:3,6 24:17 28:6 29:22 48:6 49:18 58:13 71:4 74:1 84:15,17 85:15 86:8 89:3 117:12 123:13,16 133:8 137:21 151:4 163:10
**involvement** 47:12,23 83:3 178:1
**involving** 189:3
**issue** 89:15 110:13 134:16,21 162:7 169:13 171:12
**issued** 80:22,24 170:8
**issues** 48:16 64:22 132:18
**IT-related** 14:10
**item** 41:13,13 44:18 81:18 109:3,20 111:2,20 112:15
**items** 41:14 44:20 48:16 102:12,21 114:12 168:24

**J**

**janitor** 40:8,8
**January** 8:24 9:11 73:6
**Jeff** 112:16,19 130:23
**JM** 193:25
**job** 7:6 26:9,22 35:22 38:10 39:4 49:17 52:6 82:14 86:4 87:1 89:4 118:14 124:7,8,15 132:18 133:11,23 174:20
**Joel** 1:10 7:21 195:22
**John** 4:11,19 18:4 32:6,17 42:22,22,23 48:5,9,15 50:14 60:12 61:10 90:11 97:16 101:23 114:13 117:11 136:6 137:15 147:13,15 156:10 164:23,25 165:19 167:2 168:16,22 169:7 176:2 177:7 177:11 178:6,12 179:8,11,11 181:14 181:18 182:1,10 185:19 186:13 188:24 190:1
**John's** 185:18
**JR** 2:8
**judgment** 152:12 174:14
**Judicial** 194:20
**jurisdiction** 28:3
**justified** 88:17
**justify** 144:22

**K**

**k12.org** 10:15
**Kary** 184:24 187:9
**Kate** 116:4,4
**keep** 33:8,10,15 146:18 159:22
**keeping** 83:2
**Kennesaw** 31:16 174:21
**Kennestone** 22:9
**kept** 17:12,21 173:10
**key** 135:6
**kid** 59:3
**kids** 126:1,4,6 128:7 128:12,21 142:4 148:3 158:8 159:19 187:3
**kin** 194:16
**kind** 17:12,22 19:18 24:12 25:9 26:6 30:5 32:6 37:15,23 50:1 53:20 62:22 65:10,24 70:10 75:13 76:7 81:7 83:3 84:13,18 94:15 94:16 103:11,24 104:23 107:8 111:6 112:12 113:1,2 118:2 119:4 122:15 123:17 124:15,17 124:18 128:22 132:20 136:13 148:21 151:4,11 152:10 155:13 160:7,16 162:19 165:22,22 170:11 175:24 178:23 179:24 184:8 186:9 186:23 187:4 188:16,17 191:14 191:25
**kinds** 79:18 99:5
**knew** 71:12 112:8 124:2 149:1
**know** 7:8,24 13:10,22 14:6,8 16:1 17:7,7 18:15 23:21 29:23 33:8 35:25 37:22,24 37:25 38:15 39:3,5 41:2 46:5 47:7 52:6 52:8 58:3 60:15,17 60:19,21,22,24 61:4 61:5,7,10,25 62:3 62:13,16,18 63:14 63:20 65:11,21,24 65:25 66:9 68:11,13 68:13 69:16 70:5 71:9,22,22 72:2,17 73:6,24 74:3,10,12 75:7,12,20,21 77:19 79:12 80:6,17 81:8 81:12,18 82:7,11,24 83:4 84:10,12,16 86:10 87:12 89:4 90:6,8,9,15,16,25 91:2,7 92:20 93:21 94:12,20 97:19 99:2 99:4,6,9 101:18 102:16,18 103:11 103:13 104:1,8,22 105:2,3,4 107:7,8 107:13,15,18,19 108:5,13,22 109:11 110:14,15,17 111:9 111:10,16 112:23 112:24,25 114:14 114:18 115:2,18 116:1,4,7 117:6,14 118:8 119:22 120:8 120:15 121:18,21 122:16,23 124:4,13 124:14,14,17,21 125:24,25 126:2,3,5 126:25 128:16,19 129:4 131:20 134:3 134:14,22 135:11 136:14,16,16,21 137:18,21,25 138:21,23 140:7 141:8 142:4 144:9 145:23 146:9,11,23 147:23 148:25 149:11,13,25 150:14 151:14,22 151:25 154:3,4,10 154:17 155:23 156:4 157:7 158:24 159:10,11 160:8,9 160:11 161:1,11 163:1,6 165:9 166:10 167:9,22 169:5 172:9 174:4 175:23 177:18,21 177:25 179:2,4,11 179:13,22 180:18 181:6 182:4,5 184:7 184:7 185:10,24,25 186:2,3,8,18 187:2 187:5,9,22,23,24,25 188:16 189:17 190:6 191:4,11 192:10
**knowledge** 13:18 14:19 30:24 47:14 70:19 118:17,20 124:1 125:10 150:3 172:11,14 177:11
**KSU** 22:25 23:3,5 24:16,17 35:3

**L**

**L** 2:8
**laboring** 8:13
**ladder** 160:3
**laid** 74:21 75:9 108:20 160:15
**Lamb** 4:7 155:22 156:4,12
**Lamb's** 156:24
**landline** 9:24
**lane** 190:16,19
**language** 110:15
**laptop** 173:4
**large** 61:2 161:10
**law** 1:11 5:10 6:16 72:18,18 88:10 158:2 195:11,14
**laws** 36:22
**lawsuit** 16:5 29:9 150:11
**lawyers** 16:10 29:12 36:1,20
**layperson's** 23:10
**leader** 115:19
**leadership** 35:2,19 52:14 53:22 54:4,16 54:17 55:16 72:4 82:16,16 86:11 87:15 167:3,4 185:3
**leading** 104:5,18
**learn** 85:16 128:14
**learned** 9:2 83:6 103:20 176:12
**leave** 17:25 27:20 185:5
**leaving** 185:6
**led** 92:18 148:22
**left** 26:17 27:23 53:21 62:3 99:2
**legal** 36:1 79:20
**lengthy** 46:23
**lens** 101:2 106:11
**lesser** 139:12 185:7
**lesson** 104:18
**lessons** 79:10 104:6 174:19
**let's** 17:8 24:11 37:5 95:8 100:12,18 102:5 106:19 109:15 125:18 129:20,21 139:10 141:21 142:1 158:8 158:23 169:14 183:12
**letter** 103:25 119:4,7 119:15,18 120:4,5,7 156:25 158:2 171:17,18,19 185:2
**letters** 49:25
**level** 39:14,17 50:10 51:9 55:6 101:17 110:14,18 120:14 140:14 175:7,16 181:7
**levels** 39:19 55:18
**life** 33:10 121:11 174:20
**light** 47:19
**limited** 131:16
**line** 24:12 41:12 52:1

81:18 106:19 109:3 110:12 123:3 135:12,16 160:10 164:20
**lines** 142:7
**link** 140:12
**list** 11:19 40:18 41:3 48:15 168:24
**listed** 193:5
**listen** 20:3
**litigation** 17:18 28:22 29:8 99:9
**little** 11:19 16:8 22:6 27:18 39:3 44:5,8 49:13 51:5 54:20 65:12,13,18,19 66:13 75:3 107:25 154:8 158:19 163:13 176:22 189:8
**LLC** 1:12 2:8
**LLP** 2:4
**Local** 22:12
**located** 31:13
**location** 140:15,22
**long** 11:14 13:9 15:10 25:21 26:12 35:5 58:19 145:7 149:25
**longer** 31:21 163:7
**look** 64:7,14 71:9 74:13 76:15 77:13 83:21 98:16 99:23 113:13 116:22 129:23 134:13 146:24 153:14 164:5 170:17 185:12 190:21
**looked** 15:12 87:3 92:12 122:19 125:22 136:17
**looking** 15:24 52:3,4 83:4 84:3 90:19 95:8 97:9,17 132:4 144:20
**looks** 90:20,21 91:4,5 101:25 186:12
**loop** 121:5
**Lord** 27:7 146:19
**lot** 63:17 91:15 121:9 136:23 148:24 191:14,24
**lottery** 126:21 127:3 127:4,9
**love** 186:21
**low-performing** 141:2
**lump** 132:20
**lunch** 116:15 125:20 128:25
**Lynn** 22:4

**M**

**Mableton** 167:19,24 184:13
**maintenance** 33:25 50:16
**making** 37:23 160:3 185:14
**malicious** 134:13 145:17 188:12
**man** 67:13 81:20
**manage** 148:21
**management** 136:11
**mandalas** 103:18,22 121:12
**mandatory** 110:1 111:5,11
**manner** 94:10 137:17 187:16
**manufacturing** 25:1
**March** 99:16 153:16 164:11 174:3,24 186:1
**Marietta** 1:12 2:9 22:11 193:24
**mark** 32:8 33:2 52:18 76:20 109:7,10
**marked** 76:21 77:10 98:13 146:17 155:18 164:4
**mass** 59:20
**master's** 24:2,4 25:25 26:2 34:17,22 35:1 35:18 36:14
**material** 108:5 118:1 121:25
**materials** 19:15 109:7
**math** 165:6,14
**matter** 5:15 6:23 11:16,20,21 12:3 14:20 19:3 35:12 85:17 172:12 175:6 189:3
**matters** 11:8 14:10 20:16 21:2 36:11 49:20,23 170:13
**mattress** 59:20
**meals** 25:13
**mean** 10:24 12:3 31:17 40:22 44:14 44:16 47:20 54:14 61:15,18 63:11 74:10 75:6 92:12 94:5,6 102:17 104:22 105:4 111:13 118:7 122:5 127:3,4,23 131:10 144:15 145:16 148:18 152:9 153:24 154:10 156:20 157:3,15 158:8 167:21 179:22,25 182:4 186:6 188:15 189:25
**meaning** 79:6 175:18
**means** 38:25 110:2 115:7
**meant** 29:7 68:20 155:14 186:25
**media** 163:18,20
**mediation** 110:2,3
**medication** 8:14
**meditate** 63:6,16,21
**meditation** 63:1 64:3 66:3 67:6,25 69:5 69:17 96:3 108:2,6 108:9 110:9,21 111:5 115:10,22 117:23 131:18 136:3 151:12 157:3 157:5,9 158:15 178:2,21 183:1 189:4
**meet** 55:9 77:24 102:18 179:16
**meeting** 15:8,10 20:13 41:11 45:3 46:21 48:7,12,18 69:15 84:8,11,14,19 84:25 89:11,13,18 89:25 90:7,12 91:13 91:16,18,18 92:6,9 92:12,15,19,21,25 94:21 102:12 113:19,24 114:1 130:22 132:8 134:23 136:10 149:1,12 161:7 168:23 175:2 176:8 176:17,18 177:2,3 177:15,23 178:6,7 178:14,17,19,24 179:6,15 180:17 182:12,13,14,18 183:5,6,6,13 185:22 186:7,10 190:19 191:9
**meetings** 20:7,17,24 20:25 21:7 110:1 111:5 137:4 177:24
**Melissa** 4:5 60:18 153:18 189:17
**member** 37:13,23 38:1 57:10,16,19,21 57:22,25 58:20,22 60:2 61:6 73:19 97:14 110:8 139:9 154:9
**members** 37:10 38:19 38:23 46:19 58:4 60:23 63:12 85:1 89:25 96:16 114:10 114:14 136:21 149:11
**membership** 61:2
**memo** 101:8 134:25 135:2
**memorandum** 29:16
**memories** 6:20
**memory** 8:14 102:8
**mentioned** 149:15 177:21
**message** 99:16 113:23
**messages** 170:18
**met** 15:1 77:21 94:14 102:14 114:11 116:7 187:11
**method** 65:10
**Methodist** 59:3,4,4
**methodologies** 146:2
**middle** 7:14 55:21 89:18
**midmorning** 84:21
**midst** 137:1
**mind** 70:6 144:6 160:11 161:21
**mindfulness** 65:5,23 67:5,22 68:11,16 69:6,17 73:3 79:8 79:10 97:4,12 98:3 111:12 115:15,22 116:9 124:6,24 128:1 131:18 133:16 136:4 145:19 146:2 151:11 157:5,10 158:15 159:5 178:1 178:20 183:1 187:15 189:3
**Minimal** 70:21
**minute** 27:8 37:6 39:11 102:6 116:21 141:6,21 146:24 149:15 153:10 164:6 189:8
**minutes** 20:23 21:25 100:1
**misconstrued** 132:6 133:4
**mishandle** 101:14
**misinformation** 132:12
**mistaken** 172:16
**Misty** 166:4
**modify** 54:20 133:7
**moment** 77:11 98:16 129:23
**monitor** 175:6
**month** 9:2,9 186:7
**Moore** 90:21,25 96:2 102:13,14 117:21 118:19 121:4 188:10,19 189:2
**Moore's** 121:13
**moot** 133:1
**morality** 67:2,5,7
**morning** 129:9
**Morrison** 9:14
**motivate** 159:20,21
**motivation** 142:15
**move** 100:11 137:23 138:17 140:9 143:22 175:9
**moved** 33:20 82:19

143:17 162:10
**movement** 21:11
**moving** 101:7 107:20 137:25 140:19,19 140:23 162:16
**Moyer** 1:10 195:22
**multiple** 162:16 166:1
**Muslim** 143:13 188:4

**N**

**N** 8:20
**nail** 33:14
**namaste** 79:6 103:2,7 103:15
**name** 6:6 8:18 13:15 22:3 42:21 52:11
**named** 12:6
**names** 79:7 121:16
**national** 144:18 163:17
**nature** 38:23 67:19 68:14 91:19 105:19 113:4 118:10 122:5 163:11
**NE** 2:5
**near** 175:11
**necessarily** 18:17 55:9 61:16 64:3 85:20 120:9 121:4,6 122:2 124:15 140:9 158:18 160:4
**necessary** 145:22
**necessitated** 122:22
**need** 7:8,19,23 33:14 40:3 52:8 60:5 72:21 107:19 142:10 169:19 170:4 176:8 186:15
**needed** 101:19 122:24 149:9 161:23 171:22 175:8 193:19
**needing** 121:2 186:25
**needle** 135:11
**needs** 124:14 129:12 132:8
**negative** 124:1
**network** 28:12
**networking** 23:18 24:21
**never** 61:13 73:1 100:13 108:19,19 110:18 116:11 140:2 144:2 181:2 187:11 189:1
**new** 87:8,10 168:25
**newspaper** 163:5
**night** 35:13
**nine** 37:11
**nod** 7:20
**non-Christian** 81:22
**nonelectronic** 172:1
**norm** 153:1 180:10
**normal** 166:22,24 183:24
**normally** 101:18 133:9 183:15
**NORTHERN** 1:1
**note** 145:25 179:12
**noted** 155:11
**notes** 17:11 27:18 118:2 154:14,24 155:3 179:7,15,17
**notification** 163:1
**notwithstanding** 94:23 142:14
**November** 1:13 5:1 162:11 195:20
**number** 9:16 30:19 57:2 89:16,21 102:21 127:6,7 128:17 129:8 161:10,15 169:25 178:16 180:4 193:20
**nutshell** 139:7

**O**

**oath** 6:11 13:25 18:16 129:4 189:15
**objected** 71:13 110:8 110:21
**objecting** 180:1
**objection** 63:24 70:6 105:7 110:25 135:17 178:20
**objectionable** 108:15
**objections** 5:10 19:8 71:15,23 151:21
**obtained** 35:21 109:9
**obviously** 15:18 56:2 62:14 87:17 117:4 156:2 162:3 185:17
**occasion** 176:11
**occasions** 179:19
**occur** 113:9 125:14
**occurred** 13:10 20:13 21:22 45:25 47:5,16 109:22 111:3,11,17 111:21 112:2 118:24 122:18 177:25
**occurring** 96:23 175:15
**OCGA** 195:3,7
**off-the-record** 153:7
**offended** 135:19 141:15
**offer** 113:19
**offered** 195:18
**office** 43:22 44:2 48:9 64:7 73:18 74:22 109:8,13,15 121:13 137:7 146:7,10 176:14,17 183:20
**officer** 12:1 18:5 26:6 26:19 27:24 29:5,6 32:4,8,12 33:18,21 42:16 53:10,11 54:9 54:19 55:12,16 56:19 60:6 61:11 82:16,17 86:11 87:15 167:3,4
**offices** 1:11 31:12
**official** 50:3
**oh** 22:25 26:1 27:7 44:19,19 59:17 62:6 75:20 140:6 152:11 160:24
**okay** 6:18 7:3,4,9,9 7:15 8:1,12,17 9:8 10:2,18,23 11:10,15 11:23 12:2,11,14,18 12:21,25 13:3,8 14:4,9,12,17,24 15:2,4,6,10,20 16:4 16:15 17:16,20,25 18:7,15 19:12,22 20:2,7,20 21:6,13 22:5,10,16,22,24 23:13 24:1,8 25:7 25:20 26:3,12 27:2 27:9,11 28:11,25 29:7 30:8,12 31:5,8 31:10,15,17 32:14 33:4,13 34:1,16,23 35:7,17,25 37:17 38:3,7,11 39:17,20 39:25 41:9,16,23 42:1,8,13 43:4,13 43:24 44:2,5,14 45:2,22 46:3,6 47:3 47:15,19 48:11,24 49:7,13,16 51:16,20 52:5,17,21 53:20 54:1,3,8,11,21 55:3 55:4,19 56:1 57:4 57:15,24,25 58:16 58:22 59:2,17 60:16 61:4,22,25 62:21 63:15,19,22 64:6 65:4 66:1,12 67:1 67:13,21 68:4,9 69:10,13,23 70:3,12 70:18 71:7,12 72:12 73:2,15 74:9 75:18 76:1,6,19 77:1,9,15 78:9,11 79:2 80:23 81:4,17 82:7,18,22 83:11 84:1 85:10,12 86:1,9 87:11 88:4,8 88:20 89:23 90:6,9 90:13,17,19 91:4,13 92:1,4,7,23 94:14 96:6,14,22 97:7,18 97:20 98:13,15,20 99:2,11,15 100:9,18 101:4,5,16 104:4,19 105:1,14,23 106:9 106:11,19 107:17 107:21 108:11,12 109:2,14,20 110:24 111:9,15 112:6,15 114:5,8,18 115:18 117:1,1,2,10,14 118:17,24 119:11 120:24 121:7,22 122:25 123:11,25 124:12,13,16,20 125:4,16,21,23 126:12,23 127:13 129:25 130:3,8 131:20 134:4 135:8 135:23 139:15,20 139:23 141:19 142:20 144:24 145:12,20 146:16 147:1,2,14 148:7 151:5,20 152:9,17 153:11 154:17 155:24,25 156:11 157:13 158:1,5,21 159:18 160:5 161:16 163:10 164:8,17 166:3,5,18 167:9 170:22 171:16,24 173:16 174:5,10 176:16,19 177:5,9,18 178:4,9 178:12 179:18 180:14,20,25 181:10 182:3,8 183:4,12 184:11,23 185:1,25 186:11 187:14 188:22 189:16 190:5,14 191:10,13,22 192:7
**once** 15:1 126:22 150:14 174:4
**ones** 67:18 99:13 123:1
**ongoing** 84:5 89:15
**online** 35:14,16 109:9
**open** 127:7
**operating** 104:17
**operations** 18:8 33:23 53:19 56:18
**opinion** 67:1,4 115:21
**opportunity** 18:9 77:17 108:12 123:18 129:25 171:6
**opposed** 110:16
**opposing** 115:9
**option** 126:20
**options** 124:19 126:18
**oral** 7:18 97:10 162:20
**oranges** 143:7
**order** 19:24 20:4 36:5 66:8 171:13 176:9
**ordered** 137:9
**orders** 171:16
**ordinarily** 20:17

**ordinary** 75:4 90:1 152:19 162:13
**org** 4:23 10:16 51:5,8 51:24
**organization** 38:16
**organizational** 52:22 56:11
**organizations** 23:19 36:17
**organized** 57:11
**origin** 144:18
**original** 99:15
**outcome** 166:20
**outline** 100:3
**outlined** 133:22
**Outlook** 30:7,10
**outside** 97:11 158:3 159:12
**overall** 75:14 106:10 125:8 171:2
**oversight** 152:13
**overtone** 93:25 94:5
**overtones** 57:8 93:11 187:24 188:2,5

**P**

**P** 1:10 195:22
**p.m** 1:14 99:17 129:1 129:2 169:21,22 189:12,13 192:18
**page** 3:6,10 91:8 174:10
**page(s)** 193:20
**PAGE/LINE/CHA...** 193:6
**pages** 194:10
**paragraph** 132:4 133:22 174:12
**parameters** 145:22 146:12 159:14
**paraphrasing** 93:10
**parapro** 154:2 189:20
**parapros** 188:20
**parent** 126:12 154:9 162:20 167:14,14 177:14 178:7
**parental** 144:19
**parents** 84:9 89:17 126:3 127:21,24 128:7,11,20 141:24 143:20 145:5 161:12 163:2,3 177:3,23 179:1,3 188:20
**parishioner** 57:15,19 57:22
**part** 17:2 19:19 20:19 29:21 48:22 49:17 87:3 96:1 100:19 106:22 107:2 118:6 132:14 141:20 146:4 147:24 148:9 157:10 163:25
**part-time** 174:20
**partially** 138:13
**participate** 110:4
**participated** 36:25
**particular** 47:10 118:6 133:10 136:24 140:8 142:3 150:16 158:25 179:22
**parties** 194:17 195:19
**Partners** 184:25
**party** 12:7,7,9 13:16 195:12,12,14,15
**passed** 157:22
**passion** 175:13
**Patrice** 90:20,22 96:2 102:12 109:22,23 109:25 191:12
**Patrice's** 113:19
**Paulding** 22:17,18,21 25:23 26:5,13 27:1 27:20 28:6,24
**PC** 193:24 194:23,24
**PE** 109:6,13 110:17
**Peaceful** 108:2,6,8
**Peachtree** 2:5
**penalty** 6:11
**people** 6:19 13:23 19:8 21:4 29:17,22 36:21 41:24 56:12 60:10 62:16 63:6,17 63:25 66:7 71:2,13 71:23 74:19 75:9 90:3,5 91:15,16,23 92:16,17 93:4 94:7 97:9,25 114:3 115:8 135:20 137:4,5 141:13 142:8 146:7 146:9 148:5 149:18 149:22 151:21 155:13 160:14 161:10,11 166:2 169:4 170:12 174:12 178:17 180:4 188:1
**people's** 182:6
**perceivably** 140:2
**perceived** 106:12 134:7 135:10,15 139:3 141:14 162:9 167:13
**perceiving** 81:25
**percent** 137:19 172:22
**perception** 94:11 95:11,13 100:23 101:5,10 104:9 105:9,10,17 106:17 134:6,11,17 135:22 142:20 187:20
**perfectly** 28:14,15
**performance** 50:5,8 51:11 86:5 87:1,4 89:5 120:18 123:19 124:8 132:19 133:23 138:20,22 165:7,15
**performance-related** 87:21 125:12
**performed** 123:23
**performer** 124:7
**performing** 138:5,6
**period** 120:23 172:2
**periodic** 30:21
**periodically** 25:18
**perjury** 6:12
**permanent** 33:12 34:10
**permitted** 5:10 100:5 100:6
**person** 13:24 18:11 30:25 32:18 42:8 60:15 70:5 76:6 83:24 96:20 97:3 110:20,24 112:22 115:14 127:12 130:24 142:10,16 144:14 147:4,16 149:6 152:1,13 195:9
**person's** 143:22,23
**personal** 4:14 10:9,18 11:3,7,20 17:11 39:21 70:15 91:10 91:11 93:8 106:7 170:7
**personally** 98:6 156:15,19
**personnel** 18:1 20:16 21:2 39:12 40:5,15 40:15 41:17,20 48:16 49:20,23 85:24 109:8 113:5 118:21 120:9,10,14 168:17,24
**persons** 14:19
**perspective** 137:11 175:2
**pew** 61:15
**philosophy** 62:23
**phone** 9:16,25 97:3 147:4 170:7,7,17
**physically** 88:5
**pick** 148:3
**picture** 28:3 133:15 133:24
**Piedmont** 61:20
**Piggy** 108:2,6,8
**place** 32:1 48:1 68:12 101:11 103:1,6 122:10 151:12 152:14 161:1,2 173:19
**placed** 49:25 118:21 120:8 127:8
**placing** 103:10
**Plaintiff** 1:3 2:2
**Plaintiff's** 4:2 52:20 76:23 77:3,3,8,10 98:12,14 116:18 129:19 146:15 155:17 164:3 173:24 184:22
**plan** 94:16 100:10 111:18 120:18 122:15,22 132:16 134:12 146:4 148:20,22 188:14 191:21
**planned** 130:23
**plate** 38:21
**play** 135:15 186:10 190:17
**played** 163:24
**please** 7:3,14 10:11 109:22,25 111:22 112:17 113:22 114:14 192:16 193:19
**pleasure** 175:2
**plenty** 192:11
**point** 16:5,9 23:21,24 27:5 28:23 29:11 31:17,23 32:5 74:18 76:12 82:20 100:13 109:14 122:16 123:5 124:16 127:21 130:15 131:11 134:18 159:17 161:22,25 168:5 171:13 177:20 178:5 180:19 185:8,20
**policy** 171:2,9,24 172:5,12,21
**political** 38:23
**poor** 174:14
**portions** 20:24
**pose** 79:7
**position** 24:15 26:17 32:13,16 34:12 36:5 38:24 55:6 62:5,7 87:10,14 99:3 103:2 103:6,11 185:7
**positions** 24:22 40:12
**positive** 120:10 124:1 124:4
**possible** 30:2,3,4 116:12 118:4 148:8 151:23 167:17
**possibly** 119:10 152:14
**potentially** 89:8
**Powder** 9:14
**practically** 25:15
**practice** 48:14,14 62:17 63:12 64:25 70:7,25 71:3,10,25 78:10 88:25 95:12 95:18,23 96:1 100:15,21,23 101:1

101:9,11 104:24 140:16,20 143:1 148:14 149:4 172:24 183:24
**practiced** 61:23 67:22 68:1
**practices** 47:13,17 67:17,18 68:1,20 69:18 78:24 82:23 91:24 93:3,17 96:3 97:4,12 98:3,7,8,8 105:8 110:9,21 115:10,16,24 116:9 117:24 124:25 126:8 128:1 131:18 131:21 132:5 133:7 134:24 135:1,3,18 135:19 136:4 141:14,16 151:12 157:5,10 160:7 178:21 180:3 188:17
**practicing** 67:5
**pray** 63:18
**prayed** 75:10
**prayer** 64:3 74:20 103:2,6,11 137:6 160:17 177:21
**praying-type** 74:23
**pre-board** 183:6
**precaution** 132:23
**predominant** 178:19
**preeminent** 138:4
**preparation** 16:6 130:22
**prepare** 14:25 19:25 20:4
**prepared** 100:2
**preparing** 19:19
**present** 2:11 21:7 45:17 48:12 90:10 90:11,15 91:1 130:10 183:22,23 183:25 184:1
**presented** 40:10 49:21,24 50:3,6 69:8 93:12 136:12 152:5,8 162:5 169:1
**presently** 35:22 130:16 151:18
**presents** 42:14
**preservation** 171:2 171:10,25
**preserve** 29:17
**preserved** 30:11 31:19
**press** 163:13
**pressure** 66:16 85:3
**presumably** 14:4 147:14 181:20
**pretty** 15:3 17:4 32:11 36:13 52:13 65:9 114:20 134:12 145:12 147:25 160:23 161:2 162:6 168:18
**prevent** 89:3
**previous** 33:22 86:7 89:4
**prick** 102:7
**primary** 86:21
**principal** 19:10 40:17 47:10 50:9,10 51:9 56:6,6 85:6 86:19 90:22,23 109:23 114:6,11 120:14,16 122:24 123:10,20 123:23 125:8,13 131:13,15 134:23 137:20 138:1 139:10,10 140:13 140:21 141:4 149:20,23,24 150:5 150:8 160:1 162:10 163:8 166:25 167:12 174:15 195:10
**principals** 17:22,23 50:20,21 51:12,13 52:10,10,15,16 55:24 56:3,4,5 132:22 136:20 138:18 140:9,11,11 140:17,23,24 149:16 159:24 162:17 168:5
**print** 98:19 189:6
**prior** 86:7 87:12,14 185:11
**privacy** 21:3
**private** 23:23 127:18 127:20 128:21
176:7 177:2
**probably** 32:19,23 47:7 62:16 65:18 66:12 69:25 73:5 80:8 84:5 86:7 176:20 186:15,25
**problem** 71:10 120:20 137:10
**problematic** 124:7
**problems** 64:22 69:7 125:12
**procedural** 153:1
**procedure** 5:15 104:17 140:21 159:3
**Proceedings** 3:1 76:17 129:1 169:21 189:12 192:18
**process** 17:2 29:21,24 82:9,12 83:23 84:6 87:8,24 92:21 110:16 112:10 146:6 155:1 157:8 159:2 166:22,24
**processes** 102:22 109:3
**processing** 28:17
**produced** 18:10,17,20 98:22 99:8 146:20
**product** 25:4,6,7
**production** 16:18 18:12
**productive** 69:6
**professional** 111:24
**professionalism** 175:14
**program** 35:5,13 126:22 187:15
**programming** 23:16 23:17 24:22
**programs** 20:3,3
**progressed** 104:13
**prohibited** 142:23 195:3
**promote** 111:23
**promoted** 149:19 150:4,12
**promoting** 112:3,7
**prompted** 86:8 92:11 92:15
**promulgated** 78:20
**propensity** 151:7
**protect** 21:3
**protected** 142:17 144:14
**provide** 194:25 195:8
**provided** 5:3 109:7 158:22
**providing** 12:12,14
**public** 21:19 23:22 33:25 40:13 43:16 45:25 50:17 163:4 165:22 188:6
**publicity** 65:13,15
**pulling** 169:17 187:3
**pulpit** 115:16
**punishment** 139:16 139:24
**purged** 172:9
**purportedly** 126:8
**purpose** 6:10 84:23 84:25 101:8 146:19
**purposes** 5:9,10
**pursuant** 5:4,14 194:18
**purview** 128:13
**put** 51:2,18 111:13,17 120:16 122:15 148:20 155:12 188:14 191:21
**putting** 137:7

**Q**

**quality** 109:4 185:5
**question** 5:11 6:19 7:3,6 8:4,9 33:3,9 38:12 46:9,11 63:16 82:11 93:23 95:13 97:9 104:16 130:12 130:14 170:3 190:6
**questioned** 132:6 133:4
**questions** 6:10,15 7:2 7:12,18 32:20 55:3 77:14 116:23 129:8 129:24 146:25 164:7 192:3,15 194:6
**quiet** 110:3
**quite** 118:13 137:18 143:14
**quotes** 79:5 83:8

**R**

**race** 141:25 142:3,16 143:22 144:17
**racial** 142:9
**Ragsdale** 1:8 3:3 4:5 4:7,17,19,21 5:8,17 5:21 6:1,6 8:19 40:21 52:21 77:2 83:13 110:15 153:9 193:1,22 194:14
**raised** 71:16 122:12
**raising** 92:17
**ran** 43:9
**Randy** 60:10 97:13 97:22,23 98:5 116:8 116:11
**rates** 195:18
**re-mark** 76:22
**reach** 95:18,21 175:11
**reached** 181:20
**reaching** 187:5
**reacted** 75:12
**reacting** 139:17
**reaction** 75:5,11,22
**read** 41:18 65:19 71:7 78:5 108:8,19 130:17 135:1,4,5 166:13 193:2 194:8
**reading** 91:5 165:6,15 178:10 180:22
**ready** 76:15
**reality** 95:14 101:13
**really** 14:5 25:22 33:14 34:21 38:13 62:21 65:21 73:21 82:25 84:4 100:22 105:7 131:3 135:2 138:6,12 151:10 155:9 156:14 178:22 190:16
**realm** 111:14
**reason** 21:1 47:20,20 62:23 85:14 89:16 89:22 128:15 140:5 144:14,19,21 151:23 177:7 184:15 193:6
**reasonable** 175:1
**reasons** 45:5,14 139:13 142:9

**reassign** 176:8,12
**recall** 14:21 36:12 44:12,22 45:2,6,20 46:2,11,16,17,22,24 47:1,3,4 48:4,13 49:7,11 73:10,22 74:6 75:1 84:7 88:18,21 91:22 99:19,21 103:8,16 107:6 116:12 117:19 118:7,11 123:7,8 130:6,8 147:15,19,25 148:6 148:10 155:25 156:2 163:15,17 164:9,14 167:11,16 167:17 169:10 174:6,8 177:16 178:23 179:5 183:11,25
**receipt** 155:14
**receive** 99:21 130:13 166:2
**received** 45:8 74:2 77:22,25 130:18 147:2 155:7 164:16 188:23
**receives** 171:14
**receiving** 99:19 130:6 130:10 131:25 155:25 156:7,12 164:9,14,24 174:6
**recess** 76:17 129:1 169:21 189:12
**recite** 103:2,7,14 112:20
**recognize** 99:12 117:3
**recollection** 6:21 13:19 14:15 21:9 100:7 118:12 130:10 148:23
**recommend** 181:8
**recommendation** 40:24 42:12 43:2,5 43:15,25 45:23 47:24 119:25 136:22 162:4,5,18 163:23 166:19 167:1,22 168:8,10 168:17 169:12 176:12 179:19 180:5,13 183:9 185:14,20
**recommendations** 48:16 182:6,8
**recommended** 42:9 47:21
**recommending** 45:3 45:14 49:19
**recommends** 185:3
**record** 7:19,23 8:8,18 82:13 129:3 155:21 164:10 169:24 173:5
**recorded** 20:21
**records** 28:13 171:10 171:13,22,25
**recourses** 109:10
**recreational** 158:6
**redacting** 9:6
**reduce** 65:25
**reduced** 194:7
**reducing** 65:11
**redundant** 173:17
**refer** 71:2
**reference** 45:23 47:11 47:15 93:10 107:5 108:25
**referenced** 46:4 178:16
**referred** 37:16
**referring** 175:17
**reflect** 21:25 87:6 192:2
**reflected** 95:1
**reflection** 129:11 170:3
**regard** 28:19 74:5 136:24 149:10 152:22 155:6,9 157:25 163:22
**regarding** 113:20 187:2
**regardless** 70:8 94:2 188:3
**regularly** 59:10 140:20
**Regulations** 5:5 194:19 195:5
**relate** 72:25
**related** 11:22,23 17:4 17:5 35:22 36:14 63:2 68:24 69:5
**relationship** 195:6,11
**relative** 140:6
**relatively** 31:25
**relatives** 63:12
**relax** 63:21 66:3,8 69:19
**relaxation** 65:10,24 109:16 158:7
**relevant** 29:19 114:13
**relieve** 85:3
**religion** 57:7,11 70:24 79:14,20,22 80:1 135:10,15 142:17 143:23 144:17 188:13
**religious** 19:8 57:8 64:25 67:19 70:6,9 70:15,25 71:3,13 78:20,25 82:1 91:24 93:4,11,18,24 94:4 94:12 95:12,17,25 98:7 100:15,21,23 101:1,9,10 103:19 103:22 104:23 105:3,6,8,11,15,19 106:7,12,14,16,16 106:22 107:1,23 108:14 110:22 134:14 135:18,20 141:14,15 142:9 145:10,14,18 151:21 187:24 188:2
**religiously** 143:11
**relocate** 136:19 138:17
**relocated** 140:14,18
**remedy** 101:6
**remember** 11:14,15 11:18 12:5,6,15,18 12:21 13:1,3,7,9,15 14:12 15:15 25:22 27:15,17 29:20 34:20,21 45:22 48:7 48:11 73:13,13,15 74:24,25 76:3 80:16 82:20 83:11 84:20 89:22 103:23,25 104:3 107:3,4 117:2 117:4,5 130:16 148:1,25 161:5 177:20 178:15 184:3 186:6
**remembered** 100:2 147:24
**remind** 109:22,25 111:22
**removed** 117:25
**render** 8:14
**repercussions** 118:14
**replied** 102:1
**replies** 155:13
**reply** 78:8 122:25 132:16 153:16
**replying** 83:14,19
**report** 51:3 53:23 54:16 56:3,4,5 82:22 89:13 117:17
**reported** 85:11 91:15 178:13,13 194:5
**reporter** 1:10 5:3 194:1,22 195:23
**reporting** 5:6 57:3 165:22 193:24 194:20,23,24 195:1 195:9
**reports** 32:10 39:24 50:12,12,13 51:8,19 51:22 52:4 53:8,25 54:2,5 55:7 57:2 73:24 96:20
**represent** 6:7 194:11
**represented** 32:16
**reputation** 138:7,12
**requests** 16:18 18:12 28:22 170:16
**require** 40:5 44:21
**required** 36:3 37:9,10
**requires** 112:23
**requiring** 41:14
**resemble** 103:18
**resembling** 103:21
**reserve** 192:15
**reserved** 5:12 194:9
**residential** 9:13
**resolution** 47:25
**resolve** 84:12 120:21 152:14 184:8,9
**resolved** 13:20 14:5 92:6 120:23
**resolving** 89:9
**resources** 42:16 61:11 79:10
**respect** 11:24 31:3 38:4,4 46:12 49:19 78:17 109:16 120:13 121:3 171:10
**respond** 186:16
**responding** 28:21 170:16
**response** 112:21,24 129:8 144:6 147:12 186:15,16,19 187:1
**responsibility** 85:14
**responsible** 54:7 138:13
**responsive** 16:17 18:12
**restaurants** 25:13
**restrictions** 79:19
**restroom** 169:18
**result** 47:17 50:1 84:3 127:25 131:16,24 131:25 138:14 147:17 154:11 156:7 164:24 167:14 177:25
**resulting** 112:18
**resumé** 33:15
**retain** 171:13
**retained** 171:23 172:2,8,12
**retention** 172:5,21
**Retrievable** 30:17
**returning** 151:8
**review** 18:10 19:18 19:24 20:12 50:12 50:18 77:17 87:5 114:11 130:1 155:23 164:6 175:6
**reviewed** 16:1,2 19:15 87:19 157:4 174:4
**reviewing** 19:15 49:18 99:10
**reviews** 50:6,9,15,18 51:11
**right** 6:8,12,16 7:1,17 7:22,23 8:2,3,12,21 9:3,7 11:1,25 14:24 16:6 18:17,22,25,25

19:17 21:24 22:3,5 22:14,19 23:2,3,20 24:2,5,9,11,19 25:16,20 26:23 27:11,23,25 28:5,7 28:16,25 29:9 31:12 31:22 32:18 33:6,17 34:6 35:10 36:7,17 38:9,14 39:7 40:7 40:11 42:4,19 43:2 43:22 45:10,12,12 45:17,18 46:25 47:11,21 49:7 51:3 52:23,24 53:3,6,25 54:1,5 55:8,14 56:16,21 57:7,10 58:5,19,25 59:8,14 59:19,22 60:6 61:4 61:7,12,22 62:10,15 62:17,21 63:5,8,10 63:11,15 64:2,8,10 64:23 65:2,12,16,17 66:6,15,18,22,23,23 67:14 68:8,8 69:3,4 69:10 70:1,12,23 71:6,17,20 72:2 73:2 74:4 75:16 76:1,14 77:16 78:2 78:3,15,21,25 79:1 79:14,16,23,24 80:5 81:15,24 83:18 85:8 85:10,11 86:3,13 88:12 91:5,13 92:3 93:4,13,16 94:1 95:21 96:24,25 99:7 99:18,23 100:4 101:3,12 102:3,15 102:24 103:16 104:19 105:12,20 106:5,9 109:2 112:8 113:17 114:3,6,25 115:12 116:14 119:2,13,21,24 120:19,24 123:4 125:1,4,10,14,18 126:15,23 127:2,5 127:19 128:18,24 129:4,5,6,14,20 130:20 131:1,2,2 132:3 134:4,9,10,10 135:8,21 138:8,19 139:24 141:17,18 142:25 143:23 144:16 145:1,15 147:22 150:22,25 151:13 153:9 154:15 155:20 156:4,6 157:19 158:12,17 159:4,9 159:16,23 161:6,9 162:8,14 164:13 165:2,12 167:10 168:13 169:14,23 170:6,10,15 171:1 172:19 173:9,21 174:6 175:22,23 176:1,18,24 177:5 178:9,10,11 179:14 179:18 180:2,23 181:22 182:15 183:3,14 184:2,17 184:20 185:21 186:5,5 189:11,14 189:25 190:16 191:2,22,24 192:8 192:17 194:8

**Rivera** 4:3,11,16,19 47:23 48:3 49:8 78:6 83:17 84:24 99:16 106:24 107:10 108:23 114:8,19 161:23 167:24 176:4 181:6 181:12,18 183:10 183:22 186:12 190:7 191:4
**Riverside** 86:19,20
**Riversides** 86:21
**road** 9:14 36:21
**rocks** 106:20,25
**Rogers** 1:12 2:8
**role** 32:6,13 149:22 149:23
**roles** 18:6
**rolling** 8:6
**room** 102:19 121:14 160:16
**root** 133:23 134:7
**Roswell** 193:24
**rub** 67:10
**rule** 14:17,17,18
**rule's** 9:6
**rules** 5:5,15 36:21 194:19 195:4
**rumor** 107:12
**rumors** 132:12
**run** 43:6
**running** 27:25

**S**

**safe** 96:12 178:8
**safety** 33:25 50:17
**sat** 61:15 179:14 191:6
**saves** 25:17
**saw** 61:18 62:12,13 182:8
**saying** 7:25 8:1 51:10 93:8 97:16,22 102:1 103:25 105:7 106:6 106:7 121:10 130:9 132:11,17 133:3 134:3 142:10 144:5 154:5 158:23 159:1 174:24 179:3,23
**says** 41:14 102:10 103:17 104:4 106:20 109:3,20,21 110:2 111:2,20 112:1,16 113:18 114:9 121:15 122:17 132:5 165:10 174:11 176:6,23,23 187:14
**Scamihorn** 60:10 61:5,8 97:14 116:8
**scattered** 30:20
**school** 1:5 5:16,19 11:24 20:7,13,16 21:12 22:20,21,25 23:1,6 25:23 26:5 26:13 27:21 28:7 29:2,15 35:13 36:18 40:17,21 46:5 47:9 47:10,13 48:1 52:14 53:2,22 54:3,16,17 55:16 58:10 67:23 68:2 69:25 70:13 72:19 73:4 74:20,21 75:25 79:11,13 80:10 82:16,24 84:9 84:21 85:6,13 86:10 86:15 87:15 88:25 93:3,12,23,24 94:4 95:11,18 96:4 97:5 99:8 100:14,16 105:5,17,18 110:5 112:4 113:3,9 122:4 125:3 126:1,4,7,10 126:14,17,19,21 127:11,15,18,20,25 128:7,11,12,13,21 131:1,15 133:10,19 135:3,13 136:1 137:6,10,16 138:2 138:11,14,20,22,24 139:3,4,6,11 140:4 140:12,15 141:10 141:11,23 143:10 143:10 144:11 145:15 146:8,9 148:2 149:18 150:1 150:15,20 151:6,17 157:11 158:2 159:1 159:7 160:1,15 161:17,18 162:7,22 165:15 167:2,13,14 167:19 170:8,9 171:8 173:7 175:9 176:9 177:22 182:12 185:6 188:20
**schools** 54:7 55:24 68:11 69:7 72:3 80:1 133:17 135:3 138:4 141:1,2,3 146:1 160:6,10 168:5 188:6
**scores** 138:24
**search** 16:16 17:8,9 17:14 31:2
**searched** 31:4
**searching** 31:1
**Seasons** 24:24 25:21
**seat** 127:11
**seats** 127:7
**second** 174:10,12
**secretary** 20:22,22 21:24
**sector** 23:23
**secular** 95:23,23
**see** 16:16 27:13 51:8 51:12 52:7,9 68:17 71:10 82:3 83:21 88:16 91:7 123:2 127:23 132:21 133:13,24 137:8 138:10 153:13,22 170:18 174:10 179:21 186:19
**seeing** 88:18
**seen** 25:14 65:19 95:1 120:1 121:22 179:18
**sees** 40:19 41:3
**segment** 148:10
**Selman** 80:9
**semi-aware** 172:4
**seminar** 69:16
**seminars** 36:10 68:13
**send** 78:2 130:24
**sending** 78:12 83:12 132:15 153:20 186:24
**senior** 32:9
**sense** 136:23
**sensory** 68:20
**sent** 43:25 73:21 79:4 82:4 83:7 90:4 91:9 123:9 155:22 185:13 186:11,12 189:19
**sentences** 133:14
**sentiment** 178:19
**separate** 10:9 17:10 19:22 36:7,12 46:17 48:2 49:8,10 69:13 151:20 193:20
**separately** 17:13 48:8 178:12
**September** 27:22 29:1 80:21
**serious** 118:13 122:6 122:7
**seriousness** 75:14
**served** 29:9
**server** 30:18 31:1,7 31:11,12 173:6,11
**servers** 30:19
**serves** 18:6 20:22
**service** 23:22 58:17 59:15,23,24 74:21 115:15 137:6 160:17
**services** 195:1,9

**session** 20:18 21:3,7 21:15,16,19,22 37:24,25 39:12 40:19 41:12,15 42:15 43:16,16,20 44:21 160:14
**sessions** 20:20,23
**set** 157:22
**setting** 72:19 124:5
**settling** 136:8
**seven** 38:18 39:1,6 55:17
**sex** 144:17
**shake** 7:20
**shalt** 188:16
**shape** 42:25 163:19
**shapes** 103:18,21
**shared** 175:9
**she'll** 184:12
**Sheet** 3:5
**sheet(s)** 193:20
**short** 14:6 120:11 135:25 136:13
**shortly** 13:13
**show** 77:10 98:13 113:24 114:3 146:16 155:18 164:4 173:25 184:23
**showed** 89:18 91:16
**showing** 53:1 89:25 90:3,5 129:22
**shown** 102:25 103:5 122:1
**shows** 51:7
**side** 110:13 112:12 134:21 137:14
**sign** 50:8,11,17 51:10 87:25 88:2,5,6 152:2,4 194:9
**signature** 192:15
**signed** 48:21 87:20,23 88:7 189:1
**significant** 107:16
**similar** 76:8 113:7 190:7
**simmer** 92:9
**simple** 184:5
**simply** 97:15
**single** 40:14,15 41:13 41:14 92:24
**singular** 182:5
**sir** 6:21 8:22 43:18 77:9 86:17 116:25 192:8
**sit** 18:15 64:6 75:7
**site** 30:22 31:6,19 32:2 173:13
**sitting** 93:2
**situation** 46:5 47:8 48:6 73:25 74:23 75:15 83:5 85:3,19 85:21 86:6 89:6,12 101:15 107:8 112:23 113:3,14 114:20 133:2,10,18 136:11,24 137:16 138:2 144:7 148:21 153:21,25 154:4 162:25 184:9
**situations** 86:7 113:9 155:13
**Six** 54:2
**skeptically** 155:7
**slowing** 66:8
**slung** 191:15
**smaller** 146:18,19 189:7
**Smith** 32:8,22 33:2
**So-and-so** 142:4
**solicit** 111:23
**solution** 137:10
**somebody** 16:15,22 16:24 29:25 61:14 73:21 74:25 75:7,8 91:14 112:7 142:22 167:24 187:22
**someone's** 118:14
**sooner** 76:12
**sorry** 8:25 15:2 54:18 134:1 143:21 146:23 180:25
**sort** 11:15 16:12 17:16 19:7 36:21,23 36:25 38:5 58:4 65:1 66:10 69:10 70:7 71:8,9 74:20 74:23 100:3 113:4 115:23 121:24 128:2,5,13 144:6 148:14 156:21 158:16,17 178:2
**sorts** 122:12 158:8
**sought** 43:10 121:18
**sounded** 149:17 157:4
**sounds** 153:4
**space** 193:19
**speak** 28:4 31:20 48:21 77:24 156:11 160:3 168:7
**speaking** 174:25
**special** 55:13 131:6 132:25
**specific** 13:1 41:4,5 45:5 114:20 118:11 142:24 146:11 159:5 166:24 186:2
**specifically** 21:9 29:23 31:20 37:22 41:19 46:2,20,22 47:2,4 49:12 66:4,5 67:24 68:3,5,10 84:7 103:8 107:3 110:11 123:7 154:5 154:18 167:8 182:11 188:21
**specifics** 14:13 169:11 178:15
**spend** 36:20
**split** 32:6 44:10 46:15
**spoke** 112:16 114:9
**spoken** 132:22 181:2
**spotlight** 162:12
**spring** 23:8
**Springs** 9:15
**staff** 53:12,13 73:23 82:19 101:22 106:22 109:4,21 110:3,6,8,12,20,24 111:25 112:15,18 133:7 134:19,20 136:7,8,20 139:9 161:13,14,18
**standard** 104:16
**standards** 72:21 157:21
**Stare** 64:18
**start** 8:6 129:21 190:17
**started** 24:16 25:22 26:10,16 56:11 80:19 82:9 87:7 187:23
**starting** 152:20
**starts** 53:22 160:2 174:2
**state** 8:17 13:5 72:18 157:22 194:2
**stated** 147:20 194:5
**states** 1:1 171:5 185:4
**stating** 80:12 105:25
**status** 139:12
**stay** 140:21
**staying** 190:19
**stays** 37:25
**steer** 79:25
**step** 111:6
**steps** 124:17 136:1 164:23 165:5
**stickers** 80:10 81:7
**sticky** 27:18
**stone** 148:3
**stones** 103:24 104:1,3 147:21 148:2,4 149:2
**stones/crystals** 107:5
**stop** 101:9
**stops** 152:10
**stored** 28:14,19
**stores** 25:9
**straight** 33:10
**strategy** 32:7 53:16
**straw** 89:2
**stream** 59:15
**streaming** 59:23,23 60:3
**streamingly** 115:14
**Street** 2:5,9 193:24
**stress** 65:11,25 66:9
**stretch** 158:9,23
**stretching** 109:5
**strict** 107:22
**strong** 138:16
**strongly** 140:11
**structure** 57:3
**student** 112:25 127:22
**students** 69:18,24 73:1 103:1,5,10 106:23 108:5 109:5 111:24 113:21 128:17 131:7 132:25 133:17 134:15 185:6
**stuff** 49:14 122:4 132:12 155:12
**subject** 14:20 164:12 179:9
**subjective** 138:23
**subordinates** 131:14
**subsequent** 155:4
**substance** 84:1 168:20 169:8 184:3
**suggested** 148:3
**suing** 12:9 13:16
**Suite** 2:4
**summarize** 102:11
**Sunday** 58:10,16 59:12,13
**superintendent** 5:18 18:5 33:5,7,22,23 34:3,4,11,21 38:11 39:22 50:11 53:6 54:4 55:5,12,14 56:23,25 72:3 79:12 86:5,13 133:12 160:9 187:6
**superintendent's** 42:12
**superintendents** 54:10,15 55:10,15 85:9
**Superior** 13:4,4
**supervise** 55:23
**supervises** 51:12
**supes** 54:6 55:20 85:8
**sure** 6:13 7:10,16 8:11 10:12 14:5 16:3 21:10 22:7 24:14 28:1 29:20 32:1 34:8 36:8,13 37:23 39:13 44:7 48:22 49:10,15 50:25 51:6 52:25 54:14 62:15 63:3 64:24 65:3 66:11 68:15 69:12 72:8 74:14 75:6 77:12 78:13 90:16 91:5 99:25 101:14 102:6 102:9 111:8 116:16 117:16 118:3,20 131:12 137:19 138:5,9 141:7

146:12 154:16 156:9 160:3,5,9 161:8 166:1,9 167:7 168:1 172:22 182:23 189:7
**surge** 127:24
**surrounded** 124:24
**surrounding** 151:17 170:20 183:8
**suspend** 141:22
**suspension** 118:22
**swear** 5:20
**swell** 142:2
**Swinney** 4:3 84:14 85:5,18 86:3 87:22 90:7,21 96:7 101:13 102:15 114:5,15,20 130:23 176:4,24 177:13
**swirling** 45:11
**sworn** 6:2 194:15
**symbols** 103:19,22 106:21 107:1
**system** 30:6 35:18 79:13,22 172:10
**systems** 23:9,11,19 24:6

**T**

**T** 2:3
**take** 7:21 19:23 40:20 41:3 66:13,20 71:9 76:12 77:11,13 83:21 92:2 98:16 116:15,21 125:19 128:25 129:23 132:13 142:21 146:24 152:14 154:7 158:9,9 161:1 164:5,6 165:5 169:19 175:7 179:7 179:17 182:5 189:8 189:8
**taken** 1:9 5:8,14 11:11 14:19 36:10 64:11 104:10 118:1 118:16,18,23 124:17 136:2 138:21 140:2,5 144:12 154:6 155:3 155:4 164:23
**taker** 179:12
**takes** 20:23
**talk** 24:11 37:5 38:2 44:3 68:16 85:23 91:16 96:2,6 97:3 131:3,25 147:3 160:8 165:2 169:3,7 174:21
**talked** 84:5 114:1,1 117:21 149:16 176:13
**talking** 39:11 52:15 56:16 67:19 68:17 73:20 120:5 146:1 158:14 162:11 177:19 187:3,18
**talks** 168:16 187:8
**tasked** 28:21
**taught** 72:18 78:19 79:19 118:1 159:15
**taxing** 146:23
**teach** 58:10 72:22 79:13 93:17 158:3 174:17
**teacher** 72:25 110:15 110:17 112:25 117:22 139:9 141:25 142:6 143:12,16,18 145:7 158:23 159:10,18 160:2
**teachers** 52:11 56:5 79:4 82:4 83:7 110:20 131:5 158:2 185:5
**teachers'** 121:16
**teaching** 80:1 104:11 142:3 145:15 183:1
**teachings** 79:9
**team** 133:6
**technical** 12:12,14 170:11
**technique** 65:25 159:6
**techniques** 66:2 113:21
**technology** 12:1 23:12 25:2 26:11,16 29:6 32:3,10,12,15 33:2,21,24,25
**telephonically** 115:13
147:16
**televisionally** 115:14
**tell** 7:3,9,14 8:7 23:10 44:14 48:20 51:24 65:22 83:6 84:1 91:21 103:4,20 106:24 107:10 110:19 118:8 123:22 131:13,15 167:8 168:20 169:8 177:12 178:18 184:2 186:21
**telling** 62:19 73:18 75:1 147:16
**template** 160:7
**ten** 13:10,12 58:21 60:2 66:20
**tenure** 28:24
**term** 65:5,8 157:21 180:19
**terminate** 40:1 189:22,22
**termination** 41:5 118:23 120:12 166:15
**terminations** 41:4
**terminology** 79:6 83:8,9
**terms** 23:10 36:4,22 63:17 70:18 72:2,5 72:16,16 78:20 79:19 108:17 150:25 171:1
**terrible** 75:20
**terrific** 138:12
**test** 38:11 66:17
**testified** 6:3 100:1 129:7,10
**testify** 14:1
**testifying** 13:25 14:9 14:14 130:17
**testimony** 77:1,4 129:16 170:1 173:1 192:1 193:4
**text** 170:12,18
**textbooks** 80:11
**thank** 51:17 56:7 62:9 77:9 78:12 153:18 153:19 186:23 192:11
**Thanks** 102:1 175:13
**theory** 80:13
**therapy** 158:6
**thereabouts** 73:7
**thereto** 194:6
**thing** 36:23 38:5 58:4 64:21 66:10 81:8 93:14 94:15 95:14 98:20 103:11,23 107:8 112:13 113:1 119:5 120:10 123:17 124:15,18 128:2,5,14 134:18 140:8 147:19 156:21 157:3 158:17 163:14 178:2 187:4 188:17
**things** 25:10 36:22,23 50:1 65:1 68:13 83:1 94:9,21 95:10 99:5 100:3 101:6 102:8 104:11 107:9 107:11,20 133:25 142:23 145:14,18 150:15 158:8 159:8
**think** 8:4 13:14 24:1 26:10,14 29:4 34:7 37:12 49:3 51:23 52:1,13 54:25 61:21 64:7,15 67:16,18 70:24 80:8 81:6 94:25 98:21 100:22 101:19 103:24 104:16 115:1 116:1 116:19 128:16 130:24 134:5 135:6 138:16 142:2,3,12 150:22 151:9 162:6 168:2 172:8 176:15 177:6 178:8 183:25 184:8 187:3,19,25 190:11 191:13,16
**thinking** 158:5
**third** 123:3
**thorough** 153:20 155:11
**thou** 188:16
**thought** 54:12 76:11 80:17 92:20 93:10 137:22 152:12 185:18
**thousands** 99:22
**thread** 4:3,5,11,13,18 4:21
**threading** 135:11
**threatening** 118:14
**three** 55:20 97:21 149:13
**time** 5:12,13 11:5,5 12:23 23:21 24:12 24:19 27:5 28:10,23 29:11 32:5 51:19 56:16 62:11 67:3,23 68:6 73:7 80:6 82:15,20,21 85:16 101:22 109:11 110:3 120:21,22 124:22 125:13 127:21 128:21 130:18 131:11 136:14,15,18,25 138:18 149:11 155:7 168:5 171:14 172:3 183:4 192:8
**times** 84:6
**timing** 162:7
**tiny** 153:13
**tipping** 161:21,25 177:20 178:5 180:19
**title** 26:9,21 33:4 56:23 109:12 112:21
**titles** 33:19,20 52:6
**today** 6:10 14:25 15:25 18:16 31:20 37:17 104:14,20 171:21 172:7 173:2 191:25 192:8
**told** 75:9 76:3 84:24 100:13 102:14,17 103:14 116:11 143:21 145:6 148:12 177:12
**ton** 155:12
**tone** 91:18
**top** 51:2 53:1 91:8 180:7
**totally** 110:16 139:21 159:7
**Tracie** 132:22
**track** 141:6
**tracking** 150:4

**train** 76:11
**training** 37:2,7,13,16 37:19,20,21 38:4 121:10
**trainings** 37:4
**transcript** 7:24 9:5 193:4 194:12
**transfer** 41:24 43:6,9 44:9,24 45:5 47:21 119:25 120:12 124:23 126:10 137:9 138:11 139:9 142:14,22 144:22 145:1 150:19 151:23 152:2,13,20 163:21 165:13 166:15 168:8 183:9 184:15 185:9 189:23
**transferred** 42:5,10 45:15 54:25 131:22 141:9 142:16 150:14 161:24 162:22 167:12,19 180:8 181:8 184:12
**transferring** 135:25 166:23,25 169:8 177:14
**transfers** 41:20 44:25 45:4 168:25 183:16
**transportation** 33:24 50:16 51:25
**tremendously** 153:22
**trial** 5:12 14:1,6
**trick** 38:12
**tried** 173:4
**true** 77:4 118:9,9,15 134:19 147:10 156:25 165:10 193:3 194:11
**truly** 175:2
**truth** 6:22 190:23 191:19
**truthful** 6:15
**truthfully** 7:12
**try** 7:5,11 66:9 79:25 80:2 84:12 85:2 113:14 134:14 136:23
**trying** 101:14 114:19 135:13 151:1
**turnaround** 136:14
**turned** 29:12 92:16 177:23
**TV** 62:12,13
**tweak** 124:14
**two** 26:4 32:11 33:3 49:12 55:21,21 57:2 86:20 116:15 139:21 159:7 168:1 186:9
**type** 37:11 126:22
**types** 133:17
**typical** 39:4 186:23

**U**

**uh-huh** 7:19 142:19 153:23
**ultimate** 166:20
**ultimately** 39:1 40:14 41:8 42:11 149:17 149:23 152:4 168:4 168:4 181:14
**unanimous** 44:9,13 46:12
**unapproved** 109:9
**undergraduate** 35:17
**underlying** 142:15 144:13,19,21
**understand** 6:12,14 7:2 49:16 51:1 53:1 54:15 60:8,8 61:1 68:16 70:20 102:7 137:2 138:7 141:5 149:20 152:21,25 157:7 160:19 166:13 173:2 188:1
**understood** 84:24 93:1 134:24
**Unfortunately** 24:7
**unhappy** 179:1
**united** 1:1 171:5 175:10
**units** 25:10
**unsatisfactory** 89:4
**unwillingly** 134:15
**updates** 149:8
**uproar** 124:6,25 132:11 136:3 137:2 138:15 141:12,23 142:11 143:4,7,12 143:15,17
**upset** 98:2 137:5 174:13 187:15,16
**upsurge** 128:6,11
**use** 10:21 11:3 63:17 69:17 79:4 82:4 109:4 131:5 169:17 174:17 180:18
**usual** 195:17

**V**

**valuable** 69:11
**varied** 179:2
**varies** 38:21 167:7
**vendors** 36:19
**verbally** 88:6
**versus** 5:16 75:20 80:9 89:9
**veto** 43:1
**vetoed** 88:14
**Vickers** 4:5 60:18 147:3 148:13 154:11 189:17
**Vickers'** 153:15 155:6
**video** 20:2,4 148:5
**videos** 20:12 102:25 103:3,4 131:4 132:23 133:16
**videotaped** 20:8
**view** 144:21 150:7 172:23
**violated** 105:11,15
**violates** 106:1,7
**violating** 105:22
**violation** 80:15 107:16,16,23
**violative** 81:23 98:8
**vivid** 88:21,23
**voicing** 92:18
**voluntarily** 110:4
**vote** 21:13,18 44:9,13 46:12,15
**voted** 40:13 46:10 185:23
**VP** 24:25
**vs** 1:4

**W**

**wait** 125:22,22
**waiting** 186:18
**walk** 135:13
**walking** 36:20 73:18 135:16
**walking-around** 70:19
**walks** 25:14
**wall** 64:15
**want** 8:8,9 10:3 24:12 28:2 36:8 51:8,11 52:7,9,25 54:14 74:15 76:10 77:9 88:9 97:7 98:1 102:6 104:8,10 126:25 127:10 158:25 176:22 182:23,23
**wanted** 30:14 102:11 154:3 173:3 190:21
**wants** 132:19
**warning** 120:5
**wasn't** 27:16 36:15 85:20 89:1 92:24 104:24 141:8 163:14
**watch** 20:2
**watching** 148:5
**water** 138:25
**way** 19:7 20:21 30:24 37:16 42:25 49:11 51:9 61:18 65:25 66:3 69:18 70:4 89:1 98:7,21 108:14 113:15 135:4,5 140:10 146:20 150:11 151:10 156:23 157:8,14 162:6 163:19 164:10 170:6
**ways** 145:24
**we'll** 16:8 44:5 49:13 55:2 74:13 97:19 98:17 116:14 125:19 146:25 189:8
**we're** 30:7,10 37:17 43:13 56:15 59:15 76:15,20,21 133:16 137:17 142:5 143:21 154:4 158:14 159:2,6 161:17,18 169:23 171:20 189:9
**we've** 37:2 67:18 92:12 106:13 124:16 141:16 169:25 180:24 191:24
**Wealth** 184:25
**website** 27:3 28:7 112:11
**websites** 79:3 82:3 83:7
**weeds** 49:14 157:14 157:16
**week** 15:9 176:10
**weekday** 89:19 90:1
**weeks** 15:9
**Welcome** 10:3
**went** 15:5 23:3 61:15 94:14 95:4,5 99:14 163:1 168:15
**weren't** 27:18 90:17 137:18 163:10
**West** 159:13
**whatnot** 160:12
**wife** 117:22
**Wild** 159:13
**willing** 121:16
**window** 25:10 64:7 64:12 137:7 162:15
**windows** 64:9 74:22 75:10,10 160:15
**wiring** 25:1
**wished** 40:1
**withdraw** 126:16 127:22 128:20
**withdrawing** 127:24 128:7,12
**withdrawn** 126:6
**withdrew** 126:1,4
**witness** 12:11 51:21 98:25 189:11 192:9 192:12 194:13
**witness's** 194:8
**word** 10:14 28:17 103:2,7,14 135:6 138:17
**words** 78:25 141:10 166:17
**work** 10:8,21,24,24 11:4,22,23,24 24:8 25:21 112:4 113:22 127:3 133:6

**work-related** 11:8,21
**worked** 24:19,24 150:1 181:18
**working** 35:10 62:22 64:22 124:18
**world** 107:7
**worry** 9:5
**worse** 89:9
**worth** 10:6
**wouldn't** 44:11,15 46:10 74:10 75:19 139:13
**wrinkle** 54:24
**writing** 29:15 43:24 163:3 194:7
**writings** 16:12
**written** 5:3 162:20 180:5
**wrong** 51:24 134:10 139:13,18 140:2 177:10
**wrote** 125:25

**X**

**Y**

**y'all** 30:6,21 145:12 146:18
**yeah** 10:17 11:2 13:12 14:8 15:7,21 22:15 23:14 25:19 27:10,11,17 28:1 31:9 34:2,25 35:8 38:12 39:2 46:7 49:2 50:14 51:6,14 52:3,8 55:5 56:8,24 57:5 58:1,10 59:7,9 59:9,18 61:17,17,21 62:15 63:4,19,23 64:16,20 66:12,19 66:22 67:4,8 69:13 70:3,22 74:8,10,14 74:17 75:5,17 76:2 80:23 82:2,17 85:22 86:2 89:7 91:12 93:19 94:6,19 95:7 95:24 96:18 99:25 102:2,4 107:19 108:1,3,3 113:8,12 113:16,16 119:12 120:7 125:5 127:20 137:13 144:1 145:16 147:19 148:18 152:24 153:14 155:15 157:24 162:2 165:25 166:6,8,18 168:14,16 169:6 171:18,18 175:23 176:17 177:16 180:9,18,24 181:16 185:15 187:21 190:10
**year** 9:2,9 34:10 35:6 36:2 73:5 126:22 136:15,19 139:1,5 176:9
**years** 13:10,11 23:8 26:4,14 58:21 60:2 64:11 65:14 73:6 165:7
**yellow** 27:18
**yes-or-no** 7:7
**yesterday** 174:25
**yesterday's** 102:12
**yoga** 47:12 61:23 62:17,23 63:2,12 66:3 67:5 70:19 78:19 79:5 82:23 83:9 88:25 91:24 93:3 96:3 97:4,11 98:3 104:6 106:23 110:4,8,21 111:12 115:9,15 116:8 124:6,24 126:8 128:1 131:4,17 132:23 136:3 145:19 151:11 158:15,16
**yoga-related** 47:17
**you-all** 80:5 89:10 130:24 146:20
**younger** 9:12 27:12

**Z**

**zero** 97:10

**0**

**000164** 4:4
**000166** 4:6
**000200** 4:8
**000270** 4:10
**000282** 4:12
**000304** 4:15
**000330** 4:17
**001642** 4:20
**001657** 4:22
**06** 13:13 26:15 27:22 27:24 29:1 80:21
**08** 146:22

**1**

**1** 52:18 76:22 77:3 194:10
**1.2** 38:17
**1.3** 38:17
**1.e** 107:24
**1:17-CV-01378-W...** 1:4
**1:36** 129:2
**10** 4:7 74:7 155:17,19
**10.B** 194:19
**10:00** 89:19,25
**10:05** 1:14 5:2
**11** 4:9 164:3,5 180:23 180:24
**11-2-2018** 193:25
**11:22** 76:17
**11:33** 76:18
**116** 4:21
**11th** 80:24
**12** 74:7 99:16
**12:37** 129:1
**129** 4:3
**13** 34:9,24 39:9 153:16
**14** 4:11 33:12,12 34:8 34:9,24 173:24 174:1 182:9 183:5 185:13
**146** 4:5
**14th** 195:20
**15** 4:13 26:14 33:12 77:8,11 105:24 116:21
**15-14-37(a)** 195:3
**150** 89:16,17,20,24 91:15 92:16 114:2 161:7 177:3 178:17
**155** 4:7
**164** 4:9
**165** 4:4
**1658** 4:22
**168** 4:6
**17** 4:16 98:12,14 125:19 164:11
**173** 4:11
**17th** 174:3
**18,000** 38:19
**184** 4:18
**18th** 174:24
**193** 3:5
**195** 3:6 194:10
**1969** 9:11

**2**

**2** 1:13 4:3 5:1 109:3 129:19,21,22
**2:37** 169:21
**2:48** 169:22
**20** 74:7 193:23
**2006** 80:7,21,25
**2013** 33:11 34:8
**2016** 73:6 99:16 153:16 164:11 174:3,24
**2018** 1:13 5:1 195:20
**205** 4:8
**21** 4:18 184:22,23
**22nd** 186:4,4
**23** 4:21 116:18,19,24 125:25
**237** 193:24
**24** 4:23 52:20 76:23 77:4,5
**25th** 80:25
**271** 4:10
**2745** 195:22
**283** 4:12

**3**

**3** 4:5 109:20 112:15 146:15,17 153:10
**3-10-2016** 4:22
**3-12-2016** 4:17
**3-13-2016** 4:4,6
**3-14-2016** 4:7
**3-17-2016** 4:10
**3-18-2016** 4:12
**3-22-2016** 4:19
**3-28-2016** 4:15
**3:05** 99:17
**3:14** 189:12
**3:25** 189:13
**3:28** 1:14 192:18
**30** 64:11
**30(b)(6)** 14:18,21
**30060** 2:9 193:24
**30308** 2:5
**305** 4:15
**331** 4:17
**3900** 2:4

**4**

**4** 24:24 25:21
**404.781.1100** 2:6
**4400** 9:14
**49** 2:9

**5**

**52** 4:23

**6**

**6** 3:4
**600** 2:5
**678** 9:19,20

**7**

**7.C** 195:4
**77** 4:13
**770-428-5801** 193:24
**770-485-2323** 10:7
**770.422.1776** 2:10

**8**

**8.B** 5:5
**87** 23:6,7
**873** 9:21,22
**8885** 9:23,24

**9**

**9-11-28(c)** 195:7
**92** 23:8 25:23 26:5 27:11
**98** 4:16