IN THE MATTER OF

# Cole

VS

# Cobb County School District

## TRANSCRIPT OF DEPOSITON OF

# John J. Adams

On November 16, 2018

---

*Reported by* Joel P. Moyer
*Certified Court Reporter*

---

**DONOVAN REPORTING & VIDEO CONFERENCING**
***Certified Court Reporters***
237 Roswell Street / Marietta, GA 30060
770.499.7499 800.547.1512
**Book online at <www.donovanreporting.com>**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

BONNIE COLE,
Plaintiff,

vs. CASE NO. 1:17-CV-01378-WSD

COBB COUNTY SCHOOL DISTRICT,
Defendant.

- - -

Deposition of JOHN J. ADAMS,

Taken by Edward D. Buckley III,

Before Joel P. Moyer,
Certified Court Reporter,

At the Law Offices of
Gregory Doyle Calhoun & Rogers LLC,
Marietta, Georgia,

On Friday, November 16, 2018,
Beginning at 1:12 p.m. & ending at 4:54 p.m.

- - -

APPEARANCES OF COUNSEL

For the Plaintiff:

EDWARD D. BUCKLEY III
T. BRIAN GREEN
Buckley Beal LLP
Suite 3900
600 Peachtree Street, NE
Atlanta, GA 30308
404.781.1100

For the Defendant:

CHARLES L. BACHMAN JR.
JORDAN E. DAILEY
Gregory Doyle Calhoun & Rogers LLC
49 Atlanta Street
Marietta, GA 30060
770.422.1776

ALSO PRESENT:

Bonnie Cole

INDEX TO PROCEEDINGS

EXAMINATION INDEX


JOHN J. ADAMS

Examination by Mr. Buckley 5

Errata Sheet 154

Certificate Page 156


---

EXHIBIT INDEX

Plaintiff's Exhibits


| | | |
|---|---|---|
| 1 | Email thread ending with email to John Adams from Randy Scamihorn 3-9-2016 (Cole 000139 - 140) | 83 |
| 2 | Email thread ending with email to Grant Rivera from Barbara Swinney 3-13-2016 (Cole 000164 - 165) | 98 |
| 3 | Email thread ending with email to Chris Ragsdale from Melissa Vickers 3-13-2016 (Cole 000166 - 168) | 108 |
| 10 | Email to Chris Ragsdale from Darren Lamb with attachment, 3-14-2016 (Cole 000200 - 205) | 114 |
| 11 | Email to humanresources@cobbk12.org and others from Adam Glass 3-17-2016 (Cole 000270 - 271) | 124 |
| 13 | Email thread ending with email to Adam Glass, cc'd to others 3-18-2016 (Cole 000280 - 281) | 126 |
| 14 | Email thread ending with email to Grant Rivera and others from John Adams, 3-18-2016 (Cole 000282 - 283) | 148 |


(Continued on next page)





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

| | | |
|---|---|---|
| 15 | Email thread ending with email to Bonnie Cole's personal email address from Bonnie Cole's Cobbk12.org email address, 3-28-2016 (Cole 000304 - 305) | 60 |
| 16 | Letter to Whom It May Concern, stamped received 3-10-2016 (Cole 001066 - 1069) | 95 |
| 23 | Email thread ending with email to Brian Clark from Chris Ragsdale 3-10-2016 (CCSD 001657 - 1658) | 91 |
| 29 | Email thread ending with email to Chris Ragsdale from John Adams 6-7-2016 (CCSD 001648 - 1652) | 144 |
| 46 | Composite beginning with document titled Executive Session Minutes Thursday, 3-24-2016 (CCSD 001958 - 1982) | 134 |
| 47 | Email thread ending with email to Gregory Ewing from John Adams 5-13-2016 (CCSD 002140) | 150 |

(End of Index)



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

November 16, 2018
1:12 p.m.
(Whereupon the reporter provided a written disclosure to all counsel pursuant to Article 8.B. of the Rules and Regulations of the Board of Court Reporting.)

MR. BUCKLEY: This will be the deposition of John Adams. It is taken pursuant to notice and agreement of counsel in the case of Bonnie Cole versus Cobb County School District and Chris Ragsdale individually and in his capacity as superintendent of Cobb County School District.

It is taken pursuant to the Federal Rules of Civil Procedure. All objections except as to the form of the question are reserved until the time of trial.

Would you go ahead and swear Mr. Adams in, please.

JOHN J. ADAMS,
being first duly sworn, was examined and testified as follows:

EXAMINATION
BY MR. BUCKLEY:

Q All right. Mr. Adams, my name is Ed


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Buckley, and you know I represent Bonnie Cole here. And I am going to be asking you some questions today. My purpose is to get information. If for any reason you don't understand my questions, will you please tell me, and I will try to rephrase them so you do understand them. Agreed?

A Yes, sir.

Q Okay. And just as you did just now, when you answer questions, answer them yes or no, but in any event answer them orally rather than a nod or a shake of the head because it's harder for Joel to get that down. Agreed?

A Yes, sir.

Q All right. And let me ask you this question: Are you laboring under any disability or taking any medication here today that would render your memory less than accurate?

A No.

Q All right. Good. If you are answering a question and I cut you off and start asking another question, it's because I think you're finished. You just tell me, and I'll let you finish because we want your

answers to be complete. Agreed?
A Agreed.
Q And by the same token, you may anticipate my questions and want to answer something and I haven't finished asking it. And I'll remind you if that occurs, okay, so that I ask complete questions and you can give complete answers. All right?
A Yes.
Q You understand that you're under penalty of perjury when you answer these questions here today and I am entitled to full and truthful answers. Agreed?
A Agreed.
Q All right. Good. Let me get -- I'm going to ask you some basic sort of background stuff before we get into the substance of this case. You go ahead and state your full name for the record, please?
A John Joseph Adams.
Q All right. Can you give me your date of birth?
MR. BACHMAN: Ed, I just want to go back. If we could do just month and year?
Q We can do month and year. Go ahead.

A July 1968.
Q You're not at the drug store. Give me your complete residential address.
MR. BACHMAN: That's fine.
A 6011 Fairlong, F-A-I-R-L-O-N-G, Court, Acworth, Georgia 30101.
Q Is your best phone number typically your cell phone number?
A Yes.
Q What is that number?
A We don't have a home, a home phone, so yes.
Q Okay.
A 770-856-8609.
Q Is that cell phone number one that is issued by Cobb County School District, or is that your personal number?
A That's my personal number. That's my home number.
Q All right. Do you have a cell phone number that is issued by the Cobb County School District?
A Yes.
Q What is that?
A 678-230-2316.

Q Do you conduct all of your work-related business on your work phone, or do you ever conduct any of that on your personal phone?
A Work phone. I keep both for that purpose.
Q Okay. You keep both phones for that purpose?
A One for work, one for personal.
Q Okay. Does work ever bleed over?
A I am anal, if you'll pardon the term, about making sure that they do not.
Q Okay. Fine. You have a work email address, and what is that?
A John.adams@cobbk12.org.
Q You have a personal email address as well?
A Yes, sir.
Q What is that?
A It's JohnJAdams, just the middle initial J, johnjadams@yahoo.com.
Q Do you ever use your personal email address to conduct work-related business?
A No.
Q In this case, there were a number of


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

emails sent, some of them directly to you. Some were forwarded to you from people in the community who were objecting to Ms. Cole and some of her activities. Were any emails ever sent to you on your personal email account concerning that --
A No.
Q -- matter? Okay. Were any text messages sent to you on your personal phone --
A No.
Q -- that concerned that matter?
A No. Sorry.
Q Okay. Right. Wait for me to finish my questions. Okay? All right?
A Yes.
Q Yes. Thank you. All right. Now, on the other hand, some were sent to your work-related email address; right?
A I believe so, yes.
Q Okay. Did you receive any text messages on your work-related cell phone concerning Ms. Cole and the practices that she was involved in that led to this lawsuit today?
A I can't recall specifically if I have or not.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q If you did, would they still be on your phone?
A I don't know. Oh, on the current phone? No.
Q You had another phone then?
A Give me a minute. This phone will be two years old in January, so January of '19 it will be two years old, so it will be January of 2017 I changed phones. So I believe, yes, that I had a different phone.
Q Changed work phones January --
A Yes, sir. I've since changed personal phones too, but it would be on the work phone.
Q January of 2017?
A '17, roughly within a month of --
Q Did you have the same phone number before that?
A Yes, sir.
Q When you changed to your new phone, did you transfer the data from your old phone onto your new phone?
A The tech person did that, so I can't tell you exactly what she did or didn't transfer.

Q So it is possible, but you don't know, that you have text messages from your prior cell phone on your present cell phone?
A I do not think there are any older than maybe 30 or 60 days on my work phone.
Q Is there an automatic delete of 30 to 60 days on your phone?
A It's set to 30.
Q Okay. Set for 30. But you do get work-related text messages on your work phone?
A Sure, yes.
Q Okay. Right. What about your emails, are they set to delete at a certain point in time?
A No. And they archive anyway.
Q Okay. They archive on a server, or they're downloaded and stored off site, or do you know the mechanics of that?
A No. I believe it's a cloud-based server now, but I'm not certain. I'm not the tech guy.
Q Now, with respect to your cell phone deleting text messages after 30 or 60 days, did you ever in this case that we're here about today, did you ever receive any instructions

about preserving any documents or data or information concerning the case?
A I can't recall.
Q Okay. In any event, you did not reset your phone, so it wouldn't delete as a result of any such instruction. I mean, you don't remember the instruction specifically?
A You are correct. I did not.
Q Okay. All right. Have you ever had your deposition taken before?
A Yes.
Q And how many times?
A Twice.
Q And did any of them relate to your work for the Cobb County School District?
A Yes.
Q Both of them or one of them?
A One.
Q And what did that matter concern, that deposition concern?
A That was a case -- I can't remember who it was, but it was relating to something to do with Mary Finlayson's case.
Q Mary Finlayson?
A Yes, sir.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q What sort of case was that?
A And I can't remember the details of which one it was. Randy Farmer was the attorney with you guys, but I can't remember the details of what the case was. It's been a few years now.
Q Was it an employment-related case?
A Yes. It was an employment case, and it was resulting from years ago from when I was employed with the District the first time.
Q Okay.
A Had nothing to do with Ms. -- with Ms. Cole or anybody in the current case.
Q Right. Was it a case brought by Ms. Finlayson because she alleged that she was somehow wrongfully terminated?
A I can't remember if she was a witness in the case or if it was her case. I really can't remember what it was. That's the only work-related one.
Q You don't have any memory as to whether or not it was a case where the plaintiff was claiming discrimination, do you?
A I can't remember.
Q All right. So you said that you've

been deposed twice. What was the other case you were deposed in?

A And the other one I guess technically wasn't a deposition. It was mediation in a divorce case, mine.

Q Okay.

A So technically, probably just once.

Q Did you ever testify in court in your divorce case?

A No.

Q Have you ever testified in court in any other matter?

A Oh, yes, sir.

Q Okay. What sort of things have you testified in court about?

A I was in law enforcement for seven years before I went into education, so I testified a number of times in criminal court proceedings.

Q As a police officer?

A Yes, sir.

Q Any other times that you've testified? Let's set aside your police-related work. Any other times you've actually testified in court?

A No.
Q All right. And the two times -- well, actually, you recall one time when you had your deposition taken. The other time, you --
A Mediation.
Q -- you put your mediation in sort of the deposition box, and it should have been instead in the mediation box. All right.
The case involving Finlayson, how long ago did you testify in that? And I'm sure you don't remember the exact date.
A Well, let me think. I've been back with the District four-and-a-half years now. I was gone for three. It was sometime during that period so, roughly speaking, seven years ago.
Q Okay. So it was during your first employment with the District?
A It was as a result of my first employment with the District, but I was no longer with the District --
Q Okay.
A -- at that point. I was gone for three years.

Q I see. All right.
A They all kind of blend together.
Q I get it. All right.
MR. BACHMAN: Ed, let me ask you this: Do you want me to straighten some of this out? Because I have some knowledge, and he's confused a little bit about the deposition, the case. Do you want me to do anything, or do you want me to keep my mouth shut and you ask the questions? You tell me.
MR. BUCKLEY: Well, you know, I think if you need to correct testimony, you can either do it now or we can do it when you have him on redirect. It doesn't matter to me particularly.
MR. BACHMAN: Okay.
MR. BUCKLEY: But if you want to ask him questions now to clear that up, I'm happy for you to do it.
MR. BACHMAN: Okay. Mr. Adams, do you remember testifying in a case involving some bus drivers at Cobb County School District?
THE WITNESS: Thank you.
MR. BUCKLEY: Okay.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

THE WITNESS: Yeah. She was named in the case, but it was -- yeah. I don't remember the names, but it was two or three bus drivers that were suing the District in an employment matter.

Q Okay. Was Finlayson a defendant in the case, or was Finlayson the plaintiff in the case?

A I believe she at that point was the defendant.

Q Okay.

A But as you can tell, it's hazy.

Q Okay. Yeah. Okay. But how about the time frame? Was it about what you said it was, or --

A Yeah.

Q -- is that different too?

A Yeah. It was while I was gone from the District is when I came, and I can tell you without an exact date it was shortly when the name of this firm changed.

Q Okay. All right. And so --

A Like almost a day after.

Q Do you remember roughly how many bus drivers sued the school district?



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A Two or three.
Q Okay. Do you remember how the case was resolved? Do you remember if it was dismissed or it went to trial or what?
A I did not ever go to trial, so I don't recall it going to trial. But beyond that, I can't remember.
Q You don't know if it was settled, for example?
A No.
Q All right. Do you remember what court it was in?
A No.
Q Don't remember if it was in Federal District Court or in county court?
A I do not.
MR. BUCKLEY: All right. So is that everything you need to ask him?
MR. BACHMAN: I can give you the details if you want, or I can do it now, or I can do it after the deposition.
MR. BUCKLEY: We'll do it afterwards.
MR. BACHMAN: Okay. That's fine.
Q All right. Tell me what you did to


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

prepare for this deposition here today.
A Not much. Talked to our -- my attorney briefly.
Q Chuck here?
A Yes, sir.
Q Okay.
A And that's about it. Met with him fairly briefly and reviewed a document or two with him, and that's essentially it.
Q Did you meet with Chuck today, or was this before today?
A No, that was before today. I did say hello to Chuck, and he showed me the restroom earlier today, but.
Q Well, okay. I suppose in some minor way that could be preparatory.
Do you remember what documents you reviewed?
A I reviewed the board report from, and I can't remember the date, March 20-something. And I reviewed a letter that was in the file of Barbara Swinney, that Dr. Rivera had written to Barbara Swinney.
Q For the record, who is Barbara Swinney?





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A She's currently a principal. At the time, she was an assistant superintendent.
Q Okay. Other than your lawyers, have you spoken to anybody about this case?
A Only to my secretary who knows that I'm here, and Mr. Ragsdale knows that I'm here, and my wife who knows that I'm here.
Q Okay. Did you and Mr. Ragsdale discuss at all his deposition in this case?
A No, sir.
Q Okay. Did you and he discuss anything that you might testify about?
A No.
Q Did you as part of your preparation for your deposition review any emails that you received either directly or which were forwarded to you from members of the community that essentially objected to some of what Ms. Cole was doing at Bullard school?
A Yes. Chuck did show me one or, I don't swear to the exact number, a couple of emails to that effect.
Q All right. Let me get a little bit of background information from you, Mr. Adams. What is your educational background?





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A I have a bachelor's degree in history and a master's in education leadership.
Q Where did you get your master's?
A And it's actually a master's in behavior disorders with an add-on in educational leadership. Lord, it's been a while. I graduated from high school in '86 and then was with the police department for just under seven years; finished my bachelor's, I believe, in '92; and then got my master's, I believe, two or three years after that.
Q Okay.
A It's on my resumé. And I'm 50 now. I don't remember some of those dates as well as I used to.
Q All right. Where did you go to high school?
A Went to high school in New Orleans at Isidore Newman School.
Q All right. And where did you get your bachelor's in history?
A Georgia State.
Q Okay. Is that where you got your master's too?
A Yes, sir.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q And if I understood your testimony correctly, shortly after you got out of high school you joined a police department?

A Yeah. I was in college for a while, and then I had an ROTC scholarship, gave it up to go to the police academy, dropped out of college for a while, ended up being on, as I said, about the six-and-a-half-year plan.

Went back to college as I worked for the police department, depending on the shift I was on, either working at night and going to college in the day or vice versa and then got my bachelor's in history and then decided to go into education and then went back.

At the time, the HOPE Scholarship in Georgia would pay for a master's degree in special education. I don't think they do that anymore, but they paid for my master's in special ed, and then got an add-on in education leadership, school administration.

Q Which police department were you in?

A Cobb County.

Q And what was your final rank in the Cobb County Police Department?

A I was a field training officer and a





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

patrol officer. I worked the entire time at Precinct 2 in the southern end of the county, Austell, that precinct. So we didn't have a rank for FTO. You were a patrol officer, but you had to have additional experience for that.

Q Okay. You left the police department voluntarily?

A Yes, sir.

Q Okay. Was there any disciplinary action against you while you were in the police department?

A Got a letter one time for wrecking a police car.

Q Okay.

A But never suspended or anything like that.

Q All right. So you were there for seven years, and you got a lot of your education out of the way. Looks like most of it. Had you finished with your master's when you left the Cobb Police Department?

A No. That was when I first started teaching. You could get a provisional teaching certificate back then, so I was teaching behavior disorders while finishing up that

master's program.
Q And what level were you teaching that?
A Middle school.
Q In middle school?
A Floyd Middle School.
Q So I want to be clear. You were not teaching behavior disorders to students. You're teaching it to teachers; right?
A No. It's a subcategory of special education, students who have emotionally based behaviors.
Q I see. So you were teaching that group?
A Yes, sir.
Q I get it. All right. And you were teaching a particular grade level or all grade levels?
A They were combined. It was a class. Depending on the period of the day, sixth through eighth students. But sometimes it was one or two grade levels, but I taught all three in the same day.
Q All right. In the course of teaching -- and how long did you teach?

A Three years.
Q And it was at Floyd?
A First two years at Floyd and then the third year at the West Cobb School which technically no longer exists. It was, I believe, a two-year kind of interim school. At the time Harrison High School was very overcrowded, and they set up a school for just seventh and eighth grade students in the Lost Mount Middle School building but called it the West Cobb School.
Q Dealing with kids with behavioral disorders, did you ever have occasion to try and use any techniques to calm them down?
A Yes.
Q All right. Did you ever use any, let's say, breathing techniques or mindfulness techniques or yoga techniques with these kids?
A No. I played classical music for them, which works surprisingly well, and then some -- there's a whole -- and they may have changed it, but a whole suite of approved behavior modification and behavior management techniques, but, no, not breathing.
Q Okay. Was it -- had the use of yoga



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

techniques or mindfulness techniques or breathing exercises simply not come into vogue, or it was just not the option you chose?

A I don't recall it being in vogue back in those days.

Q Okay. So just wasn't -- I mean, at least it wasn't on the horizon as something you would do?

A Not that I recall.

Q Now, since that time, have -- and let's just not talk in particular about Bonnie Cole for a minute or Bullard school. But since that time, has Cobb County School District used breathing techniques, mindfulness techniques, or yoga techniques with its students?

A I don't know specifically, but I think that there have been some schools that have done some things along those lines.

Q Has there been any discussion at your level about, A, why use such techniques and, B, whether or not there was any success in using those techniques?

A Not at my level, although I myself occasionally -- I don't know if I would describe it as mindfulness, but if I myself --



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

you'd call it biofeedback. If I'm getting upset or anxious about something or just having a difficult day, I turn the lights off, put my head back, and breathe deeply --
Q Right.
A -- for a certain period of time. And it lowers my blood pressure.
Q It's a relaxation exercise?
A Yeah.
Q Okay. All right.
A And that's -- it's 118 over 78, so.
Q Right. Okay. After or before?
A Well, when I last went to the doctor. Losing 20 pounds helped too.
Q Okay.
A My wife does yoga. I've done yoga once or twice, but I'm not very good at it.
Q Right. All right. So you taught for three years, first at Floyd, then at West Cobb School. What was your next step? And this was -- when did you come on board with the Cobb County School District? What year?
A '96. I left the police department right at the end of the Summer Olympics, and then it was, roughly speaking, Friday and then


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

the following Monday.

Q Okay.

A Switching over. And so that was in July or August of '96, probably August of '96, coming to the School District.

Q All right.

A And so after I did two years at Floyd and then I did one year at the West Cobb School, loved teaching and loved teaching the students with behavior disorders. But some administrative jobs came open, and my principal at the time, who since had retired, said, hey, you should think about going into administration.

And I at the time did not appreciate or really understood what administrators did. And this was before the Internet largely but thought they just, you know, sat in their office and surfed the Internet or something in today's standards.

And interviewed and then got a job. So the next year I was -- we had a position in Cobb called administrative assistant, and I did that for one year at Pebblebrook High School. That's in Cobb County. And then about halfway


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

through that year, my principal promoted me to assistant principal, but it wasn't effective until the next school year, basically locked me in by promoting me midway through the year.

So then the second year at Pebblebrook I was an assistant principal. The AA position was essentially a junior assistant principal by a different name.

Q All right. And you were an assistant principal for how long?

A One year at Pebblebrook.

Q Okay.

A And then I transferred voluntarily. I had at that point young children and transferred to Sanders Elementary School, also in Cobb County, again as an assistant principal.

Q Okay. And how long were you at Sanders?

A Two years at Sanders.

Q And then what was your next position?

A After that, a job in human resources came open called investigations manager, and they were looking for someone either with



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

administrative or law enforcement background. And I had both, so I put in for that position and got that job and was an investigations manager in human resources.

That's about four or five years in that position, and then I was promoted to director of employee relations in HR, and that's over investigations.

Q Okay.

A So that ended up being a total of eight years with the Cobb County schools in human resources the first time.

Q Okay. So about a year as an investigations -- no, four to five years investigations manager and then like three years as -- three to four years as director of employee relations?

A Yes, sir.

Q All right. And so what year are we up to now?

A You're going to make me take my shoes off, Mr. Buckley, to do the math in my head.

'96, '97, '98, '99 would be teaching. And then '99-2000, 2000-2001 at

Pebblebrook. 2001, 2002, 2003 at Sanders, and then up through 2011. That sounds right.
Q Okay.
A In HR.
Q 2011, you left. And why did you leave?
A We were going to change superintendents. I didn't even know yet who the new superintendent was going to be, so I voluntarily left and with another person started a nonunion teacher association.
Q Okay. Was this a nonunion teacher association -- I assume this was not strictly for the Cobb County School District. This was for a broader application?
A That's correct. We focused on Cobb, but the membership was open to anyone in Georgia.
Q Nonunion teacher association. And what -- tell me what that association -- did it have a name?
A Sure. Educators First. It's a nonprofit. Educators First Incorporated.
Q And were you president or CEO of that entity, or were you an --



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A We had --
Q I assume you were an officer?
A I'm sorry to interrupt you.
Q Yeah. Go ahead.
A We had -- yes. We had two executive directors, basically co-CEOs.
Q What was the purpose of Educators First?
A We provided similar services to PAGE or GAE, which are the predominant two groups. PAGE is the largest group. They're a nonunion association. GAE, of course, is an affiliate of the NEA and is I guess Georgia's branch of the large teacher's union.
We kind of tried to be the best of both worlds and offered people representation, services, a lawyer if they needed one.
Q Teachers?
A Teachers. Well, we also served bus drivers and other education --
Q Right, other people employed by the system. And when you say, for example, services, lawyers, and whatnot, was this for people in the system who -- people in school systems who ran into, let's say,





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

employment-related problems?
A Yes.
Q Okay. Were you-all -- was your organization basically in an advocacy position with these folks?
A Yes.
Q They paid some dues to be part of it?
A Yes.
Q And when you were providing them with legal services, were you providing them through PAGE, or what were you --
A And I didn't provide legal services, obviously. If we needed an attorney, we had one attorney in particular, but sometimes some others, and we would give them to that attorney. He would, of course, provide the legal services, and we would pay the bill if it were a teacher termination hearing, for example.
Q Okay. And this went on for a couple of years?
A Three years.
Q Three years?
A They're still in existence. But

after three years, I came back to the District.
Q Why did you decide to leave all that advocacy to come back to the Cobb County School District?
A I enjoyed it, but my role was primarily to deal with member issues and to be effective. And for us to have a competitive advantage over the other larger groups, we had to provide better customer service which meant I was on the phone every day from 3:00 to 7:00 p.m. talking to people about their personnel problems.
Q I see.
A That got old.
Q It did get old. When you came back to the Cobb County School District, you came back to the HR department, didn't you?
A Yes, sir.
Q Where you're talking to people about their personnel problems?
A Yes, sir.
Q All right.
A But not till 7:00 p.m.
Q Not till 7:00. Okay. And when you came back to the Cobb County School District,


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

what position did you come back in?
A I initially came back as the chief human resources officer, and Mr. Ragsdale also asked me to serve as the interim chief operations officer.
Q You are not still the interim COO?
A No.
Q Okay. So this was just for a limited engagement?
A Yes, sir.
Q The COO part, I'm talking about.
A Well, it ended up not being.
Q Okay.
A I had initially planned just to come back as an CHRO, and Mr. Ragsdale said, hey, I want you to do just interim chief operations officer as well. And then after a year, he promoted me to deputy superintendent, and I kept both roles as CHRO and COO.
Q And you were deputy superintendent?
A Yes, sir.
Q So you wore several hats?
A Yes, sir. You understand the metaphor.
Q So what I want to do is take this


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

little time frame and break down, you know, it sounds -- you were in different positions, and there were occasions when they overlapped and maybe occasions when then didn't. What time -- and this is, the time frame you're talking about now, your return is from it looks like 2014 --
A Yes.
Q -- to the present?
A Yes.
Q So right now your title is -- is it still chief human resources officer?
A My title is deputy superintendent. I function as the CHRO and the COO.
Q So have you functioned in that way from 2014 to the present, or has that changed during that time frame?
A No. 2014 to the present, although the title changed continuously, was both the CHRO and the COO on a practical level. The title changed at year end.
Q Do you have a written job description?
A Yes.
Q Okay. Does it cover all these

categories that you've just described?
A Yes. There actually may be multiple job descriptions. There's one for deputy superintendent, and I believe there still exists separate job descriptions for CHRO and COO.
Q Do you still -- you mentioned that you earlier worked as the investigations manager and then the director of employee relations which oversaw investigations; right?
A Yes, sir.
Q And let's go to when you were an investigations manager. What sort of investigations did you get involved in?
A We investigated allegations that involved either violations of the Georgia Code of Ethics for Educators or serious policy violations of School District or board, board policy. We call them administrative rules and policies, but I generally refer to them as a small-P policy.
And some of those obviously could have been things that were also criminal in nature although I was not at that time a law enforcement officer, but some of the ethical


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

violations could also potentially have been criminal, but basically violations of the Code of Ethics or serious School District policy violations.

Q Did you ever investigate any complaints of discrimination in that capacity?

A Yes.

Q Okay. And these were typically by employees?

A Yes.

Q Teachers?

A Yes.

Q Any principals or assistant principals in that group?

A I'm sure we had some. I can't recall specifically, but, yes, probably.

Q All right. And when you advanced to the position of director of employee relations, which you said you were over investigations, did you typically get involved as an investigator, or did that -- was that delegated to somebody else?

A When I was the director, it more likely than not was delegated to someone else. Occasionally, I would depending on the nature


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

of the case, but I had two investigations managers at that point that worked for me, and my typical practice was to give those to them.
Q I assume because you earlier said that this position -- it was a new position when you came on board, right, the investigations manager position?
A No. There was a vacancy. The position already existed.
Q But you had told me that one of the things they were looking for was somebody with some police background?
A Yeah. It was posted, they wanted one of two skill sets. It was either an administrator, kind of the standard assistant principal kind of background. Could have been a principal. But then alternately -- it was either/or.
Alternately, they were considering hiring someone who was not an educator but who had a law enforcement background.
Q And the reason for that was because in law enforcement you would have had a good deal of experience in investigating although you'd be investigating criminal matters mostly;

right?
A Yes, and also in dealing with sometimes upset people in emotionally charged situations.
Q Okay. Defusing?
A Ideally, yes.
Q Okay. All right. So in your current position, do you oversee investigations, or do you -- does the director of employee relations report to you?
A There are investigations managers still. They report to a director of employer relations, and then he reports to me.
Q Was there any kind of investigation in the hierarchical sense of the word that we're talking about right now by an investigations manager or by a director of employee relations or anyone else in their hierarchy with respect to the complaints that were made about Bonnie Cole?
A I don't recall there being anything of that nature.
Q Okay. When you initially learned of this situation, did you have an understanding -- did you yourself get involved


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

in any asking questions or trying to find out what people were upset about?
A Eventually, yes.
Q Okay. Did you ever talk to Bonnie about that?
A I was in a meeting once with Bonnie. I don't remember the date, but yes.
Q You talked to her about the complaints?
A I recall meeting I believe in the principal's office with her about them.
Q Did you interview her in the normal sense of the word where you're saying, well, this is what they're saying, is this true, or is it an exaggeration, or things along those lines?
A Generally, yes. It was not as formal or structured an interview if it were -- if it were an investigation, per se, because it wasn't that kind of meeting, but generally her side of things kind of.
Q Okay. Did you have any -- as you talked to her and as you arrived at an understanding of what she was doing at Bullard school, did you have any impression or belief

that she was engaging in a religious practice?
A I think she was engaging in some things that had religious overtones. I think that Bonnie is a good AP, and I actually had dealt with Bonnie on a couple of completely unrelated cases before, I think involving some teachers and her functioning as an AP, and I recall her being an excellent AP.
So to answer your question, I would say that this was religious overtones, quasi religious.
Q Explain to me what you mean by that because I want to make sure I understand. Is it that the overtones were something that people were sort of superimposing on what she was doing, or did you think she was actually imposing her religious beliefs on the students or teachers?
A She was -- she wasn't having church. She wasn't having religious services. She -- and a lot of this for me is going to be from what other people have described. I have not personally investigated Bonnie or witnessed many of these things.
But from as best as I can determine,


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

she was engaging in practices kind of what you refer to generally speaking as mindfulness and some other practices that were -- had religious overtones but were not religious services. And if I recall, her intentions were to try to help kids relax.

I think it was specifically even related to relaxing during testing and relieving anxiety. So, no, I don't think she was engaging in establishing a religion or trying to force people to engage in a religious practice.

It was more some probably well-intentioned attempts to try to help kids relax and help I guess staff relax too. It's a stressful time to be a teacher.

Q Well, when you say the word overtones specifically, is this something -- and you've said, well, I didn't really investigate exactly what she was doing.

But this word overtones, is this -- the idea that what she was doing had some sort of religious overtone, was that something that you concluded looking at it, or was it something that people in the community were

telling you, you know, in so many words, this -- what she's doing has religious overtones?

A I would say both. There were obviously people in the community that were concerned about the religious overtones. Looking specifically at some of the practices that were attributed to Bonnie, whether she engaged in them or not, I'm not, I'm not directly certain, but if you look at the -- there was a concern, for example, that the kids were being encouraged to tell each other namaste.

I wasn't terribly familiar with that at the time. Since, I understand that that is a greeting that at least for some people would have some sort of religious overtone depending on your definition.

I think there was a concern about the students coloring mandalas. I'm not even sure if I'm pronouncing that correctly. I didn't know what was that at the time. But apparently, that has or could have some sort of religious overtone. Again, it's not a religious activity, per se, but would have some



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

sort of religious connotation.

Yoga, I don't know that that has a religious connotation.

Q Okay.

A For me, that's a physical practice. I guess if you're doing mantras or doing some of the more truly spiritual aspects. But, for me, it's holding poses that make me fall over that I can't do.

Q Same here. Right.

A Yeah. So religious overtones, but I don't think that she was having church, if you will.

Q When you talk about religious overtones, are you talking about any particular religion?

A Well, I think it varies. And I'm not an expert on comparative religion. But apparently, some of them could potentially have overtones of eastern religions. Some of them may be different religions, but I don't know. I didn't know what the mandala was, and I can't remember which one that may or may not be linked to.

But ultimately from my perspective,

it wasn't about the religion aspect in this case.

Q Did you ever check with Bonnie to see if she was encouraging students to say namaste to each other?

A I can't remember the details of our one conversation about it. But, no, I didn't investigate or cross-examine her in any detail about that.

Q Same question with respect to coloring mandalas, did you ever ask her whether she was getting kids to color mandalas?

A I can't remember.

Q Okay.

A I think that Dr. Swinney probably handled most of that herself.

Q What is your religion, if you have one?

A No, I do.

Q Okay.

A I would, I would generically describe myself as a Christian. I was raised Catholic and have attended Methodist churches, but I have not regularly attended a church of any kind since 2001.

For a while when my mother-in-law lived with us, my mother-in-law is a Unitarian, although there's different connotations, but we attended a church at East Cobb, I'm trying to remember the name of church, but at her request because she's 84 and she had to go to church.

Q Okay.

A But I would describe myself, to answer your question, as a, as a very mild Christian. I'm not an evangelical Christian or anything like that.

Q Have you ever attended Burnt Hickory Baptist Church?

A No. I drive by it twice a day, but never been attending.

Q That's not attending. I'm going to ask you some names. Have you ever gone to church with any of these folks: Randy Scamihorn?

A No.

Q Chris Ragsdale?

A No.

Q Grant Rivera?

A No.

Q Brad Daniell.





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A No. I don't know who that is. Brad Daniell?
Q Yeah, Daniell maybe? D-A-N-I-E-L-L.
A Not to my knowledge, no, sir.
Q Heather or Brian Clark?
A No.
Q Melissa Vickers?
A No, sir.
Q Adam Glass?
A No, sir.
Q All right.
A Last Christian church I would have regularly attended would have been Due West United Methodist Church up through 2001-ish.
Q All right. What is your understanding of the term or the definition of mindfulness?
A Again, I'm not an expert, but I would say it's the practice of engaging in trying to be present in the moment and to try to clear your mind of extraneous thoughts and to, for lack of a better term, focus, focus on the now and be present.
And for me, it's, as I said, more of just a relaxation technique.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Okay.
A And to kind of clear out the mental clutter.
Q Do you see anything inherently religious in mindfulness?
A No.
Q Okay. And you've said that as far as you're concerned -- or I guess your wife may be better able to define yoga than you. But in your experience, it was putting your body in positions that made you fall over?
A And I know that it also helps people relax.
Q Right.
A I probably -- I suffer from a little bit of intermittent vertigo. And apparently, it helps with that, and it's good for your core.
Q Right.
A But I know it's also, generally speaking, a relaxation technique that would also help you focus on the present.
Q The actual physical practice of yoga as you have experienced it, did you consider it to in any way be a religious or spiritual


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

activity?
A No.
Q All right. Now separate and apart from the Cobb County School District, have you ever heard of mindfulness activities or yoga being used in the education context?
A Yes.
Q Okay. How have you heard about this? Just in your general reading and information and your job or what?
A Yes, both. I've seen it in -- I get a daily email from a magazine called District Administration Magazine, and they have little snippets culled from various places about things. But I've seen a number of times districts have used different things, yoga, mindfulness, different practices, but those in yoga and PE classes, for example.
And then I've also seen it in my personal reading as well.
Q Okay.
A That has been raised.
Q And in terms of that reading or information, have you learned anything about how or whether these practices have been used



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

to reduce disciplinary problems in school settings?
A I have.
Q What have you learned as far as your reading is concerned?
A I've seen research that would indicate that in some instances, in some settings, generally lumping all these together, that there have been cases where districts have seen or schools have seen some success with discipline.
Q And earlier we asked about your knowledge as far as these practices are concerned in the greater Cobb County School District, and my understanding of your answer was you weren't really aware of whether or not that was going on or not.
A No. I think there's some schools that have done varying practices including in the Cobb County School District.
Q Right.
A I just can't tell you specifically which ones off the top of my head.
Q Do you know with respect to any of those other schools or any of the other, let's



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

say, administrators or teachers that were engaging in those practices with students, there have been any religious objections?

A I'm not aware of any.

Q Okay. The only instance in which you're aware of religious objections to these sorts of practices is with respect to Bonnie Cole and the Bullard school where she was; right?

A That's correct.

Q All right. And just to make sure I cover this base, have you ever yourself in your professional capacity encouraged or directed anyone to use mindfulness activities as a tool in their work in the Cobb County School District?

A I haven't directed anyone to do it, but I have recommended the technique that I described to you. Whether it's mindfulness or not, I don't know, but I have -- I have told people that I've had success personally with using that technique to try to help calm down and lower my blood pressure. So directed? No. But recommended? Yes.

Q Okay. Bullard Elementary School, is

it a magnet school?
A Not that I'm -- no.
Q Okay.
A It's an elementary school.
Q I understand it's one of the, one of the sort of crown jewels in the Cobb County school system. Is that a fair way of characterizing it, or how would you characterize it?
A No. I would disagree with that. I don't know that we have any crown jewels. We have -- every school has its challenges, and I guess for teachers it depends on what you're, what you're wanting to deal with. Some schools are sought after by teachers because of the geography.
Some schools are sought after because they don't want to deal with students who are low SES. But some schools in East Cobb are avoided because they don't want to deal with parents who are attorneys or too extremely litigious.
Q I just can't imagine why anybody would have a problem with that.
A Not -- present company excluded,


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Mr. Buckley.

Q Appreciate that. Well, I don't live in Cobb County, so it's not a problem. But let me ask you this. When did you first become aware that mindfulness activities were being used at Bullard?

A In the spring of '16 or maybe very, very late winter. I don't remember the exact date.

Q Okay. How did you become aware?

A I can't remember who first told me. I can't remember if it was Dr. Rivera that told me or if I was copied on one of the emails from the various folks in the community who, who were upset about it.

Q But you became aware that there were some religious objections to the practice. People in the greater religious community were objecting to some of the practices at Bullard?

A I did become aware of that.

Q Okay. And they were specifically objecting on religious grounds?

A Some of them were, yes.

Q Some were. Okay.

A It was ultimately proved to be kind

of two different camps. But, yes, sir, I became aware of it.

Q And broadly speaking as I understand it, and I've reviewed probably the same documents you did and then some, there were two, kind of two categories of objections. One was people who, regardless of what mindfulness was or what things Bonnie Cole was doing were, they felt that they conflicted with their own personal religious beliefs and the religions that they wanted to raise their children in. Is that a fair way of characterizing it?

A Yeah. I think one of the camps were people who were concerned about their religious aspects that conflicted with theirs. They were not necessarily trying to force their religious beliefs in the place of it. But they were concerned about what they perceived, rightly or wrongly, to be religious -- this is not necessarily their word, but their belief that there was some sort of religious indoctrination side to that.

Q Okay.

A I'm not saying I agree with that assessment. That was one of the camps, broadly


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

speaking.
Q What was the other camp?
A There were some parents also who were just concerned that Bonnie and then the District as a whole had kind of taken its eyes off the academic ball, so to speak.
Q The school was -- Bonnie was an assistant principal. She wasn't the principal of the school. Were they concerned that the principal had taken her eye off of the academic ball, so to speak?
A Both. They seemed to be concerned that Bonnie -- and she was the AP, but that Bonnie was focusing on nonacademic, their perception, nonacademic endeavors. Their perception, and I don't know if it was accurate or not, but their perception was that the school had, had declined in some test measure or another. And I can't remember which one they were pointing at.
But they were also concerned that at least at the town hall meeting, for lack of a better term, the parent meeting, that the principal had allowed it to happen as well. So to answer your question, both.

Q Did you investigate to see whether there was any merit to that concern?
A To which concern?
Q To the concern that somehow the academic standards were being allowed to slip?
A Not formally, no.
Q Okay.
A From what I could tell, the academic concerns -- you can always point to any test score that varies up and down.
Q Right.
A From what I could see, and I'm by no means an academic expert, but that that was not the case.
Q Okay. And as I understand it, there were at least a couple of occasions where people got together to discuss or even pray over the reported religious concerns about what Ms. Cole might be doing at Bullard Elementary School; is that right?
A There was a meeting that I attended, a parent meeting that was actually organized by the school. I'm aware anecdotally, but obviously didn't personally attend, that there were potentially some other meetings as well.

Q The parent meeting, who was that run by? Do you remember?

A I believe it was the principal that organized it.

Q Was it called something like Coffee and Conversation or something like that?

A Something like that, yeah.

Q All right. And you heard about another instance where a number of individuals, I don't know if they were parents or just people in the community, what have you, converged on Bullard Elementary School and actually conducted some kind of prayer service; right?

A I have heard that that happened. I did not attend, but I have heard anecdotally that that occurred.

Q Who did you hear about that from?

A I can't remember.

Q Okay. But it was a topic of conversation in the Cobb County School District administration; right?

A We discussed it. I frankly dismissed it because that's not my --

Q Did you hear that some people

actually laid their hands on Bonnie Cole's office windows and said some prayers about her and what she was allegedly doing?

A I did hear that.

Q Okay. And there was a little bit of media attention that focused on this controversy; right?

A Yes, sir.

Q Okay. And I'm going to -- did that cause you any concern?

A Me?

Q Yeah.

A Only in that it was unusual, the amount. But ultimately, my job is not to succumb to media pressure. We -- it's not uncommon that we get media attention for some sort of personnel matter.

(Whereupon a document was identified as Plaintiff's Exhibit 15.)

Q Okay. Let me show you an exhibit. This is Exhibit 15.

A I should have brought my reading glasses here. Sorry. Okay.

Q You're not going to pull a Donald Trump on me and say you can't read the exhibit;

right? Are you? He --
A No. I just, I may have to have you hold it for me across the table.
Q All right.
A I have not seen him do that.
Q All right. No. He -- in his depositions, he typically doesn't bring his reading glasses. So when they pull out exhibits, he says he can't read them.
A I promise I won't tweet about it either.
Q So all right. Let's not do that. All right. Okay.
This document is an email from a person named Brian Clark who Chris Ragsdale -- Chris was the superintendent of the Cobb County School District; right?
A Yes, sir.
Q And it's subject is Question about Classroom Practices, and it looks like it was forwarded from Chris Ragsdale back to Clark, let me see, back to -- there was a thank-you to Clark, and then it got forwarded to Grant Rivera. Just for the record, who is Grant Rivera?



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A At the time, Grant was our chief leadership officer.
Q Right. And was he over you in the hierarchy, were you-all equals, or was he under you?
A Equals.
Q Okay.
A He would have been -- at that time, he was the principal's boss's boss. He would have been Barbara Swinney, who was the assistant superintendent over the principal, he was her supervisor. But we were equals in that we -- neither one reported to the other.
We both were executive cabinet members who reported to Chris Ragsdale.
Q And looks like Rivera then forwarded this email to Swinney and to Patrice Moore. She was the principal at Bullard, wasn't she?
A Yes, sir.
Q Have you ever seen this email or any of the forwarding emails before?
A I can't remember.
Q Okay.
A I don't see my name on this one, but I can't tell you for sure.

Q Okay.
A We got a lot of emails at the time.
Q Okay. But you generally recall the religious objection coming up at about the time of this email.
A Yes.
Q Right? It came to your attention?
A Yes, sir.
Q Did you get any instruction from Chris Ragsdale or anyone else for that matter, maybe Rivera or maybe someone else, about what your role should be in handling this matter?
A Yes. Dr. Rivera at various points would kind of bounce things off of me and ask for advice. At one point, I believe he -- and I can't remember the reason, but I think he was unavailable at one point, and that's how I ended up going to that coffee or whatever the meeting was.
Q Right.
A And at some point, and I can't remember the exact date, Mr. Ragsdale said something to the effect of, what's going on out there, kind of a generic kind of comment. So to answer your question, yes.

Q Well, I'm trying to -- I want to figure out roles here, and maybe Ragsdale was hovering at 30,000 feet and you were closer to this situation. And I don't know whether Rivera was closer yet or whether you and Rivera were sort of looking at it with the same level of attention.

How would you characterize your involvement?

A I would say Mr. Ragsdale was, I don't know about 30,000 feet, but at a very high level, not detailed or intimately involved. One of the great things about working with Mr. Ragsdale, although we certainly don't always agree on everything, and he gets to decide, you know, the ties, but he does not micromanage, particularly in the areas of human resources.

So he's the boss, but he leaves -- he leaves things up to me, especially in that arena, for which I am appreciative.

If I recall, Dr. Rivera and Dr. Swinney were really the folks on the ground, so to speak, looking at this and fielding things. I was copied in, and

Dr. Rivera would bounce some things off of me, but I would describe them as being more the, tactically speaking, the leaders close to it.
Q Well, now, you at that time, you were the top person in human resources; right?
A Correct.
Q And your reporting structure was you would report to him, Ragsdale?
A Correct.
Q Okay. And so when this came to your attention, did anybody characterize this to you as a human resources issue?
A Only in that some people wanted -- ultimately wanted my advice as a human resources professional as to, for lack of a better term, what should we do about this, what are our options, but not in the sense of this is a formal disciplinary issue or some sort of human resources investigation, more consultative.
Q All right. Who posed those questions to you?
A Dr. Rivera primarily. Dr. Swinney. Not directly, I don't recall Patrice Moore although I talked to her kind of about the


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

situation. I believe it was prior to that parent meeting when things were still kind of swirling.

Q Okay.

A And then Mr. Ragsdale and I would have discussed it just a little bit in that, you know, kind of what's going on there.

Q And you said that they, they either individually or collectively asked you what the options were, right, from a human resources perspective?

A Eventually.

Q All right. Eventually.

A Eventually.

Q And what were the options that -- did you give them different options, or did you simply make a recommendation? What did you do?

A And it was mainly Dr. Rivera because he was over the principals and had been really doing a lot of this and kind of tagged me to go to that meeting when he couldn't. But ultimately, we kind of first thought to decide what was happening, did Bonnie engage in anything that would warrant any kind of employee disciplinary action.

And the answer was no. She didn't -- anything she did that would have ultimately been -- and I think ultimately it was disruptive and problematic, but my conclusion was that she did it with good intentions so that she didn't -- she didn't do anything that warranted any kind of HR investigation in the formal sense or any kind of employee discipline.

The issue then -- I'll give you a minute to catch up. Sorry.

Q Go ahead. Go ahead.

A The issue then became how can we best deal with all the disruption and divisiveness that was occurring in and around the school community to try to get the best outcome for everybody concerned.

Q Now, as far as the disruption and divisiveness goes, there was quite a conversation going, as I understand it. Or maybe it was a series of conversations. But was Bonnie herself arguing with people about this and about what she was doing or whether it was okay to do it or anything of that nature?

A I don't recall Bonnie being

confrontational or arguing with people directly about this.

Q So the people who were, let's say, argumentative about it or who were creating disruption were the people in the community that were communicating with the School District. Is that a fair way of characterizing this?

A Well, I think that there's, there's a couple of things at play.

Q Right.

A Although Bonnie wasn't arguing with people or being confrontational, Bonnie does have to own some of this in that she engaged in the practices that resulted in what I'm sure was an unforeseen disruption or divisiveness. I don't think she intended --

Q Right.

A -- to fracture the school or community.

Q Right.

A But she has to take ownership of engaging in the practices that resulted in that and at least not foreseeing that that would happen.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Then you have different camps of people reacting to their perception of all this, and we've talked about the kind of two overlapping reactions to that as well.

Q And based on the reaction of these camps, you made a recommendation?

A I would disagree that it's based on the reaction to these camps.

Q Okay.

A Yeah.

Q No. What I said was, based on the reaction of these camps. So maybe I can characterize it differently.

Based on the communications from these camps and the disruption that resulted, you made a recommendation?

A I would still say it's not based on the communications of any camps. My assessment was can Bonnie continue to function at that location in her role as assistant principal, not just as a teacher because she wasn't a teacher, but can she continue to be the number-two leader of that school's community.

Given what I saw at the coffee meeting, town hall, given that the level of





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

rancor and disruption that occurred that I'm sure she didn't intend to occur but that occurred because of the practices she put in place at the school, it became clear that she had lost her ability to function at that school, knowing that we have 66 other elementary schools, and that her continued presence at that school would be -- continue to be disruptive and probably would not have ultimately been in her best interest as well.

Q Okay. Did you take any notes when you went to this coffee meeting?

A No. I sat in the -- I didn't sat. I stand because it was basically standing room only, which was a little surprising. I recall standing in the media center, and I recall standing, leaning up forward against some bookshelves in the back, frankly trying to keep a low profile and just observe.

I don't remember Bonnie being in the room, but I believe she was in the building.

Q Do you remember anything that was said in that meeting?

A Vaguely. It was surprisingly well attended given that it was -- I forget the day



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

of the week, but it was midmorning on a workday. And it was crowded, and there were two, really three sets because you had -- Bonnie had some defenders as well.

Bonnie had people that -- you had the principal, who was doing her best to try to defuse things and defend many of the practices. And then you had the two different overlapping camps who were objecting. And then Bonnie had some defenders as well.

But it was surprisingly well attended given the size of the school and the size of the meeting and was surprisingly rancorous.

Q Some people at the meeting objected to what they thought Bonnie was doing on religious grounds; correct?

A I think some people objected based on what they thought was on religious grounds, and then the separate group objected based on the taking-your-eyes-off-the-academic-ball grounds as well.

Q Okay.

A And again, the people that objected on the religious grounds, I don't recall a

single one telling me, Mr. Adams, we need to stop this, and we need to inject our viewpoint into this.

Q Right.

A They just seemed to be concerned about, as I described it, the religious overtones.

Q Right. Were there people at that meeting who said that their perception of the practices, whatever they thought they were, offended their religious beliefs or the religion that they wanted to bring their children up in?

A I don't remember if anybody used the term offended.

Q Right. Well, I'm not saying they used that term necessarily, but you know what I mean.

A Yeah. There were some that objected to their children being involved in those practices.

Q On religious grounds?

A I think some objected based on religious grounds, yes.

Q Okay.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A But again, they weren't trying to substitute theirs. They seemed to just want the school to, for lack of a better phrase, this is my phrase, not theirs, be a religion-free zone.
Q Did you -- and you heard Ms. Bullard. She was the principal? No. Who was the principal?
A Patrice Moore.
Q Ms. Moore. And ms. Swinney was there; right?
A When?
Q Was Ms. Swinney the woman who was over the principals?
A Yes, sir.
Q Okay. And did they, in their participation in this meeting, did they -- were they defenders of Ms. Cole? Were they neutrals? I think you said more defended her.
A In the coffee --
Q Yes.
A -- meeting, the town hall coffee meeting in the media center?
Q Right.
A Ms. Moore was -- she had a



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

PowerPoint or some sort of presentation on the screen and was going through the practices and was, for lack of a better term, trying to defend them. And there -- and she, in fairness to her, she was also just explaining them, putting them in context and explaining what they were and what they weren't.

Q When you say "they," you're talking about the practices that were going on at the school?

A Yes, sir.

Q Okay. The mindfulness, et cetera?

A Mindfulness, namaste, mandalas. There were some other things. Maybe there might have been a concern about the Himalayan salt rocks.

Q Okay.

A So the principal was trying to explain and to a lesser extent defend the practices and also explain what they weren't as well.

Q Okay. And she was trying to explain that they weren't religious in nature?

A I don't know that she was explicitly saying they weren't religious in nature. I


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

think she was more trying to say, look, we're just trying to get the kids to relax and help them destress.

Q Okay.

A But there was some information she was trying to clarify as well, as I said, about what they were not.

Q I don't know if I asked you this, but do you know Brian Clark?

A Only I know that he, he communicated with me at some point in this, in this thing.

Q All right. By email?

A I think so. Email or letter. They kind of fog together.

Q Have you ever talked to Brian Clark?

A I spoke to one or two parents after the coffee meeting/town hall. I can't remember which one he was, and I may have taken a phone call or two --

Q Okay.

A -- from someone, but I can't remember if it was him or not.

Q Was there any defense, robust or otherwise, of any allegations that people were, so to speak, taking their eye off the academic

ball at this meeting?
A I, I think the principal tried to explain that, look, your kids are still getting a great education here and that we -- she didn't use that phrase. I'm using that just colloquially.
Q Yeah.
A But I think she tried to talk about all the good things they're doing there. And when one of those objections specifically was raised, somebody at the meeting cited, and I don't remember what the measurement was, one of the academic measurements, I think she replied to that.
Q Okay. As you listened to this, did you -- were you satisfied that there was not a problem with the academics as they were being handled at Bullard Elementary School?
A Yes, but I am not an expert in curriculum or instruction or academics.
Q Okay.
A That is not my wheelhouse.
Q Okay.
A And schools are only as good as -- they're not -- you can't measure a school by


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

one test score at one time.
Q I understand. I understand.
A But Bullard was a great school. It's still an excellent school. And it was an excellent school then.
Q What I'm trying to drive at is, you heard these concerns that were expressed by parents about the academics, and you also heard the response or the reply to those alleged concerns. And in your mind, you were satisfied that the school was not failing to meet the standards that it should meet academically?
A Yeah. I didn't see any evidence that the school had fallen below some sort of -- I was more concerned from the HR standpoint about staff morale and school climate and to what extent, if any, and there was, that the staff also may have been divided on these topics.
Q Well, somebody sent you an email alleging that; right?
A Alleging the staff?
Q That there was staff --
A We received multiple emails, and I think many of them alleged that the staff


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

were -- some of the staff members at least were concerned.

Q Did you ever investigate any of those emails to see if what they were saying was true?

A At some point, we -- and I don't remember whose idea it was, but we sent Jeff Dess to do some work. Jeff is a, and I'm not sure what his exact full licensure is, but he is a counselor. He might be a licensed psychologist.

But he works -- he runs our prevention-intervention center. He's used often. If there's a death in the school, he and his people will go do grief counseling for the students and things like that. But he's also used as a mediator in disputes.

In this case, he was sent to the school to try to get a reading, so to speak, on the level of fracture among the staff.

Q Did you send him, or did somebody else?

A I can't remember who sent him.

Q Did he ever report back to you?

A Not formally. But at some point, I

asked him, and I think it was in the meeting with -- in a meeting at Patrice's office. I don't know if Bonnie was in the room yet or not. But I asked him essentially, and sometimes you have to ask Jeff a direct question to get a direct answer.

Q Right. Okay.

A I said, Jeff, give me a rough ballpark of how fractured the staff is or how split, probably --

Q Yeah. Okay.

A -- is on this issue. And is it roughly 50-50 or so?

And he answered, generally speaking, yes, about along those lines.

But he wouldn't give me an exact number other than to indicate that there was a split among the staff.

Q Well --

A And at a certain point, if I could have a five-minute bathroom break?

Q You can.

A But I'm good for a little while longer.

Q You can.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

I would imagine that on any given subject that there may be a split in staff on any number of things, perhaps, say, Democrats and Republicans or things of that nature.

Did he say anything along the lines that the disagreement among people on staff was at such a level that Ms. Cole needed to go or words to that effect?

A No, he didn't. He wasn't that specific. It was more, it was more to what extent is this. Is there -- is there no disagreement, is there universal disagreement, or is it somewhere in middle?

It was somewhere in the middle without a specific number. He didn't, I don't recall, make a specific recommendation, nor normally would he, about whether she should be moved or not.

Q Did he tell you that the disagreement was so disruptive that the school wasn't able to function? I'm talking about the staff level.

A I remember asking him something roughly to the effect, and we're talking about staff, some variation of can this marriage be





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

saved, so to speak.
Q Right.
A And his general answer was probably not. In other words, can we, can we get this back, rectify it, and get this back together? And his general answer -- and it's hard sometimes, again, to get a specific answer, but that's his training, but that, generally speaking, what I recall was that it's split roughly down the middle and that it probably can't really be reunified.
Q Okay. Now, before we take a break, I gather that, at least as far as he was concerned, that the staff wasn't telling him that we've let our academic standards slip or anything along those lines?
A I don't know.
Q Okay. The disagreement among the staff was whether or not these practices, mindfulness, et cetera, in some way were inappropriate, perhaps either the teaching of religion or rubbed up against people's religion. Is that the concern that he was telling you?
A I think that was some of it. I


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

think there was also some concern, and I didn't talk to them individually, so I'm kind of relying on my recollection of what he said, but also a concern that there was some staff members who did feel -- coerced is too strong a word, but that they were being encouraged by their supervisor to engage in some of these practices, but I didn't talk to them directly.

Q Did they --

A So it was more than just that religious objection piece.

Q When they said by their supervisor, were they referring expressly to Bonnie Cole or to Ms. Moore or to somebody else?

A They were -- Bonnie, referring to Bonnie.

Q Did you ever or did anybody ever check with Bonnie to find out if she was in fact coercing anybody to engage in these practices?

A I did not, but I didn't think she was. I didn't feel the need to.

MR. BUCKLEY: Okay. Why don't you take that break.

THE WITNESS: Thank you, sir.

(Proceedings in recess, 2:37 p.m. to 2:46 p.m.)

(Whereupon a document was identified as Plaintiff's Exhibit 1.)

Q Let me show you what's marked as Plaintiff's Exhibit 1 and ask you to take a minute to look at that document, and I'm going to ask you some questions about it.

A Give me a minute to read through it.

Q You bet. Tell me when you're ready.

A Okay.

Q All right. Do you remember receiving Brad Daniell's email via way of Randy Scamihorn?

A I don't remember it, but obviously I did.

Q All right. Mr. Scamihorn was a board member, right, school board member?

A Correct. Still is.

Q Yeah, still is. And when he forwarded this to you, did you-all have any conversation about what, if anything, you should do in follow-up concerning this?

A I can't remember specifically about this email because we receive -- we


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

collectively at the central office received quite a few emails, roughly speaking, along these lines.

Q Okay.

A But I can't remember specifically if it was, if it was this one or not. But we certainly had some discussions as emails came in.

Q Okay. You would agree with me that this particular email from Brad Daniell appears to object to Ms. Cole's teaching of these mindfulness practices on religious grounds?

A I would agree with that assessment.

Q But this -- so I'll probably ask you concerning some of these emails what you did as a reaction to it, and maybe it was you reacted cumulatively to this stuff, and that's fine. I just want to make sure that if, for example, one of these folks -- you're going to see several emails.

One of these folks, if you called them up to ask them more or called somebody up to verify whether or not Ms. Cole was using crystals and stones and teaching people to breathe like a dragon or trying to get them to


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

meditate in a pray-like form, I want to know if you did anything, you know, to find out about that stuff.

Did you check on any of these allegations that she was using crystals and stones and teaching children to breathe like a dragon?

A No, not personally.

Q Yeah.

A Again, Barbara Swinney was more the person on the ground working with the principal, so she would have been the person to follow up on these things. And I am not a bluenose Baptist.

Q Right.

A So my general reaction when some of these things came in was that -- to just take them I guess at face value, but take them with a very large grain of salt.

Q Right.

A But it would have been -- but, no, to answer your question directly, I did not personally investigate these claims. To the extent that anyone did, and again, for me, it was not an HR investigation, it would have been


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Dr. Swinney.

And I guess she would have referred her information to Dr. Rivera who would have told me. The only thing that I personally did was that one conversation at the coffee thing and the meeting with Bonnie and Patrice, conversations with Grant, a conversation or two with Patrice.

I don't recall a phone call, but I may have gotten a phone call or two. But I generally try to avoid taking phone calls along these lines directly. So I can't tell you if I took a phone call for someone or not. I may have. We got a lot of emails.

Q Did anybody ever tell you directly, whether it was a parent or whether it was somebody in administration, that you ought to -- that you ought to take Bonnie out of that school?

A I don't remember if anybody specifically said that or not. It became clear that she had become the lightning rod for these practices and that she was personally identified by the practices that had caused disruption among the staff and at the school.





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

And it became clear that, because of that, her continued presence at that school was most likely going to continue to be disruptive to the real mission of the school -- the educational mission of the school had also become a distraction, if you will -- and that it was in the District's best interest that she be moved to a different location where it would not be a disruption, give the school a reset, if you will, and then give her an opportunity at a different school as well.

Q As far as disruption was concerned, the disruption was coming from the community outside of the school; is that right?

A I think there was some staff disruption too judging by, by Jeff Dess's assessment and to a lesser extent Patrice Moore, so, yes, certainly community and judging by that.

The rough math at that town hall, that coffee conference, because I remember doing some in my head given the size of the school, you had, given that a lot of parents have multiple kids at the school, you had 20 to 25 percent of the, of the families at the

school who were -- who seemed to be represented at that.

That's a pretty high number for, whatever it was, a Tuesday morning and then given the informal assessment from Jeff Dess that the staff was fractured somewhere in the middle range. So it was more than just community.

And, again, the community was split. There were plenty of folks that were upset, not based on any kind of religious overtones even. And then the staff, of course, was split too, so it was really both.

Q In that meeting, did anyone, parent, staff, anyone, ask or demand that Bonnie be removed from the school?

A I don't remember if they specifically said she needs to be removed, but it was pointed at her in many cases. And it became -- it became clear that in an elementary school when you have a principal and an AP that if you have that large a portion of your community who is upset with an individual that it becomes difficult for that individual to function at that school.

It's not unheard of. We don't just routinely just move folks if there's any kind of parent rancor. I have made many parents mad at me for saying, no, we're not going to fire that teacher or, no, we're not going to do that. It's not Burger King. They don't get to just have it their way, despite what they may sometimes think.

But it is also not unheard of when we have 17,000 employees and 400 school administrators for us to reassign administrators when they've worn out their welcome at a school or need a different experience or if it's in their best interest as well.

Q Have you ever had an administrator or a principal or a staff member who was a member of a religion, let's say, I'm going to just say Muslim, for instance, who caused -- or who was the subject of objection in the parent community out of concern that that person might be teaching a religion that the parents objected to?

A Not an administrator. We have had, and not that there are even formal cases, but

we've had informal complaints over the years. And you've got to remember, I've been with the District on one side of the fence or another now for 16 years in human resources including the three when I was defending folks.

We have had the occasional -- occasional is too many, but a parent or two who has complained kind of along those lines, maybe not that they were -- it was a Muslim teacher, to use your hypothetical, not that it was a Muslim teacher who was trying to indoctrinate their child into Islam, but parents, maybe more closer back to 9-11, those days, that bristled at the fact that their child was being taught by a teacher that maybe wore a Muslim head scarf.

Q Okay.

A And I can't remember a specific name, but maybe one or two teachers that are kind of that ballpark, but not the indoctrination.

Q Was any action ever taken as a result of any of those complaints?

A No.

Q Okay. Let me show you another


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

exhibit. I'm going to apologize for the tiny print, but that's the way it was produced to us, so here you go.

A Okay.

(Whereupon a document was identified as Plaintiff's Exhibit 23.)

Q This is Plaintiff's Exhibit 23. And I'm looking at it from the top of the page down. It looks like Chris Ragsdale forwarded this to Brian Clark and cc'd you on March 10th, 2016. And there's a lengthy email from Brian and Heather Clark here.

Did you receive this document? And if you need to take a moment to review it, that's fine.

A Yeah, if you will. I'm good at this distance. But if you get any smaller, you're going to have to have somebody hold it up for me. I have one contact lens for close and one for distance, and it doesn't work out that well. Sorry. Just give me a second. Okay.

Q Okay. Do you remember receiving this email?

A No.

Q Okay. It looks like the email



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

complains as much or more about Ms. Moore, Dr. Moore, as it does Ms. Cole. Was there ever any investigation as to whether or not Dr. Moore was engaging in any kind of intimidation tactics with respect to the mindfulness activities that were going on at Bullard?

A Not by me. And again, this was not an HR investigation. So if anyone would have looked into it, it would have been Dr. Moore's supervisor, Dr. Swinney.

Q Okay. Did Dr. Swinney ever report to you that she found out that Ms. Cole was using crystals in the fifth grade classrooms explaining that they could use them to ward off negative energy?

A I cannot remember specifically that she ever reported that.

Q All right.

A So no.

Q Did you ever get a copy of the Piggy book that she references in here to see whether or not it contained material that could damage young minds?

A No.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Okay.
A I'd forgotten about the Piggy book until you showed me this. I remember now kind of chuckling over the title or whatever, the Piggy book. But, no, I did not.
Q I think it's called Peaceful Piggy's Meditation. All right.
A Okay.
Q You never read it, and you never concluded that that book was indeed some kind of a religious tract designed to alter the way of thinking of the children at the school?
A No, sir.
Q This email says that, and I'm looking at the second page, "Mrs. Cole is training their next intern, she has chosen to be the student leadership intern, at the Breath of Life Center to be a healer as well. You can find them coloring mandalas in Dr. Moore's office most days or find them coloring in a room they call Australia.
"We have ample documentation and are willing to give you teachers' names who are also concerned about the administrative intimidation and direction the school is

taking."

Do you know if there was any follow-up done with these folks to obtain the documentation they claimed to have that Ms. Cole was coloring mandalas most days in Dr. Moore's office or coloring in a room that they called Australia?

A Not of which I'm aware. Dr. Swinney, I guess, would have probably talked to Dr. Moore about the concerns, but I'm not aware. And frankly, Bonnie is a good AP. She was a good AP. I would most likely have just kind of dismissed a lot of this as kind of hyperbole unless there was evidence found to the contrary.

But to answer your question directly, I did not investigate this.

Q Okay. It's sort of over the top and fantastical stuff, is it not?

A Well, I don't know if I'd characterize that. I just -- I took a lot of this with a grain of salt. For me, it was about the widespread disruption among the parents and the staff, not about any religious aspect, and was more can Bonnie continue to be

effective at that location as an assistant principal.

(Whereupon a document was identified as Plaintiff's Exhibit 16.)

Q Okay. Let me show you -- it's another document. This is Exhibit 16. Do I need to get --

MR. BACHMAN: If you have an extra one. I mean, I don't mind sharing it with her. But if you have an extra one.

MR. BUCKLEY: I've got another.

MR. BACHMAN: Thanks.

Q You may want to take a minute to review this. I'm going to -- if you look at the last page, it says, "CC: Mr. Chris Ragsdale, Mr. John Adams, Dr. Angela Huff, and Dr. Grant Rivera."

My first question for you will be, did you receive this document, as indicated by the stamp at the top of the first page, on or about March 10, 2016?

A That's the stamp from the superintendent's office. It looks like it was cc'd to me. I can't remember receiving it, but it's entirely possible. We had -- we got many.

Q Okay. When you received -- well, so you don't know whether you received it yet or not? It says it was cc'd to you.
A Yeah. From whoever, whoever sent it. So they've -- essentially, we may have gotten 10 or 15 similar documents --
Q Okay.
A -- over time. It seems vaguely familiar, but they all have kind of blended together, but I trust that I received it.
Q You would agree with me if you review this document that it is making objections to Ms. Cole and her activities at Bullard on religious grounds, wouldn't you?
A If you'll give me just a second to review.
Q Sure.
A I'll be quick, just the first --
Q That's fine.
A Okay. What was your exact question again?
MR. BUCKLEY: Go ahead and read that back, if you don't mind.
(Whereupon the court reporter read back the referred-to portion as follows:)

Q You would agree with me if you review this document that it is making objections to Ms. Cole and her activities at Bullard on religious grounds, wouldn't you?
(Whereupon the reading back was concluded.)
A It starts off complaining, yes, about spiritual, and then it uses the term religious. So, yes, I would agree. But then it also kind of takes a turn in the second page advocating more for religious neutrality.
So, yes, I would agree with your assessment that they're objecting about the spiritual or religious overtones of the practices in which they believed Bonnie engaged, but it also stops short of trying to say she ought to be doing Christian stuff and kind of in the middle argues more towards the school just not being the place for any kind of religious practice and it being neutral.
Q Okay. And I know you said you received 15 or so --
A 10 to 15.
Q -- right --
A I'm guessing.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q -- letters like this?
A Letters, emails, communications in some form.
Q Okay. All right. Do you happen to know who wrote this document? It doesn't seem to be signed.
A No. It's -- someone's blacked out the name of Mary Elizabeth Davis who at the time would have been our chief academic officer.
Q Okay. Do you know why that name would have been blacked out? We didn't black it out.
A No. She since left the District but was with the District then.
Q Okay. Who is Angela Huff?
A Angela Huff is retired. At the time, she was the chief of staff.
(Whereupon a document was identified as Plaintiff's Exhibit 2.)
Q Okay. All right. Let me show you another document here. This is Exhibit 2. Take a minute to review it. It's an email. Well, the first -- the lower portion of it is an email from Grant Rivera to Ms. Swinney, and





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

it appears you, among others, were copied on it, dated March 12th, 2016.

And then one back from Swinney back to Rivera in which you were also copied dated March 13th, 2016. So just take a minute to review. I'm going to ask you a few questions about it.

A Yes. Okay.

Q Okay. First of all, I want to draw your attention to the portion -- the lower part of the first page. That's the email from Grant Rivera to Ms. Swinney and copying others including you.

Did you have a hand in drafting this email?

A I don't recall having a hand in drafting it. Grant may have, may have bounced off the general idea that he was going to summarize it. But this is not my writing style, frankly. I'm not as detailed as this.

Q Right. Would you have edited it perhaps? Did he send it to you in advance and say --

A Maybe, but I can't remember. Grant would send a lot of things to me or ask my

advice, but this is not, this is not my writing. I'm not as point-by-point specific.

Q Do you remember discussing with him in advance of the email being sent that he was going to send it or what it was going to say, anything of that sort?

A Not specific to this email, but in general, Dr. Rivera did ask me -- at least on a couple of occasions, he was concerned about Dr. Swinney's job performance and oversight of schools in general, effectiveness as an assistant superintendent, ability to be the principal's boss, things like that, not only in this instance but in the case of at least one other school, maybe some others.

And he was beginning to document his concerns about her job performance. And I don't recall if he specifically talked to me about this specific email, but in general I recall that that's kind of where -- the point he was at in supervising Dr. Swinney.

Q As I understand what Mr. Rivera has said, he was trying to give her specific instructions here to help her stay within the tracers, not his words. Those are mine. Does

that sound about right?

A I don't know what you mean by "tracers."

Q To stay within the lane.

A Okay.

Q Okay.

A Yeah. I would say that's probably about right, and to better clarify his expectations of what she should be doing.

Q Okay. All right. I'm looking at Ms. Swinney's email here. And Swinney, how many schools did she oversee?

A I can't remember exactly how many at the time. It's going to be -- today the equivalent assistant supe would oversee a third of our elementary schools which would be 22-ish, so probably somewhere in that ballpark.

Q Well, when she says -- and I'm looking down one, two, three, four, five lines down. As she says, "Additionally, I'm in communication with Gail Smith as our counseling department has supported mindfulness practices (these may include yoga, to which the hands to heart center or "praying hands" is common), also as a precaution."

Was it at that point that you learned that mindfulness practices were being used widely in the District?
A I can't remember specifically when I learned that some of this had been done in other places. I'm not sure I would characterize it as widely.
Q Okay.
A And I can't recall when I specifically learned that there were some schools that were doing some of these practices.
Q Okay. Well, were you alarmed when you learned that schools, other schools in the community, were using mindfulness practices?
A I don't know that -- I can't remember if it was mindfulness. I remember being a little bit surprised, not alarmed, if they were doing -- if in fact they were even doing praying hands.
Mindfulness, that practice would not and did not and does not concern me greatly.
Q Why do you think, if these practices were widespread throughout the District, why do you think that Bonnie Cole was singled out as



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

engaging, by others obviously, but is engaging in some kind of religious practice or engaging in a practice that was offensive to a religious community?

A I would respectfully disagree again with your characterization that these practices were occurring widespread across the District. It's my recollection that there were some schools that were engaging in some of these practices, but that there was not any school that was engaging in all of these practices to the extent that they were at Bullard under Bonnie.

And so although there may have been a smaller number, I wouldn't say it was any practice, even individually, was widespread. And the sum total of all these practices in one location at Bullard caused disruption in the school and in the community and caused a reaction that Bonnie did not oversee, because I don't think she intended to cause this, that did not happen in the other schools.

Q Well, when you say all these -- I'm not sure how you said it. You'd indicated that all these practices were taking place --

A Many.
Q -- at Bullard. When you say -- well, there was basically mindfulness. And when you say all these practices, what are you referring to?
A Well, there may have been a school or two that were doing yoga in PE. There might have been a school or two that was doing mindfulness or meditation. There might have been a school or two that was doing praying hands.
I don't know that we had any schools that were engaging in namaste as a greeting or anything. There might have been a school or two that was using Himalayan salt rocks. There may -- but I don't recall there being any school that was using multiple of these practices at one location. I'm not aware of it anyway.
Q And as I understand it, you're not really even sure whether at Bullard they were using the greeting namaste or coloring mandalas?
A Mandalas. That's another one, yeah.
Q You don't know. It's just that that



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

buzz started to occur; right?
A Correct. I think that Dr. Rivera and Dr. Swinney, as evidenced in this email, did a little more research into that. It looks like that they didn't have evidence that there was -- I think this is a typo. He says, "mandatory mediation or quiet time." I'm assuming he means mandatory meditation or quiet time.
Q Right.
A But he says in that Staff section, a and b, that there was no evidence that that occurred. Looks like implicitly his conclusion I guess in conversations with Dr. Swinney, who would have been more on the ground, was that there was evidence, at least more likely than not, that the other practices were occurring because he doesn't have that same hedging language for those.
But to answer your question, I have not personally investigated that or personally observed either way.
Q Okay. All right. Is it -- and, you know, in reviewing some of the emails that you've reviewed today, in your mind, some of

the things that were being said were, I think you said -- your words were hyperbole; right?

A I think that there were some people -- some of what was attributed to Bonnie was taking place, and Bonnie failed to anticipate the consequences of what she, I believe, did with the best of intentions.

Q Okay.

A She has to own that as an assistant principal, and we expect more of our APs than we would of a teacher, for example. But I think also some of the things that were attributed to Bonnie were not taking place, and all that goes into my opinion of this case is that Bonnie didn't intentionally do anything unethical.

She just failed to exercise good judgment as a veteran AP, which is unusual for her because she generally exercised and still does good judgment and is a good veteran AP. But she failed to anticipate the blow back and also the disruption not only in the community, not only based on religious grounds, but just on the nonreligious issues too and the disruption among the staff.





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Well, would you ever consider recommending that Bonnie be transferred back to Bullard?

A I don't know that enough time has passed or not, but I would consider it. I would consider -- I don't know that Bonnie's put in for a transfer, but she has the same ability to request one as any other employee.

If she were to ask me just my opinion of whether or not she should go back to Bullard, I would say she's doing well where she is currently and that if she wanted, for example, to get closer to home, it might be better that she go to Lewis and not Bullard where there's --

Like it or not, there's baggage for her at Bullard. But she certainly could pursue a transfer to another West Cobb school if that were the issue.

Q Do you think the baggage for her at Bullard is largely the baggage of the community and their perspective or the collective perspective on her?

A Community and staff.

Q Right. Well, and in terms of staff,



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

is there anyone that you can name on the staff that has been vocal in objecting to Bonnie who's presently on the staff at Bullard?
A The only one I can name is the Clarks from that email that you showed me. Apparently, she was a teacher there.
Q Right. Is she still a teacher there?
A I don't know.
Q Okay.
A But I'm going -- my assessment on the staff is based on Dr. Rivera and Dr. Swinney's assessment and then, most of all, Jeff Dess's assessment. But I have not polled the staff.
Q All right. Now I'm going to challenge you. This was --
A You're getting smaller?
(Whereupon a document was identified as Plaintiff's Exhibit 3.)
Q And it is not my doing. Okay? I'm showing you what's marked as Exhibit 3.
MR. BACHMAN: You keep blaming us. These are documents you produced.
A This is not some clever legal

strategy to make me guess at what I can't read, Mr. Buckley?

Q No. I'm not that clever. Let me first of all just make a couple of notes on Exhibit 3.

MR. BACHMAN: I can get you a magnifying glass if you really need one.

THE WITNESS: No. I'm good. I'm good. It's just --

Q All right.

A Good thing it's a Friday afternoon.

Q I want to focus on the first page of Exhibit 3 and specifically an email from Melissa Vickers sent Saturday, March 12th, to Grant Rivera which indicates it was cc'd to Randy Scamihorn, David Chastain, you, and Chris Ragsdale, Subject: Bullard Elementary, Concerns from a Bullard Employee, and ask you if you recall receiving this email.

A Okay. Let me just read it.

Q Okay.

A I'm halfway. Okay.

Q Okay. Do you recall receiving this?

A Not specifically, but it sounds generally like one of the ones we would have



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

gotten.
Q If you had received it, as this document seems to indicate, you would have reviewed it; right?
A Yes, sir.
Q And you indicated you had 10 to 15 emails that you reviewed related to Ms. Cole's practices at Bullard Elementary; right?
A Yes.
Q So you'd agree with me that Ms. Vickers' email expressly objects to the mindfulness practices at Bullard based on religious grounds; right?
A She objects to the -- something about chakras and crystals, mindfulness, so yeah. And she then -- so that's spiritual if not religious, perhaps religious. And then she talks about her own Christian faith, objects to connections to Buddhism, and then kind of switches into a -- I guess a complaint about Dr. Moore's review of Bonnie.
But I would say that, yes, in general, Ms. Vickers, yeah, who identifies herself as a parapro --
Q Right.

A -- is objecting, A, to the religious nature, spiritual nature of what she attributes to Bonnie.

And then there's also some -- I think I saw some kind of implicit concerns about -- well, I'm not sure what she means by persecution or bad mark on evaluation, but it sounds like she's also implicitly complaining about what she feels is some coercion by Bonnie being in a supervisory role as well.

So I would say religion and then also what the lady is kind of describing is, not her words, but abuse of position.

Q Well, if you look at the middle of the email, it says, "It is certainly not okay for my child. We have a very strong Christian faith, and we pray. My child does not need a crystal or a stone to protect her from negative energy. She has the blood of Jesus."

That's a pretty express religious objection to whatever she perceived is going on; right?

A I would agree. She's objecting.

Q Okay.

A I think that is religious. And then





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

it also includes the issue of Bonnie's position.

Q And she said -- you said she's a parapro. At the very conclusion of this email, it says, "This post is a teacher that has joined the revolution."

Was she a teacher, or was she a parapro?

A I'm only going by the email where it says, "Mr. Rivera, I'm a special education parapro at Bullard."

Q Okay.

A I don't know. And I get a little confused back and forth with who's talking.

Q Did Ms. Vickers, was she part of the divided staff that you were referring to earlier in your deposition?

A I don't recall her specifically, but she obviously has concerns, and I would -- I would reasonably think that she is, is on the faction that was not in favor of Bonnie and the practices, so yes.

Q Okay. All right. Did you take any action or were you directed to take any action as a result of this email being sent, or was

this simply part of the cumulative objections
that led to Ms. Cole's transfer?
A I wasn't ever directed to do
anything except, roughly speaking, monitor the
situation.
Q Right.
A And was never told to do anything
about it, period. It was largely, in the HR
realm, left up to my judgment and working with
Dr. Rivera.
Q Okay.
A So it is consistent with the other
emails. I actually recall at some point
receiving some pro-Bonnie emails too --
Q Right.
A -- in the mix as well because there
started to become kind of an escalation there.
Did I answer your question?
Q Well, sort of. Was this part of the
cumulative information that formed the basis of
your decision that Bonnie should be
transferred?
A Yes, in that it was -- it was one
data point of many. And again, for me, it's
not about any of the religious issues, pro or

con, Christian or not. It was whether an assistant principal could continue to function at a certain location.

(Whereupon a document was identified as Plaintiff's Exhibit 10.)

Q Okay. You get to go first. I'm showing you --

A Thank you for not making them smaller.

Q I'm doing what I can here. Let me show you what's marked as Exhibit 10, which is an email which contains some attachments including a lengthy communication from Darren Lamb. It's dated March 14th, 2016, addressed to Chris Ragsdale with a number of people in the School District cc'd including, it appears, you.

A Uh-huh (affirmative).

Q And I'm asking you first, did you receive this communication?

A I don't remember receiving this specific one, but it is cc'd to me, and it's consistent with the numbers that we did receive.

Q Okay. And when you received it, if

you -- well, you're not disputing that you received it.

A Yeah.

Q Right?

A I don't recall it, but I probably did receive it, yes.

Q Would you have reviewed this material upon receiving it?

A Yes.

Q Do you remember Mr. Lamb from the Coffee and Conversation meeting?

A Not specifically.

Q Okay. Do you remember ever talking to Mr. Lamb about anything that he said in his letter?

A I can't recall anything specifically. I talked and communicated with a few people afterwards, and I've had a few people email me, but I can't remember him specifically.

Q Okay. I want to draw your attention to the second page of this, of his enclosed letter, okay, which is Bates stamped Cole 202.

A Yes, sir.

Q You can see the paragraph that



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

begins, "This practice is, plain and simple" --
A Yes.
Q -- "teaching and promoting a specific religion in the school. It is the belief that turning inward to one's self for meditation and stress relief. This teaching is in direct conflict with my beliefs and religion and are not congruent with what I teach in my home."
So you would have reviewed this material when you reviewed this email; right?
A Yes.
Q And I also see that that Peaceful Piggy Meditation book has come up again here.
A Apparently, I'm going to have to get that book.
Q Right. I've read it. It's actually not bad if you're in fifth grade.
A I went to high school with the author -- the best selling children's book author of Time to Pee.
Q Okay.
A And Don't Let the Pigeon Drive the School Bus. But I'm not familiar still with the Peaceful Piggy.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Well, maybe you can read it and see if it offends your deeply held religious beliefs.
A Yeah. I don't think it will.
Q All right. So this, of course, is a letter that is objecting to the mindfulness practices on religious grounds expressly set forth indeed in bold face in the letter; right?
A I would agree with that, that the person is objecting that -- in their view.
Q All of these -- or many of these emails and letters are sent during a very short period of time in March, in the March 10th-March 12th time frame. Did it ever occur to you that somebody maybe in the religious community had decided to coordinate an effort among parents to send as many letters and communications as possible in order to make a point?
A I don't know if it occurred to me at the time, but that is not unheard of in highly publicized personnel cases that people will rally the troops on both side -- both sides, especially in this day and age of email and social media.


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Okay. And this email and letter, would it have been part of the corpus of information that you would have considered in your recommendation to transfer Bonnie?
A It would have been one data point of many, so yes. But again, for me, ultimately, the decision is not whether or not the evidence tipped in favor of Bonnie doing things that -- whether they were religious or not or advocating for or against Christianity.
For me, it's what is the level of disruption, division, and rancor and can she continue to effectively lead that school as AP.
Q But the disruption and division and rancor was based at least in part on religious objections to what she allegedly was doing; right?
A Some of the concerns were at least based in part on their religious objections. Some of the concerns were based on nonreligious objections. I don't recall anyone, though, saying that it was -- that they wanted a different religion put in place.
They were not saying, you guys should be teaching Baptist Christianity. I


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

don't at least recall that. I just recall them objecting to what they perceived to be some practices, as I described them, with religious overtones that were extremely controversial.

Q Well, let's go back to Mr. Lamb's letter, which I think you still have in front of you, and look at page two of his letter which is Bates stamped Cole 202.

A Yeah.

Q Right below the bold face, it reads, "This teaching is in direct conflict with my beliefs and religion and are not congruent with what I teach in my home." It goes on to say, "If this practice continues, I demand that the method that I believe in for relieving stress and meditation be taught in the school as an alternative method."

So he does say that; right?

A And then he goes on to say, "Since the teaching of the religion in school has been declared unconstitutional, I demand that this practice of teaching of religion stop immediately."

Q Right.

A Yes.

Q But he's referring back to Ms. Cole's alleged practice and teaching; right?
A Yes. But I think ultimately his point in that paragraph is that none of the practices be taught.
Q Yeah. But his objection is indisputably a religious objection to what's going on?
A I agree, he is objecting based on his religious perspective.
Q You never talked to Mr. Lamb?
A I can't remember talking to Mr. Lamb. He could have been one of the people that approached me after the coffee thing.
Q Okay. Was there anything that you were directed to do or that you did specifically as a result of Mr. Lamb's letter?
A I can't remember anything specific to Mr. Lamb.
Q But was part of that sort of accumulation of data that was involved in your --
A There would have been multiple data points from various inputs, emails, et cetera.

And the key data point for me was that town hall. When you go to a town hall and you see that sizable -- the coffee meeting, when you see -- and the principal, she did a pretty good job of trying to defend and defuse the practices.

And when you still see, in spite of that, people that upset, including staff members -- but, yes, to answer your question, this would have been a data point. But once again, to me, it was not about religion.

Q What about the big prayer meeting out at the school where people laid hands on Ms. Cole's windows, was that a data point?

A If that even happened, no.

Q Okay. Well, you say if it happened. Did you --

A I didn't observe it.

Q You were told that it happened, though; right?

A Well, I was told a lot of things happened.

Q Well, I get it. But, I mean, do you remember who told you that it happened?

A No.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Okay. If, you know, people numbering close to a hundred came out to a school and conducted a prayer meeting to -- concerning the activities of one of your staff members, laying hands on her windows in a form of prayer, would that be a matter of concern for you?

A Well, first of all, I don't recall hearing that it was a hundred. A hundred people conducting a prayer meeting, I wouldn't care about the prayer meeting.

Q Right.

A If a hundred, a hundred -- let's say a hundred families of a school of maybe 600 families felt that the AP couldn't be their AP. Then that would cause me to be concerned.

Q If they did on religious grounds, would that cause you concern?

A No. It's not religion. And I -- if they had come to me and said, John, we insist that you move or transfer her because we disagree with her religion or because we want our own, I would have said no.

Q Even if there was a great deal of disruption?

A Yes.
Q But there was a great deal of disruption.
A There was disruption, but the disruption for me is not necessarily -- disruption is the issue, not the religion.
Q Right.
A If there was disruption, I have to decide if someone can, regardless of whether it's religious or not, decide whether or not someone can function in their position.
Q Okay.
A So disruption is the issue. If there was disruption, I would be concerned. If it's religious in nature, at some point they're entitled to their opinion, but we're not going to move people because someone disagrees with their religion.
Q Okay. But the religious -- the objection of religious folks was part of the disruption in this matter?
A I think, I think that, yes, some of the people who were disrupting and objecting and -- were doing it based on what they perceived to be religious grounds. But for the


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

District, the issue was not her religion or the establishment of a religion.

It was did we have someone who could continue to function at this location.

MR. BUCKLEY: Let's, if we can, take a little break.

MR. BACHMAN: Okay.

(Proceedings in recess, 3:42 p.m. to 3:58 p.m.)

(Whereupon a document was identified as Plaintiff's Exhibit 11.)

Q Okay. Let me show you what's marked as Plaintiff's Exhibit 11 and ask you if you are familiar with this document, which is an email from Adam Glass dated March 17th, 2016. It's addressed to Cobb humanresources@cobbk12.org, and it looks like it's twice addressed to that address and then to other people. Do you recall receiving this email?

A You'll have to give me just a minute to read it.

Q Sure.

A Yes. He refers to himself as taking the time to chat with me, and I talked to a

couple of people after the Coffee and Conversation. I can't remember his face, but I do remember talking to one guy in particular. He was a man whose wife I think may have been an employee at the school who did the reference to the school strategic plan, SSP. So, yes, vaguely.

Q Do you know -- you don't know Mr. Glass?

A No, not other than apparently talked to him after the thing. If he is the one gentleman, we had a pleasant conversation. He was reasonable.

Q Right.

A And it was a pleasant conversation. But I don't think I would know him if he walked in the room.

Q But in Exhibit 11, he was critical of Ms. Cole's promotion of mindfulness, and he says, I'm looking at the largest paragraph on the first page, two thirds of the way down, "With the focus now being on how we as a school community move forward and heal the divisions, I think it is going to be very difficult for that to happen with parents and staff as she is



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

still an administrator at the school."

Those are what he said to you; right? He's certainly suggesting she should not remain the administrator of the school; right?

A He is suggesting that.

(Whereupon a document was identified as Plaintiff's Exhibit 13.)

Q Let me show you what is marked as Exhibit 11. I'm sorry. What I did I say? 11? 13. I'm sorry. 13. And this is your reply to that email; right?

A Give me just a second.

Q Sure.

A Yes.

Q Okay. And in this, you tell him, "We are indeed continuing to closely monitor, review, and discuss the matter at the executive cabinet level and will take any additional action as may be needed."

You are responding to his suggestion in his email that she should no longer be the assistant principal at that school; right?

A Not necessarily. That's kind of a generic phrase that we use to respond to people



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

and let them -- not committing to any specific action, but letting them know that we're essentially on it and that, as it says, we'll monitor and review.

But that's -- we've commonly in HR used that phrase, additional action as may be needed.

Q Right. Who is -- who are you referring to when you say that you're discussing this at the executive cabinet level? Who are you talking about?

A Again, I don't remember specifically sending -- obviously, I sent this, but I don't remember my state of mind when I drafted it, but most likely conversations with Dr. Rivera. Dr. Swinney, but she is not -- would not have been executive cabinet. She would have been cabinet --

Q Okay. Would that also be anyone on the board?

A No. They're not on executive cabinet.

Q Okay. Chris Ragsdale is not?

A Chris Ragsdale, he's in charge of executive cabinet.

Q Okay.
A I guess technically he's not part of the cabinet because he's the superintendent.
Q Did you, separate and apart from any school board meeting, did you have any conversations before you made your recommendation concerning Bonnie Cole with Chris Ragsdale about the situation?
A I don't remember the exact sequence of events as to when Dr. Rivera and I talked without Mr. Ragsdale. I recall at some point that I talked to Mr. Ragsdale about, generally speaking, what happened. And I think that at some point Dr. Rivera and I talked to Mr. Ragsdale as well.
Sequentially, though, ultimately, Dr. Rivera and I came up with the recommendation. Mr. Ragsdale essentially assented. And I don't mean to diminish his authority.
Q Right.
A He -- because ultimately, they're all his decisions before it goes to the board, but it really was driven by Dr. Rivera and me, and then it would have gone to him. And then





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

my office generates the personnel report. There's a big, long personnel report that goes to the board that lists transfers, people that go on leave, et cetera. Sometimes that's 15, even 30 pages.

There's a shorter executive session personnel report where we specifically report by name, one page, sometimes two, sometimes maybe three, the names of principal and higher level position recommendations or central office directors and above.

And then also historically for decades, the board likes us to report anytime we move not only a principal but an assistant principal or hire one, so a list of those as well. So my office, my secretary would prepare that in consultation with leadership management.

This was also at the time of year historically when the District has done a lot of administrative moves. We don't do quite as many now with different leadership in that area over leadership because Dr. Rivera's office really is -- especially now, his successor is more of a leadership.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

But at this time, this year, there was -- it was time for what the employees historically refer to kind of sarcastically as fruit basket turnover. There's a period at the end of the year when the assistant supes get together, decide what assistant principals need to be reassigned to different schools, either because they've outlived their welcome at a school or because they've requested a move or they'd like a different level or whatever the case. Or they are perceived by their supervisors as needing a different experience. This was at that time, so then we would have prepared that.

I always do meet with Mr. Ragsdale prior to a board meeting and go over the personnel report with him. But typically, Mr. Ragsdale looks at it and then puts it down, and we tend to talk about other things.

Q Okay.

A He is very hands off on personnel.

Q He tends to follow your recommendations?

A Yes. I can't recall a time when he has overruled one.

Q So let's talk about a couple of things. You said a mouthful there.
A Sorry.
Q No, it's okay. So let's talk about when you make the recommendation to the school board in executive session. You mentioned a document which has information concerning the people that you're recommending that there be some kind of employment-related decision on.
Is there -- is it simply a list of names and it has Transfer at the top, or is there more information, for example, why I recommend transfer?
A Two different reports. The big, longer personnel report is basically a spreadsheet.
Q Okay.
A Bonnie's name appeared on the shorter executive session personnel report. The longer report is emailed to board members outside of executive session.
Q Okay.
A In executive session, they get a list of the transfers, and then they also get -- they're stapled together, but it's a


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

separate document. They get a list of terminations, if we terminate an employee, a disciplinary action. That's a separate list completely. Bonnie was not on that list.

And then they also get a third document that are -- when we report cases to the Professional Standards Commission, when the PSC reports back and closes the case, they get that third page too.

Bonnie's name was on the first page. And I think -- and I've looked at this document fairly recently. I think that there was a -- there might have been a principal or two move. There were probably I think nine or ten APs reassigned that same day. And there may have been an assistant director. She's listed among the APs.

Q And you referred to this is the time of year when a lot of these things occur. Your recommendation to move her, though, was expressly -- it arose out of the situation we've been talking about today at Bullard Elementary School and the community conflict that arose?

A Yeah. And there's a -- there's a

lot of gray in the community conflict issue. But, yes, it was -- fortuitous is not the right word, but convenient timing that we made the decision to reassign Bonnie, which is not punitive. Or we didn't view it at punitive, anyway.

And I'm going to guess that we probably reassigned 20 to 30, maybe even 40, assistant principals. In a typical year, we've got 400, and usually it's about 8 to 10 percent. There are usually two or three board meetings, and it's kind of elementary one board meeting, middle school one board meeting, high school one board meeting because that's the way the assistant supes handle things.

Q Okay. But it's not your testimony that in the normal course you would have transferred her on this occasion. I think your testimony has been pretty consistent that the disruption, I think those are your words, or conflict that was occurring was the impetus for your recommendation?

A The disruption and her inability to function effectively in the future at that school.





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Right. But you felt she was unable to function because of the community commentary concerning her which was, let's say, vigorous?
A Community and staff.
Q All right.
A For me, staff is an even bigger concern than community. Her job is, to a certain extent, and the principal's job, obviously, is to try to lead their community. But even more importantly from my HR perspective, it's to lead the staff.
MR. BUCKLEY: All right. Okay. We need to get a document copied.
MR. GREEN: Would you mind? Thank you.
(Whereupon off-the-record discussions ensued.)
MR. BUCKLEY: Back on the record.
(Whereupon a document was identified as Plaintiff's Exhibit 46.)
Q Let me show you what's marked as Exhibit 46. Take a minute to review this document. It's Bates stamped CCSD 1958 through 1982. And I'm going to ask you if you can identify this document.

A Sure. Yes, sir.
Q Okay. What is it?
A This is to what I was referring. The top page, generally speaking, these are the notes from the board meeting on the 24th. But your top page, you have the minutes in executive session from that specific meeting.
I'm not as familiar with this second document in that I don't normally deal with this, but that's some sort of affidavit about what they discussed in executive session.
Q Okay.
A And then the next page, the third page, that Human Resources Personnel Report, that's the shorter one that I was referring to that talks about the various assistant principal moves.
Q Okay. Is this a document that's prepared by you, this third page?
A It's prepared by my secretary in consultation with the leadership management office, ultimately reviewed by me and then given to Mr. Ragsdale.
Q Just for the record, this is a document Bates stamped CCSD 1960 that we're


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

talking about here, and it's captioned Human Resources Personnel Report, March 24, 2016?

A Yes, sir.

Q Okay. Is there any -- and this is, this particular page, this is -- there are -- it says, Position Recommendations Below Principal Level, and it shows a recommendation that, a. Bonnie B. Cole, recommendation for reassignment to assistant principal, Mableton Elementary School, from assistant principal at Bullard Elementary School, effective July 11th, 2016.

Were you the person that decided she should be transferred to Mableton Elementary School?

A No. I don't remember doing that. I believe that Dr. Swinney -- and as usually would be the case with any transfer, what typically happens is the assistant supes get together and decide to reassign people based on the needs of their specific areas.

And so in this case, I seem to recall that Dr. Swinney came up with the recommendation, but I can't remember specifically where it might have originated





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

from.

Q Well, hang on because I had understood that you recommended to Mr. Ragsdale and the board that Ms. Cole be transferred.

A Be transferred.

Q Right.

A But a specific location would have been determined by the assistant superintendent.

Q All right. Would have been determined by Swinney?

A Typically. I don't recall her recommending Mableton specifically. What normally would have happened is that the assistant supe would be the one really to determine -- they know their areas better and who knows where their vacancies are.

So my recommendation was simply to reassign her. I don't recall specifically saying to reassign her to Mableton.

Q Okay. Is there or was there any more detailed written recommendation concerning the transfer of Ms. Cole that gave, for example, the reasons for transferring her?

A No. This is, this is what we would

normally give to the board, and there's nothing more specific.

Q Okay.

A This, this case was not -- it was important to us, and Ms. Cole's future is important. We take the future of all our APs very seriously, but it was not -- it was not, honestly, that difficult of a decision in the sense that it became clear that she couldn't function.

And we don't certainly acquiesce to parents every time they complain about someone, but it is also not unheard of that we reassign assistant principals.

Q Did anybody ever ask Ms. Cole whether she thought she could function in the assistant principal role?

A I don't know.

Q At Bullard, I mean.

A I don't know.

Q Right. And in terms of -- you had said, I think, several times in this deposition that she's a competent assistant principal. And Mr. Rivera sent an email to Ms. Swinney saying, here are some limitations on what



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

should be going on at the school in terms of Ms. Cole.

To your knowledge, was Ms. Cole ever given an opportunity to implement those changes and attempt to function in the assistant principal capacity?

A I don't know.

Q Okay.

A And to answer your question, I think Bonnie has always been not only competent but a very good AP. I think in this specific instance she just failed to exercise good judgment in anticipating the consequences of a lot of these gray area kind of things.

In our view, she hasn't been punished. Since that time, she's done -- I'm not aware of any concerns about her job performance at her new location.

Q Do you recognize that in the wake of this controversy that swirled around her and the school that transferring her to another school could be regarded by her as punitive?

A I understand her perspective. From our perspective, knowing that we routinely transfer, again, 20 to 40, maybe 8 to 10



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

percent, of our APs in a given year, I would not agree with that assessment. But I understand her perspective.

Q Right. Do you understand too that in the context of this controversy that surrounded her that the School District transferring her away from her school at that time could be perceived by her and perhaps by others in the community as a no-confidence vote with respect to her?

A I understand that she feels that way. Again, I don't agree with that assessment. If we didn't have confidence in her ability to function as an assistant principal elsewhere, then we could have just not renewed her contract at the end of the year. She would not have been entitled to a hearing.

But we were confident that given a different setting that she could be successful and that she has been. And the issue, again, for us was not her religion or her perceived religion. For us, it was judgment and effectiveness as an assistant principal.

Q What is the staff climate survey?





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A The staff climate survey?
Q Right.
A There is a survey. There's two different surveys. There's one survey for CCRPI that measures school climate. That is given to staff and parents. It also looks at discipline of students, things like that.
What I think you're referring to, we now call it the LKES perception survey. There is an anonymous survey that's given to employees at a school, certified and classified, specific to a number of different questions on a rating scale for each administrator.
It's a survey, survey of the staff of what they think of each various administrator in a professional sense, not necessarily likability.
Q Was there ever -- at this time, was there a staff climate survey done at Bullard?
A There should have been.
Q Do you know if there was?
A I don't remember the date. Usually, we do those in October of a given year. Typically what we do is we do one in October.



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

And then if, if administrators fall low enough, usually -- just very generally, the score ranges anywhere from a one to a three. High is good.

And there's I think eight categories, and so you get an average of the eight categories. The district average typically is about a 2.4. 80 percent of our employees get below a 2.2 and -- 2.1 and a 2.7. We become concerned if employees fall towards that lower end, below a 2.0 in particular.

If they do, and there's not necessarily a 2.0 threshold, but somewhere around that point if they score low enough in October, we give them some remediation and guidance and then readminister the survey typically in February.

Q But your recommendation was not based on the staff climate survey?

A No.

Q Okay.

A Certainly not the one in October at all. I think she was good.

Q All right. Do you normally review them when they are done?


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

A I get a spreadsheet with them all.
Q Okay. And the spreadsheet gives you just sort of a summary of where people fell in their staff climate surveys?
A It gives me -- in the case of principals, I have it separated by level, so I have all 67 principals, and there are more assistant principals. And then we average I believe it's eight rankings into an overall cumulative ranking, and I get it ranked by average lowest first by level.
Q Okay. To your knowledge, have you ever seen a staff climate survey concerning Ms. Cole that was disparaging or which characterized her or put her in a negative light?
A I don't recall -- no. I don't recall ever seeing her scores, if you will, to below enough that she was on our radar screen.
Q Okay.
A And, again, those are administered in October.
Q Was Dr. Moore ever transferred or disciplined in any way as a result of the events that we've been talking about here


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

today?
A Not as a result of these events in particular. But as a result of the sum total of Dr. Rivera's concerns, she was eventually reassigned to be principal of Riverside Elementary School.
Oh, you said Moore?
Q Moore.
A I'm sorry. Swinney. Did you mean Moore or Swinney?
Q I'm talking about Moore.
A I'm sorry. That's Dr. Swinney. Patrice Moore is still there. No, she's fine.
Q Okay.
A I apologize. And I believe it's Swinney. I keep saying Swinney.
(Whereupon a document was identified as Plaintiff's Exhibit 29.)
Q Let me show you what's marked as Exhibit 29. Take a minute to review it, and I'll ask you a few questions about it.
A Okay.
Q Okay. You received this email; right?
A Yes.

Q And there's your reply there. The email was dated June 7. It looks like you replied the same day; right?
A Yeah. It's early in the morning, but yes.
Q Okay. And in this email, Mr. Glass focuses his concerns on Ms. Moore, the principal; right?
A Yes.
Q And, in fact, he is very critical about the academics at the school; correct?
A He is. He cites the CCRPI, some fluctuations in CCRPI.
Q And just for the record, what is the CCRPI?
A That's the College and Career Readiness Performance Index.
Q Okay.
A It is an academic measure that the State uses to determine academic achievement and growth at a school. Editorially, the State has yet to leave it -- the formula twice the same, I think, beyond the first two years, so it is a moving target that they change every year after test scores are in.

Q Well, Mr. Glass indicates that the CCRPI scores at Bullard have fallen significantly below county scores, if I'm reading this correctly. Or am I not? I guess he's saying they're still above county scores, but what he says is, as I'm sure your aware, the recently released -- he says the recently released 2015 score is even lower and has now fallen below the county average.

And then he has a little paragraph where he shows that Bullard CCRPI scores for 2012 through 2015 showing that in 2015 it's fallen below the county average.

Did you look at what was in fact the case with CCRPI scores to see whether he was accurate in that?

A I don't recall verifying it. And I think you're correct. He's kind of tracking county versus Bullard per year --

Q Right.

A -- in the delta. But I don't recall specifically verifying that or not, but.

Q Well, it does seem that he is going after Dr. Moore pretty hard in this, in this memo. Was there anything done in follow-up to


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

this?

A I don't know if it was a follow-up to this. And you've got to remember, I receive a hundred emails a day, so I just can't fact-check every one of them. But I think that at some point Dr. Swinney at least was told by Dr. -- let me get my names right.

Dr. Swinney was told by Dr. Rivera to have a conversation with Dr. Moore about all of the concerns that had been raised about her, Dr. Moore's, leadership and management during this period and that one of those, I believe, was supposed to be the keeping your eyes on the academic ball.

But I have not personally spoken to Dr. Moore about this.

Q There was no discipline of Dr. Moore or transfer of her as a result of this correspondence or of other criticism concerning the academics at that school?

A I can't remember anything like that.

Q Okay. And Mr. Glass was not the only person who complained about the academic performance of Bullard Elementary School; right?

A No. I think there were others.
Q Pardon me?
A I think that there were others who complained as well.
Q Well, you've indicated --
A The two camps.
Q You've indicated that some of those folks were present in the Coffee and Conversation meeting that you attended; right?
A Yes.
Q So which --
A He is not the only one.
(Whereupon a document was identified as Plaintiff's Exhibit 14.)
Q All right. Let me show you Exhibit 14, and I'd like you to -- this is an earlier email that we discussed between you and Adam Glass. Okay?
A Okay.
Q But at the top, there is an email forwarding this to Grant Rivera, Barbara Swinney, and Chris Ragsdale; right?
A Correct.
Q And here is where you make your recommendation that Ms. Cole be transferred;


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

right?
A Correct.
Q And you said, "As Barbara and I discussed in our private debrief after the meeting, we will need to reassign the AP for next year in order for the school to get past this. We can discuss more next week." What meeting are you referring to?
A I think I'm -- I think I'm referring to talking to Barbara after that town hall/coffee sort of meeting, but Barbara and I had a number of conversations, not a huge number, but we spoke a couple of times about the situation and what we were going to do.
I'm not certain which meeting I'm referring to, but it had to be one of two or three.
Q Well, was it at the town hall/coffee meeting that you formulated the -- at or after the town hall meeting that you formulated the idea of transferring Ms. Cole?
A It was an option, but it was after the town hall meeting and the size of that meeting. And it became clear to me just how, how disruptive the practices had become. And

at that point, it became clear to me that the marriage, so to speak, couldn't be saved and that Bonnie could not be effective at that location anymore.

Q Right. When you're talking about the practices, you're talking about the mindfulness practices?

A Yes, broadly speaking.

MR. BUCKLEY: Okay. I want to show you a document that -- maybe we could copy this?

MR. BACHMAN: Sure.

MR. BUCKLEY: Why don't you make as many as you may need.

(Whereupon off-the-record discussions ensued.)

(Whereupon a document was identified as Plaintiff's Exhibit 47.)

Q This is Exhibit 47. Take a moment to review this document.

A Okay.

Q Who is Gregory Ewing?

A He's now the superintendent of the Las Cruces School District in New Mexico. At the time, he was on the executive cabinet, and

his position at this time, yeah, May of '16, would have been -- or he maybe had just left by then. What's his email? He still has a Cobb email.

But he was, at the time of the issues at Bullard, he was our chief, chief accountability officer. He was in charge of assessment and foreign languages and the international welcome center.

Q Okay.

A The title has since changed.

Q Who is Ming Fang He? I'm not sure. Do you know this person?

A No idea.

Q Okay.

A Georgia Southern EDU address.

Q It looks like you were forwarding this email to Gregory Ewing. Is that right?

A Yes.

Q What was the point of your --

A I don't remember.

Q -- one-word comment here, "Namaste"?

A I don't remember this in particular, but Dr. Ewing would have been on the cabinet at this time. And we've got, we've got a good



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

relationship. He's one -- I haven't talked to him a while, but he's one of my friends.

Q Is that sort of a joke?

A Yeah.

Q Do you know what namaste means?

A I think it may have been Dr. Ewing that had to -- Dr. Ewing is far smarter than I am. He speaks five or six languages, did his master's in Italy in Roman history or something like that, teaches Latin.

And I think, if I recall, he kind of had to enlighten me one day as to what namaste means. I might even be mispronouncing it.

Q Namaste. I think you pronounced it correctly. I did not.

A Correct that time, yeah. So he occasionally reminds me that I'm still a knuckle-dragging ex-cop.

Q Okay. So do you know what namaste means?

A If I recall, I think it means something to the effect of I respect the divine within you.

Q Okay.

A Something like that.





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

Q Or is it -- has it even been used in -- culturally as just a respectful greeting like good morning?
A I'm not aware of that.
Q Right.
A I have seen a cute bumper sticker in New Orleans where I'm from. There's some yoga studio there, and it reads, "Namaste, y'all."
Q Okay.
A But I have not seen it used just as a colloquial greeting.
MR. BUCKLEY: All right. Let's take a little break. We're close to being done.
(Proceedings in recess, 4:44 p.m. to 4:54 p.m.)
THE COURT REPORTER: The only thing I'll ask is about reading and signing.
MR. BACHMAN: Yeah. We'd like to reserve signature.
(Proceedings adjourned, 4:54 p.m.)


Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

I, JOHN J. ADAMS, Deponent, do hereby certify that I have read the foregoing deposition, and the same is a true and accurate transcript of my testimony, except for the changes listed below, if any.

PAGE/LINE/CHANGE REASON

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

If additional space is needed, please attach separate sheet(s) and indicate number of additional page(s) here:________

___________________________________

JOHN J. ADAMS, Deponent

This _____ day of ____________, 20_____.

Donovan Reporting, PC FAX: 770-428-5801
237 Roswell Street Marietta, GA 30060
Date of Deposition: 11-16-2018 CR: JM



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

CERTIFICATE OF COURT REPORTER

STATE OF GEORGIA

COUNTY OF COBB

I hereby certify that the foregoing deposition was reported as stated in the caption, and the questions and answers thereto were reduced to writing by me;

That the witness's right to read and sign the deposition was reserved;

That the foregoing pages 1 through 156 represent a true, correct, and complete transcript of the evidence given on the above-referenced date by the witness, JOHN J. ADAMS, who was first duly sworn by me;

That I am not of kin or counsel to any of the attorneys or parties in this case.

I do hereby disclose pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia that I am a Georgia Certified Court Reporter; that I am an employee of Donovan Reporting PC; that Donovan Reporting PC was contacted by the attorney taking the deposition to provide court reporting services for this deposition; that I



Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

am not taking this deposition under any contract that is prohibited by OCGA 15-14-37(a) and (b) or Article 7.C. of the Rules and Regulations of the Board; and I am not disqualified for a relationship of interest under OCGA 9-11-28(c).

There is no contract to provide reporting services between myself or any person with whom I have a principal and agency relationship nor any attorney at law in this action, party to this action, party having a financial interest in this action, or agent for an attorney at law in this action, party to this action, or party having a financial interest in this action. Any and all financial arrangements beyond my usual and customary rates have been disclosed and offered to all parties.

This 3rd day of December 2018.

__________________________
JOEL P. MOYER, CCR 2745
Certified Court Reporter





Electronically signed by Joel Moyer (501-161-376-4513) 24fd0399-7f78-4f01-b0e3-0b21b9ff331b

**A**

**AA** 30:7
**ability** 70:5 100:12 107:8 140:14
**able** 50:9 80:21
**above-referenced** 155:13
**abuse** 111:13
**academic** 57:6,10 58:5,8,13 75:25 76:13 81:15 98:9 145:19,20 147:14 147:23
**academically** 77:12
**academics** 76:17,20 77:8 145:11 147:20
**academy** 23:6
**account** 10:5
**accountability** 151:7
**accumulation** 120:22
**accurate** 6:19 57:16 146:16 154:4
**achievement** 145:20
**acquiesce** 138:11
**action** 24:10 66:25 90:22 112:24,24 126:20 127:2,6 132:3 156:11,11,12 156:13,14,15
**activities** 10:4 51:5 53:14 55:5 92:6 96:13 97:3 122:4
**activity** 45:25 51:1
**actual** 50:23
**Acworth** 8:6
**Adam** 3:18,20 49:9 124:15 148:18
**Adams** 1:8 3:3,10,23 4:8,13 5:8,19,20,25 7:20 17:20 21:24 72:1 95:16 154:1,22 155:14
**add-on** 22:5 23:19
**additional** 24:5 126:19 127:6 154:19,20
**Additionally** 101:20
**address** 4:1,2 8:3 9:14,16,23 10:18 124:18 151:16
**addressed** 114:14 124:16,18
**adjourned** 153:20
**administered** 143:21
**administration** 23:20 29:14 51:13 59:22 86:17
**administrative** 29:11 29:23 31:1 38:19 93:24 129:21
**administrator** 40:15 89:16,24 126:1,4 141:14,17
**administrators** 29:16 53:1 89:11,12 142:1
**advance** 99:22 100:4
**advanced** 39:17
**advantage** 35:8
**advice** 63:15 65:14 100:1
**advocacy** 34:4 35:3
**advocating** 97:11 118:10
**affidavit** 135:10
**affiliate** 33:12
**affirmative** 114:18
**afternoon** 109:11
**age** 117:24
**agency** 156:9
**agent** 156:12
**ago** 14:9 16:11,17
**agree** 56:24 64:15 84:9,13 96:11 97:1 97:9,12 110:10 111:23 117:9 120:10 140:2,12
**Agreed** 6:7,13 7:1,2 7:13,14
**agreement** 5:9
**ahead** 5:18 7:18,25 33:4 67:12,12 96:22
**alarmed** 102:13,18
**allegations** 38:15 75:24 85:5
**alleged** 14:15 77:9,25 120:2
**allegedly** 60:3 118:16
**alleging** 77:21,22
**allowed** 57:24 58:5
**alter** 93:11
**alternately** 40:17,19
**alternative** 119:17
**amount** 60:14
**ample** 93:22
**anal** 9:11
**anecdotally** 58:23 59:16
**Angela** 95:16 98:16 98:17
**anonymous** 141:10
**answer** 6:10,10,11 7:4,11 43:9 48:9 52:15 57:25 63:25 67:1 79:6 81:3,6,7 85:22 94:16 105:20 113:18 121:9 139:9
**answered** 79:14
**answering** 6:22
**answers** 7:1,8,13 155:6
**anticipate** 7:4 106:6 106:21
**anticipating** 139:13
**anxiety** 44:9
**anxious** 28:2
**anybody** 14:13 21:4 54:23 65:11 72:14 82:17,19 86:15,20 138:15
**anymore** 23:18 150:4
**anytime** 129:13
**anyway** 12:15 104:19 133:6
**AP** 43:4,7,8 57:13 88:22 94:11,12 106:18,20 118:13 122:15,15 139:11 149:5
**apart** 51:3 128:4
**apologize** 91:1 144:15
**apparently** 45:23 46:19 50:16 108:6 116:15 125:10
**APPEARANCES** 2:1
**appeared** 131:18
**appears** 84:10 99:1 114:16
**application** 32:15
**appreciate** 29:15 55:2
**appreciative** 64:21
**approached** 120:15
**approved** 26:22
**APs** 106:10 132:14,17 138:6 140:1
**archive** 12:15,16
**area** 129:22 139:14
**areas** 64:17 136:21 137:16
**arena** 64:21
**argues** 97:18
**arguing** 67:22 68:1 68:12
**argumentative** 68:4
**arose** 132:21,24
**arrangements** 156:16
**arrived** 42:23
**Article** 5:5 155:18 156:3
**aside** 15:23
**asked** 36:4 52:12 66:9 75:8 79:1,4
**asking** 6:2,23 7:5 42:1 80:23 114:19
**aspect** 47:1 94:25
**aspects** 46:7 56:15
**assented** 128:19
**assessment** 56:25 69:18 84:13 87:17 88:5 97:13 108:11 108:13,14 140:2,13 151:8
**assistant** 21:2 29:23 30:2,6,7,10,16 39:13 40:15 57:8 62:11 69:20 95:1 100:12 101:15 106:9 114:2 126:23 129:14 130:5,6 132:16 133:9,15 135:16 136:9,10,19 137:8,15 138:14,17 138:23 139:5 140:14,24 143:8
**association** 32:11,13 32:19,20 33:12
**assume** 32:13 33:2 40:4
**assuming** 105:8
**Atlanta** 1:2 2:5,9
**attach** 154:19
**attachment** 3:16
**attachments** 114:12
**attempt** 139:5
**attempts** 44:14
**attend** 58:24 59:16
**attended** 47:23,24 48:4,12 49:13 58:21 70:25 71:12 148:9
**attending** 48:15,16
**attention** 60:6,16 63:7 64:7 65:11 99:10 115:21
**attorney** 14:4 20:3 34:14,15,17 155:23 156:10,13
**attorneys** 54:21 155:16
**attributed** 45:8 106:4 106:13
**attributes** 111:2
**August** 29:4,4
**Austell** 24:3
**Australia** 93:21 94:7
**author** 116:20,21
**authority** 128:20
**automatic** 12:6
**average** 142:6,7 143:8,11 146:9,13
**avoid** 86:11
**avoided** 54:20
**aware** 52:16 53:4,6 55:5,10,16,20 56:2 58:23 94:8,11 104:18 139:17 146:6 153:4

**B**

**b** 27:21 105:12 136:8 156:3
**bachelor's** 22:1,9,21 23:13
**BACHMAN** 2:8 7:23 8:4 17:4,16,20 19:19,24 95:8,12 108:23 109:6 124:7 150:12 153:18
**back** 7:24 16:13 23:9 23:14 24:24 27:5 28:4 35:1,3,15,17 35:25 36:1,2,15 61:21,22 70:18 78:24 81:5,5 90:13 96:23,24 97:5 99:3 99:3 106:21 107:2 107:10 112:14

119:5 120:1 132:8 134:18
**background** 7:16 21:24,25 31:1 40:12 40:16,21
**bad** 111:7 116:18
**baggage** 107:16,20 107:21
**ball** 57:6,11 76:1 147:14
**ballpark** 79:9 90:20 101:17
**Baptist** 48:13 85:14 118:25
**Barbara** 3:12 20:22 20:23,24 62:10 85:10 148:21 149:3 149:10,11
**base** 53:12
**based** 25:11 69:5,7,11 69:14,17 71:18,20 72:23 88:11 106:23 108:12 110:12 118:15,19,20 120:10 123:24 136:20 142:19
**basic** 7:16
**basically** 30:3 33:6 34:4 39:2 70:14 104:3 131:15
**basis** 113:20
**basket** 130:4
**Bates** 115:23 119:8 134:23 135:25
**bathroom** 79:21
**Beal** 2:4
**beginning** 1:14 4:10 100:16
**begins** 116:1
**behavior** 22:5 24:25 25:8 26:23,23 29:10
**behavioral** 26:12
**behaviors** 25:12
**belief** 42:25 56:20 116:5
**beliefs** 43:17 56:10,17 72:11 116:7 117:3 119:12
**believe** 10:19 11:9 12:19 18:9 22:10,11 26:6 38:4 42:10 59:3 63:15 66:1 70:21 106:7 119:15 136:17 143:9 144:15 147:12
**believed** 97:15
**best** 8:7 33:15 43:25 67:14,16 70:10 71:6 87:7 89:14 106:7 116:20
**bet** 83:10
**better** 35:9 49:22 50:9 57:23 65:16 73:3 74:3 101:8 107:14 137:16
**beyond** 19:6 145:23 156:16
**big** 121:12 129:2 131:14
**bigger** 134:6
**bill** 34:18
**biofeedback** 28:1
**birth** 7:22
**bit** 17:7 21:23 50:16 60:5 66:6 102:18
**black** 98:12
**blacked** 98:7,12
**blaming** 108:23
**bleed** 9:10
**blend** 17:2
**blended** 96:9
**blood** 28:7 53:23 111:19
**blow** 106:21
**bluenose** 85:14
**board** 5:6 20:19 28:21 38:18,18 40:6 83:18,18 127:20 128:5,23 129:3,13 130:16 131:6,20 133:11,12,13,14 135:5 137:4 138:1 155:19 156:4
**body** 50:10
**bold** 117:8 119:10
**Bonnie** 1:3 2:12 4:1,2 5:10 6:1 27:11 41:20 42:4,6 43:4,5 43:23 45:8 47:3 53:7 56:8 57:4,7,13 57:14 60:1 66:23 67:22,25 68:12,13 69:19 70:20 71:4,5 71:9,16 79:3 82:13 82:15,16,18 86:6,18 88:16 94:11,25 97:15 102:25 103:13,20 106:4,5 106:13,15 107:2 108:2 110:21 111:3 111:9 112:21 113:21 118:4,8 128:7 132:4 133:4 136:8 139:10 150:3
**Bonnie's** 107:6 112:1 131:18 132:10
**book** 92:22 93:2,5,10 116:14,16,20
**bookshelves** 70:18
**boss** 62:9 64:19 100:13
**boss's** 62:9
**bounce** 63:14 65:1
**bounced** 99:17
**box** 16:8,9
**Brad** 48:25 49:1 83:13 84:10
**branch** 33:13
**break** 37:1 79:21 81:12 82:24 124:6 153:13
**Breath** 93:17
**breathe** 28:4 84:25 85:6
**breathing** 26:17,24 27:2,14
**Brian** 2:3 4:6 49:5 61:15 75:9,15 91:10 91:11
**briefly** 20:3,8
**bring** 61:7 72:12
**bristled** 90:13
**broader** 32:15
**broadly** 56:3,25 150:8
**brought** 14:14 60:22
**Buckley** 1:9 2:3,4 3:4 5:7,24 6:1 17:11,17 17:25 19:17,22 31:22 55:1 82:23 95:11 96:22 109:2 124:5 134:12,18 150:9,13 153:12
**Buddhism** 110:19
**building** 26:10 70:21
**Bullard** 21:19 27:12 42:24 53:8,25 55:6 55:19 58:19 59:12 62:18 73:7 76:18 77:3 92:7 96:14 97:4 103:12,18 104:2,21 107:3,11 107:14,17,21 108:3 109:17,18 110:8,12 112:11 132:22 136:11 138:19 141:20 146:2,11,19 147:24 151:6
**bumper** 153:6
**Burger** 89:6
**Burnt** 48:12
**bus** 17:22 18:3,24 33:19 116:24
**business** 9:2,23
**buzz** 105:1

C

**cabinet** 62:14 126:19 127:10,17,18,22,25 128:3 150:25 151:24
**Calhoun** 1:12 2:9
**call** 28:1 38:19 75:19 86:9,10,13 93:21 141:9
**called** 26:10 29:23 30:24 51:12 59:5 84:21,22 93:6 94:7
**calls** 86:11
**calm** 26:14 53:22
**camp** 57:2
**camps** 56:1,13,25 69:1,6,8,12,15,18 71:9 148:6
**capacity** 5:12 39:6 53:13 139:6
**caption** 155:6
**captioned** 136:1
**car** 24:13
**care** 122:11
**Career** 145:16
**case** 1:4 5:9 7:18 9:25 12:24 13:2,21,23 14:1,5,7,8,13,14,18 14:18,22 15:1,5,9 16:10 17:8,21 18:2 18:7,8 19:2 21:4,9 40:1 47:2 58:14 78:18 100:14 106:14 130:11 132:8 136:18,22 138:4 143:5 146:15 155:16
**cases** 43:6 52:9 88:19 89:25 117:22 132:6
**catch** 67:11
**categories** 38:1 56:6 142:6,7
**Catholic** 47:23
**cause** 60:10 103:21 122:16,18
**caused** 86:24 89:19 103:18,19
**CC** 95:15
**cc'd** 3:20 91:10 95:24 96:3 109:15 114:16 114:22
**CCR** 156:21
**CCRPI** 141:5 145:12 145:13,15 146:2,11 146:15
**CCSD** 4:7,9,11,13 134:23 135:25
**cell** 8:8,15,20 10:21 12:3,3,22
**center** 70:16 73:23 78:13 93:18 101:24 151:9
**central** 84:1 129:10
**CEO** 32:24
**certain** 12:13,20 28:6 45:10 79:20 114:3 134:8 149:15
**certainly** 64:15 84:7 87:18 107:17 111:15 126:3 138:11 142:22
**certificate** 3:6 24:24 155:1
**certified** 1:10 141:11 155:21 156:22
**certify** 154:2 155:4
**cetera** 74:12 81:20 120:25 129:4
**chakras** 110:15

**challenge** 108:17
**challenges** 54:12
**change** 32:7 145:24
**changed** 11:9,11,12 11:20 18:21 26:22 37:16,19,21 151:11
**changes** 139:4 154:5
**characterization** 103:6
**characterize** 54:9 64:8 65:11 69:13 94:21 102:7
**characterized** 143:15
**characterizing** 54:8 56:12 68:7
**charge** 127:24 151:7
**charged** 41:3
**CHARLES** 2:8
**Chastain** 109:16
**chat** 124:25
**check** 47:3 82:18 85:4
**chief** 36:2,4,16 37:12 62:1 98:9,18 151:6 151:6
**child** 90:12,14 111:16 111:17
**children** 30:14 56:11 72:13,20 85:6 93:12
**children's** 116:20
**chose** 27:3
**chosen** 93:16
**Chris** 3:14,16 4:6,8 5:11 48:21 61:15,16 61:21 62:15 63:10 91:9 95:15 109:16 114:15 127:23,24 128:8 148:22
**Christian** 47:22 48:10 48:10 49:12 97:17 110:18 111:16 114:1
**Christianity** 118:10 118:25
**CHRO** 36:15,19 37:14,20 38:5
**Chuck** 20:4,10,13 21:20
**chuckling** 93:4
**church** 43:19 46:12 47:24 48:4,5,6,13 48:18 49:12,14
**churches** 47:23
**cited** 76:11
**cites** 145:12
**Civil** 5:15
**claimed** 94:4
**claiming** 14:23
**claims** 85:23
**clarify** 75:6 101:8
**Clark** 4:6 49:5 61:15 61:21,23 75:9,15 91:10,12
**Clarks** 108:5
**class** 25:19
**classes** 51:18
**classical** 26:19
**classified** 141:12
**Classroom** 61:20
**classrooms** 92:14
**clear** 17:18 25:7 49:21 50:2 70:4 86:21 87:1 88:20 138:9 149:24 150:1
**clever** 108:25 109:3
**climate** 77:17 140:25 141:1,5,20 142:19 143:4,13
**close** 65:3 91:19 122:2 153:13
**closely** 126:17
**closer** 64:3,5 90:13 107:13
**closes** 132:8
**cloud-based** 12:19
**clutter** 50:3
**co-CEOs** 33:6
**Cobb** 1:5 5:10,12 8:16,21 13:15 17:22 23:22,24 24:21 26:4 26:11 27:13 28:20 28:22 29:8,23,25 30:16 31:11 32:14 32:16 35:3,16,25 48:4 51:4 52:14,20 53:15 54:6,19 55:3 59:21 61:16 107:18 124:16 151:3 155:3
**Cobbk12.org** 4:2
**Code** 38:16 39:2
**coerced** 82:5
**coercing** 82:19
**coercion** 111:9
**coffee** 59:5 63:18 69:24 70:12 73:20 73:22 75:17 86:5 87:21 115:11 120:15 121:3 125:1 148:8
**Cole** 1:3 2:12 3:11,13 3:15,17,19,21,23 4:2,4 5:10 6:1 10:3 10:22 14:13 21:19 27:12 41:20 53:8 56:8 58:19 73:18 80:7 82:13 84:23 92:2,13 93:15 94:5 96:13 97:3 102:25 115:23 119:8 128:7 136:8 137:4,23 138:15 139:2,3 143:14 148:25 149:21
**Cole's** 4:1,2 60:1 84:11 110:7 113:2 120:2 121:14 125:19 138:5
**collective** 107:22
**collectively** 66:9 84:1
**college** 23:4,7,9,12 145:16
**colloquial** 153:11
**colloquially** 76:6
**color** 47:12
**coloring** 45:20 47:11 93:19,20 94:5,6 104:22
**combined** 25:19
**come** 27:2 28:21 35:3 36:1,14 116:14 122:20
**coming** 29:5 63:4 87:13
**comment** 63:24 151:22
**commentary** 134:2
**Commission** 132:7
**committing** 127:1
**common** 101:24
**commonly** 127:5
**communicated** 75:10 115:17
**communicating** 68:6
**communication** 101:21 114:13,20
**communications** 69:14,18 98:2 117:18
**community** 10:3 21:17 44:25 45:5 55:14,18 59:11 67:16 68:5,20 69:23 87:13,18 88:8,9,23 89:21 102:15 103:4 103:19 106:22 107:21,24 117:16 125:23 132:23 133:1 134:2,4,7,9 140:9
**company** 54:25
**comparative** 46:18
**competent** 138:23 139:10
**competitive** 35:7
**complain** 138:12
**complained** 90:8 147:23 148:4
**complaining** 97:7 111:8
**complains** 92:1
**complaint** 110:20
**complaints** 39:6 41:19 42:9 90:1,23
**complete** 7:1,7,8 8:3 155:11
**completely** 43:5 132:4
**Composite** 4:10
**con** 114:1
**concern** 4:4 13:19,20 45:11,19 58:2,3,4 60:10 74:15 81:23 82:1,4 89:21 102:22 122:6,18 134:7
**concerned** 10:11 45:6 50:8 52:5,14 56:14 56:18 57:4,9,12,21 67:17 72:5 77:15 78:2 81:14 87:12 93:24 100:9 122:16 123:14 142:10
**concerning** 10:6,22 13:2 83:23 84:15 122:4 128:7 131:7 134:3 137:22 143:13 147:19
**concerns** 58:9,18 77:7 77:10 94:10 100:17 109:18 111:5 112:19 118:18,20 139:17 144:4 145:7 147:10
**concluded** 44:24 93:10 97:6
**conclusion** 67:5 105:14 112:4
**conduct** 9:1,3,23
**conducted** 59:13 122:3
**conducting** 122:10
**conference** 87:21
**confidence** 140:13
**confident** 140:19
**conflict** 116:7 119:11 132:23 133:1,21
**conflicted** 56:9,15
**confrontational** 68:1 68:13
**confused** 17:7 112:14
**congruent** 116:8 119:12
**connections** 110:19
**connotation** 46:1,3
**connotations** 48:3
**consequences** 106:6 139:13
**consider** 50:24 107:1 107:5,6
**considered** 118:3
**considering** 40:19
**consistent** 113:12 114:23 133:19
**consultation** 129:17 135:21
**consultative** 65:20
**contact** 91:19
**contacted** 155:23
**contained** 92:23
**contains** 114:12
**context** 51:6 74:6 140:5
**continue** 69:19,22 70:8 87:3 94:25 114:2 118:13 124:4
**continued** 3:25 70:7 87:2

**continues** 119:14
**continuing** 126:17
**continuously** 37:19
**contract** 140:16 156:2,7
**contrary** 94:15
**controversial** 119:4
**controversy** 60:7 139:20 140:5
**convenient** 133:3
**converged** 59:12
**conversation** 47:7 59:6,21 67:20 83:22 86:5,7 115:11 125:2 125:12,15 147:9 148:9
**conversations** 67:21 86:7 105:14 127:15 128:6 149:12
**COO** 36:6,11,19 37:14,20 38:6
**coordinate** 117:16
**copied** 55:13 64:25 99:1,4 134:13
**copy** 92:21 150:10
**copying** 99:12
**core** 50:18
**corpus** 118:2
**correct** 13:8 17:12 32:16 53:10 65:6,9 71:17 83:19 105:2 145:11 146:18 148:23 149:2 152:16 155:11
**correctly** 23:2 45:21 146:4 152:15
**correspondence** 147:19
**Council** 155:20
**counsel** 2:1 5:4,9 155:15
**counseling** 78:15 101:21
**counselor** 78:10
**county** 1:5 5:10,12 8:16,21 13:15 17:22 19:15 23:22,24 24:2 27:13 28:22 29:25 30:16 31:11 32:14 35:3,16,25 51:4 52:14,20 53:15 54:6 55:3 59:21 61:16 146:3,5,9,13,19 155:3
**couple** 21:21 34:21 43:5 58:16 68:10 100:9 109:4 125:1 131:1 149:13
**course** 25:24 33:12 34:17 88:13 117:5 133:17
**court** 1:1,10 5:6 8:6 15:8,11,15,18,25 19:12,15,15 96:24 153:16 155:1,19,21 155:24 156:22
**cover** 37:25 53:12
**CR** 154:25
**creating** 68:4
**criminal** 15:18 38:23 39:2 40:25
**critical** 125:18 145:10
**criticism** 147:19
**cross-examine** 47:8
**crowded** 71:2
**crown** 54:6,11
**Cruces** 150:24
**crystal** 111:18
**crystals** 84:24 85:5 92:14 110:15
**culled** 51:14
**culturally** 153:2
**cumulative** 113:1,20 143:10
**cumulatively** 84:17
**current** 11:3 14:13 41:8
**currently** 21:1 107:12
**curriculum** 76:20
**customary** 156:16
**customer** 35:9
**cut** 6:22
**cute** 153:6

**D**

**D** 1:9 2:3
**D-A-N-I-E-L-L** 49:3
**DAILEY** 2:8
**daily** 51:12
**damage** 92:23
**Daniell** 48:25 49:2,3 84:10
**Daniell's** 83:13
**Darren** 3:16 114:13
**data** 11:21 13:1 113:24 118:5 120:22,24 121:1,10 121:14
**date** 7:22 16:12 18:20 20:20 42:7 55:9 63:22 141:23 154:25 155:13
**dated** 99:2,4 114:14 124:15 145:2
**dates** 22:14
**David** 109:16
**Davis** 98:8
**day** 18:23 23:12 25:20,23 28:3 35:10 48:14 70:25 117:24 132:15 145:3 147:4 152:12 154:23 156:19
**days** 12:5,7,23 27:5 90:13 93:20 94:5
**deal** 35:6 40:24 54:14 54:18,20 67:14 122:24 123:2 135:9
**dealing** 26:12 41:2
**dealt** 43:5
**death** 78:14
**debrief** 149:4
**decades** 129:13
**December** 156:19
**decide** 35:2 64:16 66:22 123:9,10 130:6 136:20
**decided** 23:13 117:16 136:13
**decision** 113:21 118:7 131:9 133:4 138:8
**decisions** 128:23
**declared** 119:21
**declined** 57:18
**deeply** 28:4 117:2
**defend** 71:7 74:4,19 121:5
**defendant** 1:6 2:7 18:6,10
**defended** 73:19
**defenders** 71:4,10 73:18
**defending** 90:5
**defense** 75:23
**define** 50:9
**definition** 45:18 49:16
**defuse** 71:7 121:5
**Defusing** 41:5
**degree** 22:1 23:16
**delegated** 39:21,24
**delete** 12:6,13 13:5
**deleting** 12:23
**delta** 146:21
**demand** 88:15 119:14 119:21
**Democrats** 80:3
**department** 22:8 23:3 23:10,21,24 24:7,11 24:21 28:23 35:17 101:22
**depending** 23:10 25:20 39:25 45:17
**depends** 54:13
**Deponent** 154:1,22
**deposed** 15:1,2
**deposition** 1:8 5:8 13:10,20 15:4 16:4 16:8 17:8 19:21 20:1 21:9,15 112:17 138:22 154:3,25 155:5,9,24,25 156:1
**depositions** 61:7
**deputy** 36:18,20 37:13 38:3
**describe** 27:25 47:22 48:8 65:2
**described** 38:1 43:22 53:19 72:6 119:3
**describing** 111:12
**description** 37:23
**descriptions** 38:3,5
**designed** 93:11
**despite** 89:7
**Dess** 78:8 88:5
**Dess's** 87:16 108:14
**destress** 75:3
**detail** 47:8
**detailed** 64:12 99:20 137:22
**details** 14:2,5 19:20 47:6
**determine** 43:25 137:16 145:20
**determined** 137:8,11
**different** 11:10 18:17 30:8 37:2 46:21 48:3 51:16,17 56:1 66:16 69:1 71:8 87:8,11 89:13 118:23 129:22 130:7,10,12 131:14 140:20 141:4,12
**differently** 69:13
**difficult** 28:3 88:24 125:24 138:8
**diminish** 128:19
**direct** 79:5,6 116:7 119:11
**directed** 53:13,17,23 112:24 113:3 120:17
**direction** 93:25
**directly** 10:1 21:16 45:10 65:24 68:1 82:8 85:22 86:12,15 94:17
**director** 31:7,16 38:9 39:18,23 41:9,12,17 132:16
**directors** 33:6 129:11
**disability** 6:17
**disagree** 54:10 69:7 103:5 122:22
**disagreement** 80:6,12 80:12,20 81:18
**disagrees** 123:17
**disciplinary** 24:9 52:1 65:18 66:25 132:3
**discipline** 52:11 67:9 141:7 147:17
**disciplined** 143:24
**disclose** 155:17
**disclosed** 156:17
**disclosure** 5:4
**discrimination** 14:23 39:6
**discuss** 21:9,11 58:17 126:18 149:7
**discussed** 59:23 66:6 135:11 148:17 149:4
**discussing** 100:3 127:10
**discussion** 27:19
**discussions** 84:7

134:16 150:15
**dismissed** 19:4 59:24 94:13
**disorders** 22:5 24:25 25:8 26:13 29:10
**disparaging** 143:14
**disputes** 78:17
**disputing** 115:1
**disqualified** 156:5
**disrupting** 123:23
**disruption** 67:14,18 68:5,16 69:15 70:1 86:25 87:9,12,13,16 94:23 103:18 106:22,25 118:12 118:14 122:25 123:3,4,5,6,8,13,14 123:21 133:20,23
**disruptive** 67:4 70:9 80:20 87:3 149:25
**distance** 91:17,20
**distraction** 87:6
**district** 1:1,1,5 5:11 5:13 8:16,22 13:15 14:10 16:14,19,21 16:22 17:23 18:4,19 18:25 19:15 27:13 28:22 29:5 32:14 35:1,4,16,25 38:18 39:3 51:4,12 52:15 52:20 53:16 57:5 59:21 61:17 68:7 90:3 98:14,15 102:3 102:24 103:7 114:16 124:1 129:20 140:6 142:7 150:24
**District's** 87:7
**districts** 51:16 52:9
**divided** 77:18 112:16
**divine** 152:22
**division** 1:2 118:12 118:14
**divisions** 125:23
**divisiveness** 67:15,19 68:16
**divorce** 15:5,9
**doctor** 28:14
**document** 4:10 20:8 60:18 61:14 83:3,7 91:5,13 95:3,6,19 96:12 97:2 98:5,19 98:22 100:16 108:19 110:3 114:4 124:10,14 126:7 131:7 132:1,6,11 134:13,19,23,25 135:9,18,25 144:17 148:13 150:10,17 150:20
**documentation** 93:22 94:4
**documents** 13:1 20:17 56:5 96:6 108:24
**doing** 21:19 42:24 43:16 44:20,22 45:2 46:6,6 56:8 58:19 60:3 66:20 67:23 71:6,16 76:9 87:22 97:17 101:9 102:11 102:19,20 104:7,8 104:10 107:11 108:21 114:10 118:8,16 123:24 136:16
**Donald** 60:24
**Donovan** 154:24 155:22,22
**downloaded** 12:17
**Doyle** 1:12 2:9
**Dr** 20:22 47:15 55:12 63:13 64:22,23 65:1 65:23,23 66:18 86:1 86:3 92:2,4,10,11 92:12 93:19 94:6,9 94:10 95:16,17 100:8,10,21 105:2,3 105:15 108:12,13 110:21 113:10 127:15,16 128:10 128:14,17,24 129:23 136:17,23 143:23 144:4,12 146:24 147:6,7,8,8 147:9,11,16,17 151:24 152:6,7
**drafted** 127:14
**drafting** 99:14,17
**dragon** 84:25 85:7
**draw** 99:9 115:21
**drive** 48:14 77:6 116:23
**driven** 128:24
**drivers** 17:22 18:4,25 33:20
**dropped** 23:6
**drug** 8:2
**Due** 49:13
**dues** 34:7
**duly** 5:21 155:14

**E**

**E** 2:8
**earlier** 20:14 38:8 40:4 52:12 112:17 148:17
**early** 145:4
**East** 48:4 54:19
**eastern** 46:20
**ed** 5:25 7:23 17:4 23:19
**edited** 99:21
**Editorially** 145:21
**EDU** 151:16
**education** 15:17 22:2 23:14,17,19 24:19 25:11 33:20 51:6 76:4 112:10
**educational** 21:25 22:6 87:5
**educator** 40:20
**Educators** 32:22,23 33:7 38:17
**Edward** 1:9 2:3
**effect** 21:22 63:23 80:8,24 152:22
**effective** 30:2 35:7 95:1 136:11 150:3
**effectively** 118:13 133:24
**effectiveness** 100:11 140:24
**effort** 117:16
**eight** 31:11 142:5,7 143:9
**eighth** 25:21 26:9
**either** 17:13 21:16 23:11 30:25 38:16 40:14 61:11 66:8 81:21 105:22 130:7
**either/or** 40:18
**elementary** 30:15 53:25 54:4 58:19 59:12 70:7 76:18 88:21 101:16 109:17 110:8 132:23 133:12 136:10,11,14 144:6 147:24
**Elizabeth** 98:8
**email** 3:10,10,12,12 3:14,14,16,18,20,20 3:22,22 4:1,1,1,2,6 4:6,8,8,12,12 9:13 9:16,22 10:5,18 51:12 61:14 62:17 62:20 63:5 75:12,13 77:20 83:13,25 84:10 91:11,23,25 93:14 98:23,25 99:11,15 100:4,7,19 101:11 105:3 108:5 109:13,19 110:11 111:15 112:4,9,25 114:12 115:19 116:11 117:24 118:1 124:15,20 126:12,22 138:24 144:23 145:2,6 148:17,20 151:3,4 151:18
**emailed** 131:20
**emails** 10:1,4 12:13 21:15,22 55:13 62:21 63:2 77:24 78:4 84:2,7,15,20 86:14 98:2 105:24 110:7 113:13,14 117:12 120:25 147:4
**emotionally** 25:11 41:3
**employed** 14:10 33:21
**employee** 31:7,17 38:9 39:18 41:10,18 66:25 67:9 107:8 109:18 125:5 132:2 155:21
**employees** 39:9 89:10 130:2 141:11 142:9 142:10
**employer** 41:12
**employment** 14:8 16:19,21 18:5
**employment-related** 14:7 34:1 131:9
**enclosed** 115:22
**encouraged** 45:12 53:13 82:6
**encouraging** 47:4
**endeavors** 57:15
**ended** 23:7 31:10 36:12 63:18
**energy** 92:16 111:19
**enforcement** 15:16 31:1 38:25 40:21,23
**engage** 44:11 66:23 82:7,19
**engaged** 45:9 68:14 97:16
**engagement** 36:9
**engaging** 43:1,2 44:1 44:10 49:19 53:2 68:23 92:4 103:1,1 103:2,9,11 104:13
**enjoyed** 35:5
**enlighten** 152:12
**ensued** 134:17 150:16
**entire** 24:1
**entirely** 95:25
**entitled** 7:12 123:16 140:17
**entity** 32:25
**equals** 62:4,6,12
**equivalent** 101:15
**Errata** 3:5
**escalation** 113:17
**especially** 64:20 117:24 129:24
**essentially** 20:9 21:18 30:7 79:4 96:5 127:3 128:18
**establishing** 44:10
**establishment** 124:2
**et** 74:12 81:20 120:25 129:4
**ethical** 38:25
**Ethics** 38:17 39:3
**evaluation** 111:7
**evangelical** 48:10
**event** 6:11 13:4
**events** 128:10 143:25 144:2

**eventually** 42:3 66:12 66:13,14 144:4
**everybody** 67:17
**evidence** 77:13 94:14 105:5,12,16 118:7 155:12
**evidenced** 105:3
**Ewing** 4:13 150:22 151:18,24 152:6,7
**ex-cop** 152:18
**exact** 16:12 18:20 21:21 55:8 63:22 78:9 79:16 96:20 128:9
**exactly** 11:24 44:20 101:13
**exaggeration** 42:15
**Examination** 3:2,4 5:23
**examined** 5:21
**example** 19:9 33:22 34:20 45:11 51:18 84:18 106:11 107:13 131:12 137:24
**excellent** 43:8 77:4,5
**excluded** 54:25
**executive** 4:10 33:5 62:14 126:18 127:10,17,21,25 129:6 131:6,19,21 131:23 135:7,11 150:25
**exercise** 28:8 106:17 139:12
**exercised** 106:19
**exercises** 27:2
**exhibit** 3:8 60:19,20 60:21,25 83:4,6 91:1,6,7 95:4,6 98:20,22 108:20,22 109:5,13 114:5,11 124:11,13 125:18 126:8,10 134:20,22 144:18,20 148:14 148:16 150:18,19
**exhibits** 3:9 61:9
**existed** 40:9
**existence** 34:25
**exists** 26:5 38:5
**expect** 106:10
**expectations** 101:9
**experience** 24:5 40:24 50:10 89:14 130:12
**experienced** 50:24
**expert** 46:18 49:18 58:13 76:19
**explain** 43:12 74:19 74:20,22 76:3
**explaining** 74:5,6 92:15
**explicitly** 74:24
**express** 111:20
**expressed** 77:7
**expressly** 82:13 110:11 117:7 132:21
**extent** 74:19 77:17 80:11 85:24 87:17 103:12 134:8
**extra** 95:8,10
**extraneous** 49:21
**extremely** 54:21 119:4
**eye** 57:10 75:25
**eyes** 57:5 147:13

**F**

**F-A-I-R-L-O-N-G** 8:5
**face** 85:18 117:8 119:10 125:2
**fact** 82:19 90:14 102:19 145:10 146:14
**fact-check** 147:5
**faction** 112:21
**failed** 106:5,17,21 139:12
**failing** 77:11
**fair** 54:7 56:12 68:7
**Fairlong** 8:5
**fairly** 20:8 132:12
**fairness** 74:4
**faith** 110:18 111:17
**fall** 46:8 50:11 142:1 142:10
**fallen** 77:14 146:2,9 146:13
**familiar** 45:14 96:9 116:24 124:14 135:8
**families** 87:25 122:14 122:15
**Fang** 151:12
**fantastical** 94:19
**far** 50:7 52:4,13 67:18 81:13 87:12 152:7
**Farmer** 14:3
**favor** 112:21 118:8
**FAX** 154:24
**February** 142:17
**Federal** 5:14 19:14
**feel** 82:5,22
**feels** 111:9 140:11
**feet** 64:3,11
**fell** 143:3
**felt** 56:9 122:15 134:1
**fence** 90:3
**field** 23:25
**fielding** 64:25
**fifth** 92:14 116:18
**figure** 64:2
**file** 20:22
**final** 23:23
**financial** 156:12,14 156:15
**find** 42:1 82:18 85:2 93:19,20
**fine** 8:4 9:13 19:24 84:17 91:15 96:19 144:13
**finish** 6:25 10:13
**finished** 6:24 7:5 22:9 24:20
**finishing** 24:25
**Finlayson** 13:24 14:15 16:10 18:6,7
**Finlayson's** 13:23
**fire** 89:4
**firm** 18:21
**first** 5:21 14:10 16:18 16:20 24:22 26:3 28:19 31:12 32:22 32:23 33:8 55:4,11 66:22 95:18,20 96:18 98:24 99:9,11 109:4,12 114:6,19 122:8 125:21 132:10 143:11 145:23 155:14
**five** 31:5,14 101:19 152:8
**five-minute** 79:21
**Floyd** 25:6 26:2,3 28:19 29:8
**fluctuations** 145:13
**focus** 49:22,22 50:22 109:12 125:22
**focused** 32:16 60:6
**focuses** 145:7
**focusing** 57:14
**fog** 75:14
**folks** 34:5 48:18 55:14 64:23 84:19 84:21 88:10 89:2 90:5 94:3 123:20 148:8
**follow** 85:13 130:22
**follow-up** 83:23 94:3 146:25 147:2
**following** 29:1
**follows** 5:22 96:25
**force** 44:11 56:16
**foregoing** 154:3 155:4,10
**foreign** 151:8
**foreseeing** 68:24
**forget** 70:25
**forgotten** 93:2
**form** 5:16 85:1 98:3 122:5
**formal** 42:18 65:18 67:8 89:25
**formally** 58:6 78:25
**formed** 113:20
**formula** 145:22
**formulated** 149:19,20
**forth** 112:14 117:8
**fortuitous** 133:2
**forward** 70:17 125:23
**forwarded** 10:2 21:17 61:21,23 62:16 83:21 91:9
**forwarding** 62:21 148:21 151:17
**found** 92:13 94:14
**four** 31:5,14,16 101:19
**four-and-a-half** 16:14
**fracture** 68:19 78:20
**fractured** 79:9 88:6
**frame** 18:14 37:1,5,17 117:14
**frankly** 59:23 70:18 94:11 99:20
**Friday** 1:13 28:25 109:11
**friends** 152:2
**front** 119:6
**fruit** 130:4
**FTO** 24:4
**full** 7:12,18 78:9
**function** 37:14 69:19 70:5 80:21 88:25 114:2 123:11 124:4 133:24 134:2 138:10,16 139:5 140:14
**functioned** 37:15
**functioning** 43:7
**future** 133:24 138:5,6

**G**

**GA** 2:5,10 154:24
**GAE** 33:10,12
**Gail** 101:21
**gather** 81:13
**general** 51:9 81:3,6 85:16 99:18 100:8 100:11,19 110:23
**generally** 38:20 42:17 42:20 44:2 50:20 52:8 63:3 79:14 81:8 86:11 106:19 109:25 128:12 135:4 142:2
**generates** 129:1
**generic** 63:24 126:25
**generically** 47:21
**gentleman** 125:12
**geography** 54:16
**Georgia** 1:1,12 8:6 22:22 23:16 32:18 38:16 151:16 155:2 155:20,20
**Georgia's** 33:13
**getting** 28:1 47:12 76:3 108:18
**give** 7:7,21 8:2 11:6 19:19 34:16 40:3 66:16 67:10 79:8,16 83:9 87:9,10 91:21 93:23 96:15 100:23

124:21 126:13 138:1 142:15
**given** 69:24,25 70:25 71:12 80:1 87:22,23 88:5 135:23 139:4 140:1,19 141:6,10 141:24 155:12
**gives** 143:2,5
**glass** 3:18,20 49:9 109:7 124:15 125:9 145:6 146:1 147:22 148:18
**glasses** 60:23 61:8
**go** 5:18 7:18,23,25 19:5 22:16 23:6,13 33:4 38:12 48:6 66:20 67:12,12 78:15 80:7 91:3 96:22 107:10,14 114:6 119:5 121:2 129:4 130:16
**goes** 67:19 106:14 119:13,19 128:23 129:2
**going** 6:2 7:16 19:6 23:11 29:13 31:21 32:7,9 43:21 48:16 52:17 60:9,24 63:18 63:23 66:7 67:20 74:2,9 83:7 84:19 87:3 89:4,5,18 91:1 91:18 92:6 95:14 99:6,18 100:5,5 101:14 108:11,16 111:21 112:9 116:15 120:9 123:16 125:24 133:7 134:24 139:1 146:23 149:14
**good** 6:21 7:15 28:17 40:23 43:4 50:17 67:5 76:9,24 79:23 91:16 94:11,12 106:17,20,20 109:8 109:9,11 121:4 139:11,12 142:4,23 151:25 153:3
**gotten** 86:10 96:6 110:1
**grade** 25:17,17,22 26:9 92:14 116:18
**graduated** 22:7
**grain** 85:19 94:22
**Grant** 3:12,22 48:23 61:23,24 62:1 86:7 95:17 98:25 99:11 99:17,24 109:15 148:21
**gray** 133:1 139:14
**great** 64:13 76:4 77:3 122:24 123:2
**greater** 52:14 55:18
**greatly** 102:22
**GREEN** 2:3 134:14
**greeting** 45:16 104:13 104:22 153:2,11
**Gregory** 1:12 2:9 4:13 150:22 151:18
**grief** 78:15
**ground** 64:24 85:11 105:16
**grounds** 55:22 71:17 71:19,22,25 72:22 72:24 84:12 96:14 97:4 106:23 110:13 117:7 122:17 123:25
**group** 25:14 33:11 39:14 71:20
**groups** 33:10 35:8
**growth** 145:21
**guess** 15:3 33:13 44:15 46:6 50:8 54:13 85:18 86:2 94:9 105:14 109:1 110:20 128:2 133:7 146:4
**guessing** 97:25
**guidance** 142:16
**guy** 12:21 125:3
**guys** 14:4 118:24

**H**

**halfway** 29:25 109:22
**hall** 57:22 69:25 73:22 75:17 87:20 121:2,2 149:20,23
**hall/coffee** 149:11,18
**hand** 10:17 99:14,16
**handle** 133:15
**handled** 47:16 76:18
**handling** 63:12
**hands** 60:1 101:23,24 102:20 104:11 121:13 122:5 130:21
**hang** 137:2
**happen** 57:24 68:25 98:4 103:22 125:25
**happened** 59:15 121:15,16,19,22,24 128:13 137:14
**happening** 66:23
**happens** 136:19
**happy** 17:18
**hard** 81:6 146:24
**harder** 6:13
**Harrison** 26:7
**hats** 36:22
**hazy** 18:12
**head** 6:12 28:4 31:23 52:23 87:22 90:15
**heal** 125:23
**healer** 93:18
**hear** 59:18,25 60:4
**heard** 51:5,8 59:8,15 59:16 73:6 77:7,8
**hearing** 34:19 122:9 140:18
**heart** 101:24
**Heather** 49:5 91:12
**hedging** 105:19
**held** 117:2
**hello** 20:13
**help** 44:5,14,15 50:22 53:22 75:2 100:24
**helped** 28:14
**helps** 50:12,17
**hey** 29:12 36:15
**Hickory** 48:12
**hierarchical** 41:15
**hierarchy** 41:19 62:4
**high** 22:7,16,18 23:2 26:7 29:24 64:12 88:3 116:19 133:13 142:3
**higher** 129:9
**highly** 117:21
**Himalayan** 74:15 104:15
**hire** 129:15
**hiring** 40:20
**historically** 129:12,20
130:3
**history** 22:2,21 23:13 152:9
**hold** 61:3 91:18
**holding** 46:8
**home** 8:11,11,19 107:13 116:9 119:13
**honestly** 138:8
**HOPE** 23:15
**horizon** 27:7
**hovering** 64:3
**HR** 31:7 32:4 35:17 67:7 77:15 85:25 92:9 113:8 127:5 134:10
**Huff** 95:16 98:16,17
**huge** 149:12
**human** 30:23 31:4,12 36:3 37:12 64:18 65:5,12,14,19 66:10 90:4 135:14 136:1
**humanresources@c...** 3:18 124:17
**hundred** 122:2,9,9,13 122:13,14 147:4
**hyperbole** 94:14 106:2
**hypothetical** 90:10

**I**

**idea** 44:22 78:7 99:18 149:21 151:14
**Ideally** 41:6
**identified** 60:18 83:3 86:24 91:5 95:3 98:19 108:19 114:4 124:10 126:7 134:19 144:17 148:13 150:17
**identifies** 110:23
**identify** 134:25
**III** 1:9 2:3
**imagine** 54:23 80:1
**immediately** 119:23
**impetus** 133:21
**implement** 139:4
**implicit** 111:5
**implicitly** 105:13 111:8
**important** 138:5,6
**importantly** 134:10
**imposing** 43:17
**impression** 42:25
**inability** 133:23
**inappropriate** 81:21
**include** 101:23
**includes** 112:1
**including** 52:19 90:4 99:13 114:13,16 121:8
**Incorporated** 32:23
**Index** 3:1,2,8 4:16 145:17
**indicate** 52:7 79:17 110:3 154:20
**indicated** 95:19 103:24 110:6 148:5 148:7
**indicates** 109:15 146:1
**indisputably** 120:8
**individual** 88:24,25
**individually** 5:11 66:9 82:2 103:16
**individuals** 59:9
**indoctrinate** 90:11
**indoctrination** 56:21 90:21
**informal** 88:5 90:1
**information** 6:4 13:2 21:24 51:10,24 75:5 86:3 113:20 118:3 131:7,12
**inherently** 50:4
**initial** 9:21
**initially** 36:2,14 41:23
**inject** 72:2
**inputs** 120:25
**insist** 122:20
**instance** 53:5 59:9 89:19 100:14 139:12
**instances** 52:7
**instruction** 13:6,7 63:9 76:20
**instructions** 12:25 100:24
**intend** 70:2
**intended** 68:17 103:21
**intentionally** 106:15

**intentions** 44:5 67:6 106:7
**interest** 70:10 87:7 89:14 156:5,12,15
**interim** 26:6 36:4,6 36:16
**intermittent** 50:16
**intern** 93:16,17
**international** 151:9
**Internet** 29:17,19
**interrupt** 33:3
**interview** 42:12,18
**interviewed** 29:21
**intimately** 64:12
**intimidation** 92:5 93:25
**investigate** 39:5 44:20 47:8 58:1 78:3 85:23 94:17
**investigated** 38:15 43:23 105:21
**investigating** 40:24 40:25
**investigation** 41:14 42:19 65:19 67:8 85:25 92:3,9
**investigations** 30:24 31:3,8,14,15 38:8 38:10,13,14 39:19 40:1,7 41:9,11,17
**investigator** 39:21
**involved** 10:23 38:14 38:16 39:20 41:25 64:13 72:20 120:22
**involvement** 64:9
**involving** 16:10 17:21 43:6
**inward** 116:5
**Isidore** 22:19
**Islam** 90:12
**issue** 65:12,18 67:10 67:13 79:12 107:19 112:1 123:6,13 124:1 133:1 140:21
**issued** 8:16,21
**issues** 35:6 106:24 113:25 151:6
**Italy** 152:9

**J**

**J** 1:8 3:3 5:20 9:21 154:1,22 155:13
**January** 11:7,7,8,11 11:15
**Jeff** 78:7,8 79:5,8 87:16 88:5 108:14
**Jesus** 111:19
**jewels** 54:6,11
**JM** 154:25
**job** 29:21 30:23 31:3 37:22 38:3,5 51:10 60:14 100:10,17 121:5 134:7,8 139:17
**jobs** 29:11
**Joel** 1:10 6:13 156:21
**John** 1:8 3:3,10,22 4:8,13 5:8,20 7:20 95:16 122:20 154:1 154:22 155:13
**John.adams@cobb...** 9:15
**JohnJAdams** 9:20
**johnjadams@yaho...** 9:21
**joined** 23:3 112:6
**joke** 152:3
**JORDAN** 2:8
**Joseph** 7:20
**JR** 2:8
**judging** 87:16,18
**judgment** 106:18,20 113:9 139:13 140:23
**Judicial** 155:19
**July** 8:1 29:4 136:11
**June** 145:2
**junior** 30:7

**K**

**keep** 9:5,7 17:9 70:18 108:23 144:16
**keeping** 147:13
**kept** 36:19
**key** 121:1
**kids** 26:12,18 44:6,14 45:11 47:12 75:2 76:3 87:24
**kin** 155:15
**kind** 17:2 26:6 33:15 40:15,16 41:14 42:20,21 44:1 47:25 50:2 55:25 56:6 57:5 59:13 63:14,24 63:24 65:25 66:2,7 66:20,22,24 67:7,8 69:3 75:14 82:2 88:11 89:2 90:8,20 92:4 93:3,10 94:13 94:13 96:9 97:10,18 97:19 100:20 103:2 110:19 111:5,12 113:17 126:24 130:3 131:9 133:12 139:14 146:18 152:11
**King** 89:6
**know** 6:1 11:3 12:2 12:18 17:11 19:8 27:16,24 29:18 32:8 37:1 45:1,22 46:2 46:21,22 49:1 50:12 50:20 52:24 53:20 54:11 57:16 59:10 64:4,11,16 66:7 72:17 74:24 75:8,9 75:10 79:3 81:17 85:1,2 94:2,20 96:2 97:21 98:5,11 101:2 102:16 104:12,25 105:24 107:4,6 108:9 112:13 117:20 122:1 125:8 125:8,16 127:2 137:16 138:18,20 139:7 141:22 147:2 151:13 152:5,19
**knowing** 70:6 139:24
**knowledge** 17:6 49:4 52:13 139:3 143:12
**knows** 21:5,6,7 137:17
**knuckle-dragging** 152:18

**L**

**L** 2:8
**laboring** 6:16
**lack** 49:22 57:22 65:15 73:3 74:3
**lady** 111:12
**laid** 60:1 121:13
**Lamb** 3:16 114:14 115:10,14 120:12 120:14,20
**Lamb's** 119:5 120:18
**lane** 101:4
**language** 105:19
**languages** 151:8 152:8
**large** 33:14 85:19 88:22
**largely** 29:17 107:21 113:8
**larger** 35:8
**largest** 33:11 125:20
**Las** 150:24
**late** 55:8
**Latin** 152:10
**law** 1:11 15:16 31:1 38:24 40:21,23 156:10,13
**lawsuit** 10:23
**lawyer** 33:17
**lawyers** 21:3 33:23
**laying** 122:5
**lead** 118:13 134:9,11
**leader** 69:23
**leaders** 65:3
**leadership** 22:2,6 23:20 62:2 93:17 129:17,22,23,25 135:21 147:11
**leaning** 70:17
**learned** 41:23 51:24 52:4 102:2,5,10,14
**leave** 32:6 35:2 129:4 145:22
**leaves** 64:19,20
**led** 10:23 113:2
**left** 24:6,21 28:23 32:5,10 98:14 113:9 151:2
**legal** 34:11,13,18 108:25
**lengthy** 91:11 114:13
**lens** 91:19
**lesser** 74:19 87:17
**let's** 15:23 26:17 27:11 33:25 38:12 52:25 61:12 68:3 89:18 119:5 122:13 124:5 131:1,4 134:3 153:12
**letter** 4:4 20:21 24:12 75:13 115:15,23 117:6,8 118:1 119:6 119:7 120:18
**letters** 98:1,2 117:12 117:17
**letting** 127:2
**level** 25:2,17 27:20,23 37:20 64:6,12 69:25 78:20 80:7,22 118:11 126:19 127:10 129:10 130:10 136:7 143:6 143:11
**levels** 25:18,22
**Lewis** 107:14
**licensed** 78:10
**licensure** 78:9
**Life** 93:18
**light** 143:16
**lightning** 86:22
**lights** 28:3
**likability** 141:18
**likes** 129:13
**limitations** 138:25
**limited** 36:9
**lines** 27:18 42:16 79:15 80:5 81:16 84:3 86:12 90:8 101:19
**linked** 46:24
**list** 129:15 131:10,24 132:1,3,4
**listed** 132:16 154:5
**listened** 76:15
**lists** 129:3
**litigious** 54:22
**little** 17:7 21:23 37:1 50:15 51:13 60:5 66:6 70:15 79:23 102:18 105:4 112:13 124:6 146:10 153:13
**live** 55:2
**lived** 48:2
**LKES** 141:9
**LLC** 1:12 2:9
**LLP** 2:4
**location** 69:20 87:8 95:1 103:18 104:18 114:3 124:4 137:7

139:18 150:4
**locked** 30:3
**long** 16:11 25:25 30:10,18 129:2
**longer** 16:22 26:5 79:24 126:22 131:15,20
**look** 45:10 75:1 76:3 83:7 95:14 111:14 119:7 146:14
**looked** 92:10 132:11
**looking** 30:25 40:11 44:24 45:7 64:6,24 91:8 93:15 101:10 101:19 125:20
**looks** 24:19 37:6 61:20 62:16 91:9,25 95:23 105:5,13 124:17 130:18 141:6 145:2 151:17
**Lord** 22:6
**Losing** 28:14
**lost** 26:9 70:5
**lot** 24:18 43:21 63:2 66:20 86:14 87:23 94:13,21 99:25 121:21 129:20 132:19 133:1 139:14
**loved** 29:9,9
**low** 54:19 70:19 142:1,14
**lower** 53:23 98:24 99:10 142:11 146:8
**lowers** 28:7
**lowest** 143:11
**lumping** 52:8

**M**

**Mableton** 136:9,14 137:13,20
**mad** 89:3
**magazine** 51:12,13
**magnet** 54:1
**magnifying** 109:7
**making** 9:12 96:12 97:2 114:8
**man** 125:4
**management** 26:23 129:18 135:21 147:11
**manager** 30:24 31:4 31:15 38:9,13 40:7 41:17
**managers** 40:2 41:11
**mandala** 46:22
**mandalas** 45:20 47:11,12 74:13 93:19 94:5 104:23 104:24
**mandatory** 105:7,8
**mantras** 46:6
**March** 20:20 91:10 95:21 99:2,5 109:14 114:14 117:13,13 124:15 136:2
**Marietta** 1:12 2:10 154:24
**mark** 111:7
**marked** 83:5 108:22 114:11 124:12 126:9 134:21 144:19
**marriage** 80:25 150:2
**Mary** 13:23,24 98:8
**master's** 22:2,3,4,10 22:24 23:16,18 24:20 25:1 152:9
**material** 92:23 115:8 116:11
**math** 31:22 87:20
**matter** 10:8,11 13:19 15:12 17:14 18:5 60:17 63:10,12 122:6 123:21 126:18
**matters** 40:25
**mean** 13:6 27:6 43:12 72:18 95:9 101:2 121:23 128:19 138:19 144:9
**means** 58:13 105:8 111:6 152:5,13,20 152:21
**meant** 35:9
**measure** 57:18 76:25 145:19
**measurement** 76:12
**measurements** 76:13
**measures** 141:5
**mechanics** 12:18
**media** 60:6,15,16
70:16 73:23 117:25
**mediation** 15:5 16:6,7 16:9 105:7
**mediator** 78:17
**medication** 6:17
**meditate** 85:1
**meditation** 93:7 104:9 105:8 116:6 116:14 119:16
**meet** 20:10 77:11,12 130:15
**meeting** 42:6,10,20 57:22,23 58:21,22 59:1 63:19 66:2,21 69:25 70:12,23 71:13,15 72:9 73:17 73:22,23 76:1,11 79:1,2 86:6 88:14 115:11 121:3,12 122:3,10,11 128:5 130:16 133:13,13 133:14 135:5,7 148:9 149:5,8,11,15 149:19,20,23,24
**meeting/town** 75:17
**meetings** 58:25 133:12
**Melissa** 3:14 49:7 109:14
**member** 35:6 83:18 83:18 89:17,18
**members** 21:17 62:15 78:1 82:5 121:9 122:5 131:20
**membership** 32:17
**memo** 146:25
**memory** 6:18 14:21
**mental** 50:2
**mentioned** 38:7 131:6
**merit** 58:2
**messages** 10:9,21 12:2,10,23
**Met** 20:7
**metaphor** 36:24
**method** 119:15,17
**Methodist** 47:23 49:14
**Mexico** 150:24
**micromanage** 64:17
**middle** 9:20 25:4,5,6 26:10 80:13,14
81:10 88:7 97:18 111:14 133:13
**midmorning** 71:1
**midway** 30:4
**mild** 48:9
**mind** 49:21 77:10 95:9 96:23 105:25 127:14 134:14
**mindfulness** 26:17 27:1,14,25 44:2 49:17 50:5 51:5,17 53:14,19 55:5 56:7 74:12,13 81:20 84:12 92:6 101:22 102:2,15,17,21 104:3,9 110:12,15 117:6 125:19 150:7
**minds** 92:24
**mine** 15:5 100:25
**Ming** 151:12
**minor** 20:15
**minute** 11:6 27:12 67:11 83:7,9 95:13 98:23 99:5 124:21 134:22 144:20
**minutes** 4:10 135:6
**mispronouncing** 152:13
**mission** 87:4,5
**mix** 113:16
**modification** 26:23
**moment** 49:20 91:14 150:19
**Monday** 29:1
**monitor** 113:4 126:17 127:4
**month** 7:24,25 11:16
**Moore** 62:17 65:24 73:9,10,25 82:14 87:18 92:1,2,4 94:10 143:23 144:7 144:8,10,11,13 145:7 146:24 147:9 147:16,17
**Moore's** 92:10 93:19 94:6 110:21 147:11
**morale** 77:16
**morning** 88:4 145:4 153:3
**mother-in-law** 48:1,2
**Mount** 26:10
**mouth** 17:9
**mouthful** 131:2
**move** 89:2 122:21 123:17 125:23 129:14 130:9 132:13,20
**moved** 80:18 87:8
**moves** 129:21 135:17
**moving** 145:24
**Moyer** 1:10 156:21
**multiple** 38:2 77:24 87:24 104:17 120:24
**music** 26:19
**Muslim** 89:19 90:9,11 90:15

**N**

**namaste** 45:13 47:5 74:13 104:13,22 151:22 152:5,12,14 152:19 153:8
**name** 5:25 7:18 18:21 30:8 32:21 48:5 62:24 90:19 98:8,11 108:1,4 129:8 131:18 132:10
**named** 18:1 61:15
**names** 18:3 48:17 93:23 129:9 131:11 147:7
**nature** 38:24 39:25 41:22 67:24 74:23 74:25 80:4 111:2,2 123:15
**NE** 2:5
**NEA** 33:13
**necessarily** 56:16,20 72:17 123:5 126:24 141:18 142:13
**need** 17:12 19:18 72:1 72:2 82:22 89:13 91:14 95:7 109:7 111:17 130:6 134:13 149:5 150:14
**needed** 33:17 34:14 80:7 126:20 127:7 154:19
**needing** 130:12
**needs** 88:18 136:21

**negative** 92:16 111:18 143:15
**neither** 62:13
**neutral** 97:20
**neutrality** 97:11
**neutrals** 73:19
**never** 24:15 48:15 93:9,9 113:7 120:12
**new** 11:20,22 22:18 32:9 40:5 139:18 150:24 153:7
**Newman** 22:19
**night** 23:11
**nine** 132:14
**no-confidence** 140:9
**nod** 6:12
**nonacademic** 57:14 57:15
**nonprofit** 32:23
**nonreligious** 106:24 118:20
**nonunion** 32:11,12,19 33:11
**normal** 42:12 133:17
**normally** 80:17 135:9 137:14 138:1 142:24
**NORTHERN** 1:1
**notes** 70:11 109:4 135:5
**notice** 5:9
**November** 1:13 5:1
**number** 8:7,8,10,15 8:17,18,19,21 9:25 11:17 15:18 21:21 51:15 59:9 79:17 80:3,15 88:3 103:15 114:15 141:12 149:12,13 154:20
**number-two** 69:23
**numbering** 122:2
**numbers** 114:23

**O**

**object** 84:11
**objected** 21:18 71:15 71:18,20,24 72:19 72:23 89:23
**objecting** 10:3 55:19 55:22 71:9 97:13 108:2 111:1,23 117:6,10 119:2 120:10 123:23
**objection** 63:4 82:11 89:20 111:21 120:7 120:8 123:20
**objections** 5:15 53:3 53:6 55:17 56:6 76:10 96:13 97:3 113:1 118:16,19,21
**objects** 110:11,14,18
**observe** 70:19 121:18
**observed** 105:22
**obtain** 94:3
**obviously** 34:14 38:22 45:5 58:24 83:15 103:1 112:19 127:13 134:9
**occasion** 26:13 133:18
**occasional** 90:6,7
**occasionally** 27:24 39:25 152:17
**occasions** 37:3,4 58:16 100:9
**occur** 70:2 105:1 117:14 132:19
**occurred** 59:17 70:1 70:3 105:13 117:20
**occurring** 67:15 103:7 105:18 133:21
**occurs** 7:6
**OCGA** 156:2,6
**October** 141:24,25 142:15,22 143:22
**off-the-record** 134:16 150:15
**offended** 72:11,15
**offends** 117:2
**offensive** 103:3
**offered** 33:16 156:17
**office** 29:19 42:11 60:2 79:2 84:1 93:20 94:6 95:23 129:1,11,16,23 135:22
**officer** 15:20 23:25 24:1,4 33:2 36:3,5 36:17 37:12 38:25 62:2 98:10 151:7
**Offices** 1:11
**Oh** 11:3 15:13 144:7
**okay** 6:9 7:6 8:13 9:7 9:10,13 10:8,13,14 10:20 12:9,12,16 13:4,9 14:11 15:6 15:14 16:18,23 17:16,20,25 18:6,11 18:13,13,22 19:2,24 20:6,15 21:3,8,11 22:12,23 24:6,9,14 26:25 27:6 28:10,12 28:15 29:2 30:12,18 31:9,13 32:3,12 34:3,21 35:24 36:8 36:13 37:25 39:8 41:5,7,23 42:4,22 46:4 47:14,20 48:7 50:1,7 51:8,21 53:5 53:25 54:3 55:10,21 55:24 56:23 58:7,15 59:20 60:5,9,20,23 61:13 62:7,23 63:1 63:3 65:10 66:4 67:24 69:9 70:11 71:23 72:25 73:16 74:12,17,22 75:4,20 76:15,21,23 79:7,11 81:12,18 82:23 83:11 84:4,9 90:17 90:25 91:4,21,22,25 92:12 93:1,8 94:18 95:5 96:1,7,20 97:21 98:4,11,16,21 99:8,9 101:5,6,10 102:8,13 105:23 106:8 108:10,21 109:20,21,22,23 111:15,24 112:12 112:23 113:11 114:6,25 115:13,21 115:23 116:22 118:1 120:16 121:16 122:1 123:12,19 124:7,12 126:16 127:19,23 128:1 130:20 131:4 131:17,22 133:16 134:12 135:2,12,18 136:4 137:21 138:3 139:8 142:21 143:2 143:12,20 144:14 144:22,23 145:6,18 147:22 148:18,19 150:9,21 151:10,15 152:19,24 153:9
**old** 11:7,8,21 35:14 35:15
**older** 12:4
**Olympics** 28:24
**once** 15:7 28:17 42:6 121:10
**one's** 116:5
**one-word** 151:22
**ones** 52:23 109:25
**open** 29:11 30:24 32:17
**operations** 36:5,16
**opinion** 106:14 107:10 123:16
**opportunity** 87:10 139:4
**option** 27:3 149:22
**options** 65:17 66:10 66:15,16
**orally** 6:11
**order** 117:18 149:6
**organization** 34:4
**organized** 58:22 59:4
**originated** 136:25
**Orleans** 22:18 153:7
**ought** 86:17,18 97:17
**outcome** 67:17
**outlived** 130:8
**outside** 87:14 131:21
**overall** 143:9
**overcrowded** 26:8
**overlapped** 37:3
**overlapping** 69:4 71:8
**overruled** 130:25
**oversaw** 38:10
**oversee** 41:8 101:12 101:15 103:20
**oversight** 100:10
**overtone** 44:23 45:17 45:24
**overtones** 43:3,10,14 44:4,18,21 45:3,6 46:11,15,20 72:7 88:12 97:14 119:4
**ownership** 68:22

**P**

**P** 1:10 156:21
**p.m** 1:14,14 5:2 35:11 35:23 83:1,2 124:8 124:9 153:14,15,20
**page** 3:6,25 33:9,11 34:12 91:8 93:15 95:15,20 97:10 99:11 109:12 115:22 119:7 125:21 129:8 132:9 132:10 135:4,6,13 135:14,19 136:5
**page(s)** 154:20
**PAGE/LINE/CHA...** 154:6
**pages** 129:5 155:10
**paid** 23:18 34:7
**paragraph** 115:25 120:5 125:20 146:10
**parapro** 110:24 112:4,8,11
**pardon** 9:11 148:2
**parent** 57:23 58:22 59:1 66:2 86:16 88:15 89:3,20 90:7
**parents** 54:21 57:3 59:10 75:16 77:8 87:23 89:3,22 90:12 94:24 117:17 125:25 138:12 141:6
**part** 21:14 34:7 36:11 99:10 112:15 113:1 113:19 118:2,15,19 120:21 123:20 128:2
**participation** 73:17
**particular** 25:17 27:11 34:15 46:15 84:10 125:3 136:5 142:11 144:3 151:23
**particularly** 17:15 64:17
**parties** 155:16 156:18
**party** 156:11,11,13 156:14
**passed** 107:5
**Patrice** 62:17 65:24

73:9 86:6,8 87:17 144:13
**Patrice's** 79:2
**patrol** 24:1,4
**pay** 23:16 34:18
**PC** 154:24 155:22,23
**PE** 51:18 104:7
**Peaceful** 93:6 116:13 116:25
**Peachtree** 2:5
**Pebblebrook** 29:24 30:6,11 32:1
**Pee** 116:21
**penalty** 7:11
**people** 10:2 33:16,21 33:24,24 35:11,19 41:3 42:2 43:15,22 44:11,25 45:5,16 50:12 53:21 55:18 56:7,14 58:17 59:11 59:25 65:13 67:22 68:1,3,5,13 69:2 71:5,15,18,24 72:8 75:24 78:15 80:6 84:24 106:4 114:15 115:18,19 117:22 120:14 121:8,13 122:1,10 123:17,23 124:19 125:1 126:25 129:3 131:8 136:20 143:3
**people's** 81:22
**perceived** 56:18 111:21 119:2 123:25 130:11 140:8,22
**percent** 87:25 133:11 140:1 142:8
**perception** 57:15,16 57:17 69:2 72:9 141:9
**performance** 100:10 100:17 139:18 145:17 147:24
**period** 16:16 25:20 28:6 113:8 117:13 130:4 147:12
**perjury** 7:11
**persecution** 111:7
**person** 11:23 32:10 61:15 65:5 85:11,12 89:21 117:10 136:13 147:23 151:13 156:8
**personal** 4:1 8:17,18 9:3,9,16,22 10:5,9 11:13 51:20 56:10
**personally** 43:23 53:21 58:24 85:8,23 86:4,23 105:21,21 147:15
**personnel** 35:12,20 60:17 117:22 129:1 129:2,7 130:17,21 131:15,19 135:14 136:2
**perspective** 46:25 66:11 107:22,23 120:11 134:11 139:23,24 140:3
**phone** 8:7,8,11,15,20 9:2,4,5 10:9,21 11:2 11:4,5,6,10,14,17 11:20,21,22 12:3,3 12:5,7,10,22 13:5 35:10 75:18 86:9,10 86:11,13
**phones** 9:7 11:9,11,13
**phrase** 73:3,4 76:5 126:25 127:6
**physical** 46:5 50:23
**piece** 82:11
**Pigeon** 116:23
**Piggy** 92:21 93:2,5 116:14,25
**Piggy's** 93:6
**place** 56:17 70:4 97:19 103:25 106:5 106:13 118:23
**places** 51:14 102:6
**plain** 116:1
**plaintiff** 1:3 2:2 14:23 18:7
**Plaintiff's** 3:9 60:19 83:4,6 91:6,7 95:4 98:20 108:20 114:5 124:11,13 126:8 134:20 144:18 148:14 150:18
**plan** 23:8 125:6
**planned** 36:14
**play** 68:10
**played** 26:19
**pleasant** 125:12,15
**please** 5:19 6:5 7:19 154:19
**plenty** 88:10
**point** 12:14 16:24 18:9 30:14 40:2 58:9 63:15,17,21 75:11 78:6,25 79:20 100:20 102:1 113:13,24 117:19 118:5 120:5 121:1 121:10,14 123:15 128:11,14 142:14 147:6 150:1 151:20
**point-by-point** 100:2
**pointed** 88:19
**pointing** 57:20
**points** 63:13 120:25
**police** 15:20 22:8 23:3 23:6,10,21,24 24:6 24:10,13,21 28:23 40:12
**police-related** 15:23
**policies** 38:20
**policy** 38:17,19,21 39:3
**polled** 108:14
**portion** 88:23 96:25 98:24 99:10
**posed** 65:21
**poses** 46:8
**position** 29:22 30:7 30:22 31:2,6 34:4 36:1 39:18 40:5,5,7 40:9 41:8 111:13 112:2 123:11 129:10 136:6 151:1
**positions** 37:2 50:11
**possible** 12:1 95:25 117:18
**post** 112:5
**posted** 40:13
**potentially** 39:1 46:19 58:25
**pounds** 28:14
**PowerPoint** 74:1
**practical** 37:20
**practice** 40:3 43:1 44:12 46:5 49:19 50:23 55:17 97:20 102:21 103:2,3,16 116:1 119:14,22 120:2
**practices** 10:22 44:1 44:3 45:7 51:17,25 52:13,19 53:2,7 55:19 61:20 68:15 68:23 70:3 71:7 72:10,21 74:2,9,20 81:19 82:8,20 84:12 86:23,24 97:15 101:22 102:2,12,15 102:23 103:6,10,11 103:17,25 104:4,18 105:17 110:8,12 112:22 117:7 119:3 120:6 121:6 149:25 150:6,7
**pray** 58:17 111:17
**pray-like** 85:1
**prayer** 59:13 121:12 122:3,6,10,11
**prayers** 60:2
**praying** 101:24 102:20 104:10
**precaution** 101:25
**precinct** 24:2,3
**predominant** 33:10
**preparation** 21:14
**preparatory** 20:16
**prepare** 20:1 129:16
**prepared** 130:14 135:19,20
**presence** 70:8 87:2
**present** 2:11 12:3 37:9,16,18 49:20,23 50:22 54:25 148:8
**presentation** 74:1
**presently** 108:3
**preserving** 13:1
**president** 32:24
**pressure** 28:7 53:23 60:15
**pretty** 88:3 111:20 121:4 133:19 146:24
**prevention-interve...** 78:13
**primarily** 35:6 65:23
**principal** 21:1 29:11 30:1,2,6,8,10,17 40:16,17 57:8,8,10 57:24 59:3 62:11,18 69:20 71:6 73:7,8 74:18 76:2 85:12 88:21 89:17 95:2 106:10 114:2 121:4 126:23 129:9,14,15 132:13 135:17 136:7,9,10 138:17 138:23 139:6 140:15,24 144:5 145:8 156:9
**principal's** 42:11 62:9 100:13 134:8
**principals** 39:13,14 66:19 73:14 130:6 133:9 138:14 143:6 143:7,8
**print** 91:2
**prior** 12:3 66:1 130:16
**private** 149:4
**pro** 113:25
**pro-Bonnie** 113:14
**probably** 15:7 29:4 39:16 44:13 47:15 50:15 56:4 70:9 79:10 81:3,10 84:14 94:9 101:7,17 115:5 132:14 133:8
**problem** 54:24 55:3 76:17
**problematic** 67:4
**problems** 34:1 35:12 35:20 52:1
**Procedure** 5:15
**proceedings** 3:1 15:19 83:1 124:8 153:14,20
**produced** 91:2 108:24
**professional** 53:13 65:15 132:7 141:17
**profile** 70:19
**program** 25:1
**prohibited** 156:2
**promise** 61:10
**promoted** 30:1 31:6 36:18
**promoting** 30:4 116:3
**promotion** 125:19

**pronounced** 152:14
**pronouncing** 45:21
**protect** 111:18
**proved** 55:25
**provide** 34:13,17 35:9 155:24 156:7
**provided** 5:3 33:9
**providing** 34:10,11
**provisional** 24:23
**PSC** 132:8
**psychologist** 78:11
**publicized** 117:22
**pull** 60:24 61:8
**punished** 139:16
**punitive** 133:5,5 139:22
**purpose** 6:3 9:6,8 33:7
**pursuant** 5:4,8,14 155:17
**pursue** 107:17
**put** 16:7 28:3 31:2 70:3 107:7 118:23 143:15
**puts** 130:18
**putting** 50:10 74:6

**Q**

**quasi** 43:10
**question** 5:16 6:16,22 6:23 43:9 47:10 48:9 57:25 61:19 63:25 79:6 85:22 94:16 95:18 96:20 105:20 113:18 121:9 139:9
**questions** 6:3,5,10 7:4 7:7,12 10:14 17:10 17:18 42:1 65:22 83:8 99:6 141:13 144:21 155:6
**quick** 96:18
**quiet** 105:7,9
**quite** 67:19 84:2 129:21

**R**

**radar** 143:19
**Ragsdale** 3:14,16 4:6 4:8 5:11 21:6,8 36:3 36:15 48:21 61:15 61:21 62:15 63:10 63:22 64:2,10,14 65:8 66:5 91:9 95:16 109:17 114:15 127:23,24 128:8,11,12,15,18 130:15,18 135:23 137:3 148:22
**raise** 56:11
**raised** 47:22 51:22 76:11 147:10
**rally** 117:23
**ran** 33:25
**rancor** 70:1 89:3 118:12,15
**rancorous** 71:14
**Randy** 3:10 14:3 48:18 83:13 109:16
**range** 88:7
**ranges** 142:3
**rank** 23:23 24:4
**ranked** 143:10
**ranking** 143:10
**rankings** 143:9
**rates** 156:17
**rating** 141:13
**reacted** 84:16
**reacting** 69:2
**reaction** 69:5,8,12 84:16 85:16 103:20
**reactions** 69:4
**read** 60:25 61:9 83:9 93:9 96:22,24 109:1 109:20 116:17 117:1 124:22 154:2 155:8
**Readiness** 145:17
**reading** 51:9,20,23 52:5 60:22 61:8 78:19 97:5 146:4 153:17
**readminister** 142:16
**reads** 119:10 153:8
**ready** 83:10
**real** 87:4
**really** 14:19 29:16 44:19 52:16 64:23 66:19 71:3 81:11 88:13 104:21 109:7 128:24 129:24 137:15
**realm** 113:9
**reason** 6:4 40:22 63:16 154:6
**reasonable** 125:13
**reasonably** 112:20
**reasons** 137:24
**reassign** 89:11 133:4 136:20 137:19,20 138:13 149:5
**reassigned** 130:7 132:15 133:8 144:5
**reassignment** 136:9
**recall** 10:24 13:3 16:3 19:6 27:4,9 39:16 41:21 42:10 43:8 44:5 63:3 64:22 65:24 67:25 70:15 70:16 71:25 80:16 81:9 86:9 99:16 100:18,20 102:9 104:16 109:19,23 112:18 113:13 115:5,16 118:21 119:1,1 122:8 124:19 128:11 130:24 136:23 137:12,19 143:17 143:18 146:17,21 152:11,21
**receive** 10:20 12:25 83:25 91:13 95:19 114:20,24 115:6 147:3
**received** 4:4 21:16 77:24 84:1 96:1,2 96:10 97:22 110:2 114:25 115:2 144:23
**receiving** 83:13 91:22 95:24 109:19,23 113:14 114:21 115:8 124:19
**recess** 83:1 124:8 153:14
**recognize** 139:19
**recollection** 82:3 103:8
**recommend** 131:13
**recommendation** 66:17 69:6,16 80:16 118:4 128:7,18 131:5 132:20 133:22 136:7,8,24 137:18,22 142:18 148:25
**recommendations** 129:10 130:23 136:6
**recommended** 53:18 53:24 137:3
**recommending** 107:2 131:8 137:13
**record** 7:19 20:24 61:24 134:18 135:24 145:14
**rectify** 81:5
**redirect** 17:14
**reduce** 52:1
**reduced** 155:7
**refer** 38:20 44:2 130:3
**reference** 125:5
**references** 92:22
**referred** 86:2 132:18
**referred-to** 96:25
**referring** 82:13,15 104:5 112:16 120:1 127:9 135:3,15 141:8 149:8,9,16
**refers** 124:24
**regarded** 139:22
**regardless** 56:7 123:9
**regularly** 47:24 49:13
**Regulations** 5:5 155:18 156:4
**relate** 13:14
**related** 44:8 110:7
**relating** 13:22
**relations** 31:7,17 38:10 39:18 41:10 41:13,18
**relationship** 152:1 156:5,10
**relax** 44:6,15,15 50:13 75:2
**relaxation** 28:8 49:25 50:21
**relaxing** 44:8
**released** 146:7,8
**relief** 116:6
**relieving** 44:9 119:15
**religion** 44:10 46:16 46:18 47:1,17 72:12 81:22,23 89:18,22 111:11 116:4,7 118:23 119:12,20 119:22 121:11 122:19,22 123:6,18 124:1,2 140:22,23
**religion-free** 73:5
**religions** 46:20,21 56:10
**religious** 43:1,3,10,11 43:17,20 44:3,4,11 44:23 45:2,6,17,24 45:25 46:1,3,11,14 50:5,25 53:3,6 55:17,18,22 56:10 56:14,16,19,21 58:18 63:4 71:17,19 71:25 72:6,11,22,24 74:23,25 82:11 84:12 88:11 93:11 94:24 96:14 97:4,9 97:11,14,20 103:2,3 106:23 110:13,17 110:17 111:1,20,25 113:25 117:2,7,15 118:9,15,19 119:3 120:8,11 122:17 123:10,15,19,20,25
**relying** 82:3
**remain** 126:4
**remediation** 142:15
**remember** 13:7,21 14:2,4,17,19,24 16:12 17:21 18:3,24 19:2,3,7,11,14 20:17,20 22:14 42:7 46:23 47:6,13 48:5 55:8,11,12 57:19 59:2,19 62:22 63:16 63:22 70:20,22 72:14 75:17,22 76:12 78:7,23 80:23 83:12,15,24 84:5 86:20 87:21 88:17 90:2,18 91:22 92:17 93:3 95:24 99:24 100:3 101:13 102:4 102:17,17 114:21 115:10,13,19 120:13,19 121:24

125:2,3 127:12,14 128:9 136:16,24 141:23 147:3,21 151:21,23
**remind** 7:6
**reminds** 152:17
**removed** 88:16,18
**render** 6:18
**renewed** 140:16
**rephrase** 6:6
**replied** 76:13 145:3
**reply** 77:9 126:11 145:1
**report** 20:19 41:10,12 65:8 78:24 92:12 129:1,2,7,7,13 130:17 131:15,19 131:20 132:6 135:14 136:2
**reported** 58:18 62:13 62:15 92:18 155:5
**reporter** 1:10 5:3 96:24 153:16 155:1 155:21 156:22
**reporting** 5:6 65:7 154:24 155:19,22 155:23,25 156:8
**reports** 41:13 131:14 132:8
**represent** 6:1 155:11
**representation** 33:16
**represented** 88:2
**Republicans** 80:4
**request** 48:5 107:8
**requested** 130:9
**research** 52:6 105:4
**reserve** 153:19
**reserved** 5:17 155:9
**reset** 13:5 87:9
**residential** 8:3
**resolved** 19:3
**resources** 30:23 31:4 31:12 36:3 37:12 64:18 65:5,12,15,19 66:10 90:4 135:14 136:2
**respect** 12:22 41:19 47:10 52:24 53:7 92:5 140:10 152:22
**respectful** 153:2
**respectfully** 103:5
**respond** 126:25
**responding** 126:21
**response** 77:9
**restroom** 20:14
**result** 13:6 16:20 90:23 112:25 120:18 143:24 144:2,3 147:18
**resulted** 68:15,23 69:15
**resulting** 14:9
**resumé** 22:13
**retired** 29:12 98:17
**return** 37:6
**reunified** 81:11
**review** 21:15 91:14 95:14 96:12,16 97:2 98:23 99:6 110:21 126:18 127:4 134:22 142:24 144:20 150:20
**reviewed** 20:8,18,19 20:21 56:4 105:25 110:4,7 115:7 116:10,11 135:22
**reviewing** 105:24
**revolution** 112:6
**right** 5:25 6:15,21 7:8 7:15,21 8:20 10:13 10:14,16,18 12:12 13:9 14:14,25 16:2 16:9 17:1,3 18:22 19:11,17,25 21:23 22:16,20 24:17 25:9 25:16,24 26:16 28:5 28:10,12,18,18,24 29:6 30:9 31:19 32:2 33:21 35:22 37:11 38:10 39:17 40:6 41:1,7,16 46:10 49:11,15 50:14,19 51:3 52:21 53:9,11 58:11,20 59:8,14,22 60:7 61:1,4,6,12,13,17 62:3 63:7,20 65:5 65:21 66:10,13 68:11,18,21 72:4,8 72:16 73:11,24 75:12 77:21 79:7 81:2 83:12,17,18 85:15,20 87:14 92:19 93:7 97:24 98:4,21 99:21 101:1 101:8,10 105:1,10 105:23 106:2 107:25 108:7,16 109:10 110:4,8,13 110:25 111:22 112:23 113:6,15 115:4 116:11,17 117:5,8 118:17 119:10,18,24 120:3 121:20 122:12 123:7 125:14 126:3 126:5,12,23 127:8 128:21 133:2 134:1 134:5,12 137:6,10 138:21 140:4 141:2 142:24 144:24 145:3,8 146:20 147:7,25 148:9,15 148:22 149:1 150:5 151:18 153:5,12 155:8
**rightly** 56:18
**Rivera** 3:12,22 20:22 48:23 55:12 61:24 61:25 62:16 63:11 63:13 64:5,5,22 65:1,23 66:18 86:3 95:17 98:25 99:4,12 100:8,22 105:2 108:12 109:15 112:10 113:10 127:15 128:10,14 128:17,24 138:24 147:8 148:21
**Rivera's** 129:23 144:4
**Riverside** 144:5
**robust** 75:23
**rocks** 74:16 104:15
**rod** 86:22
**Rogers** 1:12 2:9
**role** 35:5 63:12 69:20 111:10 138:17
**roles** 36:19 64:2
**Roman** 152:9
**room** 70:14,21 79:3 93:21 94:6 125:17
**Roswell** 154:24
**ROTC** 23:5
**rough** 79:8 87:20
**roughly** 11:16 16:16 18:24 28:25 79:13 80:24 81:10 84:2 113:4
**routinely** 89:2 139:24
**rubbed** 81:22
**rules** 5:5,15 38:19 155:18 156:3
**run** 59:1
**runs** 78:12

**S**

**salt** 74:16 85:19 94:22 104:15
**Sanders** 30:15,19,20 32:1
**sarcastically** 130:3
**sat** 29:18 70:13,13
**satisfied** 76:16 77:10
**Saturday** 109:14
**saved** 81:1 150:2
**saw** 69:24 111:5
**saying** 42:13,14 56:24 72:16 74:25 78:4 89:4 118:22,24 137:20 138:25 144:16 146:5
**says** 61:9 93:14 95:15 96:3 101:18,20 105:6,11 111:15 112:5,10 125:20 127:3 136:6 146:6,7
**scale** 141:13
**Scamihorn** 3:10 48:19 83:14,17 109:16
**scarf** 90:16
**scholarship** 23:5,15
**school** 1:5 5:10,13 8:16,21 13:15 17:22 18:25 21:19 22:7,17 22:18,19 23:3,20 25:4,5,6 26:4,6,7,8 26:10,11 27:12,13 28:20,22 29:5,9,24 30:3,15 32:14 33:24 35:3,16,25 38:18 39:3 42:25 51:4 52:1,14,20 53:8,15 53:25 54:1,4,7,12 57:7,9,18 58:20,23 59:12,21 61:17 67:16 68:6,19 70:4 70:6,8 71:12 73:3 74:10 76:18,25 77:3 77:4,5,11,14,16 78:14,19 80:20 83:18 86:19,25 87:2 87:4,5,9,11,14,23 87:24 88:1,16,21,25 89:10,13 93:12,25 97:19 100:15 103:10,19 104:6,8 104:10,14,17 107:18 114:16 116:4,19,24 118:13 119:16,20 121:13 122:3,14 125:5,6,22 126:1,4,23 128:5 130:9 131:5 132:23 133:13,14,25 136:10,11,15 139:1 139:21,22 140:6,7 141:5,11 144:6 145:11,21 147:20 147:24 149:6 150:24
**school's** 69:23
**schools** 27:17 31:11 52:10,18,25 54:14 54:17,19 70:7 76:24 100:11 101:12,16 102:11,14,14 103:9 103:22 104:12 130:7
**score** 58:10 77:1 142:2,14 146:8
**scores** 143:18 145:25 146:2,3,5,11,15
**screen** 74:2 143:19
**se** 42:19 45:25
**second** 30:5 91:21 93:15 96:15 97:10 115:22 126:13 135:8
**secretary** 21:5 129:16 135:20
**section** 105:11
**see** 17:1 25:13 35:13 47:4 50:4 58:1,12

61:22 62:24 77:13 78:4 84:19 92:22 115:25 116:13 117:1 121:2,4,7 146:15
**seeing** 143:18
**seen** 51:11,15,19 52:6 52:10,10 61:5 62:20 143:13 153:6,10
**self** 116:5
**selling** 116:20
**send** 78:21 99:22,25 100:5 117:17
**sending** 127:13
**sense** 41:15 42:13 65:17 67:8 138:9 141:17
**sent** 10:1,5,9,17 77:20 78:7,18,23 96:4 100:4 109:14 112:25 117:12 127:13 138:24
**separate** 38:5 51:3 71:20 128:4 132:1,3 154:20
**separated** 143:6
**sequence** 128:9
**Sequentially** 128:16
**series** 67:21
**serious** 38:17 39:3
**seriously** 138:7
**serve** 36:4
**served** 33:19
**server** 12:16,20
**service** 35:9 59:13
**services** 33:9,17,23 34:11,13,18 43:20 44:4 155:25 156:8
**SES** 54:19
**session** 4:10 129:6 131:6,19,21,23 135:7,11
**set** 12:8,9,13 15:23 26:8 117:7
**sets** 40:14 71:3
**setting** 140:20
**settings** 52:2,8
**settled** 19:8
**seven** 15:16 16:16 22:9 24:18
**seventh** 26:9
**shake** 6:12
**sharing** 95:9
**Sheet** 3:5
**sheet(s)** 154:20
**shift** 23:10
**shoes** 31:22
**short** 97:16 117:12
**shorter** 129:6 131:19 135:15
**shortly** 18:20 23:2
**show** 21:20 60:20 83:5 90:25 95:5 98:21 114:11 124:12 126:9 134:21 144:19 148:15 150:9
**showed** 20:13 93:3 108:5
**showing** 108:22 114:7 146:12
**shows** 136:7 146:11
**shut** 17:10
**side** 42:21 56:22 90:3 117:23
**sides** 117:23
**sign** 155:9
**signature** 153:19
**signed** 98:6
**significantly** 146:3
**signing** 153:17
**similar** 33:9 96:6
**simple** 116:1
**simply** 27:2 66:17 113:1 131:10 137:18
**single** 72:1
**singled** 102:25
**sir** 6:8,14 9:18 11:12 11:19 13:25 15:13 15:21 20:5 21:10 22:25 24:8 25:15 31:18 35:18,21 36:10,21,23 38:11 49:4,8,10 56:1 60:8 61:18 62:19 63:8 73:15 74:11 82:25 93:13 110:5 115:24 135:1 136:3
**site** 12:17
**situation** 41:24 64:4 66:1 113:5 128:8 132:21 149:14
**situations** 41:4
**six** 152:8
**six-and-a-half-year** 23:8
**sixth** 25:20
**sizable** 121:3
**size** 71:12,13 87:22 149:23
**skill** 40:14
**slip** 58:5 81:15
**small-P** 38:21
**smaller** 91:17 103:15 108:18 114:9
**smarter** 152:7
**Smith** 101:21
**snippets** 51:14
**social** 117:25
**somebody** 39:22 40:11 76:11 77:20 78:21 82:14 84:22 86:17 91:18 117:15
**someone's** 98:7
**sorry** 10:12 33:3 60:23 67:11 91:21 126:10,11 131:3 144:9,12
**sort** 7:16 14:1 15:14 16:7 38:13 43:15 44:22 45:17,23 46:1 54:6 56:21 60:17 64:6 65:18 74:1 77:14 94:18 100:6 113:19 120:21 135:10 143:3 149:11 152:3
**sorts** 53:7
**sought** 54:15,17
**sound** 101:1
**sounds** 32:2 37:2 109:24 111:8
**southern** 24:2 151:16
**space** 154:19
**speak** 57:6,11 64:24 75:25 78:19 81:1 150:2
**speaking** 16:16 28:25 44:2 50:21 56:3 57:1 65:3 79:14 81:9 84:2 113:4 128:13 135:4 150:8
**speaks** 152:8
**special** 23:17,19 25:10 112:10
**specific** 80:10,15,16 81:7 90:18 100:2,7 100:19,23 114:22 116:4 120:19 127:1 135:7 136:21 137:7 138:2 139:11 141:12
**specifically** 10:24 13:7 27:16 39:16 44:7,18 45:7 52:22 55:21 76:10 83:24 84:5 86:21 88:18 92:17 100:18 102:4 102:10 109:13,24 112:18 115:12,17 115:20 120:18 127:12 129:7 136:25 137:13,19 146:22
**spiritual** 46:7 50:25 97:8,14 110:16 111:2
**spite** 121:7
**split** 79:10,18 80:2 81:9 88:10,13
**spoke** 75:16 149:13
**spoken** 21:4 147:15
**spreadsheet** 131:16 143:1,2
**spring** 55:7
**SSP** 125:6
**staff** 44:15 77:16,18 77:22,23,25 78:1,20 79:9,18 80:2,6,22 80:25 81:14,19 82:4 86:25 87:15 88:6,12 88:15 89:17 94:24 98:18 105:11 106:25 107:24,25 108:1,3,12,15 112:16 121:8 122:4 125:25 134:4,6,11 140:25 141:1,6,15 141:20 142:19 143:4,13
**stamp** 95:20,22
**stamped** 4:4 115:23 119:8 134:23 135:25
**stand** 70:14
**standard** 40:15
**standards** 29:20 58:5 77:12 81:15 132:7
**standing** 70:14,16,17
**standpoint** 77:16
**stapled** 131:25
**start** 6:23
**started** 24:22 32:11 105:1 113:17
**starts** 97:7
**state** 7:18 22:22 127:14 145:20,21 155:2
**stated** 155:5
**STATES** 1:1
**stay** 100:24 101:4
**step** 28:20
**sticker** 153:6
**stone** 111:18
**stones** 84:24 85:6
**stop** 72:2 119:22
**stops** 97:16
**store** 8:2
**stored** 12:17
**straighten** 17:5
**strategic** 125:6
**strategy** 109:1
**Street** 2:5,9 154:24
**stress** 116:6 119:15
**stressful** 44:16
**strictly** 32:13
**strong** 82:5 111:16
**structure** 65:7
**structured** 42:18
**student** 93:17
**students** 25:8,11,21 26:9 27:15 29:10 43:17 45:20 47:4 53:2 54:18 78:16 141:7
**studio** 153:8
**stuff** 7:17 84:17 85:3 94:19 97:17
**style** 99:20
**subcategory** 25:10
**subject** 61:19 80:2 89:20 109:17
**substance** 7:17
**substitute** 73:2

**success** 27:21 52:10 53:21
**successful** 140:20
**successor** 129:24
**succumb** 60:15
**sued** 18:25
**suffer** 50:15
**suggesting** 126:3,6
**suggestion** 126:21
**suing** 18:4
**suite** 2:4 26:22
**sum** 103:17 144:3
**summarize** 99:19
**summary** 143:3
**Summer** 28:24
**supe** 101:15 137:15
**superimposing** 43:15
**superintendent** 5:12 21:2 32:9 36:18,20 37:13 38:4 61:16 62:11 100:12 128:3 137:9 150:23
**superintendent's** 95:23
**superintendents** 32:8
**supervising** 100:21
**supervisor** 62:12 82:7 82:12 92:11
**supervisors** 130:12
**supervisory** 111:10
**supes** 130:5 133:15 136:19
**supported** 101:22
**suppose** 20:15
**supposed** 147:13
**sure** 9:12 12:11 16:11 32:22 39:15 43:13 45:21 53:11 62:25 68:15 70:2 78:9 84:18 96:17 102:6 103:24 104:21 111:6 124:23 126:14 135:1 146:6 150:12 151:12
**surfed** 29:19
**surprised** 102:18
**surprising** 70:15
**surprisingly** 26:20 70:24 71:11,13
**surrounded** 140:6
**survey** 140:25 141:1 141:3,4,9,10,15,15 141:20 142:16,19 143:13
**surveys** 141:4 143:4
**suspended** 24:15
**swear** 5:18 21:21
**Swinney** 3:12 20:22 20:23,25 47:15 62:10,17 64:23 65:23 73:10,13 85:10 86:1 92:11,12 94:9 98:25 99:3,12 100:21 101:11 105:3,15 127:16 136:17,23 137:11 138:24 144:9,10,12 144:16,16 147:6,8 148:22
**Swinney's** 100:10 101:11 108:13
**swirled** 139:20
**swirling** 66:3
**switches** 110:20
**Switching** 29:3
**sworn** 5:21 155:14
**system** 33:22,24 54:7
**systems** 33:25

**T**

**T** 2:3
**table** 61:3
**tactically** 65:3
**tactics** 92:5
**tagged** 66:20
**take** 31:21 36:25 68:22 70:11 81:12 82:24 83:6 85:17,18 86:18 91:14 95:13 98:23 99:5 112:23 112:24 124:5 126:19 134:22 138:6 144:20 150:19 153:12
**taken** 1:9 5:8,14 13:10 16:4 57:5,10 75:18 90:22
**takes** 97:10
**taking-your-eyes-of...** 71:21
**talk** 27:11 42:4 46:14 76:8 82:2,8 130:19 131:1,4
**talked** 20:2 42:8,23 65:25 69:3 75:15 94:10 100:18 115:17 120:12 124:25 125:10 128:10,12,14 152:1
**talking** 35:11,19 36:11 37:5 41:16 46:15 74:8 80:21,24 112:14 115:13 120:13 125:3 127:11 132:22 136:1 143:25 144:11 149:10 150:5,6
**talks** 110:18 135:16
**target** 145:24
**taught** 25:22 28:18 90:14 119:16 120:6
**teach** 25:25 116:8 119:13
**teacher** 32:11,12,19 34:19 44:16 69:21 69:22 89:5 90:9,11 90:15 106:11 108:6 108:7 112:5,7
**teacher's** 33:14
**teachers** 25:9 33:18 33:19 39:11 43:7,18 53:1 54:13,15 90:19
**teachers'** 93:23
**teaches** 152:10
**teaching** 24:23,23,24 25:2,8,9,13,17,25 29:9,9 31:25 81:21 84:11,24 85:6 89:22 116:3,6 118:25 119:11,20,22 120:2
**tech** 11:23 12:21
**technically** 15:4,7 26:5 128:2
**technique** 49:25 50:21 53:18,22
**techniques** 26:14,17 26:18,18,24 27:1,1 27:14,14,15,20,22
**tell** 6:5,24 11:24 17:10 18:12,19 19:25 32:20 45:12 52:22 58:8 62:25 80:19 83:10 86:12 86:15 126:16
**telling** 45:1 72:1 81:14,24
**ten** 132:14
**tend** 130:19
**tends** 130:22
**term** 9:12 49:16,22 57:23 65:16 72:15 72:17 74:3 97:8
**terminate** 132:2
**terminated** 14:16
**termination** 34:19
**terminations** 132:2
**terms** 51:23 107:25 138:21 139:1
**terribly** 45:14
**test** 57:18 58:9 77:1 145:25
**testified** 5:22 15:11 15:15,18,23,25
**testify** 15:8 16:11 21:12
**testifying** 17:21
**testimony** 17:12 23:1 133:16,19 154:4
**testing** 44:8
**text** 10:8,20 12:2,10 12:23
**Thank** 10:16 17:24 82:25 114:8 134:14
**thank-you** 61:22
**Thanks** 95:12
**theirs** 56:15 73:2,4
**thereto** 155:6
**they'd** 130:10
**thing** 75:11 86:4,5 109:11 120:15 125:11 153:16
**things** 15:14 27:18 38:23 40:11 42:15 42:21 43:3,24 51:15 51:16 56:8 63:14 64:13,20,25 65:1 66:2 68:10 71:7 74:14 76:9 78:16 80:3,4 85:13,17 99:25 100:13 106:1 106:12 118:8 121:21 130:19 131:2 132:19 133:15 139:14 141:7
**think** 6:24 12:4 16:13 17:12 23:17 27:17 29:13 43:2,3,6,16 44:7,9 45:19 46:12 46:17 47:15 52:18 56:13 63:16 67:3 68:9,17 71:18 72:23 73:19 75:1,13 76:2 76:8,13 77:25 79:1 81:25 82:1,21 87:15 89:8 93:6 102:23,25 103:21 105:2,6 106:1,3,12 107:20 111:5,25 112:20 117:4 119:6 120:4 123:22,22 125:4,16 125:24 128:13 132:11,12,14 133:18,20 138:22 139:9,11 141:8,16 142:5,23 145:23 146:18 147:5 148:1 148:3 149:9,9 152:6 152:11,14,21
**thinking** 93:12
**third** 26:4 101:15 132:5,9 135:13,19
**thirds** 125:21
**thought** 29:18 66:22 71:16,19 72:10 138:16
**thoughts** 49:21
**thread** 3:10,12,14,20 3:22 4:1,6,8,12
**three** 16:15,25 18:3 19:1 22:11 25:22 26:1 28:19 31:15,16 34:23,24 35:1 71:3 90:5 101:19 129:9 133:11 142:3 149:17
**threshold** 142:13
**Thursday** 4:11
**ties** 64:16
**till** 35:23,24
**time** 5:17 12:14 14:10 16:3,4 18:14 21:2 23:15 24:1,12 26:7 27:10,13 28:6 29:12

29:15 31:12 37:1,4 37:5,17 38:24 44:16 45:15,22 62:1,8 63:2,4 65:4 77:1 96:8 98:9,18 101:14 105:7,9 107:4 116:21 117:13,14 117:21 124:25 129:19 130:1,2,13 130:24 132:18 138:12 139:16 140:8 141:19 150:25 151:1,5,25 152:16
**times** 13:12 15:18,22 15:24 16:2 51:15 138:22 149:13
**timing** 133:3
**tiny** 91:1
**tipped** 118:8
**title** 37:11,13,19,21 93:4 151:11
**titled** 4:10
**today** 6:3,17 7:12 10:23 12:25 20:1,10 20:11,12,14 101:14 105:25 132:22 144:1
**today's** 29:20
**token** 7:3
**told** 40:10 53:20 55:11,12 86:4 113:7 121:19,21,24 147:6 147:8
**tool** 53:14
**top** 52:23 65:5 91:8 94:18 95:20 131:11 135:4,6 148:20
**topic** 59:20
**topics** 77:19
**total** 31:10 103:17 144:3
**town** 57:22 69:25 73:22 87:20 121:1,2 149:10,18,20,23
**tracers** 100:25 101:3
**tracking** 146:18
**tract** 93:11
**training** 23:25 81:8 93:16
**transcript** 154:4
155:12
**transfer** 11:21,25 107:7,18 113:2 118:4 122:21 131:11,13 136:18 137:23 139:25 147:18
**transferred** 30:13,15 107:2 113:22 133:18 136:14 137:4,5 143:23 148:25
**transferring** 137:24 139:21 140:7 149:21
**transfers** 129:3 131:24
**trial** 5:17 19:4,5,6
**tried** 33:15 76:2,8
**troops** 117:23
**true** 42:14 78:5 154:3 155:11
**truly** 46:7
**Trump** 60:25
**trust** 96:10
**truthful** 7:13
**try** 6:6 26:13 44:5,14 49:20 53:22 67:16 71:6 78:19 86:11 134:9
**trying** 42:1 44:11 48:4 49:20 56:16 64:1 70:18 73:1 74:3,18,22 75:1,2,6 77:6 84:25 90:11 97:16 100:23 121:5
**Tuesday** 88:4
**turn** 28:3 97:10
**turning** 116:5
**turnover** 130:4
**tweet** 61:10
**twice** 13:13 15:1 28:17 48:14 124:18 145:22
**two** 11:7,8 16:2 18:3 19:1 20:8 22:11 25:22 26:3 29:7 30:20 33:5,10 40:1 40:14 56:1,6,6 69:3 71:3,8 75:16,19 86:7,10 90:7,19
101:19 104:7,8,10 104:15 119:7 125:21 129:8 131:14 132:13 133:11 141:3 145:23 148:6 149:16
**two-year** 26:6
**typical** 40:3 133:9
**typically** 8:7 39:8,20 61:7 130:17 136:19 137:12 141:25 142:8,17
**typo** 105:6

**U**

**Uh-huh** 114:18
**ultimately** 46:25 55:25 60:14 65:14 66:22 67:3,3 70:10 118:6 120:4 128:16 128:22 135:22
**unable** 134:1
**unavailable** 63:17
**uncommon** 60:16
**unconstitutional** 119:21
**understand** 6:5,7 7:10 36:23 43:13 45:15 54:5 56:3 58:15 67:20 77:2,2 100:22 104:20 139:23 140:3,4,11
**understanding** 41:25 42:24 49:16 52:15
**understood** 23:1 29:16 137:3
**unethical** 106:16
**unforeseen** 68:16
**unheard** 89:1,9 117:21 138:13
**union** 33:14
**Unitarian** 48:2
**United** 1:1 49:14
**universal** 80:12
**unrelated** 43:6
**unusual** 60:13 106:18
**upset** 28:2 41:3 42:2 55:15 88:11,23 121:8
**use** 9:22 26:14,16,25
27:20 53:14 76:5 90:10 92:15 126:25
**uses** 97:8 145:20
**usual** 156:16
**usually** 133:10,11 136:17 141:23 142:2

**V**

**vacancies** 137:17
**vacancy** 40:8
**vaguely** 70:24 96:8 125:7
**value** 85:18
**variation** 80:25
**varies** 46:17 58:10
**various** 51:14 55:14 63:13 120:25 135:16 141:16
**varying** 52:19
**verify** 84:23
**verifying** 146:17,22
**versa** 23:12
**versus** 5:10 146:19
**vertigo** 50:16
**veteran** 106:18,20
**vice** 23:12
**Vickers** 3:14 49:7 109:14 110:23 112:15
**Vickers'** 110:11
**view** 117:10 133:5 139:15
**viewpoint** 72:2
**vigorous** 134:3
**violations** 38:16,18 39:1,2,4
**vocal** 108:2
**vogue** 27:2,4
**voluntarily** 24:7 30:13 32:10
**vote** 140:9
**vs** 1:4

**W**

**Wait** 10:13
**wake** 139:19
**walked** 125:16
**want** 6:25 7:4,23 17:5 17:8,9,17 19:20 25:7 36:16,25 43:13
54:18,20 64:1 73:2 84:18 85:1 95:13 99:9 109:12 115:21 122:22 150:9
**wanted** 40:13 56:11 65:13,14 72:12 107:12 118:22
**wanting** 54:14
**ward** 92:15
**warrant** 66:24
**warranted** 67:7
**wasn't** 15:4 27:6,7 30:2 42:20 43:19,20 45:14 47:1 57:8 62:18 68:12 69:21 80:9,21 81:14 113:3
**way** 20:16 24:19 37:15 50:25 54:7 56:12 68:7 81:20 83:13 89:7 91:2 93:11 105:22 125:21 133:14 140:12 143:24
**we'll** 19:22 127:3
**we're** 12:24 41:16 75:1 80:24 89:4,5 123:16 127:2 135:25 153:13
**we've** 69:3 81:15 90:1 127:5 132:22 133:9 143:25 151:25,25
**week** 71:1 149:7
**welcome** 89:13 130:8 151:9
**well-intentioned** 44:14
**went** 15:17 19:4 22:18 23:9,14 28:13 34:21 70:12 116:19
**weren't** 52:16 73:1 74:7,20,23,25
**West** 26:4,11 28:19 29:8 49:13 107:18
**whatnot** 33:23
**wheelhouse** 76:22
**widely** 102:3,7
**widespread** 94:23 102:24 103:7,16
**wife** 21:7 28:16 50:8 125:4
**willing** 93:23

**windows** 60:2 121:14 122:5
**winter** 55:8
**witness** 14:18 17:24 18:1 82:25 109:8 155:13
**witness's** 155:8
**witnessed** 43:23
**woman** 73:13
**word** 41:15 42:13 44:17,21 56:20 82:6 133:3
**words** 45:1 80:8 81:4 100:25 106:2 111:13 133:20
**wore** 36:22 90:15
**work** 9:2,5,9,10,13 11:11,14 12:5,10 13:15 15:24 53:15 78:8 91:20
**work-related** 9:2,23 10:18,21 12:10 14:20
**workday** 71:2
**worked** 23:9 24:1 38:8 40:2
**working** 23:11 64:14 85:11 113:9
**works** 26:20 78:12
**worlds** 33:16
**worn** 89:12
**wouldn't** 13:5 79:16 96:14 97:4 103:15 122:10
**wrecking** 24:12
**writing** 99:19 100:2 155:7
**written** 5:3 20:23 37:22 137:22
**wrongfully** 14:16
**wrongly** 56:19
**wrote** 98:5

**X**

**Y**

**y'all** 153:8
**yeah** 18:1,2,13,16,18 23:4 28:9 33:4 40:13 46:11 49:3 56:13 59:7 60:12 69:10 72:19 76:7 77:13 79:11 83:20 85:9 91:16 96:4 101:7 104:24 110:16,23 115:3 117:4 119:9 120:7 132:25 145:4 151:1 152:4,16 153:18
**year** 7:24,25 26:4 28:22 29:8,22,24 30:1,3,4,5,11 31:13 31:19 36:17 37:21 129:19 130:1,5 132:19 133:9 140:1 140:17 141:24 145:25 146:19 149:6
**years** 11:7,8 14:6,9 15:17 16:14,16,25 22:9,11 24:18 26:1 26:3 28:19 29:7 30:20 31:5,11,14,16 31:16 34:22,23,24 35:1 90:1,4 145:23
**yoga** 26:18,25 27:15 28:16,16 46:2 50:9 50:23 51:5,16,18 101:23 104:7 153:7
**you-all** 34:3 62:4 83:21
**young** 30:14 92:24

**Z**

**zone** 73:5

**0**

**000139** 3:11
**000164** 3:13
**000166** 3:15
**000200** 3:17
**000270** 3:19
**000280** 3:21
**000282** 3:23
**000304** 4:2
**001066** 4:5
**001648** 4:9
**001657** 4:7
**001958** 4:11
**002140** 4:13

**1**

**1** 3:10 83:4,6 155:10
**1:12** 1:14 5:2
**1:17-CV-01378-W...** 1:4
**10** 3:16 95:21 96:6 97:23 110:6 114:5 114:11 133:10 139:25
**10.B** 155:18
**1069** 4:5
**108** 3:14
**10th** 91:10
**10th-March** 117:14
**11** 3:18 124:11,13 125:18 126:10,10
**11-16-2018** 154:25
**114** 3:16
**118** 28:11
**11th** 136:11
**124** 3:18
**126** 3:20
**12th** 99:2 109:14 117:14
**13** 3:20 126:8,11,11
**134** 4:10
**13th** 99:5
**14** 3:22 148:14,16
**140** 3:11
**144** 4:8
**148** 3:22
**14th** 114:14
**15** 4:1 60:19,21 96:6 97:22,23 110:6 129:4
**15-14-37(a)** 156:2
**150** 4:12
**154** 3:5
**156** 3:6 155:10
**16** 1:13 4:4 5:1 55:7 90:4 95:4,6 151:1
**165** 3:13
**1652** 4:9
**1658** 4:7
**168** 3:15
**17** 11:16
**17,000** 89:10
**17th** 124:15
**19** 11:7
**1958** 134:23
**1960** 135:25
**1968** 8:1
**1982** 4:11 134:24

**2**

**2** 3:12 24:2 98:20,22
**2.0** 142:11,13
**2.1** 142:9
**2.2** 142:9
**2.4** 142:8
**2.7** 142:9
**2:37** 83:1
**2:46** 83:2
**20** 28:14 87:24 133:8 139:25 154:23
**20-something** 20:21
**2000-2001** 31:25
**2001** 32:1 47:25
**2001-ish** 49:14
**2002** 32:1
**2003** 32:1
**2011** 32:2,5
**2012** 146:12
**2014** 37:7,16,18
**2015** 146:8,12,12
**2016** 91:11 95:21 99:2,5 114:14 124:15 136:2,12
**2017** 11:9,15
**2018** 1:13 5:1 156:19
**202** 115:23 119:8
**205** 3:17
**22-ish** 101:17
**23** 4:6 91:6,7
**237** 154:24
**24** 136:2
**24th** 135:5
**25** 87:25
**271** 3:19
**2745** 156:21
**281** 3:21
**283** 3:23
**29** 4:8 144:18,20

**3**

**3** 3:14 108:20,22 109:5,13
**3-10-2016** 4:4,7
**3-13-2016** 3:13,15
**3-14-2016** 3:16
**3-17-2016** 3:19
**3-18-2016** 3:21,23
**3-24-2016** 4:11
**3-28-2016** 4:2
**3-9-2016** 3:11
**3:00** 35:10
**3:42** 124:8
**3:58** 124:9
**30** 12:5,6,8,9,23 129:5 133:8
**30,000** 64:3,11
**30060** 2:10 154:24
**30101** 8:6
**30308** 2:5
**305** 4:3
**3900** 2:4
**3rd** 156:19

**4**

**4:44** 153:14
**4:54** 1:14 153:15,20
**40** 133:8 139:25
**400** 89:10 133:10
**404.781.1100** 2:6
**46** 4:10 134:20,22
**47** 4:12 150:18,19
**49** 2:9

**5**

**5** 3:4
**5-13-2016** 4:13
**50** 22:13
**50-50** 79:13

**6**

**6-7-2016** 4:9
**60** 4:1 12:5,7,23
**600** 2:5 122:14
**6011** 8:5
**66** 70:6
**67** 143:7
**678-230-2316** 8:25

**7**

**7** 145:2
**7.C** 156:3
**7:00** 35:11,23,24
**770-428-5801** 154:24
**770-856-8609** 8:14
**770.422.1776** 2:10
**78** 28:11

**8**

**8** 133:10 139:25
**8.B** 5:5
**80** 142:8
**83** 3:10

**84** 48:6
**86** 22:7

**9**

**9-11** 90:13
**9-11-28(c)** 156:6
**91** 4:6
**92** 22:10
**95** 4:4
**96** 28:23 29:4,4 31:24
**97** 31:24
**98** 3:12 31:24
**99** 31:24
**99-2000** 31:25